UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| GEORGE R. JARKESY, JR. | § | |
| | § | |
| and | § | |
| | § | |
| PATRIOT28, LLC, | § | |
| | § | |
| Petitioners, | § | Case No. _____ |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES SECURITIES AND | § | |
| EXCHANGE COMMISSION, | § | |
| | § | |
| Respondent. | § | |

## PETITION FOR REVIEW

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure, George R. Jarkesy, Jr., a resident of the State of Texas, and Patriot28, LLC, with offices and principal place of business located at 18205 Burkhardt Road, Tomball, TX 77377 (collectively, "Petitioners"), hereby petition the United States Court of Appeals for the Fifth Circuit for review of a Final Order of the United States Securities and Exchange Commission (the "Commission") in the matter styled *In re John Thomas Capital Management Group LLC d/b/a Patriot 28 LLC; and George R. Jarkesy, Jr.*, Admin. Proc. File No. 3-15255, dated September 4, 2020, and reported as Securities Act of 1933, Release No. 10834; Securities Exchange Act of 1934, Release No. 89775; Investment Advisers Act of 1940, Release No. 5572; and Investment Company Act of 1940, Release No. 34003 (the "Order"), attached as Exhibit A.

1.      This Court has jurisdiction in this matter pursuant to 15 U.S.C. §§ 77i(a); 78y(a)(1); 80a-42(a); and 80b-13(a).  Both Petitioners are parties aggrieved by the Order.  Petitioner George

*Petition for Review*                                          1

R. Jarkesy, Jr. resides in and Petitioner Patriot28, LLC has its principal place of business within this judicial circuit as defined in 28 U.S.C. § 41.

2.      The Commission's Order against Petitioners is not supported by substantial evidence and is both contrary to law and the United States Constitution.

3.      Copies of this Petition for Review are being submitted to the Commission Officer and Office Designated pursuant to 28 U.S.C. § 2112.

4.      Petitioners respectfully pray that this Court review and set aside the Commission's Order and that Petitioners receive any further relief to which they may be entitled.

Respectfully Submitted,

S. MICHAEL MCCOLLOCH, PLLC

By:  ___/s/ S. Michael McColloch___
S. Michael McColloch
E-mail: smm@mccolloch-law.com
3131 McKinney Avenue, Suite 600
Dallas, Texas 75204
Phone: 214.643.6055
Fax: 214.295.9556

and

KAREN COOK, PLLC
Karen L. Cook
E-mail: karen@karencooklaw.com
3131 McKinney Avenue, Suite 600
Dallas, Texas 75204
Phone: 214.643.6054
Fax: 214.295.9556

Attorneys for Petitioners
George R. Jarkesy, Jr. and Patriot28, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the forgoing document was served by overnight courier and electronic mail on October 28, 2020 to the following:

Vanessa Countryman, Secretary        John Thomas Financial, Inc.
Office of the Secretary                 Anastasios Belesis
U.S. Securities and Exchange Commission  c/o Ira L. Sorkin
100 F Street N.E.                       Mintz & Gold
Mail Stop 3628                        600 Third Avenue, 15th Floor
Washington, DC 20549             New York, NY 10016
Email: *apfilings@sec.gov*          Email: *sorkin@mintzandgold.com*
                                  Counsel of record for John Thomas
                                  Financial, Inc. and
                                  Anastasios Belesis

By: ___*/s/ S. Michael McColloch*___
      S. Michael McColloch

| | |
|---|---|
| GEORGE R. JARKESY, JR., | § |
| | § |
| and | § |
| | § |
| PATRIOT28, LLC, | § |
| | § |
| Petitioners, | § |
| | § |
| v. | § |
| | § |
| UNITED STATES SECURITIES AND | § |
| EXCHANGE COMMISSION, | § |
| | § |
| Respondent. | § |

## PETITION FOR REVIEW

# EXHIBIT A

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES ACT OF 1933
Release No. 10834 / September 4, 2020

SECURITIES EXCHANGE ACT OF 1934
Release No. 89775 / September 4, 2020

INVESTMENT ADVISERS ACT OF 1940
Release No. 5572 / September 4, 2020

INVESTMENT COMPANY ACT OF 1940
Release No. 34003 / September 4, 2020

Admin. Proc. File No. 3-15255

---

In the Matter of

JOHN THOMAS CAPITAL MANAGEMENT
GROUP LLC, d/b/a PATRIOT 28 LLC; and
GEORGE R. JARKESY, JR.

---

OPINION OF THE COMMISSION

INVESTMENT ADVISER PROCEEDING

INVESTMENT COMPANY PROCEEDING

CEASE-AND-DESIST PROCEEDING

**Grounds for Remedial Action**

**Antifraud violations**

Investment adviser and its owner committed securities fraud by making material misstatements and omissions to investors in two hedge funds. *Held*, it is in the public interest to bar owner from the securities industry and from participating in the offering of a penny stock; to impose cease-and-desist orders on owner and adviser; to order adviser to pay disgorgement of $684,935.38 plus prejudgment interest; and to order owner and adviser to pay civil penalties of $300,000 jointly and severally.

APPEARANCES:

*Karen Cook* and *S. Michael McColloch* for John Thomas Capital Management Group LLC and Gary R. Jarkesy, Jr.

*Todd D. Brody* and *Alix Biel* for the Division of Enforcement.

Appeal filed:   November 10, 2014
Last brief received: March 21, 2019

This proceeding concerns fraudulent conduct by George R. Jarkesy, Jr. and John Thomas Capital Management Group LLC ("JTCM"), the unregistered investment adviser that he owned, in the offer and sale of interests in two hedge funds: John Thomas Bridge and Opportunity Fund LP I ("Fund I") and John Thomas Bridge and Opportunity Fund LP II ("Fund II"). Jarkesy founded JTCM in 2007, and together they launched Fund I in 2007 and Fund II in 2009. JTCM served as the Funds' general partner; Jarkesy managed and controlled JTCM and the Funds. Together, the Funds had about 120 investors. Fund I accepted new investors from 2007 to 2010 (for a total of about $20 million assets under management), and Fund II accepted new investors from 2009 to 2010 (for a total of about $4 million assets under management).

Respondents appeal from an administrative law judge's initial decision finding that they violated, and aided and abetted and caused violations of, the antifraud provisions of the federal securities laws by (i) misrepresenting the identity of the Funds' auditor and prime broker, and the Funds' investment parameters and safeguards; and (ii) overvaluing the Funds' holdings to increase management and performance fees.[1] The ALJ barred Jarkesy from the securities industry and from participating in the offering of a penny stock; ordered Respondents to cease and desist from antifraud violations; and ordered Respondents to pay, jointly and severally, disgorgement of $1,278,597, plus prejudgment interest, and third-tier civil penalties of $450,000. On appeal, Respondents challenge the ALJ's findings of fact and conclusions of law, and raise numerous constitutional and procedural objections; the Division of Enforcement cross-appeals and requests an accounting and greater monetary sanctions.[2]

Based on our independent review of the record, we find that Respondents violated Section 17(a)(2) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) thereunder, and Section 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-8 thereunder. We impose bars on Jarkesy; cease-and-desist orders on Respondents; civil penalties of $300,000 on Respondents jointly and severally; and disgorgement of $684,935.38 plus prejudgment interest on JTCM.

---

[1] *John Thomas Cap. Mgmt. Grp. LLC, d/b/a Patriot28 LLC*, Initial Decision Release No. 693, 2014 WL 5304908 (Oct. 17, 2014). Two other respondents settled this proceeding: John Thomas Financial, Inc. ("JTF"), a broker-dealer and the Funds' primary placement agent, and Anastasios "Tommy" Belesis, JTF's founder and CEO. *John Thomas Cap. Mgmt. Grp. LLC, d/b/a Patriot28 LLC*, Exchange Act Release No. 70989, 2013 WL 6327500 (Dec. 5, 2013).

[2] We previously granted in part and deferred ruling in part on Respondents' request to adduce additional evidence pertaining to ALJ Foelak's appointment as an SEC ALJ. *See John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 75590, 2015 WL 4608057 (Aug. 3, 2015). We now deny the remainder of Respondents' request because, as we stated in an order issued on February 21, 2019, Respondents expressly forfeited, waived, and withdrew their petition for review "any right to challenge the historical proceedings before [ALJ Foelak] on the grounds that the ALJ had not been constitutionally appointed." *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 85172, 2019 WL 857535, at *1 (Feb. 21, 2019).

# I. Violations

Exchange Act Section 10(b) and Rule 10b-5(b) thereunder prohibit, through means of interstate commerce and in connection with the purchase or sale of securities, making an untrue statement of material fact or omitting to state a material fact necessary to make statements not misleading.[3] A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[4] Scienter is required to violate these provisions.[5] Scienter is the intent to deceive, manipulate, or defraud.[6] It includes recklessness—highly unreasonable conduct that represents an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the [respondent] or is so obvious that the [respondent] must have been aware of it."[7]

Securities Act Section 17(a)(2) prohibits, through means of interstate commerce and in the offer or sale of securities, obtaining money or property by means of an untrue statement of material fact or omission of material fact.[8] And Advisers Act Section 206(4) and Rule 206(4)-8 thereunder make it unlawful for an investment adviser to a pooled investment vehicle to make a material misstatement or material omission to any investor or prospective investor in the pooled investment vehicle.[9] Negligence is sufficient to establish a violation of Securities Act Section 17(a)(2) and Advisers Act Section 206(4) and Rule 206(4)-8 thereunder.[10]

We find that Respondents violated Exchange Act Section 10(b) and Rule 10b-5(b) thereunder, Securities Act Section 17(a)(2), and Advisers Act Section 206(4) and Rule 206(4)-8 thereunder by making material misstatements and omissions with scienter to Fund investors in

---

[3]  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

[4]  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("The question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor.").

[5]  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976).

[6]  *See, e.g., SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992).

[7]  *Id.* (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)); *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005).

[8]  15 U.S.C. § 77q(a)(2).

[9]  15 U.S.C. § 80b-6(4); 17 C.F.R. § 275.206(4)-8. Unlike Securities Act Section 17(a) and Exchange Act Section 10(b), Advisers Act Section 206 does not require that the fraudulent conduct occur "in the offer or sale" or "in connection with the purchase or sale" of securities.

[10]  *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *Steadman*, 967 F.2d at 643 n.5, 647.

marketing materials, financial statements, and monthly account statements. Both Jarkesy and JTCM are liable because Jarkesy's actions are imputed to JTCM.[11]

In finding Respondents liable, we find that they acted through means of interstate commerce because they used wires and the mails to communicate with investors and transfer funds.[12] We also find that Respondents' misconduct was "in the offer or sale" and "in connection with the purchase or sale" of securities because Respondents' misrepresentations and omissions coincided with their offer and sale of interests in the Funds.[13] And Respondents "obtain[ed] money . . . by means of" their misstatements and omissions because they obtained investments in the Funds and fees from the Funds via their fraud.

We find further that Respondents were investment advisers under Advisers Act Section 206. The Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."[14] JTCM met this definition because this was its business. Whether an individual meets the definition of an investment adviser is a facts and circumstances inquiry. In this circumstance, the fact that Jarkesy was JTCM's sole owner and that he controlled all of its operations and activities

---

[11]    *A.J. White & Co. v. SEC*, 556 F.2d 619, 624 (1st Cir. 1977) (holding that a firm "can act only through its agents, and is accountable for the actions of its responsible officers"); *Warwick Capital Mgmt., Inc.*, Advisers Act Release No. 2694, 2008 WL 149127, at *9 n.33 (Jan. 16, 2008) ("A company's scienter is imputed from that of the individuals controlling it.").

[12]    *United States v. Vilar*, 729 F.3d 62, 93 (2d Cir. 2013) (finding that defendant's use of "the mails and wire transfers to carry out his scheme" was sufficient to establish nexus to interstate commerce required to sustain defendant's conviction for securities fraud).

[13]    *See SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008) (stating that the Supreme Court has "stated that 'it is enough that the fraud alleged "coincide" with a securities transaction'" to satisfy the "in connection with" requirement) (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) and *SEC v. Zandford*, 535 U.S. 813, 819 (2002)); *Fundamental Portfolio Advisors, Inc.*, Exchange Act Release No. 48177, 2003 WL 21658248, at *8 (July 15, 2003) (finding that material misstatements and omissions by an investment adviser in a fund's prospectuses and sales materials "were made in connection with the offer, purchase, or sale of securities, *i.e.* shares of the Fund" under Securities Act Section 17(a), and Exchange Act Rule 10(b) and Rule 10b-5), *petition denied*, 167 F. App'x 836 (2d Cir. 2006).

[14]    Advisers Act Section 202(a)(11), 15 U.S.C. § 80b-2(a)(11); *see also Koch v. SEC*, 793 F.3d 147, 157 (D.C. Cir. 2015) (stating that the "definition of investment adviser does not include whether one is registered or not with the SEC").

is sufficient to establish that he met the definition of an investment adviser.[15]  Respondents were also investment advisers to a "pooled investment vehicle"—the Funds—under Advisers Act Rule 206(4)-8(a) because they made investment decisions on behalf of their hedge funds.[16]

---

[15]    *Montford & Co., Inc., d/b/a/ Montford Assocs.*, Advisers Act Release No. 3829, 2014 WL 1744130, at *2 n.8 (May 2, 2014), *petition denied*, 793 F.3d 76 (D.C. Cir. 2015); *see also Warwick Capital Mgmt.*, 2008 WL 149127, at *1 & n.4, *9 n.37 (finding that individual who owned investment advisory firm with his wife, was its founder, president, and sole control person, and acted at all times on its behalf met the definition of an investment adviser); *John J. Kenny*, Exchange Act Release No. 47847, 2003 WL 21078085, at *17 & n.54 (May 14, 2003) (finding that individual who owned investment advisory firm with his wife, served as its chairman and CEO, and admitted that he controlled it met the definition of an investment adviser), *aff'd*, 87 F. App'x 608 (8th Cir. 2004).

[16]    *See Timothy S. Dembski*, Advisers Act Release No. 4671, 2017 WL 1103685, at *10 (Mar. 24, 2017) (stating that the general partner of a hedge fund, a pooled investment vehicle, was an investment adviser to the fund), *petition denied*, 726 F. App'x 841 (2d Cir. 2018); *see also SEC v. The Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 781-82 (N.D. Ill. 2016) (finding that both advisory firm to hedge fund and firm's owner violated Rule 206(4)-8)).

**A.      Respondents violated the antifraud provisions by knowingly or recklessly making material misstatements and omissions in marketing the Funds.**[17]

We find that Respondents misrepresented the identity of the Funds' auditor and prime broker. We also find that Respondents misrepresented Fund I's investment strategy and asset allocation. We reject Respondents' justifications for these misrepresentations.

**1.      Respondents misrepresented that KPMG was the auditor and Deutsche Bank the prime broker for the Funds.**

From 2008 through 2010, Jarkesy drafted, and caused JTCM to distribute to investors, newsletters and a PowerPoint presentation that identified KPMG as the Funds' auditor and Deutsche Bank as the Funds' prime broker.[18] The newsletters were dated August and September

---

[17]      Respondents object to the admission of various business records offered by the Division. Reviewing the issue *de novo*, *see, e.g.*, *Michael Lee Mendenhall*, Exchange Act Release No. 74532, 2015 WL 1247374, at *1 (Mar. 19, 2015); *optionsXpress, Inc.*, Exchange Act Release No. 78621, 2016 WL 4413227, at *48-49 (Sep. 13, 2016), we overrule these objections. We have repeatedly stressed that "all relevant evidence" should be considered and given such weight as appropriate in light of its "probative value, reliability, and the fairness of its use." *City of Anaheim*, Exchange Act Release No. 42140, 1999 WL 1034489, at *2 (Nov. 16, 1999); *see also* Rule of Practice 320, 17 C.F.R. § 201.320. The Division's business records affidavits provide a foundation for, and sufficiently establish the authenticity and reliability of, the documents in question. Each affiant was either a custodian of records for or another qualified person familiar with the recordkeeping practices and systems of his or her respective institution. Each affidavit also recites that the documents, which were produced pursuant to subpoena, were made at or near the time of the occurrence of the matters set forth therein and both made as a regular practice and kept in the course of a regularly conducted business activity. Given our preference for "liberality in the admission of evidence" in administrative proceedings, we have no difficulty finding that the business record affidavits are sufficient to support admission of the documents at issue under Rule 320. *See Del Mar Fin. Servs., Inc.*, Exchange Act Release No. 48691, 2003 WL 22425516, at *8 (Oct. 24, 2003). Indeed, even under the Federal Rules of Evidence—which do not apply to our administrative proceedings, *City of Anaheim*, 1999 WL 1034489, at *2—the business records affidavits comply with Rules 803 and 902. Respondents assert that the business record affidavits were defective, but their failure to support this contention with argument means they have waived any such claim. *See, e.g., Anthony Fields, CPA*, Exchange Act Release No. 74344, 2015 WL 728005, at *19 & n.115 (Feb. 20, 2015). And contrary to Respondents' claim, unavailability of the affiant is not a prerequisite to reliance on a business record affidavit, even in federal district court practice. *See, e.g., United States v. Anekwu*, 695 F.3d 967, 976 (9th Cir. 2012).

[18]      The ALJ correctly admitted these and other marketing materials. We reject Respondents' contention that the ALJ unfairly allowed Arthur Coffey, a manager at a JTF branch location, to testify and authenticate these documents and to confirm that Respondents provided them to JTF and/or to investors. Although Coffey did not appear on the Division's original witness list, we find no merit to Respondents' claim that they did not have an adequate opportunity to prepare for his cross-examination. Respondents had access to the Division's investigative file in the form of

(footnote continued . . .)

2008, April and May 2009, and March and August 2010. Respondents used the PowerPoint presentation in meetings with brokers and prospective investors, emailed it to brokers to solicit investors, and provided brokers, investors, and prospective investors with access to a virtual library that contained the presentation. Respondents admit, however, that KPMG never audited the Funds; instead, a small Houston-based firm, Mir Fox & Rodriguez, audited them. And neither the Funds nor JTCM ever had a prime brokerage account with Deutsche Bank.

Deutsche Bank learned that Respondents had identified it as the prime broker in Fund II's private placement memorandum ("PPM") dated February 5, 2009, and demanded that its name be removed from the document. Although Respondents complied, they continued to identify Deutsche Bank as the Funds' prime broker in newsletters and the PowerPoint presentation.

Respondents' misrepresentations that KPMG was the Funds' auditor and Deutsche Bank was the Funds' prime broker were material. Contrary to Respondents' claim that prime brokers are not relevant to a fund's operations or performance, we have stated that auditors and prime brokers "perform important roles as 'gatekeepers' for private funds,"[19] and disclosure of their identity by advisers helps investors "conduct[] due diligence," "evaluat[e] potential managers," and "protect against fraud."[20] Thus, a reasonable investor would have considered their identity important.[21] Respondents acted at least recklessly because Jarkesy controlled JTCM and the Funds and therefore knew or must have known that KPMG and Deutsche Bank never provided services to the Funds when he made the misstatements.

Respondents contend that they had "express authority to change professionals and the business plan," that they negotiated with KPMG and Deutsche Bank to be the auditor and prime broker for another fund that they never launched, and that they intended to feed Fund II's assets into that fund. But whether Respondents had the authority to change professionals or attempted to engage KPMG and Deutsche Bank for another fund has no bearing on whether Respondents misrepresented that KPMG was the auditor and Deutsche Bank the prime broker for the Funds.

---

(. . . footnote continued)

a text-searchable database, which allowed them to locate pertinent documents concerning Coffey. *See infra* section III.C. They also received a transcript of testimony that Coffey provided in a FINRA proceeding against Belesis. Moreover, they declined the opportunity to recall Coffey and cross-examine him a second time several days after his examination.

[19] *Rules Implementing Amendments to the Investment Advisers Act of 1940*, Advisers Act Release No. 3221, 2011 WL 2482892, at *24 (June 22, 2011) (adopting release).

[20] *Id.* at *46; *Rules Implementing Amendments to the Investment Advisers Act of 1940*, Advisers Act Release No. 3110, 2010 WL 4686053, at *39 (Nov. 19, 2010) (proposing release).

[21] *Cf. Schwartzman v. Morningstar, Inc.*, No. 12-1647, 2014 WL 3843875, at *19 (E.D. Pa. Aug. 5, 2014) ("A rigorous audit . . . reduce[s] the likelihood that a hedge fund is fraudulent or mismanaged. Information that the [fund] had an obscure auditor . . . may have changed investors' view of the [fund] as a sound investment.").

**2.      Respondents misrepresented Fund I's asset allocation and investment strategy.**

From 2007 through 2010, Respondents provided a PPM for Fund I to investors and prospective investors. Respondents reviewed and controlled the contents of this document. The PPM stated that Fund I would make two types of investments: (1) in-force life insurance policies acquired through life settlement transactions (hereinafter, "life settlement policies");[22] and (2) short to medium term debt and equity investments (hereinafter, "corporate investments").

With respect to life settlement policies, the PPM stated that Fund I would invest 50% of its capital commitments in the policies. The policies would provide a "Return *of* Capital," while the corporate investments would provide a "Return *on* Capital" (emphasis in original). The PPM stated that JTCM would put the life settlement portfolio in a master trust to "contain sufficient cash . . . to pay the premiums . . . for the expected life expectancy," and to segregate returns "from the risks associated with the [corporate] investments."

Respondents repeated these representations in newsletters, a podcast, and a PowerPoint presentation. Six newsletters—dated August and September 2008, April and May 2009, and March and August 2010—stated that JTCM had "segregate[d] half of the Fund's investment in life settlement policies." And three newsletters—dated January 15, April 15, and June 30, 2008—stated that JTCM had put the policies into a master trust.

In the podcast, Jarkesy stated that "50% of [capital commitments] go[] into life settlements"; "30% of the life settlement portfolio buys a dollar's worth at face, and 70% . . . is set aside to pay premiums through the life expectancy." Similarly, the PowerPoint presentation stated that 50% of capital commitments would be put in a master trust to purchase life settlement policies and "to pay for premiums based on life expectancies."

Jarkesy drafted and caused JTCM to distribute the newsletters to investors, caused JTCM to distribute the podcast to investors, and prepared and used the PowerPoint presentation in marketing Fund I. Indeed, Respondents do not contest that Jarkesy showed the presentation to investor Steven Benkovsky before Benkovsky invested in Fund I in 2008. Benkovsky testified that the life settlement portfolio made him "comfortable in" investing in Fund I. Respondents also do not contest that Jarkesy told another investor, Robert Fullhardt, that the life settlement portfolio would provide a return of capital in Fund I to hedge against any corporate investment losses. Fullhardt testified that this was important in his decision to invest in Fund I.

Despite these representations, Respondents invested substantially less than 50% of Fund I's capital commitments in life settlement policies. Between September 28, 2007 and May 1, 2009, Respondents purchased 13 life settlement policies in Fund I, which (combined with the premium payments thereon) represented 10% of capital commitments as of December 31, 2008, 11% as of December 31, 2009, and 19% as of December 31, 2010. Respondents also put only 11

---

[22]      Life settlement refers to the purchase of existing life insurance policies at a discount to their face values, maintaining them by paying the premiums, and collecting when the insured dies. The face value is the amount to be paid on the death of the insured.

policies in a master trust and never set aside cash needed to pay the premiums in a master trust. Most of the policies lapsed because Fund I did not have sufficient cash to pay the premiums.

With respect to corporate investments, the PPM stated that Fund I's total investment in the debt and equity of "any one company at any one time w[ould] not exceed 5% of the aggregate Capital Commitments." Jarkesy also drafted, and caused JTCM to distribute to investors, newsletters dated January 15, April 15, June 30, July 15, and October 15, 2008, stating that Fund I "is limited to 5% in any one corporate investment"; and drafted and sent a Due Diligence Questionnaire to Fund I's placement agent, JTF, in 2009, stating that Fund I is "limited to no more than five percent allocation of the Fund's investable assets in any single investment." Jarkesy repeated this representation to JTF's sales force, which obtained investors for the Funds, in several meetings about information needed to sell Fund I. Respondents do not contest that Jarkesy told Benkovsky and Fullhardt, before they invested in Fund I in 2008, that Fund I would not invest more than 5% of its assets in any single company. Both investors testified that, because of benefits from diversification, the 5% limitation was important in deciding to invest.

Nearly from its inception, however, Fund I made investments in individual companies that exceeded the 5% limitation. Fund I held the following investments as a percentage of its capital commitments in 2007: 7.2% in UFood Restaurant Group, 6.8% in EnterConnect, Inc., 5.9% in Reddi Brake Supply Corp., and 5.5% in G/O Business Solutions, Inc. From 2008 through 2010, Fund I became heavily invested in America West Resources, Inc.; increasing its exposure from 8.4% in 2008, to 10.2% in 2009, to 11.3% in 2010.[23]

Respondents' misstatements were material because they concerned Fund I's risk profile: the life settlement portfolio was designed to hedge risk from the corporate investments; the master trust was designed to reduce risk by ensuring that premiums were paid through life expectancy and life settlement returns were segregated from corporate investments; and the corporate investment limitation was designed to reduce risk through diversification. A reasonable investor would have considered changes to portfolio composition that increased the risk exposure of the fund important.[24] Also, Respondents' misstatements were material because they concerned Fund I's investment strategy. A reasonable investor would consider important whether the fund "would be able to achieve its stated investment objectives."[25] Indeed, investors

---

[23]     These percentages are derived from Fund I's cost to purchase the securities in comparison to its year-end capital commitments. In the alternative, if they were derived from the securities' year-end market values, they would have resulted in greater percentages for UFood (11.1%), EnterConnect (13%), and Reddi Brake (11.6%), and the same percentage for G/O.

[24]     *Fundamental Portfolio Advisors, Inc.*, 2003 WL 21658248, at *11-12 (holding that changes to a fund's portfolio resulting in increased interest rate risk and volatility were material); *see also SEC v. Fife*, 311 F.3d 1, 10 (1st Cir. 2002) (finding that misrepresentations regarding risk were material "because a reasonable investor would want to know the risks involved").

[25]     *Fundamental Portfolio Advisors, Inc.*, 2003 WL 21658248, at *12; *see also David Henry Disraeli*, Advisers Act Release No. 2686, 2007 WL 4481515, at *5 (Dec. 21, 2007) ("The disposition of the proceeds of a securities offering is material information, and issuers must adhere strictly to the uses for the proceeds described in [a PPM].") (quoting *Brian Prendergast*,

(footnote continued . . .)

Benkovsky and Fullhardt both testified that the life settlement portfolio and corporate investment limitation were important to their decisions to invest in Fund I.

We find that Respondents acted with scienter because Jarkesy controlled Fund I's assets and thus knew or must have known that the representations were not true.[26]

### 3. Respondents' contentions concerning the marketing materials lack merit.

#### a. Fund I's PPM did not authorize Respondents' misrepresentations.

Respondents contend that Fund I's PPM permitted them to adjust the asset mix and strategy. Although the PPM stated that JTCM may change Fund I's investment and management policies "at [its] discretion," we have held that "in offering documents, specific statements control more general language such as that an allocation plan is 'flexible.'"[27] It is misleading to include "specific language describing asset allocation when [a fund manager] intend[s] to rely on more general language to authorize a departure from" that description.[28] Respondents misled investors by failing to notify them that they intended to pursue an investment strategy different from the specific strategy identified in the PPM.[29] And Respondents' representations concerning the life settlement policies and corporate investment limitation in marketing materials they provided to investors *after* they deviated from the stated strategy were materially false.

Respondents also contend that a section on risk in the PPM warned that "[b]ecause *as much as 10%* of [Fund I's] aggregate committed capital may be invested in a single Portfolio Company, a loss with respect to such a Portfolio Company could have a significant adverse impact on [Fund I's] capital" (emphasis added). But "not every mixture with the true will neutralize the deceptive."[30] "It is only 'when the inconsistency would exhaust the misleading conclusion's capacity to influence' the reasonable investor that the conclusion will be rendered

---

(. . . footnote continued)

Exchange Act Release No. 44632, 2001 WL 872693, at *7 (Aug. 1, 2001)), *petition denied*, 334 F. App'x 334 (D.C. Cir. 2009).

[26]   *Cf. Prendergast*, 2001 WL 872693, at *8 (finding that respondent acted with scienter because he prepared a hedge fund's PPM and knew its provisions for the use of offering proceeds but did not tell investors of his "decision to change the disposition of the proceeds").

[27]   *Id*.

[28]   *Id.*

[29]   *Id.* (finding that respondent misled investors by changing the investment strategy from that stated in the fund's PPM without disclosing the change to investors).

[30]   *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

immaterial."[31]  As a result, "a misleading statement displayed prominently and in numerous places may not be cured by inconspicuous and scattered warnings."[32]

Here, the statement about a 10% corporate investment limitation was not repeated in the other marketing materials in the record.  Yet Respondents misrepresented that Fund I had a 5% corporate investment limitation not only in the PPM, but also in five newsletters, a questionnaire, and in statements by Jarkesy in separate meetings with investors Benkovsky and Fullhardt and JTF's sales force.  These marketing materials were supposed "to inform [investors], not to challenge their critical wits in the hunt for contradictions."[33]  To the extent the statement in the PPM that Respondents highlight served as a corrective disclosure, therefore, we find that it was not conveyed to investors "'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by'" the misstatements.[34]  In any case, the representation that there was a 10% corporate investment limitation was itself false because Fund I exceeded it in both 2009 and 2010.

Respondents contend further that the PPM for Fund I advised investors not to rely on any statements other than those in the PPM.  But the PPM stated only that "[a]ny representations (whether oral or written) other than those expressly set forth in [the PPM] and any information (whether oral or written) other than that expressly contained in documents furnished by [Fund I] must not be relied upon."  Here, Respondents' misrepresentations were either expressly set forth in the PPM or were contained in materials that Jarkesy and JTCM furnished on behalf of Fund I. In any event, Respondents cannot disclaim liability for their material misstatements or omissions.[35]  Nor can Respondents evade liability because the PowerPoint presentations included disclaimers that their delivery "shall not constitute an offer to sell or a solicitation to purchase securities," and that any such offer or solicitation "can only be made by delivery of" a PPM. Respondents cannot contract away their duties and obligations under the securities laws.[36]

---

[31]     *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (quoting *Sandberg*, 501 U.S. at 1097-98).

[32]     *In re Lehman Bros. Sec. and Erisa Litig.*, 799 F. Supp. 2d 258, 314 (S.D.N.Y. 2011).

[33]     *SEC v. Church Extension of the Church of God, Inc.*, No. 1:02CV1118-DFH-VSS, 2005 WL 3370568, at *8 (S.D. Ind. Dec. 12, 2005).

[34]     *SEC v. Mudd*, 885 F. Supp. 2d 654, 667 (S.D.N.Y. 2012) (citations omitted).

[35]     *See Ward*, 2003 WL 1447865, at *10 n.47 (holding that broker's disclaimer in promotional materials that information contained therein about securities "should not be relied upon" as accurate and complete "in no way overrode" broker's omission of material facts).

[36]     *See Avello v. SEC*, 454 F.3d 619, 626 (7th Cir. 2006).

Similarly, Respondents contend that the ALJ improperly ignored cautionary terms in the PPM, including "the discussion of risk factors." But Respondents do not identify, and we have not found, any terms that made their misstatements not misleading.[37]

Finally, Respondents contend that the ALJ erred in finding that they used the PPMs without alterations in selling interests in the Funds. We agree with the ALJ, however, that "Respondents, who are in the best position to know of any successor PPM amendments, did not offer evidence of any changes" to the PPMs.[38]

### b. Respondents cannot blame others for their misrepresentations.

Respondents attempt to blame Benkovsky and Fullhardt for failing to review the PPM. Benkovsky's and Fullhardt's testimony was that they had read some but not all of the PPM. Nonetheless, Respondents assert that Benkovsky and Fullhardt represented prior to investing in Fund I that they had read the PPM and later testified that they had not read the PPM. They also assert that Benkovsky testified that he would not have invested in Fund I had he been aware of certain disclosures in the PPM. As discussed above, however, the PPM did not contain disclosures that cured Respondents' misstatements. Respondents' misstatements to Benkovsky and Fullhardt were material regardless of whether any disclosures in the PPM would have caused them to act differently because the misstatements were important enough that they would have assumed actual significance in the deliberations of a reasonable investor.[39] Whether Benkovsky or Fullhardt read and relied on the PPM's disclosures is legally irrelevant.[40]

Respondents also contend that, because JTF was the broker for Benkovsky and Fullhardt, JTF was responsible for explaining the PPM. But because the PPM itself contained material misstatements, explaining it to Benkovsky and Fullhardt would not have prevented Respondents' fraud. Respondents also made misstatements to those investors in other communications.

Respondents argue further that Jarkesy never solicited Benkovsky's investment in Fund I. The record contradicts this assertion. The record also belies Respondents' claim that Benkovsky testified that their representations did not matter to his investment decision and that what mattered was that his broker said that "everything is fine" with the investment. Benkovsky testified only that he "relied on [his] broker to say . . . everything is fine" as to the content of the

---

[37]    *Cf. Dembski*, 2017 WL 1103685, at \*12 ("For cautionary statements in a PPM to be meaningful, they must discredit the alleged misrepresentations to such an extent that the real risk of deception drops to nil." (internal quotations and citations omitted)).

[38]    Fund I's PPM was amended on August 21, 2007 to remove a $10 million minimum capital commitment requirement, but that amendment is immaterial to our finding here.

[39]    *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991) (stating that a fact need not "'have caused the reasonable investor to change his'" decision but rather "need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder'") (quoting *TSC Indus.*, 426 U.S. at 449).

[40]    *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (noting that reliance is not an element of a Commission enforcement action).

PPM, not as to whether to invest. He also testified that Fund I's life settlement portfolio strategy and corporate investment limitation were important to his investment decision.

### c. Respondents' advice of counsel and fair notice defenses fail.

Respondents contend that the ALJ erred in rejecting their advice of counsel defense, which Respondents appear to base on Jarkesy's testimony that counsel prepared the PPMs and reviewed the newsletters. However, we have afforded no weight to Jarkesy's uncorroborated testimony as to disputed facts. The ALJ found that Jarkesy "generally testified in an evasive manner that did not provide any assurances of the reliability of his testimony," noting that "Jarkesy evaded a large portion of the Division's questions," while "his recollection markedly improved when questioned by his own counsel." We accord "explicit credibility" findings "considerable weight."[41] Having reviewed the hearing transcript, we, too, find that Jarkesy's testimony lacks credibility:[42] Jarkesy provided detailed answers to his attorneys' questions but repeatedly answered—hundreds of times—that he could not remember in response to the Division's questions. Given the myriad "examples in the record where [he] was selective and evasive in answering questions,"[43] we find that Jarkesy was not a credible witness.[44]

Moreover, "[a] claim of reliance on the advice of counsel requires a showing that the party claiming it 'made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith.'"[45] Respondents failed to make the required showing to establish an advice of counsel defense.

---

[41]     *Kenneth R. Ward*, Exchange Act Release No. 47535, 2003 WL 1447865, at *10 (Mar. 19, 2003), *aff'd*, 75 F. App'x 320 (5th Cir. 2003)); *accord Kay v. FCC*, 396 F.3d 1184, 1189 (D.C. Cir. 2005) (stating "that an agency is not required to accept the credibility determinations of an administrative law judge" but may give as much weight to them as warranted).

[42]     Where "objective inconsistency or fundamental implausibility is at issue"—instead of a demeanor-based observation—an ALJ "has no special advantage . . . in determining credibility." *Dray v. RR. Ret. Bd.*, 10 F.3d 1306, 1314 (7th Cir. 1993); *NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 501 (2d Cir. 1967) (distinguishing between "credibility findings" that "rest mainly on an analysis of the testimony" and those "explicitly based on demeanor").

[43]     *Yu Ying Zheng v. Gonzales*, 235 F. App'x 667, 668 (9th Cir. 2007).

[44]     *See, e.g.*, *Cannon v. Trammell*, 796 F.3d 1256, 1271 (10th Cir. 2015) (affirming credibility determination based on the witness's "evasive[ness] on cross-examination and . . . overly selective memory when it came to helpful and harmful facts"); *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1317 (7th Cir. 1991) (affirming agency's adoption of "ALJ's decision that [the witness's] testimony lacked credibility" based on the witness's "selective memory"); *see also United States v. Figueroa*, No. CR-10-0864-TUC-JMR-DTF, 2010 WL 5563545, at *3 (D. Ariz. Dec. 15, 2010) (finding that witness did not testify credibly when, "[o]n direct examination, [she] described the alleged promises with some precision," whereas "[o]n cross-examination, however, [she] was unable to recall most other aspects").

[45]     *Disraeli*, 2007 WL 4481515, at *7 n.39 (quoting *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994)).

Indeed, the record contains no evidence that Respondents made disclosures to counsel about the identities of the Funds' auditor and prime broker or the composition of Fund I's assets, and Respondents have not introduced evidence about the legal advice they sought or received.

Respondents also contend that they were denied "fair notice" because the Order Instituting Proceedings ("OIP") contained no allegations concerning "target ownership percentages in the [PPM] related to insurance policies." This contention is meritless because the OIP alleged that Respondents' "marketing materials for the Funds contained material misrepresentations about the Funds' . . . allocation of assets."[46] In any event, the record shows that Respondents "understood the issue and [were] afforded full opportunity to justify [their] conduct during the course of the litigation."[47] The parties fully litigated the issue before the ALJ, and Respondents did not assert that they lacked fair notice until this appeal. Nor have Respondents asserted or shown prejudice—they have not identified evidence or defenses they would have proffered had they better understood the charges against them.[48]

**B.      Respondents violated the antifraud provisions by knowingly or recklessly making material misstatements and omissions about asset valuations.**

Respondents represented in the Funds' financial statements that JTCM followed generally accepted accounting principles ("GAAP") in valuing the Funds' assets, including GAAP's definition of "fair value." The Funds' Limited Partnership Agreements—entered into between the Funds' general partner (*i.e.*, JTCM) and limited partners (*i.e.*, investors)—stated that JTCM would value assets such as those discussed below "at fair value" or at "such value as [JTCM] may reasonably determine." We find numerous instances in which Respondents failed to value assets at their fair or reasonable value and misrepresented those asset valuations in the Funds' financial statements and the account statements they provided to investors.

**1.      Respondents misrepresented the value of the Funds' assets in financial statements and monthly account statements.**

Under the PPMs, the Funds paid JTCM fees based on JTCM's "good faith" valuations of the Funds' holdings. These fees consisted of: (i) a management fee of 2% of the Funds' total net asset value ("NAV"); and (ii) a performance fee, from Fund II only, of 20% of any appreciation

---

[46]      *John Thomas Capital Mgmt. Grp. LLC, d/b/a Patriot28 LLC*, Exchange Act Release No. 69208, 2013 WL 1180836, at *8 (March 22, 2013).

[47]      *Aloha Airlines, Inc. v. Civil Aeronautics Bd.*, 598 F.2d 250, 262 (D.C. Cir. 1979) (internal quotation marks omitted); *see also Clawson v. SEC*, No. 03-73199, 2005 WL 2174637, at *1 (9th Cir. Sept. 8, 2005) (finding notice sufficient where the facts ultimately found were "consistent with" and "subsumed in" the theory alleged in the OIP); *James L. Owsley*, Exchange Act Release No. 32491, 1993 WL 226056, at *4 (June 18, 1993) (stating that a defect in an administrative pleading "can be remedied if the record demonstrates that the respondent understood the issue and was afforded a sufficient opportunity to justify his conduct").

[48]      *See Aloha Airlines, Inc.*, 598 F.2d at 262.

above 7% in Fund II's total NAV. Although Fund I's PPM also included a performance fee provision, the record does not show that Fund I paid such a fee.

Jarkesy determined the valuations for JTCM, which in turn reported them to investors in the Funds' year-end financial statements. Respondents also sent investors monthly account statements that reported individual account values based on the value of the Funds' holdings. Through December 31, 2010, the Funds paid JTCM management fees of $1,278,597, and Fund II paid JTCM performance fees of $123,338.38.

From 2008 to 2011, Respondents grossly overvalued certain of the Funds' holdings. In doing so, they contravened assertions in the Funds' financial statements that, for all valuations, JTCM applied GAAP's definition of "fair value"—"the price that would be received to sell an asset . . . in an orderly transaction between market participants at the measurement date."[49] As a result, the Funds issued misleading statements to investors and paid Respondents excessive fees.

### a.    America West

Respondents overvalued the Funds' investment in America West by failing to write down defaulted notes. By the end of 2009, America West had defaulted on $1,330,000 in notes issued to Fund I. But Respondents did not write down the value of the notes at year-end 2009 or throughout 2010. The Funds made additional loans to America West in 2010. By year-end, America West had defaulted on $1,710,000 in notes issued to the Funds. But Respondents did not write down the value of the notes at year-end 2010.

Respondents contend that they did not write down the notes because they expected JTF to provide financing to America West to enable it to pay off the notes. But it was unreasonable for Respondents to assume, in determining "fair value" under GAAP, that the Funds would be able to sell the defaulted notes for their par value based on the possibility of future financing.[50]

### b.    Radiant

Respondents' valuation of the Funds' investment in the stock and warrants of Radiant Oil & Gas, Inc., was also inflated.[51] Because Radiant's stock traded infrequently—including from September 2009 to December 2010 when no one traded it on the open market—Respondents decided as early as 2008 to base "fair value" not on the quoted price but rather on their own assumptions as to the price at which the Funds would be able to sell the stock. For example, Radiant's stock had a quoted price of $0.12 per share from September 10, 2009 to December 16,

---

[49]    Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 820-10-20 (and its predecessor Financial Accounting Standards No. 157 ¶ 5).

[50]    *See, e.g.*, *The Heritage Org. LLC*, 413 B.R. 438, 504 (Bankr. N.D. Tex. 2009) (rejecting as "not credible" testimony that the fair value of defaulted notes was its "face value"), *aff'd*, 544 F. App'x 512 (5th Cir. 2013).

[51]    In April 2010, G/O Business Solutions changed its name to Radiant Oil & Gas, Inc.

2010, but Respondents valued it at $0.06 per share from March 2009 to March 2010, $0.30 per share from April to July 2010, and $1.00 per share from August 2010 to December 2010.[52]

Nevertheless, at the end of 2010, Respondents changed their valuation method to take advantage of a more than 3,000% increase in the quoted price of Radiant's stock from $0.12 to $4.00 per share on December 17, 2010 (where the price finished the year). Respondents did not disclose the change in fair valuation technique to the Funds' investors despite the fact that such disclosure is required by GAAP, and they have not provided a justification for the change.

Respondents' change in valuation method was inconsistent with their decision more than a year earlier to continue valuing Radiant's stock at $0.06 per share from March 2009 to March 2010 even though the quoted price was greater throughout that period. But the change allowed Respondents to take advantage of their own actions. Respondents caused the 3,000% increase in the quoted price in December 2010 by hiring a firm to promote Radiant's stock in postings on the firm's websites and emails to the firm's approximately 5,000 subscribers.

Respondents contend that the quoted price did not increase because of the promotional campaign but rather due to Radiant's acquisition of Jurasin Oil & Gas, Inc. in August 2010, issuance of 1,215,000 shares for $1,215,000 in a private offering on November 17, 2010, and receipt of debt financing in the last quarter of 2010. But the first two events happened before the December 2010 promotional campaign and did not result in any price movement; indeed, there was no open-market trading of Radiant stock between September 10, 2009 and December 17, 2010. And the last event is based solely on Jarkesy's uncorroborated testimony.

Respondents also contend that there is no evidence that it was improper to pay third parties to render their professional opinions. But Respondents' liability is not based on the fact that they paid the promotional firm or on the firm's work. It is based on Respondents' overvaluations in the financial statements and monthly account statements that were not reasonable and were only purportedly supported by an arbitrary and unreasonable change in their valuation method. Indeed, the price increase resulting from the promotional campaign was inconsistent with Radiant's significant financial problems at the time. Radiant's Form 10-K for year-end 2010, which Jarkesy signed as a director of the company, reported that conditions at Radiant "raise[] substantial doubt as to [its] ability to continue as a going concern."

Moreover, for the monthly account statements dated January 31, 2011, Respondents arbitrarily changed their valuation method back to using their own assumptions. This let them value Radiant's warrants at prices in excess of the stock's quoted price.[53] At the time, the Funds owned 125,000 warrants to purchase Radiant stock at an exercise price of $1.00 per share. Although the quoted price for Radiant stock was $2.25 per share on January 31, Respondents valued the warrants at $6.92 per warrant. When the Funds' administrator questioned the valuation for the warrants, stating that Respondents had last priced them at $0.12 per warrant in

---

[52]     These increases coincided with reverse stock splits.

[53]     A warrant "is a contractual right to purchase a security at a specified exercise price within the term of the contract." Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corp. Law* § 2:91 (2d ed. 2016).

August 2010, JTCM's controller responded in an email: "I know the stock price was crazy in Jan[uary] for [Radiant]. Checked with George [Jarkesy] and he said to run with it at $6.92."

### c. Galaxy

Respondents also overvalued the Funds' investment in Galaxy Media & Marketing Corp. Galaxy was formed in April 2010 through the merger of Amber Ready, Inc. and CK41 Direct, Inc. The Funds had been invested in Amber Ready's non-publicly traded stock since 2009, and continued to own millions of shares of Galaxy after the merger. Galaxy's stock also was not publicly traded and had no quoted price, so Respondents based its "fair value" on their assumptions as to the price at which the Funds could sell it. But Respondents continually increased their valuation of Galaxy's stock despite knowing it was essentially worthless.

Belesis (a significant investor in Amber Ready and its investment banker) emailed Jarkesy that Galaxy needed all money raised from the merger or it would "go out of business."[54] After the merger, Respondents received a series of requests from Galaxy for "urgently needed" financing because Galaxy was "without any money to operate." Respondents concede that—as Gary Savage, Galaxy's CEO, testified—"[a]ll along" Savage told "Jarkesy that [Galaxy's] shares weren't worth anything because the company had no real assets and no funding."

Galaxy's financial statements corroborated this conclusion. On October 1, 2010, Galaxy sent Jarkesy its financial statements showing that from mid-2005 to mid-2010, Amber Ready and CK-41 together had over $18 million in net losses and $45,198 in total revenues, and that Galaxy had over $36 million in liabilities and $5.6 million of assets. On February 11, 2011, Galaxy filed an amended Form S-1 Registration Statement which stated that its net losses—$75,808,771 in 2009 and $9,835,053 in 2008—"raise substantial doubt about [its] ability to continue as a going concern," that it did "not have any contracts or commitments for additional funding" needed to "continue [its] operations," and that it had a negative $0.80 net tangible book value per share.

Nevertheless, Respondents greatly inflated their valuation of Galaxy's stock. Respondents, who had been valuing Amber Ready's and then Galaxy's stock at $0.30 per share, increased their valuation by 1,000% to $3.30 per share in July 2010. They maintained that valuation for two months, then decreased it to $1.00 per share in September 2010 and to $0.80

---

[54]     We grant Respondents' January 13, 2015 motion and overrule the Division's objection to admit Belesis' March 13, 2014 affidavit. The affidavit, which Respondents procured, recites excerpts from Belesis' investigative testimony and avers that "if asked the following questions posed during that investigative testimony, [Belesis] would give the same answers." Although the ALJ declined to admit the affidavit, she did admit into evidence the proffered excerpts from Belesis' investigative testimony as well as the Division's counter-designations. We give minimal weight to an affidavit that does no more than quote and reaffirm earlier sworn testimony, especially given Respondents' representation that Belesis would assert his Fifth Amendment Privilege against self-incrimination and decline to testify if called at the hearing. *See, e.g.*, *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 642 (9th Cir. 2012); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990). Nonetheless, we admit the affidavit and have considered Belesis' investigative testimony in making our factual findings.

per share in October 2010—amounts that were 233% and 167% greater than the prior $0.30 per share valuation. These valuations were arbitrarily inflated because they had no reasonable basis and ran counter to Galaxy's significant financial problems.

Respondents contend that their revaluations coincided with a reverse stock split and Galaxy's issuance of penalty shares for missing registration statement deadlines. But the reverse stock split occurred in April 2010. Respondents do not explain why the reverse stock split would justify increasing the stock price by 1,000% three months later in July 2010. Nor do they explain why, if the reason they increased the stock price three months later in July 2010 was to account for a reverse stock split, they reduced the stock price two months after that in September 2010. Galaxy's issuance of penalty shares cannot account for the reevaluation to $1.00 per share in September 2010 because Galaxy's first issuance of penalty shares occurred in October 2010, and Galaxy's second issuance of penalty shares occurred in January 2011.

Respondents also contend that the stock price was affected by (i) financing for Galaxy from the Funds and JTF "appear[ing] to be in place" until JTF failed to "live up to its promise to provide" the financing; and (ii) Galaxy issuing 25 million shares and then rescinding that issuance. But Respondents do not explain how these events justified the overvaluation. And the latter contention is based solely on Jarkesy's uncorroborated testimony, which we do not credit.

In addition to overvaluing Galaxy's stock, Respondents overvalued the Funds' $278,235 investment in Galaxy notes by failing to write down their value during the first half of 2011 after Galaxy defaulted on them in December 2010 and January 2011.[55] Respondents contend that they waited to write down the defaulted notes until July 2011 because they expected JTF to provide financing to Galaxy to enable it to pay off the notes. But it was unreasonable for Respondents to assume, in determining "fair value" under GAAP, that the Funds would be able to sell the defaulted notes for their par value based on the possibility of future financing.[56]

### d. Restricted stock

Respondents overstated Fund I's investment in the restricted stock of various issuers by valuing the stock price at or greater than the quoted price for the issuers' free trading stock. For example, Respondents valued Fund I's investment in 296,000 restricted shares of Red Roller Holdings Inc. at a price greater than the quoted price for the issuer's free trading stock in March, June, and July 2008. Respondents also valued Fund I's investment in restricted stock at the same price as the issuer's free trading stock with respect to (i) the Red Roller shares from December 2007 to February 2008 and in August 2008; (ii) 500,000 shares of Sahara Media Holdings Inc. in October 2008; (iii) 150,000 shares of Nevada Gold Holdings in January 2009; (iv) 1,000,000 shares of Foster Drilling Corp. in February 2009; and (v) 17,879,999 shares of America West in September 2009. These valuations violated GAAP's requirement that the fair value of a restricted security "be based on the quoted price for an otherwise identical unrestricted security

---

[55]     Respondents decreased their valuation of Galaxy's stock to $0.10 per share in December 2010, $0.02 per share in May 2011, and $0.00 per share in July 2011. Respondents eventually wrote down the value of the four notes to $279.03 in July 2011.

[56]     *See supra* note 50.

of the same issuer that trades in a public market, adjusted to reflect the effect of the restriction."[57] "The adjustment would reflect the amount market participants would demand because of the risk relating to the inability to access a public market for the security for the specified period."[58] Yet Respondents made no such adjustment here.

Respondents contend that, as to Red Roller, the Division introduced no evidence specific to the company concerning the valuation of its stock. But Respondents stated in the Funds' financial statements that JTCM applied GAAP's definition of fair value, and GAAP required that the restricted nature of any securities be taken into consideration in valuing them. The Division introduced evidence that Respondents nonetheless valued Red Roller's restricted stock greater than Red Roller's free trading stock, and Respondents failed to provide any justification for their valuations of Red Roller's restricted stock to counter the Division's contention that its restricted stock should not have been valued greater than its free trading stock.[59]

### e. Life settlement policies

Respondents overvalued Fund I's life settlement policies. Fund I bought five life settlement policies in April 2009. In that same reporting period, Respondents increased Fund I's valuation of the policies by $1,112,567 above their cost (*i.e.*, from $1,195,000 to $2,307,567). This violated GAAP's requirement that when third-party investors in life settlement policies use the fair value method, they "recognize the initial investment at the transaction price" and not "remeasure the investment at fair value" until subsequent reporting periods.[60]

### 2. Respondents' misrepresentations were material and made with scienter.

Respondents' misstatements about the value of the Funds' holdings were material. The valuation of an investment is of paramount importance to any reasonable investor.[61] Moreover, the overvaluations here were substantial both individually and in the aggregate.

---

[57] FAS 157 ¶ A.29 (2008).

[58] *Id.*

[59] *Cf. Worcester Cty. Tr. Co. v. Comm'r of Internal Revenue*, 134 F.2d 578, 582 (1st Cir. 1943) ("A commodity freely salable is obviously worth more on the market than a precisely similar commodity which cannot be freely sold.").

[60] FASB Staff Position No. FTB 85-4-1 (March 27, 2006).

[61] *See SEC v. Seghers*, 298 F. App'x 319, 330 (5th Cir. 2008) (affirming finding that misrepresentations overvaluing fund holdings were material because the "value of an investor's account and the month-to-month performance of the [f]unds are indisputably relevant to the investor's investment decision"); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, at *20 (S.D. Fla. Sept. 24, 2008) (finding misrepresentations and omissions regarding a fund's portfolio valuation, which the fund's manager had "artificially inflat[ed]," to be "clearly material"), *aff'd*, 478 F. App'x 550 (11th Cir. 2012).

Respondents acted with scienter because Jarkesy controlled the Funds' valuations. As an experienced securities professional with a professed ability to value securities, Jarkesy knew or must have known that defaulted notes are not worth their par value, that valuation methods cannot be switched arbitrarily, and that the fair value of infrequently and non-publicly traded stock does not increase by many multiples in periods when no positive events occurred. Jarkesy also knew or must have known that the fair value of restricted stock is not equal to or greater than that of the issuer's free trading stock absent a reason for such valuation, and that life settlement policies cannot have their fair values double immediately after purchase.

Our finding that Respondents acted with scienter is supported by their motive to increase their fees by artificially inflating the value of the Funds' holdings. We have long held that a "pecuniary motive for engaging in the . . . scheme" is "circumstantial evidence of . . . scienter."[62]

3. **Respondents' contentions concerning their asset valuations lack merit.**

Respondents contend that the Division failed to establish that Respondents' valuations violated GAAP because it did not call a witness with knowledge of valuing the assets at issue. But we need not defer to an expert in determining whether Respondents violated GAAP.[63] Here, the GAAP standards did not require clarification, and it is clear the respondents had no reasonable basis for their valuations given the information available to them.

Respondents also blame the overvaluations on third parties, including the Funds' administrator, auditor, and counsel. According to Respondents, the Funds' administrator "influenced" valuations and "insisted on changes to valuations . . . by JTCM." The record shows, however, that Respondents were responsible for the valuation of the Funds' holdings, and that third parties relied on Respondents for those valuations.[64] For example, Respondents overrode objections by the Funds' administrator to valuing Radiant warrants at $6.92 per warrant and to valuing restricted America West stock at the same price as the issuer's free-trading stock.

Respondents contend that there is no evidence that the Funds' financial statements "were not prepared in good faith in a manner consistent with the Partnership's [*i.e.*, the Funds'] written guidelines in the Limited Partnership Agreement[s]." But Respondents represented that JTCM

---

[62]     *Guy P. Riordan*, Exchange Act Release No. 61153, 2009 WL 4731397, at *9 (Dec. 11, 2009), *petition denied*, 627 F.3d 1230 (D.C. Cir. 2010); *Fields*, 2015 WL 728005, at *16 ("Fields had a motive for overstating AFA's assets, which provides additional circumstantial evidence of his scienter." (internal quotation and alteration omitted)); *see also SEC v. Koenig*, 557 F.3d 736, 740 (7th Cir. 2009) (finding it unnecessary to prove a motive to establish securities fraud).

[63]     *See Gregory M. Dearlove, CPA*, Exchange Act Release No. 57244, 2008 WL 281105, at *20 (Jan. 31, 2008) ("The Commission may consider expert testimony, but it is not bound by such testimony even where it is available, and the absence of expert testimony does not preclude the Commission from making necessary findings with respect to principles of accounting."), *petition denied*, 573 F.3d 801 (D.C. Cir. 2009).

[64]     We note that the Funds' administrator used third-party valuations (*e.g.*, Bloomberg L.P.) where available for certain of the Funds' assets, but not for the assets at issue here.

followed GAAP in preparing the Funds' financial statements. Yet Respondents did not follow GAAP in valuing the assets at issue here. Nor were Respondents' valuations consistent with the Funds' Limited Partnership Agreements. For example, the Limited Partnership Agreements stated that assets such as those discussed above would be valued "at fair value" or at "such value as [JTCM] may reasonably determine," but we have found numerous instances where Respondents failed to value assets at their fair or reasonable value.

## II. Sanctions

### A. Industry and penny stock bars

Investment Company Act Section 9(b) authorizes us to bar a person from association with an investment company if we find that the person willfully violated the federal securities laws and such a bar is in the public interest.[65] Advisers Act Section 203(f) authorizes us to bar a person who willfully violated the federal securities laws from association with an investment adviser, broker, dealer, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization if we find that, at the time of the misconduct, the person was associated with an investment adviser and that such a bar is in the public interest.[66] Exchange Act Section 15(b)(6) also authorizes us to impose such a bar, as well as a bar from participating in the offering of penny stock, on a person who willfully violated the federal securities laws if the person participated in a penny stock offering at the time of the misconduct and such bars are in the public interest.[67]

As discussed above, Jarkesy violated antifraud provisions of the federal securities laws. Jarkesy does not dispute that he acted willfully, and we find that he did because he acted with scienter. We also find, and Jarkesy does not dispute, that at the time of his misconduct he was associated with JTCM, an unregistered investment adviser, as its owner and manager.[68] And Jarkesy participated in a penny stock offering at the time of his misconduct. As a director of, and investor and manager of Funds invested in, Radiant—a penny stock issuer[69]—Jarkesy orchestrated a campaign to promote the stock of that issuer.[70]

---

[65]    15 U.S.C. § 80a-9(b).

[66]    15 U.S.C. § 80b-3(f).

[67]    15 U.S.C. § 78*o*(b)(6).

[68]    *See* 15 U.S.C. § 80b-2(a)(17) (defining "person associated with an investment adviser").

[69]    *See* Exchange Act Section 3(a)(51)(A), 15 U.S.C. § 78c(a)(51)(A); Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1 (defining a "penny stock" to include "any equity security other than a security . . . that has a price of five dollars or more").

[70]    *See* Exchange Act Section 15(b)(6)(C), 15 U.S.C. § 78*o*(b)(6)(C) (defining "person participating in an offering of penny stock" to include "any person acting as any promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock."); *cf. Harold F. Harris*, Exchange Act Release No. 53122A, 2006 WL 307856, at *4 (Jan. 13, 2006) (finding that officers of penny stock issuer who

In determining whether bars are in the public interest we consider, among other things, the egregiousness of the respondent's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the respondent's assurances against future violations, the respondent's recognition of the wrongful nature of his conduct, and the likelihood that the respondent's occupation will present opportunities for future violations.[71]

Jarkesy's misconduct was egregious, recurrent, and at least reckless. For over three years, Jarkesy repeatedly misled investors and prospective investors, thereby increasing the fees he collected from his clients.[72] "[W]e have consistently viewed misconduct involving a breach of fiduciary duty or dishonest conduct on the part of a fiduciary . . . as egregious."[73]

Jarkesy has not recognized the wrongful nature of his misconduct; instead he has attempted to blame the Funds' administrator, auditor, and counsel. Nor has Jarkesy supplied assurances against future violations. And considering his occupation as a fund manager and investment adviser, he will be presented with opportunities to violate the securities laws in the future. Jarkesy contends that he has no intention to serve as a fund manager or investment adviser, but absent a bar there would be nothing to prevent him from reentering the industry.

---

(. . . footnote continued)

drafted or reviewed documents the issuer "used to attempt to induce investors to purchase" its stock were persons "participating in an offering of penny stock").

[71]     *Gary M. Kornman*, Exchange Act Release No. 59403, 2009 WL 367635, *6 (Feb. 13, 2009) (citing *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981)), *petition denied*, 592 F.3d 173 (D.C. Cir. 2010).

[72]     Respondents sought to subpoena tax returns and investment account statements from the investors who testified at the hearing. The ALJ correctly limited the scope of these subpoenas because this information was not relevant to any issue in the proceeding. The OIP does *not* allege that the Funds were sold to non-accredited investors or that they were unsuitable investments under FINRA guidelines. Investor sophistication is not a factor when evaluating materiality, *e.g.*, *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1535 (2d Cir. 1991); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013), and although it may bear on the reasonableness of reliance in other contexts, reliance is not an element of an enforcement action brought by the Commission, *e.g.*, *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012). Nor have we considered the investors' sophistication (or lack thereof) in assessing the egregiousness of respondents' conduct for purposes of sanctions. Finally, respondents were not prejudiced by the limitation of the subpoenas. The ALJ gave Respondents significant latitude in cross-examining the witnesses about their sophistication and risk tolerance, and they successfully elicited that one of the Funds' investors was an accountant, received an MBA in finance, and had previously invested in mutual funds and individual stocks.

[73]     *James C. Dawson*, Advisers Act Release No. 3057, 2010 WL 2886183, at *4 (July 23, 2010).

We conclude that Jarkesy poses a significant danger to investors, and that bars will prevent him from putting investors at further risk. Accordingly, we find it in the public interest to bar Jarkesy from the securities industry and from participating in a penny stock offering.[74]

Respondents contend that Jarkesy should not be barred because he was not a registered securities professional and JTCM was not registered. But Respondents acknowledge that this factor "is not a barrier to" a bar, and courts and the Commission have held that the Commission has authority under Advisers Act Section 203(f) to bar persons associated with unregistered investment advisers.[75] Moreover, Exchange Act Section 15(b)(6) and Investment Company Act Section 9(b) do not require that Jarkesy be a registered securities professional or JTCM a registered investment adviser in order for us to bar him to protect the public.[76]

## B.      Cease-and-desist order

Securities Act Section 8A, Exchange Act Section 21C, and Advisers Act Section 203(k) authorize us to issue cease-and-desist orders on any person who has violated the federal securities laws.[77] In determining whether to issue such an order, we look to whether there is some risk of future violation.[78] The risk "need not be very great" and is ordinarily established by a single past violation absent evidence to the contrary.[79] We also consider whether other factors demonstrate a risk of future violations, including the public interest factors discussed above as well as whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought.[80]

---

[74]      The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), expanded the categories of associational bars that Advisers Act Section 203(f) and Exchange Act Section 15(b)(6) authorize and allowed the Commission to impose a bar on participation throughout the securities industry. Respondents' misconduct after Dodd-Frank's effective date included overvaluing defaulted notes, Radiant stock and warrants, and Galaxy stock in financial statements and monthly account statements, and making misrepresentations in a newsletter. We are relying solely on Respondents' post-Dodd-Frank conduct in imposing the industry-wide bar.

[75]      *See, e.g., Teicher v. SEC*, 177 F.3d 1016, 1017-18 (D.C. Cir. 1999).

[76]      *See John Kilpatrick*, Exchange Act Release No. 23251, 1986 WL 626187, at *5 (May 19, 1986).

[77]      15 U.S.C. §§ 77h-3(a), 78u-3(a), 80a-9(f), 80b-3(k).

[78]      *Robert L. Burns*, Advisers Act Release No. 3260, 2011 WL 3407859, at *8 n.34 (Aug. 5, 2011).

[79]      *KPMG Peat Marwick LLP*, Exchange Act Release No. 43862, 2001 WL 47245, at *24 (Jan. 19, 2001), *petition denied*, 289 F.3d 109 (D.C. Cir. 2002).

[80]      *Id.* at *26.

Here, Respondents' violations, the egregiousness of their misconduct, and the other public interest factors discussed above establish a risk of future violations. Accordingly, we find it in the public interest to order Respondents to cease and desist from committing or causing any violations or future violations of the antifraud provisions.

## C. Civil money penalties

Securities Act Section 8A, Exchange Act Section 21B, Advisers Act Section 203(i), and Investment Company Act Section 9(d) authorize us to impose civil money penalties for willful violations of the securities laws when such penalties are in the public interest.[81]  In determining the public interest, we consider:  (1) whether the act or omission involved fraud; (2) whether the act or omission resulted in harm to others; (3) the extent to which any person was unjustly enriched; (4) whether the individual has committed previous violations; (5) the need to deter such person and others from committing violations; and (6) such other matters as justice may require.[82]  A three-tier system establishes the maximum penalty that may be imposed for each violation found.  A third-tier penalty may be warranted for "each act or omission" involving fraud that, directly or indirectly, resulted in (or created a significant risk of) substantial losses to other persons or resulted in substantial gains to the wrongdoer.[83]

We find that civil money penalties are in the public interest.  Respondents repeatedly engaged in fraudulent misconduct that significantly harmed investors in the Funds and unjustly enriched themselves.  Their conduct was highly egregious and at least reckless, and warrants the imposition of civil money penalties as a deterrent to Respondents and others.  Respondents' lack of a disciplinary history does not outweigh such considerations.[84]

Third-tier penalties are warranted because Respondents' fraud resulted in substantial losses to investors and substantial gains to themselves.  Respondents' misconduct caused investors to invest or remain invested in the Funds, and Respondents stated that the Funds had lost around $15 million by the time of the hearing.  Respondents also received excessive fees from the Funds based on their overvaluation of the Funds' holdings.

We impose two maximum third-tier penalties—one for Respondents' misrepresentations and omissions in the marketing materials and in their other communications with investors, and one for Respondents' overvaluation of Fund assets.[85]  The maximum third-tier penalty for natural

---

[81]     15 U.S.C. §§ 77h-1(g)(1), 78u-2, 80a-9(d), 80b-3(i).

[82]     15 U.S.C. §§ 78u-2, 80a-9(d), 80b-3(i).

[83]     15 U.S.C. §§ 77h-1(g)(2)(C), 78u-2(b)(3), 80a-9(d)(2), 80b-3(i)(2)(C).

[84]     *Cf. Dembski*, 2017 WL 1103685, at *16 (finding that "the egregiousness of [respondent's] misconduct and the need for appropriate deterrence outweigh any consideration of the lack of a prior disciplinary history in imposing third-tier civil penalties").

[85]     *See Fields*, 2015 WL 728005, at *24 n.162 (noting that, although the statute authorizes penalties for certain acts or omissions, it "leaves the precise unit of violation undefined"); *cf. Steven E. Muth*, Exchange Act Release No. 52551, 2005 WL 2428336, at *19 (Oct. 3, 2005) ("[W]e believe that a civil money penalty based on the number of customers that Muth defrauded

(footnote continued . . .)

persons for the period of Respondents' violations is $150,000.[86]  Accordingly, we impose a total civil money penalty of $300,000 on Respondents jointly and severally.[87]

Respondents contend that we cannot impose civil money penalties for conduct that predated the Dodd-Frank Act's effective date—July 21, 2010—because we would be impermissibly applying its enhanced penalty provisions retroactively.  But Respondents' misconduct after July 21, 2010, warrants the civil money penalties imposed.[88]  In any case, the Dodd-Frank Act is not what authorizes us to impose civil money penalties in this proceeding.  Although Section 929P(a) of Dodd-Frank amended the federal securities laws by authorizing us to impose civil money penalties in administrative proceedings that were instituted to determine whether a person should be ordered to cease-and-desist from violating the securities laws,[89] prior to Dodd-Frank we had authority to impose civil money penalties in administrative proceedings that were instituted to determine whether a person should be suspended or barred from associating in certain capacities in the securities industry.[90]  As discussed above, this is such a proceeding.

## D.    Disgorgement

Securities Act Section 8A(e), Exchange Act Sections 21B(e) and 21C(e), Advisers Act Section 203, and Investment Company Act Section 9(e) authorize us to order disgorgement in this proceeding.[91]  Disgorgement deprives wrongdoers of the net profits obtained from their violations.[92]  Calculating disgorgement requires only a reasonable approximation of net profits

---

(. . . footnote continued)
. . . is appropriate.").  *See generally Brendan E. Murray*, Advisers Act Release No. 2809, 2008 WL 4964110, at *12 (Nov. 21, 2008) (stating that within the statutory framework governing civil money penalties "we have discretion in setting the amount of penalty").

[86]    *See* 17 C.F.R. § 201.1001.

[87]    The ALJ imposed a third maximum third-tier penalty of $150,000 (for a total of $450,000) on Respondents for material misrepresentations and omissions relating to their "relationship with JTF/Belesis."  As discussed *infra* note 107, we make no findings on that issue and the sanctions we have imposed are not premised on it.  Because Jarkesy is JTCM's sole owner, and it is through Jarkesy's conduct that JTCM's violations occurred, joint and several liability is appropriate for the amount of the civil penalty that we do impose.  *Donald L. Koch*, Exchange Act Release No. 31047, 2014 WL 1998524, at *25 n.246 (May 16, 2014), *petition granted in part on other grounds and denied in part*, 793 F.3d 147 (D.C. Cir. 2015).

[88]    *See supra* note 74.

[89]    *See* Pub. L. No. 111-203, 124 Stat. 1376, 1862-65 (July 21, 2010).

[90]    *See* 15 U.S.C. §§ 78u-2, 80a-9(b), (d), 80b-3(f), (i).

[91]    15 U.S.C. §§ 77h-1(e), 78u-2(e), 78u-3(e), 80a-9(e), 80b-3(j), (k).

[92]    *Montford and Co., Inc. v. SEC*, 793 F.3d 76, 83 (D.C. Cir. 2015); *see also Liu v. SEC*, 140 S. Ct. 1936, 1940, 1946 (2020) (holding that disgorgement of net profits may qualify as equitable relief for purposes of Exchange Act Section 21(d)(5)).

causally connected to the violation.[93]  Once the Division shows that its disgorgement figure is a reasonable approximation of the amount of the net profits, the burden shifts to the respondent to demonstrate that the Division's estimate is not a reasonable approximation.[94]  Where disgorgement cannot be exact, the burden of uncertainty in calculating net profits falls "on the wrongdoer whose illegal conduct created that uncertainty."[95]

The Division has shown that the $1,401,935.38 in management and performance fees JTCM received through December 31, 2010, is a reasonable approximation of Respondents' net profits causally connected to their violations.[96]  Respondents have not offered an alternative disgorgement amount or proposed what portion of their fees should be disgorged.  Rather, Respondents contend that disgorgement of all fees is appropriate only as to "ventures that are completely fraudulent" and that JTMC's fees do not necessarily equal its net profits because it had expenses on behalf of the Funds.  But ordering that Respondents disgorge all of their fees is appropriate.  Respondents' fraud concerned the decision to invest in and remain invested in the Funds.  Investors invested funds with Respondents as a result of the fraud, and the fees Respondents received represent their profits from the fraud.[97]  And because Respondents

---

[93]     *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).

[94]     *Id.* at 1232.

[95]     *Id.*; *see also SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) ("[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude."); Restatement (Third) of Restitution § 51(5)(c)-(d) & cmt. I (stating that "the claimant has the burden of proving revenues and the defendant has the burden of proving deductions," that if the claimant submits a reasonable approximation of the gain the "defendant is then free . . . to introduce *evidence* tending to show that the true extent of unjust enrichment is something less," and that any "uncertainty in calculating net profit is assigned to the defendant" since "the uncertainty arises from the defendant's wrong") (emphasis added).

[96]     We agree with the Division that when the ALJ ordered disgorgement of management fees ($1,278,597), she overlooked performance fees ($123,338.38), and that those amounts together are a reasonable approximation of JTCM's net profits.

[97]     *See Dembski*, 2017 WL 1103685, at *15 (ordering 50% owner of general partner for hedge fund to disgorge his share of fees paid by the fund to the general partner, which he received as a result of inducing his clients to purchase $4 million in limited partnership interests in the fund by misrepresenting the fund's investment strategy and projected returns and the professional background of a fund manager); *Joseph John VanCook*, Exchange Act Release No. 61039A, 2009 WL 4026291, at *17 (Nov. 20, 2009) (ordering disgorgement of all management fees earned from seven accounts held by a client even though the client had engaged in late trading in only two accounts because the client maintained all seven accounts as a result of respondent's offer to allow late trading), *petition denied*, 653 F.3d 130 (2d Cir. 2011).

introduced no evidence of any expenses paid out of those fees on behalf of the Funds,[98] there are no legitimate expenses in the record to deduct from the amount of the fees.[99]

Respondents seek an offset for the Funds' two distributions to investors (proceeds from a life settlement policy in 2011 and shares in Radiant stock in 2013). But we are not ordering that Respondents disgorge the money they deceived investors to invest in the Funds. Thus, the two distributions are irrelevant to our disgorgement calculation; they were a return on investment, not a refund of Respondents' ill-gotten fees. We also have not factored in the Funds' substantial losses in calculating disgorgement, which far outweigh the distributions. Jarkesy's contention that he lost his own money by investing in or loaning money to the Funds is likewise irrelevant.[100] We are ordering disgorgement from JTCM, not from Jarkesy.

Respondents contend that the Division "failed to present sufficient evidence showing the amount of fees paid from the Funds to the Advisor." But the Division established the payments by introducing the Funds' financial statements and Fund II's bank account transaction spreadsheet, which show that the Funds paid $1,401,935.38 to JTCM. For the reasons discussed above, we find $1,401,935.38 to be a reasonable approximation of JTCM's net profits from its wrongdoing.[101]

---

[98]    The Supreme Court decided *Liu*, supra note 92, on June 22, 2020. In *Liu*, the court stated that "courts must deduct legitimate expenses before ordering disgorgement under" Exchange Act Section 21(d)(5). Respondents had numerous opportunities to introduce evidence of their expenses previously, and following *Liu* also could have made a motion to adduce additional evidence of their expenses under Rule of Practice 452. *See* 17 C.F.R. § 201.452 (stating that a "party may file a motion for leave to adduce additional evidence at any time prior to issuance of a decision by the Commission"). Respondents have not filed such a motion.

[99]    *See optionsXpress, Inc.*, Exchange Act Release No. 78621, 2016 WL 4413227, at *36 & nn.131-32 (Aug. 18, 2016) (recognizing that even when a respondent may be "'entitled to a deduction for all *marginal* costs incurred in producing the revenues that are subject to disgorgement,'" the respondent must provide evidence to substantiate such an offset, since the "risk of uncertainty" properly falls on the wrongdoer) (quoting Restatement (Third) of Restitution § 51 cmt. H); *see also Liu*, 140 S. Ct. at 1940, 1946, 1950 (holding that, in a district court action, disgorgement that does not exceed "net profits from wrongdoing" qualifies as "equitable relief" available under Exchange Act Section 21 and that as a result "courts must deduct legitimate expenses before ordering disgorgement").

[100]   *See Seghers*, 298 F. App'x at 336-37 (holding that district court erred in denying disgorgement on the ground that defendant lost his own money in the hedge funds because "[a]ny profits that [defendant] obtained by wrongdoing are ill-gotten gains whether he retained them or lost them in the [funds] or another investment").

[101]   *See* Restatement (Third) of Restitution § 51(4) (stating that disgorgement is a remedy that seeks to "eliminate profit from wrongdoing" and that the "unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong").

Nonetheless, because *Kokesh v. SEC* held that disgorgement is a penalty for purposes of the five-year statute of limitations in 28 U.S.C. § 2462 applicable to actions seeking a "fine, penalty, or forfeiture,"[102] we limit disgorgement to the $1,064,935.38 in fees from 2009 and 2010. Also, we offset that amount by $380,000 that Respondents paid investors to settle a class action.[103] Accordingly, we order JTCM to disgorge $684,935.38, plus prejudgment interest.

Respondents argue that, under *Kokesh*, disgorgement "is subject to the maximum cap[] imposed by statute" for civil money penalties of $150,000 per third-tier violation and that the disgorgement ordered here exceeds that cap and is duplicative of the $450,000 civil money penalty the ALJ imposed. But "the sole question presented" in *Kokesh* was whether a particular pecuniary sanction—disgorgement—constituted a fine, penalty, or forfeiture "within the meaning of § 2462."[104] *Kokesh* applied Section 2462's five-year statute of limitation to disgorgement actions. It did not hold that disgorgement was the same as the civil money penalties the Commission is authorized to impose under the securities laws.[105] Congress's statutory enactments make clear that the Commission is authorized to order disgorgement *in addition* to civil money penalties, and the statutory limits apply only to civil money penalties.[106]

Finally, Respondents contend that disgorgement and the other sanctions we are imposing are unwarranted because they are harsher than those we imposed in similar cases and on two parties who settled this proceeding: Belesis and JTF.[107] But Respondents have not identified

---

[102]  *See Kokesh v. SEC*, 137 S. Ct. 1635, 1645 (2017) (quoting 28 U.S.C. § 2462).

[103]  *See e.g., Larry C. Grossman*, Exchange Act Release No. 79009, 2016 WL 5571616, at *22 (Sept. 30, 2016) ("Because the claims at issue in the arbitration overlap with Grossman's violations, we conclude as an equitable matter that the amount of disgorgement . . . should be reduced by . . . the amount he paid to settle the arbitration."), *vacated on other grounds*, No. 16-16907 (11th Cir. Aug. 11, 2017). Respondents made a total settlement payment to investors of $500,000. But because we included in disgorgement only 76% of the fees paid to JTCM, we offset disgorgement by 76% of Respondents' settlement payment. Also, we reject Respondents' request to offset disgorgement by $1,550,000 that JTF, Belesis, and MFR Group, Inc. (the Funds' former auditor) paid to investors to settle the class action. *See Ralph Calabro*, Exchange Act Release No. 75076, 2015 WL 3439152, at *44 & n.226 (May 29, 2015) (finding no basis to offset disgorgement by settlement to which respondent "made no monetary contribution").

[104]  *Kokesh*, 137 S. Ct. at 1639, 1642 n.3.

[105]  *See supra* note 91; *see also Liu*, 140 S. Ct. at 1946 (rejecting argument that the Supreme Court "effectively decided in *Kokesh* that disgorgement is necessarily a penalty").

[106]  *Compare* 15 U.S.C. §§ 77h-1(e), 78u-2(e), 78u-3(e), 80a-9(e), 80b-3(j) & (k) (authorizing the Commission to enter orders requiring disgorgement), *with* 15 U.S.C. §§ 77h-1(g), 78u-2(a) & (b), 80a-9(d), 80b-3(i) (authorizing the Commission to impose civil money penalties within the limitations imposed by the three-tier system discussed above).

[107]  The ALJ found that Respondents made material misrepresentations and omissions relating to their "relationship with JTF/Belesis," such as "Belesis's input into [Respondents'] decisions concerning [Fund] portfolio companies and [JTF's] receipt of fees from such companies." *John Thomas Cap. Mgmt. Grp. LLC, d/b/a Patriot28 LLC*, 2014 WL 5304908, at

(footnote continued . . .)

any cases in support of their contention other than the settled action with Belesis and JTF.[108] And we have long held that the remedies imposed in settled actions are inappropriate comparisons.[109]

## E.    Accounting

The statutes that authorize us to order disgorgement also authorize us to order an accounting.[110]  The Division requests an accounting for two reasons:  (i) to "provide evidence of further disgorgement to be required of the Respondents;" and (ii) "to ensure the safety of the funds' assets," which it contends are at risk because "the current value of investors' assets is unknown," and because Respondents have not "distribute[d] the assets of the funds to investors notwithstanding that Respondents" dissolved Fund I in March 2013.

---

(. . . footnote continued)

*15-19, 27.  In the exercise of our discretion, *see, e.g.*, *Swift v. United States*, 318 F.3d 250, 252-53 (D.C. Cir. 2003), we have determined to discontinue the proceeding as to that issue, and we accordingly make no findings and impose no sanctions with respect to it.  JTF and Belesis consented to findings—without admitting or denying them—that they aided and abetted and caused Respondents' breaches of fiduciary duty to the Funds in violation of Advisers Act Section 206(2); and consented to the imposition of (i) a cease-and-desist order, (ii) a censure, (iii) industry, penny stock, and investment company bars for Belesis with the right to apply for reentry after one year; (iv) civil money penalties of $100,000 for Belesis and $500,000 for JTF; and (v) disgorgement of $311,948, plus prejudgment interest, for Belesis.  *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 70989, 2013 WL 6327500, at *1, 7-8 (Dec. 5, 2013).

[108]    The ALJ correctly modified a subpoena to Belesis to exclude his tax returns and investment account statements.  Respondents assert that "numerous financial transactions involving all respondents were at issue."  But the violations we have found involved Respondents' misrepresentations to investors in marketing the Funds and their inflation of the Funds' holdings to increase the management fees paid to JTCM.  Belesis' personal finances or the taxes he paid as an individual are irrelevant to those violations.  Respondents also assert that the "relative culpability of the settling respondents versus themselves was an issue."  We again disagree.  As discussed, the settling respondents engaged in different conduct, and remedies imposed as to settling parties are not appropriate comparisons as a general matter.  *See, e.g.*, *Monterosso*, 756 F.3d at 1339; *VanCook v. SEC*, 653 F.3d 130, 144 (2d Cir. 2011).

[109]    *Michael C. Pattison, CPA*, Exchange Act Release No. 67900, 2012 WL 4320146, at *11-12 (Sept. 20, 2012); *see also Leslie A. Arouh*, Exchange Act Release No. 50889, 2004 WL 2964652, at *11 (Dec. 20, 2004) (rejecting respondent's argument that sanction was unjust where "more culpable" respondent who settled with the Commission received lesser sanction because "the appropriate sanction depends on the facts and circumstances of each particular case" and "cannot be precisely determined by comparison with action taken in other proceedings").

[110]    15 U.S.C. §§ 77h-1(e), 78u-2(e), 78u-3(e), 80a-9(e), 80b-3(j), (k); *see also Laurie Jones Canady*, Exchange Act Release No. 41250, 1999 WL 183600, at *11-12 & n.50 (Apr. 5, 1999).

The principal purpose of an accounting is to fix, or lend greater clarity to, the amounts to be disgorged.[111] Here, the OIP did not explicitly seek an accounting (even though it did specify disgorgement and civil penalties as potentially appropriate remedial action),[112] the Division did not before the ALJ identify any specific evidentiary gaps pertaining to disgorgement or the disposition of the funds' assets,[113] and the Division made only a conclusory request for an accounting in its briefs to the ALJ.[114] Under these circumstances—and because we are able to make a satisfactory assessment of the amount to be disgorged on the basis of the existing record—we will not delay these proceedings further by ordering an accounting.[115]

## F.    Fair Fund

Based on the facts of this case, we find that it is appropriate to order that the disgorgement, prejudgment interest, and civil penalty be used to create a Fair Fund for the benefit of investors harmed by Respondents' violations.[116]

---

[111]    *See, e.g.*, *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990) (stating that the purpose of an accounting "is to identify assets subject to disgorgement").

[112]    *John Thomas Capital Mgmt. Grp. LLC, d/b/a Patriot28 LLC*, 2013 WL 1180836, at *13.

[113]    *Cf. First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) (affirming denial of accounting because, among other things, plaintiff had full access to defendant's records during discovery and "could ascertain the correct amount of compensation to which [it] was entitled"); *Felton v. Teel Plastics, Inc.*, 724 F. Supp. 2d 941, 952 (W.D. Wis. 2010) (denying accounting because the plaintiff had not established "that ordinary discovery is inadequate to provide the answers he seeks").

[114]    *John Thomas Capital Mgmt. Group LLC, d/b/a Patriot28 LLC*, 2014 WL 5304908, at *30 n.39 ("The Division, however, nowhere provides any more detail about this request . . . .").

[115]    Our denial of the Division's request for an accounting in the context of the instant proceeding expresses no view as to whether an accounting might be appropriately pursued in another forum or by another party asserting different claims (e.g., the Funds' investors in a state-law action for breach of contract or unjust enrichment).

[116]    17 C.F.R. § 201.1100.  The Funds had about 120 investors.  The Division has not expressed a view on whether to create a Fair Fund here, but the statutory and regulatory scheme vests the Commission with the discretionary authority to create one in "any administrative proceeding in which a final order is entered against a respondent requiring disgorgement and payment of a civil money penalty."  *Adoption of Amendments to the Rules of Practice*, Exchange Act Release No. 49412, 2004 WL 503739, at *5 (March 19, 2004); *see also* 15 U.S.C. § 7246(a) (providing for creation of Fair Fund "at the direction" of the Commission); *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82-85 (2d Cir. 2006) (recognizing Commission's discretion regarding creation and terms of a Fair Fund).

### III.   Respondents' Constitutional and Procedural Claims

**A.   Alleged ALJ Bias**

Respondents argue that "ALJs' status as mere employees infects the hearings they conduct" and raises a "substantial question of bias." They assert that there is a "substantial danger that the Division [of Enforcement] does not see ALJs as sufficiently removed and independent" because ALJs, like Enforcement staff, are employees of the Commission.

Supreme Court precedent forecloses the argument that the "structure of agency employment of ALJs is a . . . reason to conclude ALJs" are biased.[117]  As the Supreme Court has explained, "[t]he process of agency adjudication is currently structured [under the APA] so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency."[118]  It is well-settled that the Commission does not "improperly act[] as both an enforcer and arbiter" simply because "SEC employees gathered and presented the evidence," and the hearing is held before an ALJ.[119]  The Supreme Court has held that the "combination of investigative and adjudicative functions" within an agency "does not, without more, constitute a due process violation."[120]  There must be "special facts and circumstances present in the case" that indicate "that the risk of unfairness is intolerably high."[121]  Respondents cite no such facts and circumstances here.

Respondents rely on a *Wall Street Journal* article in which a former ALJ of the Commission, who left the Commission years before the hearing in this matter, alleged that she experienced pressure from the Chief ALJ to rule in favor of the Division during her tenure at the Commission.[122]  But ALJs are presumed to be unbiased.[123]  To overcome this presumption, the

---

[117]    *Harlin v. DEA*, 148 F.3d 1199, 1204 (10th Cir. 1998) (citing *Withrow v. Larkin*, 421 U.S. 35 (1975), *Butz v. Economou*, 438 U.S. 478 (1978), and *Ramspeck v. Fed. Trial Exam'rs Conference*, 345 U.S. 128 (1953)); *see also Knapp v. USDA*, 796 F.3d 445, 468 (5th Cir. 2015) ("Judicial Officer's employment relationship with the Department does not suffice to demonstrate bias").

[118]    *Butz*, 438 U.S. at 513.

[119]    *Sheldon v. SEC*, 45 F.3d 1515, 1518-19 (11th Cir. 1995); *see also Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (observing that combination of functions within agencies has been commonplace "since the beginning of the Republic"); *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty. Tex.*, 57 F.3d 436, 446 (5th Cir. 1995) (holding that an agency's "dual role[] of investigating and adjudicating disputes and complaints" does not establish unconstitutional bias).

[120]    *Withrow*, 421 U.S. at 58.

[121]    *Id.*

[122]    *See* Jean Eaglesham, *SEC Wins with In-House Judges*, The Wall Street Journal (May 6, 2015).  The Commission requested that its Office of the Inspector General investigate the allegations made in the *Wall Street Journal* article.  The OIG's investigation was completed in January 2016 and "did not develop any evidence to support the allegations of improper

(footnote continued . . .)

party claiming bias must establish a "conflict of interest or some other specific reason for disqualification,"[124] such as where the ALJ's behavior, "in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"[125]

Far from presenting the requisite "convincing evidence that 'a risk of actual bias or prejudgment'" is present, Respondents offer only unsupported "speculation or inference" in attempting to link the former ALJ's allegations to this proceeding or the ALJ who presided over it.[126] That is not enough to demonstrate bias or unfairness here.[127] Nor is it enough to warrant further factual development as to that claim.[128] We accordingly deny Respondents' request for discovery relating to this issue and reject the claim.

## B. Alleged Prejudgment and *Ex Parte* Communications

Respondents contend that the Commission engaged in prejudgment by accepting a settlement with Belesis and JTF. Although the Commission's order accepting that settlement stated that the "findings herein . . . are not binding on any other person or entity in this or any

---

(. . . footnote continued)

influence" or "to support the allegation that ALJ personnel were pressured to shift the burden of proof to respondents." *See* Office of Inspector General, U.S. Securities and Exchange Commission, Report of Investigation, Case #15-ALJ-0482-I, *available at* https://www.sec.gov/ oig/reportspubs/Final-Report-of-Investigation.pdf (last visited September 3, 2020).

123    *See, e.g.*, *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow*, 421 U.S. at 47.

124    *Schweiker*, 456 U.S. at 195.

125    *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)); *accord Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).

126    *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 364 (6th Cir. 2004) (rejecting argument that ALJ in a social security disability case was biased); *see also Wells v. SSA*, 777 F. App'x 429, 433 (11th Cir. 2019) (requiring "evidence in the record establishing any partiality on the part of or a specific reason to disqualify the administrative law judge"); *Valentine v. SSA*, 574 F.3d 685, 690 (9th Cir. 2009) (holding that "pointed questions," "general preconceptions," and "expressions of impatience, dissatisfaction, annoyance, and even anger" do not "come close to the required show" to overcome presumption that ALJs are unbiased).

127    A showing of actual bias is required to compel disqualification of an ALJ because the "appearance of impropriety standard is not applicable to administrative law judges." *Bunnell v. Barnhart*, 336 F.3d 1112, 1114 (9th Cir. 2003) (collecting cases); *Greenberg v. Bd. of Governors of Fed. Reserve Sys.*, 968 F.2d 164, 166-67 (2d Cir. 1992) (requiring case-specific showing that the "risk of unfairness is intolerably high").

128    We previously deferred ruling on Respondents' request for discovery regarding their "claim that their 'right to a fair forum and an impartial and unbiased judge has been violated,'" and now deny that request. *John Thomas Capital Mgmt. Grp. LLC*, 2015 WL 4608057, at *1.

other proceeding,"[129] Respondents argue that the Commission is now unable to fairly adjudicate the case against them. Respondents also contend that the Commission engaged in impermissible *ex parte* communications with the Division in connection with that settlement.

Respondents raised similar claims in a petition for interlocutory review, which we denied.[130] That denial has no force or effect given our subsequent order "vacat[ing] any prior opinion" we issued in this matter.[131] In any case, a denial of interlocutory review does not preclude a party from renewing its arguments if and when it petitions the Commission for review of an initial decision.[132] Therefore, we have considered Respondents' submissions without deferring or giving weight to our order denying interlocutory review. Nonetheless, we find persuasive the reasoning we articulated in our prior order[133] and adopt it anew.[134]

We briefly summarize that reasoning here. No prejudgment of a non-settling respondent's case occurs even when an agency may have acquired some familiarity with the underlying events at another stage of the proceedings involving respondents who settle. Specifically, the "consideration of [certain respondents'] offer of settlement" during the pendency of proceedings against "other respondents [is] proper and [does] not violate the

---

[129] *John Thomas Capital Mgmt. Grp. LLC,* Exchange Act Release No. 70989, 2013 WL 6327500, at *1 n.1 (Dec. 5, 2013).

[130] *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 71415, 2014 WL 294551 (Jan. 28, 2014).

[131] *Pending Admin. Proceedings*, Exchange Act Release No. 83907, 2018 WL 4003609, at *1 (Aug. 22, 2018).

[132] *Gary L. McDuff*, Exchange Act Release No. 78066, 2016 WL 3254513, at *6 (June 14, 2016).

[133] A prior decision reversed or vacated on other grounds is often treated as persuasive authority by the court of appeals. *See Garcia-Dorantes v. Warren*, 801 F.3d 584, 603 (6th Cir. 2015) (holding that the district court "correctly considered" and followed as persuasive authority a Sixth Circuit decision "[d]espite its reversal on other grounds"); *In re Digital Island Sec. Litig.*, 357 F.3d 322, 334 n.17 (3d Cir. 2004) ("We regard [the court's prior case] as persuasive, despite the fact that it was reversed on other grounds . . ."); *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998) ("[O]ur prior affirmance . . . remains viable as persuasive authority, notwithstanding the Supreme Court's vacatur . . . on other grounds."); *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1298 (7th Cir. 1989) ("decision vacated by Supreme Court remains persuasive precedent where Court did not reject the decision's underlying reasoning"); *see also United States v. Funds in the Amount of One Hundred Thousand*, No. 03 C 03644, 2016 WL 3459527, at *1 (N.D. Ill. June 24, 2016) (declining to reverse or reconsider district court's own pre-trial and other evidentiary rulings made prior to reversal and remand of case on other grounds).

[134] *John Thomas Capital Mgmt. Grp. LLC*, 2014 WL 294551, at *2 & nn.11-15 (collecting cases).

Administrative Procedure Act . . . or our rules regarding *ex parte* communications."[135]  As the Supreme Court has recognized, the APA "'does not . . . forbid the combination with judging of instituting proceedings [or] negotiating settlements.'"[136]

Respondents claim that our decisions rejecting claims of disqualification or impermissible *ex parte* communications on analogous facts have "never been reviewed by a federal court, and undoubtedly would not be upheld."[137]  This is incorrect.  For example, in *Edward Sinclair*, the non-settling respondent, who was an employee of a broker-dealer, argued that any Commissioner who participated in the decision to accept the broker-dealer's offer of settlement for failing to supervise should be disqualified.[138]  We rejected this argument, and the Second Circuit agreed by "find[ing] no merit in the argument that [the] Commissioner . . . had prejudged [the employee's] case by participating in the Commission's decision to accept [the broker-dealer's] settlement offer setting forth certain stipulated facts."[139]

More recently, in *The Stuart-James Co., Inc.*, we again concluded that acceptance of a settlement did not require dismissal of the administrative proceeding as to the non-settling respondents.  We reasoned that, "[t]aken at face value, the respondents' arguments suggest that it

---

[135]     *C. James Padgett*, Exchange Act Release No. 38423, 1997 WL 126716, at *16 (Mar. 20, 1997), *petition denied*, 159 F.3d 637 (D.C. Cir. 1998).

[136]     *Withrow*, 421 U.S. at 57 n.24 (quoting 2 K. Davis, *Administrative Law Treatise* § 13.11, p. 249 (1958)); *see also Richardson v. Perales*, 402 U.S. 389, 410 (1971) (upholding agency structure in which ALJs both investigate and decide claims in the first instance).

[137]     The principal case relied upon by respondents, *Antoniu v. SEC*, is inapposite.  877 F.2d 721 (8th Cir. 1989).  There, a court found prejudgment where a Commissioner made a speech singling out the respondent as an "indifferent violator" and announcing that the bar imposed on him had been "made permanent," even though the Commission had yet to issue a final opinion. *See id.* at 723.  The circumstances here are entirely different:  the agreed-upon factual findings in the Commission's order accepting the settlement as to Belesis and JTF are expressly limited by the proviso that they are not "binding on any other person or entity in this or any other proceeding binding on any other person or entity in this or any other proceeding."  Moreover, the violations for which we have imposed sanctions as to Respondents—their misrepresentation of the identity of the Funds' auditor and prime broker and the Funds' investment parameters and safeguards and their overvaluing of the Funds' holdings to increase fees—have only an attenuated connection to the stipulated facts agreed to by Belesis and JTF.  *John Thomas Capital Mgmt. Grp. LLC*, 2013 WL 6327500, at *1, 7-8.  As noted above, Respondents' violations and sanctions do not turn on whether they made material misrepresentations related to their relationship with JTF and Belesis.  *See supra* notes 87 and 107.

[138]     Exchange Act Release No. 9115, 1971 WL 120487, at *4 (Mar. 24, 1971).

[139]     *Sinclair v. SEC*, 444 F.2d 399, 401-02 (2d Cir. 1971) (finding no grounds for disqualification where, as here, the settled decision "stated that it was not binding on the other respondents" and the Commission's "findings with respect to [the non-settling respondent] were based upon presentation of evidence before a Hearing Examiner, findings independently made by him on the basis of the proof, and independent review by the Commission").

is virtually impossible for the Commission . . . to . . . entertain individual settlements in proceedings involving multiple respondents," and rejected this result as "contrary to the Administrative Procedure Act" and "common sense."[140]  We adhered to *The Stuart-James Co., Inc.* in a subsequent proceeding,[141] and in affirming the D.C. Circuit found the issues so well-settled that they "occasion[ed] no need for a published opinion."[142]

In short, ample precedent supports our rejection of Respondents' contention that an adjudicative body is precluded from further consideration of a multi-party case once it has passed upon one party's settlement.  That conclusion, if accepted, necessarily would entail that a judge could not accept guilty pleas from fewer than all co-conspirators in a multiple-defendant case, which is not the law:  "The mere fact that a judge has . . . accepted the guilty plea of a coconspirator . . . does not establish prejudice or bias."[143]

Additionally, Respondents assert that the Commission's acceptance of the offer of settlement "effectively removed" their ability to obtain corroborating testimony from Belesis by "preclud[ing] [him] from testifying" as to the "truth."  But the offer of settlement expressly states that Belesis' "testimonial obligations" are unaffected by his settlement.  Only a "[s]ubstantial [government] interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant," and a routine plea or settlement agreement does not violate due process.[144]  At any rate, given that Belesis' name did not appear on Respondents' pre-

---

[140]    Exchange Act Release No. 28810, 1991 WL 291802, at *1 (Jan. 23, 1991).  A blanket rule that prohibited considering settlements that did not completely resolve a multi-respondent proceeding would be in tension with the APA, which requires agencies to give "all interested parties" the opportunity for the "submission and consideration of . . . offers of settlement, when time, the nature of the proceeding, and the public interest permit."  5 U.S.C. § 554(c)(1).

[141]    *Padgett*, 1997 WL 126716, at *15-16.

[142]    *Sullivan v. SEC*, 159 F.3d 637 (table), 1998 WL 388511, at *1 (D.C. Cir. 1998) (per curiam); *see also infra* note 143 (collecting cases holding that acceptance of a guilty plea of a defendant does not preclude judge from presiding over trial of alleged co-conspirators).

[143]    *United States v. Gigax*, 605 F.2d 507, 511 (10th Cir. 1979); *see also FTC v. Cement Inst.*, 333 U.S. 683, 702-03 (1948) ("[J]udges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court."); *United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir. 1976) (stating that information acquired "by way of guilty pleas of codefendants or alleged coconspirators[] or . . . pretrial proceedings" does not require disqualification); *BCCI Holdings v. Khalil*, 182 F.R.D. 335, 340 (D.D.C. 1998) (explaining that "no appearance of prejudice" arises even when a district court "presided over criminal and civil litigation" arising out of same facts and "accepted guilty pleas on the basis of largely uncontested factual proffers").

[144]    *United States v. Terzado-Madruga*, 897 F.2d 1099, 1108 (11th Cir. 1990) (holding that due process was not violated where the "plea agreement did not prohibit the witness from testifying for the defendant, nor condition its operation upon the witness' refusal to testify) (quotation marks omitted; alteration in original); *accord United States v. Yarbrough*, 852 F.2d

(footnote continued . . .)

hearing witness list and they subsequently represented that Belesis would assert his Fifth Amendment privilege against self-incrimination if called as a witness at the hearing, we do not see how Respondents could have been prejudiced by this provision in the offer of settlement.

Finally, we find that Respondents' request to disqualify the entire Commission fails as a matter of law. The "Commission is the only governmental agency with the statutory authority" to institute and adjudicate administrative proceedings under the securities laws, which means that "disqualification cannot be permitted to prevent the Commission, the only tribunal with the power to act in this matter, from performing its duties."[145]

In sum, our findings as to Respondents are "based solely on the record" adduced before the law judge and have "in no way [been] influenced by our findings as to [Belesis and JTF] based on [their] offer of settlement."[146] We find no basis either for dismissing these proceedings or for disqualification on the basis that Respondents' cases have been prejudged.[147]

## C. The Division of Enforcement's Disclosure Obligations

Respondents claim that the Division of Enforcement did not comply with its disclosure obligations. Under Rule of Practice 230, the Division must make its investigative file available to Respondents and may not withhold, "contrary to the doctrine of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), documents that contain material exculpatory evidence."[148] The Division produced the investigative file in the form the Division maintained it—a text-searchable Concordance

---

(. . . footnote continued)

1522, 1537-38 (9th Cir. 1988) (setting forth "general rule" that a co-defendant "who has pled guilty may testify against non-pleading defendants without raising due process concerns").

[145]     *Jean-Paul Bolduc*, Exchange Act Release No. 43884, 2001 WL 59123, at *2 (Jan. 25, 2001) (applying the "rule of necessity"); *Augion-Unipolar Corp.*, Securities Act Release No. 5113, 1970 WL 103717, at *2 (Nov. 18, 1970). Each Commissioner has determined that his or her disqualification is not appropriate. *See* 17 C.F.R. § 200.60 (providing that each member shall individually rule on the question of his or her disqualification).

[146]     *Sinclair*, 1971 WL 120487, at *4.

[147]     We deny Respondents' request for discovery regarding the Division's communications with the Commission relating to the Settling Respondents' offer of settlement. These communications are irrelevant because they do not relate to the Commission's resolution of Respondents' claims and do not run afoul of either the APA or our rules governing *ex parte* communications. *Padgett*, 1997 WL 126716, at *16. Given their lack of relevance, the law judge correctly denied Respondents' subpoena requests directed at them.

[148]     17 C.F.R. § 201.230. Under *Brady*, the prosecution in a criminal case must disclose materially exculpatory or impeaching evidence to the defendant. *Brady* has no direct application to our administrative proceedings. *optionsXpress, Inc.*, Exchange Act Release No. 70698, 2013 WL 5635987, at *3 & n.15 (Oct. 16, 2013).

database.[149]  It also provided Respondents with transcripts of investigative testimony taken before the institution of proceedings, exhibits used for those interviews, a declaration summarizing the potentially exculpatory material provided by those witnesses whose interviews were not transcribed, and a withheld document list and accompanying declaration stating that the listed documents did not contain material exculpatory evidence.

As with their claim of prejudgment, Respondents initially raised their discovery objections in a prior petition for interlocutory review, which we denied.[150]  We again have considered Respondents' submissions without deferring or giving weight to our now-vacated order denying interlocutory review.  Nonetheless, we continue to find persuasive the analysis we previously set forth, and adopt it as our present resolution of Respondents' *Brady* claim.[151]

Contrary to Respondents' submission, the Division was not obliged to direct them "to specific items of potentially exculpatory evidence within . . . a larger body of disclosed material" or provide a "roadmap" for respondents to most efficiently employ those documents.[152]  Even in the criminal context, it is settled that an "open file" production satisfies the government's disclosure obligations and does not violate the defendant's due process rights.[153]  Although the "Supreme Court in *Brady* held that the Government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case."[154]  Respondents cite several district court cases for the proposition that "large, haphazard document productions" may, under some circumstances, "violate the Federal Rules of Civil Procedure."  But the Federal Rules of Civil Procedure do not apply in our administrative proceedings, and the investigative file was produced in the manner maintained by the Division.[155]  Respondents offer no evidence to substantiate the assertion that the production was "haphazard."

Respondents claim that their due process rights also were violated because they had the opportunity to review only a "miniscule percentage" of these documents and lacked sufficient

---

[149]     A significant proportion of the file consisted of documents provided to the Division by respondents in response to investigative subpoenas and document requests.

[150]     *John Thomas Capital Mgmt. Grp.*, Exchange Act Release No. 30820, 2013 WL 6384275, at *6 (Dec. 6, 2013).

[151]     *See supra* note 133 (collecting cases where a decision vacated on unrelated grounds retains value as persuasive authority).

[152]     *John Thomas Capital Mgmt. Grp.*, 2013 WL 6384275, at *6.

[153]     *See id.* at *6 & n.41 (citing *Rhoades v. Henry*, 638 F.3d 1027, 1039 n.12 (9th Cir. 2011); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010); *United States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997)); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) *United States v. Wooten*, 377 F.3d 1134, 1142 (10th Cir. 2004)).

[154]     *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990).

[155]     *See, e.g.*, *John A. Carley*, Exchange Act Release No. 50954, 2005 WL 17992, at *2 n.6 (Jan. 3, 2005).

time to prepare for their defense. Although the Division's investigative file was voluminous, Respondents did not have to laboriously conduct a page-by-page review; the file was produced in an electronically searchable database format, which allowed them to locate documents matching specified parameters. And Respondents had sufficient time to prepare because the file was produced to them in May 2013 and they received several adjournments of the hearing, which did not commence until nine months later in February 2014.

Insofar as Respondents were denied an even lengthier continuance, we do not believe that to have been the product of an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."[156] Respondents have been represented by counsel since the beginning of the investigation, several years before the Commission instituted proceedings in March 2013. Shortly afterwards, in May 2013, Respondents replaced their counsel with new lawyers who were unfamiliar with the record; subsequently, the ALJ twice postponed the hearing at Respondents' request.[157] Respondents' decision to substitute counsel did not, however, entitle them to dictate the timing of the hearing.[158] Finally, in August 2018, the Commission gave Respondents the opportunity for a new hearing before a different ALJ who would prepare an initial decision.[159] Respondents elected to forgo "another hearing on the same issues before another [ALJ]," and instead requested that the Commission consider the matter based on the original initial decision and the existing record.[160] Under the circumstances, we find that Respondents had a sufficient understanding of the matters in dispute, the relevant evidence, and a meaningful opportunity to prepare and present a defense, which is all that due process requires.

We also reject Respondents' specific *Brady* allegations, which relate to witness interview notes prepared by Division staff in connection with the investigation of Respondents and in anticipation of these proceedings. Because such notes reflect attorneys' mental impressions, opinions, and analyses, they are entitled to heightened work-product privilege protection.[161] The

---

[156]     *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotation marks omitted); *Dearlove*, 2008 WL 281105, at *35.

[157]     Respondents also secured a month-long interim stay of proceedings during the pendency of their petition for interlocutory review as to their *Brady* claim. *See John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 70841, 2013 WL 5960689 (Nov. 8, 2013).

[158]     *See, e.g.*, *United States v. Whitehead*, 487 F.3d 1068, 1071 (8th Cir. 2007); *Berri v. Gonzales*, 468 F.3d 390, 394-95 (6th Cir. 2006); *United States v. Todisco*, 667 F.2d 255, 261 (2d Cir. 1981); *see also United States v. Uptain*, 531 F.2d 1281, 1286 (5th Cir. 1976) (holding that the party's "role in shortening the effective preparation time" is "highly relevant" in assessing "claims of inadequate preparation time").

[159]     *Pending Admin. Proceedings*, 2018 WL 4003609, at *1.

[160]     *John Thomas Capital Mgmt. Grp. LLC*, 2019 WL 857535, at *1.

[161]     *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981); *United States v. Gupta*, 848 F. Supp. 2d 491, 496 (S.D.N.Y. 2012); *SEC v. Treadway*, 229 F.R.D. 454, 455-56 (S.D.N.Y. 2005); *cf.* Fed. R. Civ. P. 23(b)(3)(B).

Division satisfied its obligations under Rule of Practice 230 by providing Respondents with a declaration setting out the potentially exculpatory facts contained in those documents.[162]

Respondents express skepticism as to whether the Division's summaries "contain all of the *Brady* material that the Division was required to produce" and ask that the Commission conduct an *in camera* review of the withheld notes. We do not believe that such action is warranted. It is well-established that the party seeking *in camera* review first must make a "plausible showing" that the undisclosed documents in question contain information that is both favorable and material to its defense.[163] "[I]t takes more than the adverse party's conclusory suspicions to impel the adjudicator" to conduct an *in camera* review and "delve behind the government's representation that it has conducted a *Brady* review and found nothing."[164] Here, "[e]xcept for bare speculation, [Respondents] ha[ve] nothing to suggest the existence" of favorable and material evidence in the notes that was omitted from the Division's summaries.[165]

## D. Separation of Powers

Respondents assert that the Dodd-Frank Act's "transfer of coextensive administrative enforcement to the Commission" without "specific guidelines or an intelligible principle" to govern the Commission's selection of forum violates the separation of powers. According to Respondents, this "power of the Commission to institute administrative enforcement actions" is "legislative" in nature because it affects the "legal rights, duties and relations" of respondents.

This argument lacks merit. The provisions of the Dodd-Frank Act at issue confer on the Commission authority to obtain civil penalties in administrative cease-and-desist proceedings brought to enforce the securities laws. Contrary to Respondents' argument, whenever the Commission brings an enforcement action—whether in federal district court or in an administrative proceeding—it is not acting in a *legislative* capacity; instead, it is acting in an *executive* capacity, enforcing laws that Congress has enacted or regulations promulgated by the

---

[162] *optionsXpress, Inc.*, 2013 WL 5635987, at *4 & n.19.

[163] *See, e.g.*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15 (1987); *Davis v. Litscher*, 290 F.3d 943, 947-48 (7th Cir. 2002); *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002); *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001); *United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996); *Love v. Johnson*, 57 F.3d 1305, 1313-15 (4th Cir. 1995).

[164] *Landry v. FDIC*, 204 F.3d 1125, 1137 (D.C. Cir. 2000); *see also optionsXpress, Inc.*, 2013 WL 5635987, at *6.

[165] *See Williams-Davis*, 90 F.3d at 513; *see also John Thomas Capital Mgmt. Grp.*, 2013 WL 6384275, at *4-5 (concluding that certain inadvertently produced notes "do not, in fact, contain material exculpatory or impeachment evidence that has not elsewhere been disclosed to respondents"). Because Respondents have failed to make the requisite "plausible showing" that the notes contain *Brady* material, we deny their *Brady* claim without the need to conduct an *in camera* review and deny their request for discovery and to adduce additional evidence on this claim.

Commission pursuant to its Congressionally authorized rulemaking authority.[166] Congress's decision to create a statutory scheme that allows the Commission to choose the forum in which it brings enforcement actions does not constitute a delegation of legislative authority.[167] The selection of a forum is not a legislative act, but part of the discretionary decisionmaking authority that the Commission exercises in carrying out its mandate to enforce—*i.e.*, execute—the law,[168] akin to the Commission's decisions regarding whether or not to bring an enforcement action, which parties should be named respondents, and what statutory violations to assert.[169]

Relying on *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, Respondents assert that any "Government action[] that ha[s] the 'purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative branch,'" constitutes legislative action.[170] And invoking *INS v. Chadha*, Respondents claim that legislative action includes "decision-making surrounding agency adjudications" insofar as they "'alter[] the legal rights, duties, and relations of persons . . . outside the legislative branch,' and involve 'determinations of policy.'"[171] Neither case supports Respondents' contentions.

---

[166] *See, e.g.*, *Flint v. City of Belvidere*, 791 F.3d 764, 796 (7th Cir. 2015) ("[P]rosecution of crimes is a quintessentially executive function.") (quotation marks omitted); *United States v. Lujan*, 504 F.3d 1003, 1007 (9th Cir. 2007) (stating that "investigat[ion]" and "prosecut[ion]" are "quintessential law enforcement functions vested in the executive branch"); *see also In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) (characterizing "civil enforcement decisions brought by the Federal Government"—there, by the Nuclear Regulatory Commission, an independent agency—as "presumptively an exclusive Executive power").

[167] Respondents assert that Congress can authorize an agency to bring an administrative proceeding only when those procedures are exclusive, and the agency lacks discretion to bring an enforcement action in federal district court. Their sole authority for this proposition is an out-of-context quote from *Free Enterprise Fund v. PCAOB*. There, the Court addressed whether a federal district court had jurisdiction to hear a constitutional challenge to the validity of the PCAOB or whether that challenge had to first proceed through the administrative process. It was in that context that the Court stated that procedures for *judicial review* of agency action are generally considered exclusive when they are intended to allow "agency expertise to be brought to bear on particular problems." *See* 561 U.S. 477, 489 (2010) (quotation marks omitted).

[168] *See, e.g.*, 15 U.S.C. §§ 80b-3, 80b-9; 17 C.F.R. § 201.5(b) ("[T]he Commission may in its discretion take one or more of the following actions: Institution of administrative proceedings . . . , initiation of injunctive proceedings in the courts, . . .").

[169] *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch . . . .") (quotation marks and citation omitted).

[170] 501 U.S. 252, 276 (1991).

[171] 462 U.S. 919, 952, 954 (1983).

The underlying issue in these two cases was whether Congress could fashion a statutory scheme in which legislative power was exercised other than through the legislative process contemplated by Article I of the Constitution—that is, passage of a bill by both houses of Congress and presentment to the President. In *Metropolitan Washington Airports Authority*, Congress created a board composed of members of Congress with authority to veto decisions made by a regional airport authority; in *Chadha*, either house of Congress reserved the right to nullify the Attorney General's decision to allow a removable individual to remain in the United States. Nothing like this is at issue here. Congress has empowered the Commission to enforce the securities law in an administrative forum, without reserving to itself (or any subset of its members) the power to overturn our enforcement decisions. In short, Congress does not unlawfully delegate legislative authority in violation of separation of powers when it provides agencies the authority to pursue administrative remedies to enforce the laws that it has passed.[172]

## E.    Removal

Citing the Supreme Court's decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*,[173] Respondents assert that "ALJs' . . . appointments . . . violate the Appointments Clause of Article II of the Constitution" on the ground that they are inferior officers "separated from the President by at least two layers of 'for cause' tenure protection."

In *Free Enterprise Fund*, the Court held that the structure of the Public Company Accounting Oversight Board was unconstitutional because it "commit[ed] substantial executive authority to officers protected by two layers of for-cause removal."[174] Members of the PCAOB enjoyed "rigorous" protections from removal: A member could be removed only upon a finding by the Commission that the member "willfully violated" the Sarbanes-Oxley Act, the securities laws, or the PCAOB's rules; "willfully abused" his authority; or "without reasonable justification or excuse," failed to enforce compliance with the statutes, rules, or PCAOB standards.[175] And the Court assumed that members of the Commission, in turn, were removable by the President only for "inefficiency, neglect of duty, or malfeasance in office."[176] The Court held that the "novel" and "unusual" barriers to removal created by this two-tiered scheme left the President

---

[172]    To whatever extent the Commission's choice of forum can be seen as involving some policy judgment, the Court has held that Congress has considerable leeway in delimiting the boundaries of that judgment, even in the context of quasi-legislative, rulemaking authority. *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 464 (2001) ("We have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.") (quotation marks and citations omitted). The Court has never held that inherently discretionary executive decisionmaking, such as whom, where, and how to prosecute, must be constrained by specific and objective criteria.

[173]    561 U.S. 477 (2010).

[174]    *Id.* at 505.

[175]    *Id.* at 486, 496 (quotation marks omitted).

[176]    *Id.* at 487.

with insufficient ability to supervise the PCAOB's members, who collectively exercised "expansive powers to govern an entire industry."[177]

*Free Enterprise Fund* does not compel the conclusion that the statutory restrictions on removal of ALJs violate separation-of-powers principles. Section 7521 of the APA provides that an ALJ may be removed by an agency—here, the Commission—for "good cause established and determined by" the Merit Systems Protection Board, whose members themselves are removable by the President "only for inefficiency, neglect of duty, or malfeasance in office."[178] The Supreme Court has long recognized that Congress may impose such limited restrictions on the President's removal power, including, for example, for-cause removal restrictions on the power to remove principal officers of certain independent agencies and for-cause restrictions on a principal officer's ability to remove inferior officers.[179] *Free Enterprise Fund* itself declined to extend its holding to ALJs, noting that unlike members of the PCOAB, many ALJs—including those employed by the Commission—"perform adjudicative rather than enforcement or policymaking functions, or possess purely recommendatory powers."[180]

*Free Enterprise Fund* does not, in short, hold that multiple layers of removal protections are *per se* unconstitutional. While ALJs' status as inferior officers who enjoy such removal protections implicates separation-of-powers principles, Section 7521 can be construed to alleviate any constitutional concerns. In particular, construing Section 7521 to permit agency heads to remove ALJs for performance-related reasons, subject to limited review by the MSPB, provides constitutionally sufficient supervision, consistent with Article II. The term "good cause" is undefined in the APA, but we believe it is best read to authorize removal of an ALJ for misconduct, poor job performance, or failure to follow lawful directives.[181] This construction provides agencies with constitutionally sufficient latitude to remove an ALJ for appropriate job-related reasons, thereby ensuring the agency heads'—and by extension, the President's—control over inferior officers. Although this construction would still involve multiple layers of protection for ALJs at independent agencies, it comports with the constitutional requirements recognized in *Free Enterprise Fund*. Accordingly, the Commission does not find persuasive

---

[177]    *Id.* at 485, 496.

[178]    5 U.S.C. §§ 1202(d), 7521(a).

[179]    *Free Enter. Fund*, 561 U.S. at 493-94 (collecting cases); *see, e.g.*, *Wiener v. United States*, 357 U.S. 349, 353-54 (1958) (upholding removal restrictions of War Claims Commission members in part because they performed "quasijudicial" rather than purely executive functions).

[180]    561 U.S. at 507 n.10.

[181]    *See* Black's Law Dictionary 822 (4th ed. 1951) (defining "good cause" as a "substantial" or "legally sufficient ground or reason"). Our briefs in other proceedings have set forth at length this analysis, and we do not repeat it here. Br. for the Securities and Exchange Commission at 45-53, *Lucia v. SEC*, No. 17-130 (S. Ct.); Reply Br. for the Securities and Exchange Commission at 17, *Lucia v. SEC*, No. 17-130 (S. Ct.); SEC Br. 30-33, *Cochran v. SEC*, No. 19-10396 (5th Cir.); Defs.' Mem. in Supp. of Mot. to Dismiss at 14-18, *Raymond J. Lucia Cos. v. SEC*, Case No.: 3:18-cv-02692-DMS-JLB (S.D. Cal.).

Respondents' contention that the longstanding, limited "good cause" removal protection provided for ALJs in Section 7521 violates the separation of powers.

## F.     The Seventh Amendment

Respondents argue that the provisions of the Dodd-Frank Act that authorize the imposition of civil penalties against unregistered persons in administrative proceedings violate their Seventh Amendment right to a jury trial.  We have repeatedly rejected claims that our administrative proceedings violate the Seventh Amendment.[182]  The Supreme Court held in *Atlas Roofing Co. v. OSHA* that the "Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible."[183]  The statutory scheme approved in *Atlas Roofing* allowed the government, "proceeding before an administrative agency, . . . to impose civil penalties on any employer maintaining any unsafe working condition."[184]  As a result, we again reject the argument that our administrative proceedings violate the Seventh Amendment.

Respondents contend that *Atlas Roofing* does not control.  Instead, they assert that the civil penalty authority created by the Dodd-Frank Act violates the Seventh Amendment because it is indistinguishable from the civil penalty authority at issue in *Tull v. United States*, in which the Supreme Court held that the Seventh Amendment guarantees a jury trial when a suit is brought in federal district court to enforce a civil penalty under the Clean Water Act.[185]  But Respondents' reliance on *Tull* is misplaced.  Citing *Atlas Roofing*, *Tull* reiterated that "the Seventh Amendment is not applicable to administrative proceedings."[186]

## G.     The Equal Protection Clause

Respondents assert that the Commission violated the Equal Protection Clause for two reasons.  First, they claim that the Commission's choice of an administrative forum violates their "fundamental right to a jury trial guaranteed by the Seventh Amendment" and therefore is subject to strict scrutiny.  But, as discussed above, there is no right to a trial by a jury in the context of an administrative proceeding, and thus strict scrutiny does not apply.

---

[182]     *See, e.g.*, *Charles L. Hill, Jr.*, Exchange Act Release No. 79459, 2016 WL 7032731, at *3 (Dec. 2, 2016); *Vladlen "Larry" Vindman*, Securities Act Release No. 8679, 2006 WL 985308, at *11 & n.60 (Apr. 14, 2006).

[183]     430 U.S. 442, 450 (1977).

[184]     *Id.* at 445.

[185]     481 U.S. 412, 427 (1987).

[186]     *Id.* at 418 n.4; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51 (1989) (reiterating that Congress may assign the adjudication of an enforcement action "to an administrative agency with which a jury would be incompatible" without violating the Seventh Amendment (citing *Atlas Roofing*, 430 U.S. at 455)).

Second, Respondents invoke a "class-of-one" theory, under which someone who does not assert the deprivation of another constitutional right and is not a member of a protected class nonetheless may assert an equal protection claim by showing that he or "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[187] We reject this claim as well. "Nothing in Dodd-Frank or the securities laws explicitly constrains the [Commission's] discretion in choosing between a court action and an administrative proceeding."[188] In *Engquist v. Oregon Department of Agriculture*, the Court held that a class-of-one claim does not apply to "forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."[189] And both the Sixth and Seventh Circuits have held that *Engquist* precludes such challenges to prosecutors' decisions about whom, how, and where to prosecute.[190] Relying on these authorities, the Commission has previously held that its inherently discretionary decision to enforce the securities laws in one forum rather than another is not, as a matter of law, susceptible to attack on a class-of-one theory.[191] Respondents have supplied no persuasive reason for the Commission to revisit these decisions.

Respondents' equal protection claim fails for another reason. They have not shown "an extremely high degree of similarity" between themselves and others purportedly similarly situated.[192] They identify other cases in which claims were pursued under the same statutory provisions in federal district court. But the mere fact that another case involves the same provisions of the law does not demonstrate that the respondent is being treated differently from others similarly situated for purposes of equal protection.[193]

---

[187]    *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

[188]    *Jarkesy v. SEC*, 803 F.3d 9, 12 (D.C. Cir. 2015); *see also SEC v. Citigroup Global Mkts., Inc.*, 752 F.3d 285, 297 (2d Cir. 2014) (noting that the Commission "is free to eschew the involvement of the [district] courts and employ its own arsenal of remedies instead").

[189]    553 U.S. 591, 603 (2008).

[190]    *United States v. Green*, 654 F.3d 637, 650 (6th Cir. 2011) (rejecting class-of-one claim premised on "decision to prosecute [defendant] . . . in the civilian justice system while prosecuting his coconspirators . . . in the military justice system"); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (rejecting class-of-one challenge brought by defendant who was prosecuted in federal court while similarly situated defendants were prosecuted in state court).

[191]    *E.g., Newport Coast Sec., Inc.*, Exchange Act Release No. 88548, 2020 WL 1659292, at *13 (Apr. 3, 2020); *Hill*, 2016 WL 7032731, at *2.

[192]    *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

[193]    *See Chau v. SEC*, 72 F. Supp. 3d 417, 435 n.148 (S.D.N.Y. Dec. 11, 2014) ("This Court . . . has serious doubts about whether plaintiffs' "superficial comparisons' are sufficient to allege plausibly a 'class of one' claim, particularly as to the SEC's discretionary choice of the forum in which to bring charges."), *aff'd*, 665 F. App'x 67 (2d Cir. 2016). We find that an adequate record for resolving Respondents' class-of-one claim exists and so deny their requests for additional information regarding the basis for the Commission's forum-selection decisions. *See,*

(footnote continued . . .)

## H.     Due process

Finally, Respondents argue that the Commission violated their right to due process because the Commission's administrative proceedings do not allow Respondents to assert counterclaims for constitutional violations or to develop an evidentiary record of such alleged violations.  But Respondents have availed themselves of the opportunity to assert constitutional violations and develop a record before the law judge,[194] through petitions for interlocutory review to the Commission,[195] and on appeal to the Commission of the law judge's initial decision.[196]  Thus, as the D.C. Circuit has explained, Respondents' "challenges lie firmly within the Commission's ordinary course of business," which has "proven fully capable of considering [respondents'] attacks on the fairness of [this] proceeding."[197]  And there is "no dispute that [they] will have the opportunity to raise all of their constitutional claims before a Court of Appeals."[198]  Accordingly, we find no due process violation.

An appropriate order will issue.[199]

By the Commission (Chairman CLAYTON and Commissioners PEIRCE, ROISMAN, LEE, and CRENSHAW).

Vanessa A. Countryman
Secretary

---

(. . . footnote continued)

*e.g.*, *Mann v. Brenner*, 375 F. App'x 232, 238-39 (3d Cir. 2010) (affirming district court's dismissal of class-of-one claim without discovery); *Ponterio v. Kaye*, 328 F. App'x 671, 672-73 (2d Cir. 2009) (same).  For this reason, we find that the ALJ properly quashed Respondents' subpoenas directed at obtaining documents on this issue.

[194]     *John Thomas Capital Mgmt. Grp. LLC*, 2014 WL 5304908, at *2-7.

[195]     *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 73375, 2014 WL 5282156 (Oct. 16, 2014); *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 71415, 2014 WL 294551 (Jan. 28, 2014); *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 71021, 2013 WL 6384275 (Dec. 6, 2013).

[196]     *John Thomas Capital Mgmt. Grp. LLC*, Exchange Act Release No. 74345, 2015 WL 728006, at *3 (Feb. 20, 2015); *see also* Rule of Practice 452, 17 C.F.R. § 201.452.

[197]     *Jarkesy*, 803 F.3d at 28.

[198]     *Jarkesy v. SEC*, 48 F. Supp. 3d 32, 38 (D.D.C. 2014), *aff'd*, 803 F.3d 9 (D.C. Cir. 2015).

[199]     We have considered all of the parties' contentions.  We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 10834 / September 4, 2020

SECURITIES EXCHANGE ACT OF 1934
Release No. 89775 / September 4, 2020

INVESTMENT ADVISERS ACT OF 1940
Release No. 5572 / September 4, 2020

INVESTMENT COMPANY ACT OF 1940
Release No. 34003 / September 4, 2020

Admin. Proc. File No. 3-15255

---

In the Matter of

JOHN THOMAS CAPITAL MANAGEMENT
GROUP LLC, d/b/a PATRIOT 28 LLC; and
GEORGE R. JARKESY, JR.

---

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that George R. Jarkesy, Jr. and John Thomas Capital Management Group LLC, d/b/a Patriot28 LLC, cease and desist from committing or causing any violations or future violations of Section 17(a)(2) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) thereunder, and Section 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-8 thereunder.

ORDERED that George R. Jarkesy, Jr. and John Thomas Capital Management Group LLC, d/b/a Patriot28 LLC, pay a civil money penalty of $300,000 jointly and severally.

ORDERED that John Thomas Capital Management Group LLC, d/b/a Patriot28 LLC, disgorge $684,935.38, plus prejudgment interest of $297,419.81, such prejudgment interest calculated beginning from January 1, 2011, with such interest continuing to accrue on funds owed until they are paid, in accordance with Rule of Practice 600, 17 C.F.R. § 201.600.

ORDERED that the disgorgement, prejudgment interest, and civil money penalty amounts be used to create a Fair Fund for the benefit of investors harmed by Respondents' violations.

ORDERED that George R. Jarkesy, Jr. is barred from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.

ORDERED that George R. Jarkesy, Jr. is barred from acting as a promoter, finder, consultant, or agent; or otherwise engaging in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 15(b)(6)(A), (C).

ORDERED that George R. Jarkesy, Jr. is prohibited, permanently, from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

Payment of civil money penalties and disgorgement plus prejudgment interest shall be (i) made by United States postal money order, certified check, bank cashier's check, or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) mailed to Enterprises Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, 6500 South MacArthur Blvd., Oklahoma City, OK 73169; and (iv) submitted under cover letter that identifies the respondent and the file number of this proceeding.

By the Commission.


Vanessa A. Countryman
Secretary