# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GEORGE R. JARKESY, JR.; PATRIOT28, L.L.C.,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

On Petition for Review of an Order
of the Securities and Exchange Commission

## BRIEF FOR RESPONDENT

MICHAEL A. CONLEY
   *Solicitor*
DOMINICK V. FREDA
   *Assistant General Counsel*
PAUL G. ALVAREZ
   *Senior Counsel*

Securities and Exchange Commission
100 F Street NE
Washington, DC  20549

BRIAN M. BOYNTON
   *Acting Assistant Attorney
   General*
MARK B. STERN
JOSHUA M. SALZMAN
DANIEL AGUILAR
AMANDA L. MUNDELL
   *Attorneys*

U.S. Department of Justice
Civil Division, Appellate Branch
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-5432

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as respondent is a government agency.  Fifth Cir. R. 28.2.1.

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument would facilitate the Court's resolution of this case.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... v

STATEMENT OF JURISDICTION ....................................................... 1

INTRODUCTION ................................................................................. 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE .............................................................. 3

I.    Statutory And Regulatory Framework ........................................ 3

II.   Petitioners' Enforcement Proceeding ........................................ 5

    A.    Petitioners' Violations Of The Securities Laws .......................... 5

    B.    SEC Enforcement Proceeding ...................................... 8

SUMMARY OF ARGUMENT ............................................................ 13

STANDARD OF REVIEW ................................................................ 17

ARGUMENT .................................................................................... 17

I.    Congress Constitutionally Granted The Commission Authority To Impose Civil Penalties In Administrative Proceedings ............................................................................... 17

    A.    Congress Can Authorize The Executive Branch To Adjudicate Violations Of Public Rights And Impose Civil Penalties ................................................................ 17

    B.    The Securities Laws Create Public Rights That Can Be Adjudicated In An Administrative Proceeding And Enforced By Civil Penalties ................................... 22

    C.    The Commission Appropriately Imposed Civil Penalties ......... 26

iii

II.   THE REMOVAL RESTRICTIONS FOR ADMINISTRATIVE LAW JUDGES ARE CONSTITUTIONAL AND PRESERVE THE EXECUTIVE BRANCH'S CHAIN OF COMMAND................................................. 32

    A.   Under Article II, Inferior Officers Must Be Removable For Misconduct, Poor Performance, Or Failure To Follow Lawful Directions .................................................. 33

    B.   Under 5 U.S.C. § 7521, The Commission May Remove ALJs For Misconduct, Poor Performance, Or The Failure To Follow Lawful Directions ................................. 41

III.  PETITIONERS' REMAINING OBJECTIONS LACK MERIT.............................. 51

    A.   Bringng An Enforcement Proceeding Is An Exercise of Executive Authority, Not Legislative Authority......................... 51

    B.   Petitioners Fail To Demonstrate That The Commission Impermissibly Treated Them Differently From Other Similarly Situated Parties ......................................... 53

    C.   The Proceeding Complied With Due Process ........................... 58

CONCLUSION........................................................................... 62

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akin v. Office of Thrift Supervision,*
   950 F.2d 1180 (5th Cir. 1992) ....................................................... 13, 30, 31

*Antoniu v. SEC,*
   877 F.2d 721 (8th Cir. 1989) .................................................................. 62

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,*
   430 U.S. 442 (1977)............................................... 13, 18, 19, 20, 21, 27, 28

*Austin v. Shalala, Austin v. Shalala,*
   994 F.2d 1170 (5th Cir. 1993)...........................................13, 19-20, 22, 30

*Boos v. Barry,*
   485 U.S. 312 (1988) ................................................................................ 44

*Bowsher v. Synar,*
   478 U.S. 714 (1986) ................................................................................ 34

*Cavallari v. Office of Comptroller of Currency,*
   57 F.3d 137 (2d Cir. 1995) ......................................................................31

*Cinderella Career & Finishing Schools, Inc. v. FTC,*
   425 F.2d 583 (D.C. Cir. 1970) ................................................................ 62

*Collins v. Mnuchin,*
   938 F.3d 553 (5th Cir. 2019) (en banc) .................................................. 47

*Crowell v. Benson,*
   285 U.S. 22 (1932)...................................................................................19

*Curtis v. Loether,*
   415 U.S. 189 (1974)................................................................................21

*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ................................................................................ 48

*Doe v. Boland,*
   698 F.3d 877 (6th Cir. 2012).................................................................. 49

*Edmond v. United States,*
520 U.S. 651 (1997) ................................................................ 35

*Engquist v. Oregon Dep't of Agriculture,*
553 U.S. 591 (2008) .................................................... 16, 54, 55

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185 (1976) ................................................................ 3, 4

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
537 F.3d 667 (D.C. Cir. 2008) ................................................ 39

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
561 U.S. 477 (2010) ........................14, 15, 34, 35, 36, 37, 38, 43, 46, 47, 51

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33 (1989) ..................................................... 23, 28, 29

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ............................................................ 52

*Heckler v. Chaney,*
470 U.S. 821 (1985) ................................................................ 51

*Helvering v. Mitchell,*
303 U.S. 391 (1938) ................................................................ 19

*Humphrey's Executor v. United States,*
295 U.S. 602 (1935) ...................................................... 14, 35, 46

*In re U.S. Financial Securities Litig.,*
609 F.2d 411 (9th Cir. 1979) ................................................. 28

*In re United States,*
397 F.3d 274 (5th Cir. 2005) .......................................... 53, 54

*Integrity Collision Center v. City of Fulshear,*
837 F.3d 581 (5th Cir. 2016) ......................................... 53, 54

*Jarkesy v. SEC,*
48 F. Supp. 3d 32 (D.D.C. 2014) ............................................ 8
*aff'd* 803 F.3d 9, 12 (D.C. Cir. 2015) ...................................... 8

*Judicial Watch, Inc. v. U.S. Secret Serv.,*
    726 F.3d 208 (D.C. Cir. 2013) ................................................................ 44

*Kalaris v. Donovan,*
    697 F.2d 376 (D.C. Cir. 1983) ................................................................ 40

*Kuretski v. Commissioner,*
    755 F.3d 929 (D.C. Cir. 2014) ................................................................ 39

*Lucia v. SEC,*
    138 S. Ct. 2044 (2018) ........................................................................ 9, 41

*Mahoney v. Donovan,*
    721 F.3d 633 (D.C. Cir. 2013) ................................................................ 39

*Marx v. General Revenue Corp.,*
    568 U.S. 371 (2013) .............................................................................. 49

*Meadows v. SEC,*
    119 F.3d 1219 (5th Cir. 1997) ................................................................ 17

*Morrison v. Olson,*
    487 U.S. 654 (1988) ...................................... 14, 36, 37, 39, 40, 41, 42, 49

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
    59 U.S. 272 (1855) ................................................................................ 20

*Myers v. United States,*
    272 U.S. 52 (1926) .......................................................................... 34, 40

*Myron v. Hauser,*
    673 F.2d 994 (8th Cir. 1982) .................................................................. 31

*Nash v. Califano,*
    613 F.2d 10 (2d Cir. 1980) .................................................................... 32

*NLRB v. Jones & Laughlin Steel Corp.,*
    301 U.S. 1 (1937) .................................................................................. 44

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) .............................................................................. 48

*Oceanic Steam Navigation Co. v. Stranahan,*
    214 U.S. 320 (1909) .............................................................................. 20

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
138 S. Ct. 1365 (2018) ............................................ 22

*Public Citizen v. U.S. Dep't of Justice,*
491 U.S. 440 (1989) ............................................ 44

*Ramspeck v. Federal Trial Examiners Conf.,*
345 U.S. 128 (1953) ................................... 32, 43, 48

*SEC v. Calvo,*
378 F.3d 1211 (11th Cir. 2004) ............................... 23

*SEC v. Capital Gains Research Bureau, Inc.,*
375 U.S. 180 (1963) .................................... 4, 22, 23

*SEC v. Rind,*
991 F.2d 1486 (9th Cir. 1993) ............................... 23

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) ................................... 35, 37

*Simpson v. Office of Thrift Supervision,*
29 F.3d 1418 (9th Cir. 1994) ................................ 31

*Sinclair v. SEC,*
444 F.2d 399 (2d. Cir. 1971) ................................ 11

*Smallwood v. Pearl Brewing Co.,*
489 F.2d 579 (1974) ......................................... 4

*Texaco, Inc. v. FTC,*
336 F.2d 754 (D.C. Cir. 1964) ............................... 62

*Tull v. United States,*
481 U.S. 412 (1987) ...................................... 11, 21

*Twin River Paper Co. v. SEC,*
934 F.3d 607 (D.C. Cir. 2019) ............................... 4

*United States ex rel. Dunlap v. Black,*
128 U.S. 40 (1888) .......................................... 50

*United States v. Armstrong,*
517 U.S. 456 (1996) ......................................... 53

*United States v. Badger,*
818 F.3d 563 (10th Cir. 2016) ................................................................ 23

*United States v. Bernstein,*
533 F.2d 775 (2d Cir. 1976) ..................................................................... 61

*United States v. Bruce,*
950 F.3d 173 (3d Cir. 2020) .................................................................... 52

*United States v. Clark,*
67 F.3d 1154 (5th Cir. 1995) .................................................................. 60

*United States v. Moore,*
543 F.3d 891 (7th Cir. 2008) .................................................................. 55

*United States v. Nixon,*
418 U.S. 683 (1974) ................................................................................ 51

*United States v. Perkins,*
116 U.S. 483 (1886) ........................................................................ 36, 49

*United States v. Richards,*
755 F.3d 269 (5th Cir. 2014) .................................................................. 33

*United States v. Wilson,*
77 F.3d 105 (5th Cir. 1996) ............................................... 17, 59, 60, 61

*United States v. X-Citement Video, Inc.,*
513 U.S. 64 (1994) .................................................................................. 33

*Wayman v. Southard,*
23 U.S. 1 (1825) ..................................................................................... 52

*Whitman v. American Trucking Ass'ns,*
531 U.S. 457 (2001) ............................................................................... 52

*Withrow v. Larkin,*
421 U.S. 35 (1975) ................................................................................. 10

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ............................................................................... 44

*Zitserman v. FTC,*
200 F.2d 519 (8th Cir. 1952) ................................................................. 48

## U.S. Constitution

U.S. Const., art. II........................................................ 39, 42, 44, 45, 46, 50

U.S. Const., art. II, §§ 1, 3 ............................................................. 33

U.S. Const., art. II, § 2, cl. 2........................................................... 34

U.S. Const., amend. VII...................2, 11, 13, 18, 19, 20, 21, 22, 28, 29, 30, 57

## Statutes

Administrative Procedure Act,
  Pub. L. No. 79-404 § 11,
  60 Stat. 237, 244 (1946) ........................................................ 32

Investor Protection and Securities Reform Act of 2010,
  Pub. L. No. 111-203, Title IX,
  124 Stat. 1376, 1822 (2010) .................................................... 26

Securities Enforcement Remedies and Penny Stock Reform Act of 1990,
  Pub. L. No. 101-429 §§ 202(a), 301(a), 401,
  104 Stat. 931, 937, 941-42, 946 ............................................. 24

5 U.S.C. § 556(b)........................................................................ 39

5 U.S.C. § 706(2)(A) .................................................................. 17

5 U.S.C. § 7521 .................... 2, 12, 13, 14,15,  33, 39, 41, 43, 46, 47, 48, 49, 50

5 U.S.C. § 7521(a) ..................................................................... 32

15 U.S.C. § 77h-1(a) ............................................................... 4, 51

15 U.S.C. § 77h-1(g) .................................................................. 26

15 U.S.C. § 77i(a) ........................................................................ 1

15 U.S.C. § 78d-1(a) ................................................................... 4

15 U.S.C. § 78u-2(a)............................................................... 24, 26

15 U.S.C. § 78u-3(a)................................................................. 4, 51

15 U.S.C. § 78y ..................................................................1, 5

15 U.S.C. § 80a-9(b) .........................................................4, 51

15 U.S.C. § 80a-9(d) ......................................................24, 26

15 U.S.C. § 80a-42(a) ............................................................1

15 U.S.C. § 80b-3(f) ..........................................................4, 51

15 U.S.C. § 80b-3(i) ......................................................24, 26

15 U.S.C. § 80b-6(2) ............................................................58

15 U.S.C. § 80b-13(a) ............................................................1

15 U.S.C. § 7217(d)(3) ...............................................15, 43, 47

16 U.S.C. § 1858(a) ...............................................................18

29 U.S.C. § 666(j) .................................................................18

42 U.S.C. 2000e-16(a) .........................................................45

42 U.S.C. § 1320a-8 .............................................................18

42 U.S.C. § 1320d-5(a) .......................................................18

49 U.S.C. § 46301 ................................................................18

## Regulations

17 C.F.R. §§ 201.221-201.360 ..............................................5

17 C.F.R. § 201.410(a) ............................................................5

17 C.F.R. § 201.411(a) ............................................................5

17 C.F.R. § 201.411(c) ............................................................5

## Books, Articles, and Reports

Black's Law Dictionary (4th ed. 1951) ..............................42

H.R. Rep. No. 101-616 (1990)...................................................... 25

Mark Jickling,
  Congressional Research Service,
  R41503 *The Dodd-Frank Wall Street Reform and Consumer
  Protection Act: Title IX, Investor Protection* (2010) ............................ 26

Lawrence Lessig & Cass R. Sunstein,
  *The President and the Administration*,
  94 Colum. L. Rev. 1 (1994) ...................................................... 42

John F. Manning,
  *The Independent Counsel Statute:  Reading "Good Cause"
  in Light of Article II*,
  85 Minn. L. Rev. 1285 (1999) .................................................... 45

Neomi Rao,
  *Removal: Necessary and Sufficient for Presidential Control*,
  65 Ala. L. Rev. 1205 (2014)...................................................... 45

S. Rep. No. 101-337 (1990) .................................................. 24, 25

## Court and Administrative Filings

*Decker Coal Co. v. Pehringer*,
  Fed. Resp. Br.,
  2020 WL 7634933 (9th Cir. Dec. 14, 2020) ...................................... 41-42

*Fleming v. USDA*,
  Resp. Supp. Br.,
  2020 WL 1025336 (D.C. Cir. Feb. 27, 2020)........................................41

*In re George R. Jarkesy*,
  Order (SEC Feb. 21, 2019),
  https://go.usa.gov/xHVAB ...................................................... 9

*In re David F. Bandimere* (SEC Dec. 6, 2012),
  Order Instituting Proceedings,
  https://go.usa.gov/xHV9m........................................................ 57

*Lucia v. SEC,*
  Resp Br.,
  2018 WL 1251862 (U.S. Feb. 21, 2018) .................................................41

*SEC v. Thomas*, No. 13-739 (N.D. Tex.)

  Compl. (Feb. 14, 2013) .................................................................... 56

  Mot. for Preliminary Injunction (Mar. 5, 2013) ................................. 56

  Order (Mar. 4, 2014) ...................................................................... 56

*Seila Law LLC v. CFPB,*
  Resp. Br.,
  2019. WL 6727094 (U.S. Dec. 9, 2019) .................................................. 42

**STATEMENT OF JURISDICTION**

After an evidentiary hearing and adversarial briefing, the Securities and Exchange Commission (SEC or Commission) found that petitioners had violated the securities laws, ROA.6-8, and imposed sanctions under the Securities Act, the Exchange Act, the Investment Company Act, and the Investment Advisers Act, ROA.24-32. This Court has jurisdiction under those Acts to review the Commission's order. 15 U.S.C. §§ 77i(a), 78y, 80a-42(a), 80b-13(a).

**INTRODUCTION**

Petitioners convinced investors to put millions of dollars into hedge funds that they designed. In doing so, petitioners lied about who audited those funds, who was their prime broker, what the funds were invested in, and how much the funds were worth. The Securities and Exchange Commission brought an enforcement action against petitioners for these violations of the federal securities laws, found them liable, and imposed sanctions. Petitioners do not contest the merits of those decisions.

Instead, petitioners erroneously argue that the Commission proceeding was unconstitutional and that the Commission's only course of action was to sue them in district court. But Congress granted the Commission both the authority and the discretion to choose when to

institute an administrative enforcement proceeding for violations of the securities laws, and that grant of authority is consistent with the precedents of the Supreme Court and this Court. Petitioners fail to engage with binding precedent which makes clear that administrative proceedings like this do not offend the Seventh Amendment, the non-delegation doctrine, Equal Protection, or Due Process.

Petitioners also err in summarily asserting that the Commission's ability to remove an administrative law judge (ALJ) only for "good cause," 5 U.S.C. § 7521, violates the separation of powers. That standard allows for removal if the ALJ performs poorly, engages in misconduct, or fails to follow the Commission's lawful directions. That level of control over the ALJ's actions ensures that the President—acting through his lawfully appointed Department Heads like the Commission—can properly control the Executive Branch.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether monetary penalties issued in an administrative enforcement proceeding violate the Seventh Amendment.

2. Whether the removal restrictions for administrative law judges in 5 U.S.C. § 7521 violate the separation of powers.

3.  Whether a federal agency's decision to initiate an administrative enforcement proceeding rather than file a complaint in district court is an unconstitutional exercise of legislative authority.

4.  Whether the initiation of petitioners' enforcement proceeding violated equal protection.

5.  Whether the Commission was impermissibly biased against petitioners.

## STATEMENT OF THE CASE

### I.    STATUTORY AND REGULATORY FRAMEWORK

Congress has created a comprehensive scheme for regulating securities and vested the Securities and Exchange Commission with authority to oversee that regulation in order to promote efficient capital markets, fair dealings, and investor confidence.  For example, the Securities Act of 1933 (Securities Act) was "designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).  Likewise, Congress passed the Securities Exchange Act of 1934 (Exchange Act) to "protect investors against manipulation of stock prices

through regulation of transactions upon securities exchanges and in over-the-counter markets." *Id.*

In the same vein, the Investment Advisers Act of 1940 (Advisers Act) seeks to "protect[] investors through the prophylaxis of disclosure," in order to eliminate "the darkness and ignorance of commercial secrecy," which "are the conditions upon which predatory practices best thrive." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 200 (1963). And the Investment Company Act of 1940 (Company Act) "regulates investment companies to protect investors" and benefit shareholders. *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 617 (D.C. Cir. 2019). Thus, as this Court has explained, the "broad congressional purpose" of the securities laws is to "protect investors." *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 592 (5th Cir. 1974).

The securities laws do this, in part, by authorizing the Commission to address potential violations by bringing an enforcement action through an administrative proceeding before the agency. *See, e.g.*, 15 U.S.C. §§ 77h-1(a), 78u-3(a), 80a-9(b), 80b-3(f). Once the proceeding begins, the Commission may delegate the matter to several members of the Commission, to a single Commissioner, or to an ALJ. *Id.* § 78d-1(a). When an ALJ presides, the ALJ receives evidence, holds a hearing, hears

argument, and issues an initial decision on liability and any potential sanctions.  17 C.F.R. §§ 201.221-201.360.  The respondent or the SEC's Division of Enforcement may appeal that decision by filing a petition for review with the Commission, and the Commission can also review any ALJ decision *sua sponte*.  *Id*. §§ 201.410(a), 201.411(c).  The Commission engages in de novo review of the ALJ's decision, and issues an order affirming, reversing, modifying, or setting aside the ALJ's decision, or remanding for further proceedings.  *Id*. § 201.411(a).  If the Commission issues a decision adverse to the respondent, the respondent can seek judicial review in the courts of appeal.  *E.g*. 15 U.S.C. § 78y.

## II.  PETITIONERS' ENFORCEMENT PROCEEDING

## A.  Petitioners' Violations Of The Securities Laws

Petitioners George Jarkesy and his advisory firm Patriot28 LLC launched two hedge funds that attracted about 120 investors, and which held about $24 million in assets under management.  ROA.5.[1]  Petitioners violated the securities laws by misrepresenting who audited the hedge funds, misrepresenting who served as the funds' prime broker, misrepresenting the funds' investment parameters and safeguards, and

---

[1] Jarkesy's company is officially named John Thomas Capital Management Group LLC, and does business under the name Patriot28. ROA.3.

overvaluing the funds' assets to increase the fees they were able to charge investors.  ROA.5.

Over the course of three years, Jarkesy drafted "newsletters and a PowerPoint presentation that identified KPMG as the Funds' auditor and Deutsche Bank as the Funds' prime broker."  ROA.9.  Petitioners distributed these items to brokers and investors in meetings, emails, and through a virtual library.  ROA.10.  Petitioners "admit, however, that KPMG never audited the Funds" and that neither the funds nor Patriot28 "ever had a prime brokerage account with Deutsche Bank."  ROA.10.  After learning about this misrepresentation, Deutsche Bank "demanded that its name be removed from the document," but petitioners nevertheless "continued to identify Deutsche Bank as the Funds' prime broker."  ROA.10.

During the same time period, petitioners consistently misrepresented one of the fund's investment allocation and asset strategy.  Petitioners repeatedly made public statements and represented in private meetings with investors that the first hedge fund (John Thomas Bridge and Opportunity Fund LP I) would invest 50% of its capital commitments in certain life insurance policies.  ROA.5, ROA.11.  In fact, that fund only allocated 10% to 19% of its capital commitments to those kind of policies.

ROA.11.  At the same time, petitioners repeatedly stated that the fund's total investment in any given company would "not exceed 5% of the aggregate Capital Commitments."  ROA.12.  But in reality, the fund regularly exceeded this investment limit, putting anywhere from 5.5% to 11.3% of its capital contributions in a single company.  ROA.12.  Through these false statements, petitioners misrepresented the risk of investing in the fund.  The fund was supposed to be chiefly invested in life insurance policies to hedge against risk from corporate investments, and those corporate investments were supposed to be diversified to mitigate against potential exposure.  Instead, the fund had minimal commitments to the life insurance policies and placed concentrated bets on individual companies. ROA.12.

In financial statements for both funds, petitioners also represented that they followed generally accepted accounting principles and their assets were fairly and reasonably valued under those principles.  ROA.17.  But petitioners inappropriately inflated the funds' valuations so that they could charge millions in management fees.  ROA.18.  For example, the funds were heavily invested in a company that had defaulted on millions of dollars' worth of notes issued to the funds.  ROA.18.  Yet petitioners failed to write down the value of those notes—as required under generally accepted

accounting principles—and instead chose to misrepresent the notes as positive assets for the funds.  ROA.18.  In another instance, the funds held millions of shares in a company whose CEO told petitioners that the "shares weren't worth anything because the company had no real assets and no funding."  ROA.20.  Yet despite knowing that these stocks were "essentially worthless," petitioners falsely increased their valuation for each of these shares ten-fold, from $0.30 to $3.30.  ROA.20.

### B.    SEC Enforcement Proceeding

**1.**  The Commission initiated this enforcement proceeding against petitioners in 2013.  App. 1.  Petitioners sued in the district court for the District of Columbia to enjoin the proceeding based on various constitutional challenges.  The district court and the court of appeals held that petitioners could not bring suit in district court, but must instead continue with the proceeding and challenge any adverse final order in the court of appeals.  *See Jarkesy v. SEC*, 48 F. Supp. 3d 32, 40 (D.D.C. 2014), *aff'd* 803 F.3d 9, 12 (D.C. Cir. 2015).  The Commission assigned the proceeding to an ALJ, who held an evidentiary hearing and issued an initial decision finding that petitioners had violated the securities laws.  App. 30.

Petitioners then sought Commission review.  While that petition was pending, the Supreme Court held that the Commission's ALJs had not been

properly appointed under the Constitution's Appointments Clause, which required them to receive an appointment by the Commission.  *Lucia v. SEC*, 138 S. Ct. 2044, 2054-55 (2018).  As a remedy, the Court held that the Commission must assign the proceeding to a different, properly appointed ALJ for a new proceeding.  *Id.*  Consistent with *Lucia*, the Commission assigned petitioners' proceeding to a different ALJ whom the Commission properly appointed for a new hearing.  Order at 2, *In re George R. Jarkesy* (SEC Feb. 21, 2019), https://go.usa.gov/xHVAB.  Petitioners chose, however, to waive their right to a new hearing, and so the Commission decided the case based on petitioners' earlier request for review.  *Id.* at 2-3.

**2.**  In its final order, the Commission found that petitioners had violated the securities laws based on their numerous misrepresentations about how the funds were managed, audited, and valued.  ROA.9-22. Based on those violations, the Commission ordered that petitioners cease and desist from committing future violations of the securities laws, that they pay a civil monetary penalty of $300,000, and that Patriot28 disgorge $684,935.38 in ill-gotten gains (plus pre-judgment interest).  ROA.49.  The Commission also barred petitioner Jarkesy from associating with brokers, dealers, and investment advisers; barred him from participating in the

offering of penny stocks; and barred him from acting as an officer or director of an advisory board or investment adviser.  ROA.50.

**3.**  The Commission also considered and rejected a number of constitutional claims raised by petitioners.  Although petitioners alleged that the ALJ was unfairly biased against them, the only support for this claim was a *Wall Street Journal* article about a different ALJ who had "left the Commission years before the hearing in this matter."  ROA.34.  The Commission held that this was "[f]ar from presenting the requisite convincing evidence that a risk of actual bias or prejudgment is present." ROA.35 (cleaned up).

The Commission also rejected a claim that it had inappropriately pre-judged petitioners' case by accepting a settlement agreement with other entities (the company who served as the primary placement agent for petitioners' hedge funds and that company's CEO).  ROA.5, 35.  The Commission explained that it may institute proceedings, adjudicate cases, and negotiate settlements in a manner consistent with due process and the Administrative Procedure Act.  ROA.36-37 (citing *Withrow v. Larkin*, 421 U.S. 35, 56 n.24 (1975)).  Here, the settlement agreement with the other entities explained that it was "not binding on any other person or entity," ROA.35, and the Commission noted that the factual basis for the settlement

had "only an attenuated connection" to petitioners' case, ROA.37 n.137 (cleaned up); *see* ROA.37 n.137 (petitioners' "violations and sanctions do not turn on whether they made material misrepresentations related to their relationship with" the settling entities).  Thus, the Commission concluded that petitioners' case had been properly adjudged "based upon presentation of evidence" before the ALJ and the Commission.  ROA.37 n.139 (quoting *Sinclair v. SEC*, 444 F.2d 399, 401-02 (2d. Cir. 1971)).

Petitioners claimed that the Commission's choice to initiate an enforcement proceeding administratively rather than sue petitioners in district court constituted an unconstitutional exercise of legislative power.  The Commission explained, however, that "whenever the Commission brings an enforcement action—whether in federal district court or in an administrative proceeding—it is not acting in a *legislative* capacity; instead, it is acting in an *executive* capacity" by enforcing the pre-existing securities laws.  ROA.42.  The Commission also explained that precedent foreclosed petitioners' claim that the enforcement proceeding violated the Seventh Amendment's provision for jury trials, because "the Seventh Amendment is not applicable to administrative proceedings."  ROA.46 (quoting *Tull v. United States*, 481 U.S. 412, 418 n.4 (1987)).  The Commission likewise rejected petitioners' claim that the enforcement proceeding violated their

equal protection rights, noting that a determination whether to bring an enforcement action in an administrative proceeding or in district court is based on an array of case-specific assessments, and that petitioners had not demonstrated that they had been treated differently than other similarly situated parties. ROA.47.

Petitioners also contended that the removal restrictions in 5 U.S.C. § 7521 for the Commission's ALJ violated the separation of powers. ROA.44. The Commission explained that the Supreme Court had previously approved "for-cause removal restrictions on the power to remove principal officers of certain independent agencies and for-cause restrictions on a principal officer's ability to remove inferior officers." ROA.45. The Commission concluded that the "good cause" removal restriction in § 7521 is consistent with those previously approved statutory restrictions because the statute permits the Commission to remove "an ALJ for misconduct, poor job performance, or failure to follow lawful directives." ROA.45. The statute thus provides the Commission "with constitutionally sufficient latitude to remove an ALJ for appropriate job-related reasons, thereby ensuring the agency heads'—and by extension, the Presidents'—control over inferior officers." ROA.45.

## SUMMARY OF ARGUMENT

**I.** The Supreme Court and this Court have consistently held that Congress may create public rights that are enforceable by civil monetary penalties, and that Congress may constitutionally direct the Executive Branch to adjudicate whether those rights have been violated and whether civil penalties are appropriate. *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 448-50 (1977); *Akin v. Office of Thrift Supervision*, 950 F.2d 1180, 1181-82 (5th Cir. 1992); *Austin v. Shalala*, 994 F.2d 1170, 1177-78 (5th Cir. 1993). Those holdings apply here. Congress enacted the securities laws to create public rights enforceable by the government in administrative proceedings, to ensure that markets are competitive, dealings are fair, and investors are protected. And over 30 years ago, Congress granted the Commission authority to impose civil monetary penalties in administrative proceedings to further those public rights. Under the Supreme Court's and this Court's decisions, the Commission can exercise that authority because the Seventh Amendment does not require a jury trial in administrative proceedings to adjudicate public rights.

**II.** Under 5 U.S.C. § 7521, an ALJ—whose tasks are limited to delegated adjudicatory duties, subject to plenary review by the

Commission—may be removed by the Commission "only for good cause established and determined by" the Merit Systems Protection Board (MSPB). And although there is no statutory restriction on the removal of the SEC Commissioners, it is assumed that the President may remove them "under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office.'" *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010).

That framework fully preserves the President's ability to control and direct the Executive Branch. The "good cause" standard in 5 U.S.C. § 7521 authorizes removal of an ALJ for misconduct, poor performance, or failure to follow lawful directions. *See Morrison v. Olson*, 487 U.S. 654, 692 (1988) ("good cause" encompasses "misconduct"); *id.* at 724 n.4 (Scalia, J., dissenting) (explaining that "for cause" includes "the failure to accept supervision"). The MSPB's role in "establish[ing] and determin[ing]" good cause is appropriately understood as authorizing the MSPB to adjudicate whether there is substantial evidence to support the employing agency's proffered, good-faith grounds for cause. Within that framework, ALJs are subject to the constitutionally requisite level of accountability in exercising their delegated responsibilities in adjudication.

Petitioners are quite wrong to insist that the Supreme Court decided the claim that they advance here in *Free Enterprise*. There, the Court invalidated a double layer of removal restrictions under which certain inferior officers under the SEC could be removed only for specified violations of the securities laws, willful abuse of authority, or unreasonable failure to enforce compliance with a securities statute or rule. *Free Enterprise*, 561 U.S. at 486 (citing 15 U.S.C. § 7217(d)(3)). Under that statutory scheme, the President would be unable to direct removal of a Board member even if they appeared to be engaging in criminal conduct. In holding these removal restrictions invalid, the Supreme Court cautioned that it was not making any "general pronouncements" on matters like "the civil service system within independent agencies" or the removal restrictions on "administrative law judges" in § 7521. *Id.* at 506-07 & n.10. Section 7521, properly construed with due regard to constitutional considerations, does not unduly interfere with the President's command of the Executive Branch, and ensures that ALJs can be removed for misconduct, poor performance, or failure to follow a lawful direction.

**III.** Petitioners' remaining challenges to the Commission's order fail on their merits.

**A.** Petitioners allege that by instituting an enforcement proceeding against them, the Commission has exercised legislative authority in violation of the non-delegation doctrine. But bringing an enforcement action is necessarily an exercise of *executive* authority, and the non-delegation doctrine therefore does not apply.

**B.** Petitioners erroneously contend that the Commission violated their Equal Protection rights by bringing an administrative action against them when the Commission has sued other defendants in district court. Petitioners fail to explain how they are similarly situated to any of the district court cases that they cite and, even if they were, petitioners refuse to acknowledge that the Commission has brought administrative proceedings against other similarly situated parties. More fundamentally, petitioners do not allege that the Commission acted based on a discriminatory motive, and the mere fact that the Commission used its discretion to bring an particular enforcement action against petitioners is insufficient to support an equal protection claim. *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 603-04 (2008).

**C.** Finally, petitioners mistakenly argue that the Commission was impermissibly biased and prejudged their case because it accepted a settlement offer from their co-respondents in the administrative

proceeding. This Court has already rejected that theory in the context of criminal prosecutions, where the due process interests are obviously higher. *United States v. Wilson*, 77 F.3d 105, 110-11 (5th Cir. 1996). *Wilson* makes clear that a court can rule on a co-defendant's guilt—even if the underlying facts implicate a defendant yet to be tried—without offending due process or pre-judging a case. That reasoning applies here.

## STANDARD OF REVIEW

The Court will uphold an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court reviews questions of law de novo. *Meadows v. SEC*, 119 F.3d 1219, 1224 (5th Cir. 1997).

## ARGUMENT

**I.    CONGRESS CONSTITUTIONALLY GRANTED THE COMMISSION AUTHORITY TO IMPOSE CIVIL PENALTIES IN ADMINISTRATIVE PROCEEDINGS**

**A.    Congress Can Authorize The Executive Branch To Adjudicate Violations Of Public Rights And Impose Civil Penalties**

Congress has, across a number of statutes, authorized federal agencies to conduct administrative proceedings to determine if someone has violated the law and, if so, to impose civil monetary penalties as appropriate. For example, civil penalties may be imposed in administrative

proceedings for violations of the Occupational Safety and Health Act,[2] the

Health Insurance Portability and Accountability Act,[3] the Magnuson-

Stevens Fishery Act,[4] the federal aviation laws,[5] and for knowingly making

false statements when applying for Social Security benefits.[6]  If an

aggrieved party wishes to challenge such a penalty, they may do so by

seeking judicial review of the agency's order.  *See, e.g.*, 16. U.S.C. § 1858(b).

But if the order is upheld, then the government may enforce the imposed

civil penalty—and it does not need to re-prove the entire case to a jury

before doing so.  As the Supreme Court has explained, "Congress is free to

provide an administrative enforcement scheme without the intervention of

a jury."  *Atlas Roofing Co. v. Occupational Safety & Health Review

Comm'n*, 430 U.S. 442, 448 (1977).

Accordingly, Congress may properly grant the Executive Branch the

authority to conduct administrative enforcement proceedings without

offending the Seventh Amendment.  That Amendment ensures that "the

right of a trial by jury shall be preserved" in "[s]uits at common law"

involving more than twenty dollars.  U.S. Const. amend. VII.  Thus, there is

---

[2] 29 U.S.C. § 666(j).
[3] 42 U.S.C. § 1320d-5(a).
[4] 16 U.S.C. § 1858(a).
[5] 49 U.S.C. § 46301.
[6] 42 U.S.C. § 1320a-8.

no right to a jury trial for suits seeking equitable relief—such as disgorgement or injunctive relief, which the Commission ordered here. *Atlas Roofing*, 430 U.S. at 449 (distinguishing suits at common law from the courts of equity and admiralty).

Nor does the Seventh Amendment apply to administrative proceedings "in which 'public rights' are being litigated—*e.g.*, cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." *Atlas Roofing*, 430 U.S. at 450. Congress can thus create administrative agencies to adjudicate matters involving public rights that Congress has authority to regulate, such as "interstate and foreign commerce, taxation, immigration, the public lands, [and] public health." *Crowell v. Benson*, 285 U.S. 22, 51 (1932). And in such adjudications, Congress can authorize the agency to impose a civil penalty without a jury trial. *Helvering v. Mitchell*, 303 U.S. 391, 402-03 (1938) (affirming the Commissioner of Internal Revenue's authority to impose a civil penalty for tax delinquency in administrative proceedings). As this Court has explained, "Congress may employ an administrative body as a factfinder in imposing money penalties for the violation of federal laws." *Austin v. Shalala*, 994 F.2d 1170, 1177-78 (5th

Cir. 1993) (citing *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

The reasoning behind these precedents is straightforward. The Seventh Amendment "was declaratory of the existing law" as it stood at the Founding, for it required that the right to jury trials be "preserved," and "thus did not purport to require a jury trial where none was required before." *Atlas Roofing*, 430 U.S. at 459. Thus, after the Seventh Amendment's enactment, Congress can and has created new public rights that can either be adjudicated in a district court with a jury trial or adjudicated instead in administrative proceedings. *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855) ("[T]here are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper."); *accord Atlas Roofing*, 430 U.S. at 451 & n.8 (quoting *Murray's Lessee*). Because the Seventh Amendment "took the existing legal order as it found it," and preserved jury trials where they had already existed, the Amendment does not apply to the adjudication of later-enacted statutory public rights. *Atlas Roofing*, 430 U.S. at 460.

Accordingly, when Congress creates new statutory public rights, it can assign their adjudication to a district court, to an administrative proceeding, or both. If the adjudication of civil penalties is in district court, then the Seventh Amendment applies and "a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." *Curtis v. Loether*, 415 U.S. 189, 195 (1974); *see also Tull v. United States*, 481 U.S. 412, 420 (1987) (district court action for over $22 million in civil penalties required a jury trial). By contrast, the "Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication." *Curtis*, 415 U.S. at 194. Thus, when Congress authorizes the Executive Branch to adjudicate civil penalties in an administrative proceeding, a jury trial is not required. *Atlas Roofing*, 430 U.S. at 455 (holding that the Seventh Amendment does not apply to the adjudication of public rights in an administrative proceeding "even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law").

Congress may thus constitutionally authorize "an administrative agency" to adjudicate violations and impose civil penalties "even if a jury would be required if Congress had chosen to enforce the law with judicial

proceedings." *Austin*, 994 F.2d at 1178. That conclusion is consistent with the general principle that "[w]hen Congress properly assigns a matter to adjudication in a non-Article III tribunal, 'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.'" *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1379 (2018).

### B. The Securities Laws Create Public Rights That Can Be Adjudicated In An Administrative Proceeding And Enforced By Civil Penalties

The Securities Act, the Exchange Act, the Company Act, and the Advisers Act all work together to promote fair and efficient markets that allow investors to make informed financial decisions. The Acts are principally designed to "eliminate * * * abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's" by adopting a "philosophy of full disclosure" to "achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963). They act as a "prophylaxis" designed not just to prevent "dishonor, but also [] conduct that tempts dishonor." *Id.* at 200. Thus, the Acts prohibit not just "the elements of [] common-law fraud" but also actions that pose a "potential for abuse." *Id.* Consider an investment adviser who recommends that his

clients purchase shares in a certain security—without disclosing that the adviser intends to sell his own shares of the security for a profit after the clients make the purchase and the share price increases. *Id.* at 181. The securities laws prohibit this kind of conduct, not because it necessarily meets all the standards of a fraudulent tort, but because the Advisers Act and "other securities legislation" are designed to be applied "flexibly [and] to effectuate [their] remedial purposes." *Id.* at 195.

As such, the courts have consistently recognized that the Commission enforces the securities laws to protect public rights. *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993) ("When the Commission sues to enforce the securities laws, it vindicates public rights and furthers the public interest."); *SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004) ("In this instance, the United States is acting in its sovereign capacity" to "vindicat[e] public rights and further[] public interests"); *United States v. Badger*, 818 F.3d 563, 566 (10th Cir. 2016) (SEC's action for disgorgement and civil penalties sought to "protect[] the public interest" from "one who has violated a statute").[7]

---

[7] Those public rights are clearly present here, where the "rights pertain[] to claims brought by or against the United States," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 68 (1989) (Scalia, J., concurring in part and concurring in the judgment), because the Commission has brought claims against regulated investment advisers in order to enforce the federal securities laws.

To further protect those public rights, Congress granted the Commission authority to impose civil penalties when they are violated. In 1990, Congress amended the Exchange Act, Company Act, and Advisers Act to grant the SEC authority to impose civil monetary penalties in administrative proceedings. *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429 §§ 202(a), 301, 401, 104 Stat. 931, 937, 941-42, 946 (amending 15 U.S.C. §§ 78u-2(a), 80a-9(d), 80b-3(i)). Those amendments were a response to some of "the biggest insider trading scandals in history, widespread incidences of fraudulent financial reporting by financial institutions and other corporations, illegal activity in connection with tender offers, billions of dollars of losses to small investors as a result of illegal activity in the 'penny stock' market, market manipulation and other illegal trading activity, and fraudulent and misleading disclosures in the sale of securities." S. Rep. No. 101-337, at 2 (1990).

Congress therefore sought to protect the "strength of the U.S. capital markets [which] rests on investor confidence" by "authorizing new civil money penalties to deter unlawful conduct" that was "necessary for investor protection." S. Rep. No. 101-337, at 1-2. This new enforcement authority would help to "preserve[] the integrity of the securities markets" by

"assur[ing] investors that those who participate in the markets will play by the same rules, [and] by ensuring that those who break the rules will be detected, prosecuted, and appropriately sanctioned." *Id.* at 6. *Accord* H.R. Rep. No. 101-616, at 14 (1990) (authorizing civil monetary penalties because an "effective enforcement program is necessary to maintain investor confidence in the integrity, fairness, and efficiency of our securities markets").

Congress enacted these monetary penalties to "provide a financial disincentive to violations" of the securities laws, particularly in cases where investors may "be exposed to significant risk of loss, even though the violations may not involve affirmative conduct to defraud investors." S. Rep. No. 101-337, at 10. As an example, Congress pointed to "violations of bookkeeping provisions or the SEC's customer protection rule, which requires that customers' fully paid and excess margin securities be maintained in a separate account, and customers may be exposed to a serious risk of loss." *Id.* at 10-11. And Congress envisioned that while civil penalties may not be appropriate in all cases, they could properly be imposed in cases involving reckless "disregard of the customer protection rules," even when there might not have been an "intentional" violation. *Id.* at 12.

Congress later buttressed these civil penalty provisions in response to the 2008 financial crisis as part of the Investor Protection and Securities Reform Act of 2010, which was incorporated into the Dodd-Frank Act as Title IX.  Pub. L. No. 111-203, 124 Stat. 1376, 1822 (2010).  The amendments in Title IX were "intended to improve investor protection" and respond to financial misconduct like the Bernard Madoff Ponzi scheme.  Mark Jickling, Congressional Research Service, R41503 *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Title IX, Investor Protection* at i (2010).  As part of those amendments, Congress authorized civil penalties for administrative proceedings under the Securities Act, 15 U.S.C. § 77h-1(g), and expanded the Commission's authority to impose civil penalties in cease-and-desist proceedings under the Exchange Act, Company Act, and Advisers Act, 15 U.S.C. §§ 78u-2(a), 80a-9(d), 80b-3(i).  *See* 124 Stat. 1862-64.

## C.    The Commission Appropriately Imposed Civil Penalties

Here, the Commission determined that petitioners "engaged in fraudulent misconduct" that was "highly egregious and at least reckless," and that their misconduct "significantly harmed investors" and "unjustly enriched" petitioners.  ROA.27.  By misrepresenting who acted as the funds' auditor and prime broker, and misrepresenting the funds' actual

investments, petitioners "caused investors to invest or remain invested in the Funds." ROA.27. And by overvaluing the funds' assets, petitioners "received excessive fees" from their investors. ROA.27. Accordingly, the Commission determined that it was appropriate to impose two civil penalties totaling $300,000 for petitioners' misrepresentations and overvaluations. ROA.27-28. As authority for these civil penalties, the Commission relied both on the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, and the Investor Protection and Securities Reform Act of 2010. ROA.28 & nn.89-90.

Those penalties were "in the public interest" and necessary to act "as a deterrent" to petitioners and others who might violate the securities laws and thereby cause "harm to investors or the marketplace." ROA.26-27. And in imposing those penalties to protect the public interest, the Commission was acting in the way approved by the Supreme Court in *Atlas Roofing*. There, the Court considered the Occupational Safety and Health Act of 1970, through which Congress authorized the Executive Branch to impose civil penalties in an administrative proceeding if an employer "maintain[ed] any unsafe working condition" even if no "employee is actually injured or killed as a result of the condition." *Atlas Roofing*, 430 U.S. at 445. The Supreme Court affirmed that scheme as constitutional,

explaining that "Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field." *Id.*

That does not mean that all new statutory rights are automatically exempted from the Seventh Amendment. To the contrary, private rights in "tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated" by the public-rights doctrine. *Atlas Roofing*, 430 U.S. at 458. Thus, private rights of action brought under the securities laws that seek money damages must comply with the Seventh Amendment. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 n.4 (1989) ("The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'"); *see also In re U.S. Financial Securities Litig.*, 609 F.2d 411, 432 (9th Cir. 1979) (holding that complex consolidated securities actions must be tried before a jury).

But the Seventh Amendment does not "render[] Congress powerless * * * to create new public rights and remedies by statute and commit their enforcement, if it chose, to a tribunal other than a court of law—such as an administrative agency—in which facts are not found by juries." *Atlas*

*Roofing*, 430 U.S. at 460. Instead, Congress may assign "a claim that is legal in nature [and] asserts a 'public right'" to adjudication before "an administrative agency." *Granfinanciera*, 492 U.S. at 42 n.4. Thus, cases "involving statutory rights that are integral parts of a public regulatory scheme" may be adjudicated in administrative proceedings and Congress may constitutionally "decline to provide jury trials" in those proceedings. *Id.* at 55 n.10. Put differently, "Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity." *Id.* at 53.

Petitioners are thus mistaken when they assert, Br. 21-24, that *Granfinanciera* departed from the Supreme Court's previous decisions involving public rights. To the contrary, *Granfinanciera* reiterated that the Seventh Amendment does not apply to administrative proceedings concerning public rights, *i.e.*, those "cases that 'arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" 492 U.S. at 51 & n.8; *accord id.* at 65 (Scalia, J., concurring in part and concurring in the judgment) (collecting cases explaining that

public rights cases "must at a minimum arise 'between the government and others'").

Consistent with these precedents, this Court has repeatedly held that public rights like the securities laws may be enforced by the Executive Branch in administrative proceedings. In *Austin v. Shalala*, 994 F.2d at 1177-78, this Court held that a Social Security claimant was not entitled to a jury trial when the government sought to recoup excessive past benefits in an administrative proceeding. In so holding, the Court explained that because "Congress may employ an administrative body as a factfinder in imposing money penalties for the violation of federal laws," *a fortiori*, it may "employ such a body to recover overpayments of" benefits. *Id.* Likewise, this Court rejected a petitioner's claim that he was entitled to a jury trial when the Office of Thrift Supervision ordered him to pay nearly $20 million to his failed savings and loan association. *Akin v. Office of Thrift Supervision*, 950 F.2d 1180, 1181-82 (5th Cir. 1992). Instead, the Court held that "[w]here there is a proper administrative forum for adjudicating public rights, there is no right to a jury trial." *Id.* at 1186.

Those decisions are consistent with the holdings of other courts of appeals. The Second Circuit rejected a Seventh Amendment challenge to proceedings before the Office of Comptroller of Currency, where the

petitioner alleged that the civil penalty was a "disguised tort award[]" that necessitated a jury trial. *Cavallari v. Office of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir. 1995). The court rightly observed that the government was acting under its statutory authority to "safeguard the thrift industry" from "unsafe or unsound banking practice[s]" that could destabilize the country's financial sector. *Id.* at 143, 145. The administrative proceeding "clearly implicate[d] public rights, as distinct from any legal claims" that a private entity might bring, and "[t]herefore, no jury trial was required." *Id.* at 145 (citing *Akin*, 950 F.2d at 1186). *See also Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1423-24 (9th Cir. 1994) (relying on *Akin* to hold that jury trials are not required in administrative proceedings that adjudicate public rights). The Eighth Circuit has similarly explained that for enforcement proceedings under the Commodity Futures Trading Commission Act, there is no right to a jury trial because "the Government sues in its sovereign capacity to enforce public rights." *Myron v. Hauser*, 673 F.2d 994, 1005 (8th Cir. 1982).

Here, as in those cases, the Commission may constitutionally enforce the securities laws' public rights by adjudicating petitioners' violations and imposing appropriate civil penalties.

## II. THE REMOVAL RESTRICTIONS FOR ADMINISTRATIVE LAW JUDGES ARE CONSTITUTIONAL AND PRESERVE THE EXECUTIVE BRANCH'S CHAIN OF COMMAND

Congress created ALJs (then called hearing examiners) when it enacted the Administrative Procedure Act in 1946. *See* Pub. L. No. 79-404 § 11, 60 Stat. 237, 244 (1946). The Act provided that ALJs would be "[s]ubject to the civil-service" and "shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission." *Id.* That provision is now codified in 5 U.S.C. § 7521(a), which provides that ALJs may be removed by their appointing agency "only for good cause established and determined by the Merit Systems Protection Board."

This longstanding scheme gives ALJs a "qualified right of decisional independence," *Nash v. Califano*, 613 F.2d 10, 15 (2d Cir. 1980), and was designed to rebut allegations that ALJs might be "mere tools of the agency." *Ramspeck v. Federal Trial Examiners Conf.*, 345 U.S. 128, 131 (1953).

At the same time, however, the "good cause" standard permits Heads of Departments, like the Commission, to remove ALJs if they engage in misconduct, exhibit poor job performance, or fail to follow a lawful direction from the Department Head, thereby preserving the constitutionally requisite degree of control. And that degree of control is

consistent with the MSPB's role in adjudicating removals. The statute authorizes the MSPB to adjudicate whether there is substantial evidence to support the employing agency's proffered, good-faith grounds for cause, but it does not authorize it to substitute its judgment as to whether those grounds warrant removal. Other constructions of 5 U.S.C. § 7521, which might raise "serious constitutional doubts," should be rejected, under the long-standing rule that the Court will "read the statute to eliminate those doubts so long as such a reading is not plainly contrary to the intent of Congress." *United States v. Richards*, 755 F.3d 269, 274-75 (5th Cir. 2014) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994)).

## A. Under Article II, Inferior Officers Must Be Removable For Misconduct, Poor Performance, Or Failure To Follow Lawful Directions

The Constitution vests in the President "[t]he executive Power" of the United States and obligates him to "take Care that the Laws be faithfully executed." U.S. Const., art. II, §§ 1, 3. James Madison observed during the First Congress, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834). The Supreme Court has long recognized that, as "the President alone and unaided could not execute the laws," it is "essential" that his executive

power include authority both in the "selection of administrative officers" and in "removing those for whom he cannot continue to be responsible." *Myers v. United States*, 272 U.S. 52, 117 (1926). The "power to oversee executive officers through removal" is a "traditional executive power," *Free Enterprise*, 561 U.S. at 492, because "[o]nce an officer is appointed, it is only the authority that can remove him * * * that he must fear and, in the performance of his functions, obey," *Bowsher v. Synar*, 478 U.S. 714, 726 (1986).

The Constitution's vesting of executive power and responsibility in the President ensures political accountability. "The Framers created a structure in which '[a] dependence on the people' would be the 'primary control on the government.'" *Free Enterprise*, 561 U.S. at 501. As "[t]he people do not vote for the 'Officers of the United States,'" *see* U.S. Const. art. II, § 2, cl. 2, they must "look to the President to guide the 'assistants or deputies * * * subject to his superintendence.'" *Id.* at 497-98. For "those who are employed in the execution of the law," it is thus imperative that "the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 Annals of Cong., at 499 (Madison). This "clear and effective chain of command" is necessary so that the people can

"determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Free Enterprise*, 561 U.S. at 498. Restricting the President's power to effectuate the removal of subordinate officers therefore creates the risk that the Executive Branch "may slip from the [Chief] Executive's control, and thus from that of the people." *Id.* at 499.

The Supreme Court has held that principal officers answering directly to the President generally must be removable at will by the President himself, with the sole exception of "expert agencies led by a *group* of principal officers removable by the President only for good cause." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2192 (2020) (citing *Humphrey's Executor v. United States*, 295 U.S. 602, 627-29 (1935)).

The Supreme Court has also addressed the removal of "inferior" officers—subordinate officials "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). In three decisions, the Court has established that Congress may vest removal authority in a Department Head rather than the President personally, and subject to limited restrictions that do not place

such officers beyond adequate presidential control.  *See Free Enterprise*, 561 U.S. at 493-95.

*First*, in *United States v. Perkins*, 116 U.S. 483 (1886), the Court upheld a removal restriction that required the Secretary of the Navy to make a misconduct finding or convene a court-martial before removing a naval cadet-engineer during peacetime.  *Id.* at 485.  The Court had no occasion to consider what sort of behavior would warrant removal under the statute because it was undisputed that the cadet was discharged, not for any reason related to misbehavior, but solely for want of a vacancy.  *Id.* at 483.  *Cf. Free Enterprise*, 561 U.S. at 507 ("Military officers are broadly subject to Presidential control through the chain of command and through the President's powers as Commander in Chief.").

*Second*, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Court upheld a statute that allowed the Attorney General to remove only for "good cause" an independent counsel appointed to investigate and prosecute serious crimes committed by certain high-ranking executive officers.  *Id.* at 685-93. The Court did not decide "exactly what is encompassed within the term 'good cause,'" but stressed its understanding that "the Attorney General may remove an independent counsel for 'misconduct.'"  *Id.* at 692. Through that removal authority, the Court stated, the President "retains

ample authority to assure that the counsel is competently performing his or her statutory responsibilities." *Id.* The Court also emphasized that its conclusion rested in part on the independent counsel's "limited jurisdiction and tenure and lack [of] policymaking or significant administrative authority." *Id.* at 691. Although the independent counsel exercised "discretion and judgment" in carrying out his responsibilities, the Court concluded that "the President's need to control the exercise of that discretion [was not] so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92. *See also Seila Law*, 140 S. Ct. at 2199 (explaining that *Morrison*'s removal restrictions "did not unduly interfere with the functioning of the Executive Branch").

*Third*, in *Free Enterprise*, the Court invalidated a statutory provision that imposed stringent limitations on the removal of inferior officers who could be removed only by principal officers also subject to good cause removal. The members of the Public Company Accounting Oversight Board (Board) could be removed only by the SEC Commissioners, and only for "willful violations of the [Sarbanes-Oxley] Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance—as determined in a formal Commission order, rendered on the

record and after notice and an opportunity for a hearing." *Free Enterprise*, 561 U.S. at 503. And it was assumed—without statutory citation—that the President could remove the Commissioners only for "inefficiency, neglect of duty, or malfeasance in office" and not "simple disagreement with the [Commission's] policies or priorities." *Id*. at 486-87, 502. The Court concluded that this "novel" and "rigorous" structure meant that "the President [was] no longer the judge of the Board's conduct" because he lacked "the ability to oversee the Board, or to attribute the Board's failings to those whom he *can* oversee." *Id*. at 492, 496. Accordingly, the Court invalidated and severed the Board's removal restrictions. *Id*. at 509.

The Court took pains, however, to explain that it was not making "general pronouncements on matters neither briefed nor argued here," and *Free Enterprise*, 561 U.S. at 506, and that the invalidation of the Board's "highly unusual" and "sharply circumscribed" removal standard, *id*. at 505, should not "cast doubt on the use of what is colloquially known as the civil service system within independent agencies," *id*. at 507. The Court also made explicit that its holding did "not address that subset of independent agency employees who serve as administrative law judges," who "perform adjudicative rather than enforcement or policymaking functions." *Id*. at 507 n.10. Then-Judge Kavanaugh (whose dissenting opinion in the D.C.

Circuit accorded with the Supreme Court's subsequent decision) similarly noted that "ALJs perform only adjudicatory functions that are subject to review by agency officials," which "arguably would not be considered 'central to the functioning of the Executive Branch' for purposes of the Article II removal precedents." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (quoting *Morrison*, 487 U.S. at 691-92). Then-Judge Kavanaugh further noted that agencies have a "choice whether to use ALJs for hearings," as the agency head can always adjudicate the matter personally. *Id.* (citing 5 U.S.C. § 556(b)).

The Supreme Court has thus established that inferior officers like ALJs—who perform limited adjudicative functions and whose decisions are reviewed by Senate-confirmed Department Heads—can have some protection from removal that is consistent with the Constitution's separation of powers. While ALJs are "officers subject to presidential [control by] removal," they may also have "a measure of independence from other executive actors." *Kuretski v. Commissioner*, 755 F.3d 929, 944 (D.C. Cir. 2014). *See also Mahoney v. Donovan*, 721 F.3d 633, 635 (D.C. Cir. 2013) (explaining that 5 U.S.C. § 7521 and other provisions "are designed to safeguard the decisional independence of" ALJs).

In *Myers*, the Supreme Court recognized that there may be adjudicative duties "imposed on executive officers * * * whose decisions after hearing affect interests of individuals," which the "President cannot in a particular case properly influence or control" by threat of removal. 272 U.S. at 135. Thus, while it is not constitutionally required for adjudicators to have for-cause removal protections, *see Kalaris v. Donovan*, 697 F.2d 376, 397-98 (D.C. Cir. 1983) (holding that members of the Benefits Review Board are removable at-will by the Secretary of Labor), Congress can grant some removal protections for inferior officers who have limited adjudicatory duties. But if those inferior officers were entirely insulated from removal, then the President would be prevented from discharging "his own constitutional duty of seeing that the laws be faithfully executed." *Myers*, 272 U.S. at 135. Thus, at a minimum, there must be good cause for removing an inferior officer if that officer "fail[s] to accept supervision." *See Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting).

Consistent with this understanding, ALJs are accountable to the Department Heads and, by extension, to the President. If, for example, an ALJ issues a pattern of decisions that lack reasoned explanations, or repeatedly compiles records that omit key documents and testimony, the Department Head must be able to remove the ALJ for poor performance.

Removal would likewise be warranted if an ALJ flouts binding and authoritative agency interpretations of the governing law, and insists on substituting their own interpretation of applicable statutes for that of the agency. Removal would similarly be required if the ALJ refused to comply with a lawfully issued directive, such as an order to conduct a new hearing consistent with the Supreme Court's remedy in *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018). And consistent with *Morrison*, 487 U.S. at 692, ALJs must be removable for misconduct.

As long as these measures of supervision are preserved, ALJs may receive limited protections against removal that promote public confidence in their decisional independence.

**B.  Under 5 U.S.C. § 7521, The Commission May Remove ALJs For Misconduct, Poor Performance, Or The Failure To Follow Lawful Directions**

**1.**  The removal restrictions in 5 U.S.C. § 7521 conform to these constitutional principles.[8]  The statute's "good cause" standard does not

---

[8] Petitioners mistakenly assert that the United States has "conceded" that 5 U.S.C. § 7521 is unconstitutional.  Br. 55.  To the contrary, the United States has consistently argued that § 7521 raises separation-of-powers concerns but is constitutional because it allows for Department Heads to remove ALJs for poor performance, misconduct, or the failure to follow lawful directions.  *See, e.g.*, Resp Br. 48-53, *Lucia v. SEC*, 2018 WL 1251862 (U.S. Feb. 21, 2018); Resp. Supp. Br. 13-36, *Fleming v. USDA*, 2020 WL 1025336 (D.C. Cir. Feb. 27, 2020); Fed. Resp. Br. 26-45, *Decker*

purport to abrogate a Department Head's ability to remove ALJs for misconduct, poor performance, or failure to follow lawful directions, and at the same time it protects the ALJ from removal based on invidious or otherwise improper reasons. *See Black's Law Dictionary* 822 (4th ed. 1951) (defining "good cause" to include "any ground which is put forward by authorities in good faith and which is not arbitrary, irrational, unreasonable or irrelevant to the duties with which such authorities are charged"); Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 111 (1994) ("Purely as a textual matter, the words 'good cause' * * * seem best read to" allow removal of officers for "lack of diligence, ignorance, incompetence, or lack of commitment to their legal duties."); *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting) ("*for cause* * * * would include, of course, the failure to accept supervision"). Indeed, the Supreme Court has squarely held that, while Congress did not intend for ALJs to be removed "at the whim or caprice of the agency or for political reasons," the agency could remove them for "legitimate reasons"

---

*Coal Co. v. Pehringer*, 2020 WL 7634933 (9th Cir. Dec. 14, 2020). In other cases, the United States has appropriately declined to defend statutory removal restrictions that do violate the separation of powers and unconstitutionally impinge the President's Article II authority. *See* Resp. Br. 26-44, *Seila Law LLC v. CFPB*, 2019 WL 6727094 (U.S. Dec. 9, 2019) (arguing that the statutory restrictions on the President's ability to remove the CFPB Director are unconstitutional).

even if those would not justify removal of Article III judges.  *See Ramspeck*, 345 U.S. at 142-43.

This construction of 5 U.S.C. § 7521 is consistent with *Free Enterprise*, where the statutory grounds for removing the Board members stand in stark contrast to § 7521.  In *Free Enterprise,* the removal restrictions were both unusually high and unambiguously delineated: members were removable only if they "willfully violated" certain laws, "willfully abused [their] authority," or "without reasonable justification or excuse * * * failed to enforce compliance with" specified rules or standards. 15 U.S.C. § 7217(d)(3); *see Free Enterprise*, 561 U.S. at 486-87, 502-03. Those strict limitations on removal were further exacerbated by the Board's widespread regulatory authority and limited oversight by the SEC.  Unlike ALJs—who exercise limited adjudicative authority that is delegated by the Commission—the Board had "expansive powers to govern an entire industry."  *Id.* at 485.  And while the Commission retains plenary authority to review its ALJ's adjudication, "not every Board action is encapsulated in a final Commission order or rule."  *Id.* at 490.

Insofar as this Court has concerns regarding the scope of 5 U.S.C. § 7521, it can and should construe the statute in a manner that ameliorates any constitutional concerns.  This Court not only has "the power to adopt

[a] narrowing construction[]" of the statute, but an affirmative "duty to avoid constitutional difficulties by" adopting such a construction if it is "fairly possible" to do so.  *Boos v. Barry*, 485 U.S. 312, 330-31 (1988).  "We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act.  Even to avoid a serious doubt the rule is the same."  *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) (if a statute has multiple interpretations, "our plain duty is to adopt that [interpretation] which will save the act" or "avoid a serious doubt").

That "'cardinal principle' of statutory interpretation," *see Zadvydas v. Davis*, 533 U.S. 678, 689 (2001), applies with full force to statutes "conern[ing] the relative powers of coordinate branches of government." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465-66 (1989) (rejecting "a straightforward reading of 'utilize' " in the Federal Advisory Committee Act in light of (among other things) the "decisive[]" consideration that such a reading would raise "formidable constitutional difficulties" under Article II); *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 231 (D.C. Cir. 2013) (construing the statutory term "agency records" to "avoid substantial separation-of-powers questions").  And it is

applicable when construing statutory "[g]ood-cause limits" for "non-principal officers and adjudicators."  Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1250 (2014).  If a narrowing construction is available that "ensure[s] supervision" of an adjudicator "by an officer fully accountable to the President," then the "[c]ourts can interpret the statutory requirements" of a for-cause removal restriction "alongside [the relevant] constitutional concerns."  *Id.* at 1250-51.  *Accord* John F. Manning, *The Independent Counsel Statute:  Reading "Good Cause" in Light of Article II*, 85 Minn. L. Rev. 1285, 1325-26 (1999) ("[C]laims of inherent Article II removal authority" may properly inform a narrowing construction of statutory "good cause" requirements).

The Commission still may not remove ALJs at will or for invidious or other improper reasons in light of their adjudicatory function.  *See, e.g.*, 42 U.S.C. § 2000e-16(a) ("All personnel actions affecting employees  * * *  in executive agencies  * * *  shall be made free from any discrimination based on race, color, religion, sex, or national origin.").  But those limitations are consistent with Article II, because the other broad grounds for removal give the Commission and the President sufficient ability to supervise and control the exercise of executive adjudication.

The SEC Commissioners are assumed to have for-cause protection from removal by the President, which is a constitutionally permissible standard for agencies like the Commission, *Humphrey's Executor*, 295 U.S. at 628-30, and they are responsible for removing ALJs under the good-cause standard in § 7521. Contrary to petitioners' assertion, that scheme does not offend "the requirements of Article II," Br. 55, because there is no "diffusion of accountability" in the Executive Branch's "clear and effective chain of command." *Free Enterprise*, 561 U.S. at 497-98. In *Free Enterprise*, that chain of command was circumvented because the inferior officers—charged with affirmatively regulating an entire industry and bringing coercive enforcement actions—were "not accountable to the President" because they could only be removed by the Commission under a unique and "rigorous good-cause standard." 561 U.S. at 485, 495-96. But in exercising their adjudicative authority, ALJs are continuously subject to Commission review and control, and can be removed for poor performance in exercising their purely delegated authority or for failing to follow the Commission's directions. There is thus no question that the ALJs are directly accountable to the Commissioners, whom the President constitutionally oversees. Moreover, there is no lack of accountability for the Commission either. All understand that the order now under review in

this Court is the *Commission*'s order, not the ALJ's. After the ALJ issued an initial decision, the Commission granted plenary review and disagreed with the ALJ on factual findings, ROA.31 n.107, evidentiary decisions, ROA.20 n.54, appropriate civil penalties, ROA.28 n.87, and the amount of disgorgement, ROA.29 n.96. This is not a case where the Court needs to "speculate about whether appropriate" oversight would have rendered a different result. *Collins v. Mnuchin*, 938 F.3d 553, 594 (5th Cir. 2019) (en banc). The Commission thoroughly reviewed the ALJ's initial decision and issued its own decision making all necessary changes.

Petitioners appear to argue that two layers of for-cause removal are categorically prohibited. Br. 55-56. But as already explained, 5 U.S.C. § 7521—unlike the highly specific and rigorous standard at issue in *Free Enterprise*, 15 U.S.C. § 7217(d)(3)—can and should be understood to preserve the President's authority to supervise and control executive adjudication. Indeed, *Free Enterprise* emphasized that it was not making a "general pronouncement[]" that "two levels of good-cause tenure" are *always* unconstitutional, and it did not question the "civil service system within independent agencies." 561 U.S. at 505-07. And the limited protections for ALJs are not a "novel structure," *cf. Free Enterprise*, 561 U.S. at 505, given the more than seventy-year long history of providing

tenure protection to inferior adjudicative officers at independent agencies, *see, e.g.*, *Zitserman v. FTC*, 200 F.2d 519, 520-21 (8th Cir. 1952).  As the Supreme Court has explained, this kind of "systematic, unbroken executive practice, long pursued * * * and never before questioned * * * may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II."  *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981); *see also NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of great weight in a proper interpretation of" the Constitution).

**2.**  The rest of 5 U.S.C. § 7521 is reasonably understood to comport with the constitutionally necessary power to remove inferior officers.  The Merit System Protection Board's power to "establish[] and determine[]" the existence of "good cause" under § 7521 properly limits MSPB's role to adjudicating whether factual evidence exists to support the Commission's proffered, good-faith grounds for cause, and does not to authorize it to make a determination about whether those grounds warrant removal (as opposed to a lesser sanction).  The statute authorizes MSPB only to "determine" whether the employing agency has provided good cause for removing the ALJ and to "establish" the factual basis (or lack thereof) in a written opinion.  *Cf. Ramspeck*, 345 U.S. at 142 (holding that the original

version of § 7521 "leaves with the agency the responsibility" to determine whether unneeded hearing examiners should be discharged, subject to appeal to MSPB's predecessor to "prevent any devious practice by an agency which would abuse" that power).  The phrase "established and determined" might also be understood as referring to the adjudication of the removal by the MSPB, as a "doublet[]—two ways of saying the same thing that reinforce its meaning," which are common throughout the U.S. Code.  *Doe v. Boland*, 698 F.3d 877, 881-82 (6th Cir. 2012) (collecting examples); *see also Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013) (presumption against surplusage "is not an absolute rule").

Notably, the MSPB's role in removing ALJs does not present an additional level of tenure protection.  The Supreme Court has repeatedly upheld "cause" restrictions on removal of inferior officers that were subject to judicial review by federal courts, *see Morrison*, 487 U.S. at 663-64; *Perkins*, 116 U.S. at 484-85, over which the President has no removal authority.  As long as the MSPB is limited to adjudicating whether the Commission has provided good-faith factual support for "good cause" under the broad standard identified above, its role in the review process does not create a constitutional obstacle to the President's ability to supervise and control ALJs.

In sum, there is no legal impediment to construing 5 U.S.C. § 7521 as authorizing the Commission to remove an ALJ who has engaged in misconduct, poor performance, or insubordination, while limiting MSPB's role to adjudicating whether the employing agency has provided good-faith factual support for removal under that standard. And that construction eliminates any Article II concerns that implicate the rights of respondents who appear before ALJs.[9]

**3.** If the Court were to nonetheless hold 5 U.S.C. § 7521 unconstitutional, it would be appropriate to sever whatever portion or portions of § 7521 cannot be interpreted, even under principles of constitutional avoidance, to accord agency heads appropriate supervision of

---

[9] This construction of 5 U.S.C. § 7521—allowing for broad but permissible grounds for removal of an adjudicator—is consistent with due process protections in administrative proceeding. Generally speaking, adjudication in the Executive Branch can be performed by officers who are removable at-will, and likewise can be performed by officers who have restrictions on their removal. *See* Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Reserve L. Rev. 1083, 1089-90 (2015) (describing adjudication of pension claims by the Secretary of War in the late-18th and early-19th centuries). A Secretary may, for instance, personally review a file and reverse a subordinate officer's determination if the Secretary disagrees with it. *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 50-51 (1888). In those circumstances, the Secretary acts as a "superior tribunal," and his decisions are "binding on an inferior" officer, who has a "ministerial duty * * * to obey it and carry it out." *Id.* at 52. Those proceedings, where the politically accountable officer directly handles adjudication, comply with due process, as do proceedings before an ALJ.

ALJs as inferior officers within their agencies. That remedy would be consistent with the "normal rule" that "partial, rather than facial, invalidation is the required course." *Free Enterprise*, 561 U.S. at 508.

## III.  PETITIONERS' REMAINING OBJECTIONS LACK MERIT

### A.  Bringing An Enforcement Proceeding Is An Exercise of Executive Authority, Not Legislative Authority

The Securities Act, Exchange Act, Company Act, and Advisers Act authorize the Commission to institute administrative enforcement proceedings to determine whether a respondent has violated the securities laws. *See* 15 U.S.C. §§ 77h-1(a); 78*o*(b)(4), (b)(6); 78u-3(a); 80a-9(b), 80b-3(f). Those provisions, like many other federal statutes, grant "complete discretion to the [agency] to decide how and when they should be exercised," *Heckler v. Chaney*, 470 U.S. 821, 835 (1985), and are consistent with the general principle that the "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon,* 418 U.S. 683, 693 (1974). These kinds of enforcement decisions have "long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Chaney*, 470 U.S. at 832.

Thus, "whenever the Commission brings an enforcement action—whether in federal district court or in an administrative proceeding—it is not acting in a *legislative* capacity; instead, it is acting in an *executive* capacity, enforcing laws that Congress has enacted or regulations promulgated by the Commission pursuant to its Congressionally authorized rulemaking authority." ROA.42-43. That exercise of executive power does not implicate the non-delegation doctrine, which "applies only to delegations by Congress of legislative power." *United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020); *id.* at 176 (rejecting a non-delegation challenge because the challenged action was "an exercise of executive, not legislative, power"). Instead, as the Supreme Court has reiterated, the non-delegation doctrine applies only to "powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality) (quoting *Wayman v. Southard*, 23 U.S. 1, 42-43 (1825)).

Petitioners do not challenge any substantive rulemaking by the Commission, which would normally be the kind of action subject to a non-delegation challenge. *See, e.g.*, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001) (upholding agency regulations as permissibly following a statutorily set "intelligible principle"). Instead, they argue that the Commission's decision to institute an administrative proceeding, rather

than filing a district court action, represents a "core *legislative* power." Br. 34. That argument fails on its own terms. Bringing an enforcement action either in an administrative proceeding or in a court is an exercise of executive authority—and the choice between those options is likewise an executive decision. Petitioners cite no authority endorsing their novel proposition to the contrary.

### B. Petitioners Fail To Demonstrate That The Commission Impermissibly Treated Them Differently From Other Similarly Situated Parties

Consistent with the above, the decision to bring an enforcement action is generally within the Executive's discretion, and the Court presumes that the Executive has acted in "good faith and constitutional compliance," *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005), unless there is "clear evidence to the contrary," *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Of course, an enforcement decision cannot be premised on impermissible criteria, such as a respondent's race or religion, *id.*, and there is no allegation that the Commission considered such factors here. Instead, petitioners raise a class-of-one equal protection claim, alleging that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Integrity Collision Center v. City of Fulshear*, 837 F.3d 581,

586 (5th Cir. 2016).  To support that claim, petitioners must "present evidence of *both* discriminatory effect *and* discriminatory intent."  *In re United States*, 397 F.3d at 284.

Petitioners' class-of-one claim fails at a fundamental level.  Principles of equal protection do not compel the Commission "to develop a formal process with constitutionally measurable criteria for determining" which cases should proceed in district court and which should be handled in an administrative proceeding.  *Integrity Collision Center*, 837 F.3d at 588.  That discretionary choice by its nature is "based on a vast array of subjective, individualized assessments"—as are most enforcement decisions.  *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 603 (2008).  In these cases, equal protection is not offended when similar individuals are treated differently, because that different treatment "is an accepted consequence of the discretion granted."  *Id.*  If petitioners could challenge the Commission's choice of forum for enforcement proceedings, that would "undermine the very discretion that" the Commission is "entrusted to exercise."  *Id.*

In *Engquist*, the Supreme Court provided an instructive example of when a class-of-one claim must fail.  It considered a traffic officer who observed many drivers exceeding the speed limit, and who then issued a

ticket to one arbitrarily chosen driver. *Engquist*, 553 U.S. at 603. In that case, the ticketed driver would have no basis to complain that they had "been singled out for no reason." *Id.* at 604. Unlike a claim that the officer had acted on the basis of race or sex (which would clearly state an equal protection claim), a claim that the officer acted "for no discernible or articulable reason" will not suffice because that claim "does not invoke the fear of improper government classification." *Id.* The driver's challenge would be directed at "the legitimacy of the underlying action itself" and "would be incompatible with the discretion inherent in the challenged action." *Id.* In other words, the driver cannot challenge "what in its nature is a subjective, individualized decision" just because the decision "was subjective and individualized." *Id.* Accordingly, as the Seventh Circuit has explained, the "exercise of prosecutorial discretion cannot be successfully challenged merely on the ground that it is irrational or arbitrary; in the realm of prosecutorial charging decisions, only invidious discrimination is forbidden." *United States v. Moore*, 543 F.3d 891, 900 (7th Cir. 2008) (collecting cases).

That conclusion applies with full force here. Congress granted the Commission the discretion to choose whether to pursue cases in district court or in enforcement proceedings, and petitioners cannot seek to

invalidate the Commission's order on the mere basis that the Commission exercised that discretion in their case.

Even if that were not so, petitioners fail to substantiate that they were treated differently from other similarly situated parties. Instead, they cite without elaboration to a list of nine enforcement actions that the Commission brought in district court that concern some of the same statutory violations involved here. Br. 43 n.96 (citing App. 171-72). That meager offering fails to establish that petitioners were similarly situated to those cases—petitioners do not describe the facts of those cases, the legal theories relied upon, or whether the cases presented other considerations. *See* ROA.47 (rejecting petitioners' argument for this reason). For instance, petitioners cite *SEC v. Thomas*, No. 13-739 (N.D. Tex.) as a comparable case. *See* App. 171. But that case concerned a Ponzi scheme,[10] where the Commission needed to obtain a district court preliminary injunction to freeze assets directly tied to the alleged fraud,[11] and where the Commission won a default judgment because the defendants failed to defend the action.[12] Petitioners nowhere explain how these, or any other cases they

---

[10] Compl. ¶ 4, *SEC v. Thomas*, No. 13-739 (N.D. Tex. Feb. 14, 2013)

[11] Mot. for Preliminary Injunction ¶¶ 4-8, *SEC v. Thomas*, No. 13-739 (N.D. Tex. Mar. 5, 2013).

[12] Order at 3, *SEC v. Thomas*, No. 13-739 (N.D. Tex. Mar. 4, 2014).

cite, are similarly situated to their own.  Nor do petitioners acknowledge that the Commission has instituted administrative proceedings against other parties for violating some of the same statutory provisions at issue here.  *Compare* Order Instituting Proceedings at 12, *In re David F. Bandimere* (SEC Dec. 6, 2012) (instituting administrative proceeding to determine whether respondents "violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder"),[13] *with* App. 15 (instituting administrative proceeding to determine whether petitioners "violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder").

Petitioners also assert that the Commission's decision to institute administrative proceeding must be examined under strict scrutiny because it implicates the Seventh Amendment.  Br. 45-48.  But as explained above, Congress may constitutionally authorize the Commission to conduct administrative proceedings without a jury trial.  Petitioners cannot collaterally attack Congress's proper vesting of that authority in the Commission by claiming that the Commission's exercise of that authority is subject to strict scrutiny.

---

[13] Available at https://go.usa.gov/xHV9m.

## C.　The Proceeding Complied With Due Process

When this proceeding originally began in March 2013, Jarkesy and Patriot28 were co-respondents with John Thomas Financial, Inc. and Anastasios Belesis.  App. 1.  In December 2013, John Thomas Financial and Belesis reached a settlement with the Commission.  Subsequently, the Commission published an order finding that John Thomas Financial and Belesis violated 15 U.S.C. § 80b-6(2) and imposed sanctions and equitable remedies against them.  App. 25-28.  As a basis for that order, the Commission made factual findings of misconduct, which John Thomas Financial and Belesis consented to, without admitting or denying them.  In particular, John Thomas Financial and Belesis consented to the entry of findings that they had "aided, abetted and caused" the manager and adviser of the funds to breach their fiduciary duties in violation of 15 U.S.C. § 80b-6(2).  App. 19.  The Commission's order explained, however, that these findings were "pursuant to" the settlement agreement "and are not binding on any other person or entity in this or any other proceeding."  App. 19 n.1.

After those parties had settled, petitioners had a full hearing before the ALJ, where they were able to present evidence and arguments to contest the allegations against them.  After the ALJ issued an adverse order, petitioners appealed to the Commission and successfully argued that the

Commission should consider an affidavit provided by Belesis that the ALJ had originally excluded. ROA.20 n.54 (granting petitioners' motion to admit the affidavit). The Commission ultimately found that petitioners had violated the securities laws, but it rescinded a $150,000 monetary penalty that the ALJ had imposed that was premised on petitioners "material misrepresentations and omissions relating to their 'relationship with JTF/Belesis." ROA.28 n.87. The Commission explained that it made "no findings on that issue and the sanctions we have imposed are not premised on it." ROA.28 n.87; *see also* ROA.31-32 n.107 (Commission's decision to "discontinue the proceeding" with respect to any alleged misconduct between petitioners and John Thomas Financial and Belesis).

Petitioners erroneously contend that because the Commission settled the proceedings with their co-respondents, the Commission must have impermissibly pre-judged the case and been biased against them. Br. 48-55. But this Court has held that a tribunal does not violate due process simply by adjudicating some co-defendants' cases before others—even if one co-defendant's liability implicates another. *United States v. Wilson*, 77 F.3d 105, 110-111 (5th Cir. 1996).

Michael Wilson was set to be tried with five other defendants on drug charges, but his case was severed and tried later, after his co-defendants

had been convicted. *Wilson*, 77 F.3d at 108 & n.1 (citing *United States v. Clark*, 67 F.3d 1154 (5th Cir. 1995)). Those earlier convictions were based, in part, on evidence that Wilson had engaged in criminal conduct with his co-defendants, including wiretaps of Wilson "informing members of the conspiracy to destroy evidence." *See Clark*, 67 F.3d at 1162; *see also id.* at 1160 (money laundering count based on actions by defendant Michael Wilson); *id.* at 1161 (same for conspiracy count); *id.* at 1162 (same for evidence of possession of cocaine). In sentencing those co-defendants, the district court judge reviewed presentence reports that implicated Wilson in the criminal conduct, and further stated that "Mike Wilson's primary responsibility was in the cocaine and cocaine base end." *Wilson*, 77 F.3d at 110. The same judge then presided at Wilson's later trial. *Id.*

Wilson moved for the judge's recusal, arguing that "the court has predetermined Michael Wilson's guilt in violation of the Due Process Clause of the Fifth Amendment." *Wilson*, 77 F.3d at 110. This Court affirmed the denial of that motion, explaining that "[o]pinions formed during the prior proceedings do not constitute a basis" for recusal—under either statutes or due process—"unless the opinion displays a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 111. That holding makes good sense. If multiple defendants are accused

of acting together in a conspiracy, one defendant might plead guilty on a factual basis that could implicate the others.  A district court judge's acceptance of that factual basis—without more—would not then require the judge to recuse from a later trial of the remaining defendants.  *Id.* ("[A] trial judge is not disqualified because he presided over the trial of a co-defendant or accepted the guilty plea of a co-defendant.").  *Accord United States v. Bernstein*, 533 F.2d 775, 784-85 (2d Cir. 1976) (rejecting claim of bias based on the district court's acceptance of guilty pleas from co-defendants and statements that they had engaged in "a great big scheme").

Here, of course, the Commission took lengths to make clear that it was not considering any evidence related to misconduct by John Thomas Financial and Belesis in adjudicating petitioners' case.  ROA.31-32 n.107. To the contrary, the Commission reversed the civil penalty that the ALJ had imposed based on petitioners' conduct with respect to John Thomas Financial and Belesis and exercised its discretion in discontinuing the proceeding for claims arising from that conduct.  ROA.28 n.87, ROA.32 n.107.

Petitioners point to nothing demonstrating that the Commission improperly considered any evidence outside of their administrative proceeding.  And the cases petitioners rely upon to support their due

process claim all concern public statements outside of the adjudicatory proceedings, which indicated that the adjudicator was predisposed to a particular outcome.  Br. 50-52 (citing *Antoniu v. SEC*, 877 F.2d 721, 723 (8th Cir. 1989); *Texaco, Inc. v. FTC*, 336 F.2d 754, 759-60 (D.C. Cir. 1964); *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 589-90 (D.C. Cir. 1970)).  Petitioners identify no authority for the proposition that a tribunal becomes impermissibly biased by adjudicating a related party's liability.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

MICHAEL A. CONLEY
  *Solicitor*
DOMINICK V. FREDA
  *Assistant General Counsel*
PAUL G. ALVAREZ
  *Senior Counsel*

Securities and Exchange Commission
100 F Street NE
Washington, DC  20549

BRIAN M. BOYNTON
  *Acting Assistant Attorney*
  *General*
MARK B. STERN
JOSHUA M. SALZMAN
*/s/ Daniel Aguilar*
DANIEL AGUILAR
AMANDA L. MUNDELL
  *Attorneys*

U.S. Department of Justice
Civil Division, Appellate Branch
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-5432

May 2021

## CERTIFICATE OF SERVICE

I certify that on May 17, 2021, I filed an copy of this brief with the Clerk of Court for the Fifth Circuit Court of Appeals through the Court's CM/ECF system, which will serve counsel for all parties.

*/s/ Daniel Aguilar*
Daniel Aguilar


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,958 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ Daniel Aguilar*
Daniel Aguilar

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

U.S. Const., art. II, § 1, cl. 1.................................................Add. 1

U.S. Const., art. II, § 2, cl. 2.................................................Add. 1

U.S. Const., art. II, § 3 .......................................................Add. 1

U.S. Const., amend. V..........................................................Add. 1

U.S. Const., amend. VII........................................................Add. 1

5 U.S.C. § 7521................................................................Add. 1

15 U.S.C. § 77h-1(g) ..........................................................Add. 2

15 U.S.C. § 78u-2(a)...........................................................Add. 3

15 U.S.C. § 80a-9(d) ..........................................................Add. 6

15 U.S.C. § 80b-3(i) ..........................................................Add. 9

**U.S. Const., art. II, § 1, cl. 1.**

The executive Power shall be vested in a President of the United States of America.

**U.S. Const., art. II, § 2, cl. 2.**

[H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

**U.S. Const., art. II, § 3.**

He shall * * * take Care that the Laws be faithfully executed * * *.

**U.S. Const., amend. V.**

No person shall be * * * deprived of life, liberty, or property, without due process of law * * *.

**U.S. Const., amend. VII.**

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

**5 U.S.C. § 7521.  Actions against administrative law judges.**

(a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.

(b) The actions covered by this section are—

(1) a removal;

(2) a suspension;

(3) a reduction in grade;

(4) a reduction in pay; and

(5) a furlough of 30 days or less;

but do not include—

(A) a suspension or removal under section 7532 of this title;

(B) a reduction-in-force action under section 3502 of this title; or

(C) any action initiated under section 1215 of this title.

## 15 U.S.C. § 77h-1.  Cease-and-desist proceedings.

\*       \*       \*

(g) Authority to impose money penalties

(1) Grounds

In any cease-and-desist proceeding under subsection (a), the Commission may impose a civil penalty on a person if the Commission finds, on the record, after notice and opportunity for hearing, that—

(A) such person—

(i) is violating or has violated any provision of this subchapter, or any rule or regulation issued under this subchapter; or

(ii) is or was a cause of the violation of any provision of this subchapter, or any rule or regulation thereunder; and

(B) such penalty is in the public interest.

(2) Maximum amount of penalty

(A) First tier

The maximum amount of a penalty for each act or omission described in paragraph (1) shall be $7,500 for a natural person or $75,000 for any other person.

(B) Second tier

Notwithstanding subparagraph (A), the maximum amount of penalty for each such act or omission shall be $75,000 for a natural person or $375,000 for any other person, if the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(C) Third tier

Notwithstanding subparagraphs (A) and (B), the maximum amount of penalty for each such act or omission shall be $150,000 for a natural person or $725,000 for any other person, if—

(i) the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(ii) such act or omission directly or indirectly resulted in—

(I) substantial losses or created a significant risk of substantial losses to other persons; or

(II) substantial pecuniary gain to the person who committed the act or omission.

(3) Evidence concerning ability to pay

In any proceeding in which the Commission may impose a penalty under this section, a respondent may present evidence of the ability of the respondent to pay such penalty. The Commission may, in its discretion, consider such evidence in determining whether such penalty is in the public interest. Such evidence may relate to the extent of the ability of the respondent to continue in business and the collectability of a penalty, taking into account any other claims of the United States or third parties upon the assets of the respondent and the amount of the assets of the respondent.

\*　　\*　　\*

## 15 U.S.C. § 78u-2.  Civil remedies in administrative proceedings.

(a) Commission authority to assess money penalties

(1) In general

In any proceeding instituted pursuant to sections 78o(b)(4), 78o(b)(6), 78o-6, 78o-4, 78o-5, 78o-7, or 78q-1 of this title against any person, the Commission or the appropriate regulatory agency may impose a civil penalty if it finds, on the record after notice and opportunity for hearing, that such penalty is in the public interest and that such person—

>(A) has willfully violated any provision of the Securities Act of 1933, the Investment Company Act of 1940, the Investment Advisers Act of 1940, or this chapter, or the rules or regulations thereunder, or the rules of the Municipal Securities Rulemaking Board;

>(B) has willfully aided, abetted, counseled, commanded, induced, or procured such a violation by any other person;

>(C) has willfully made or caused to be made in any application for registration or report required to be filed with the Commission or with any other appropriate regulatory agency under this chapter, or in any proceeding before the Commission with respect to registration, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or has omitted to state in any such application or report any material fact which is required to be stated therein; or

>(D) has failed reasonably to supervise, within the meaning of section 78o(b)(4)(E) of this title, with a view to preventing violations of the provisions of such statutes, rules and regulations, another person who commits such a violation, if such other person is subject to his supervision;

(2) Cease-and-desist proceedings

In any proceeding instituted under section 78u-3 of this title against any person, the Commission may impose a civil penalty, if the Commission finds, on the record after notice and opportunity for hearing, that such person—

>(A) is violating or has violated any provision of this chapter, or any rule or regulation issued under this chapter; or

>(B) is or was a cause of the violation of any provision of this chapter, or any rule or regulation issued under this chapter.

(b) Maximum amount of penalty

(1) First tier

The maximum amount of penalty for each act or omission described in subsection (a) shall be $5,000 for a natural person or $50,000 for any other person.

(2) Second tier

Notwithstanding paragraph (1), the maximum amount of penalty for each such act or omission shall be $50,000 for a natural person or $250,000 for any other person if the act or omission described in subsection (a) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(3) Third tier

Notwithstanding paragraphs (1) and (2), the maximum amount of penalty for each such act or omission shall be $100,000 for a natural person or $500,000 for any other person if—

(A) the act or omission described in subsection (a) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(B) such act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission.

(c) Determination of public interest

In considering under this section whether a penalty is in the public interest, the Commission or the appropriate regulatory agency may consider—

(1) whether the act or omission for which such penalty is assessed involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;

(2) the harm to other persons resulting either directly or indirectly from such act or omission;

(3) the extent to which any person was unjustly enriched, taking into account any restitution made to persons injured by such behavior;

(4) whether such person previously has been found by the Commission, another appropriate regulatory agency, or a self-

regulatory organization to have violated the Federal securities laws, State securities laws, or the rules of a self-regulatory organization, has been enjoined by a court of competent jurisdiction from violations of such laws or rules, or has been convicted by a court of competent jurisdiction of violations of such laws or of any felony or misdemeanor described in section 78o(b)(4)(B) of this title;

(5) the need to deter such person and other persons from committing such acts or omissions; and

(6) such other matters as justice may require.

(d) Evidence concerning ability to pay

In any proceeding in which the Commission or the appropriate regulatory agency may impose a penalty under this section, a respondent may present evidence of the respondent's ability to pay such penalty. The Commission or the appropriate regulatory agency may, in its discretion, consider such evidence in determining whether such penalty is in the public interest. Such evidence may relate to the extent of such person's ability to continue in business and the collectability of a penalty, taking into account any other claims of the United States or third parties upon such person's assets and the amount of such person's assets.

\*      \*      \*


## 15 U.S.C. § 80a-9.  Ineligibility of certain affiliated persons and underwriters.

\*      \*      \*

(d) Money penalties in administrative proceedings

(1) Authority of Commission

(A) In general

In any proceeding instituted pursuant to subsection (b) against any person, the Commission may impose a civil penalty if it finds, on the record after notice and opportunity for hearing, that such penalty is in the public interest, and that such person—

(i) has willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, subchapter

II of this chapter, or this subchapter, or the rules or regulations thereunder;

(ii) has willfully aided, abetted, counseled, commanded, induced, or procured such a violation by any other person; or

(iii) has willfully made or caused to be made in any registration statement, application, or report required to be filed with the Commission under this subchapter, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or has omitted to state in any such registration statement, application, or report any material fact which was required to be stated therein;

(B) Cease-and-desist proceedings

In any proceeding instituted pursuant to subsection (f) against any person, the Commission may impose a civil penalty if the Commission finds, on the record, after notice and opportunity for hearing, that such person—

(i) is violating or has violated any provision of this subchapter, or any rule or regulation issued under this subchapter; or

(ii) is or was a cause of the violation of any provision of this subchapter, or any rule or regulation issued under this subchapter.

(2) Maximum amount of penalty

(A) First tier

The maximum amount of penalty for each act or omission described in paragraph (1) shall be $5,000 for a natural person or $50,000 for any other person.

(B) Second tier

Notwithstanding subparagraph (A), the maximum amount of penalty for each such act or omission shall be $50,000 for a natural person or $250,000 for any other person if the act or omission described in

paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(C) Third tier

Notwithstanding subparagraphs (A) and (B), the maximum amount of penalty for each such act or omission shall be $100,000 for a natural person or $500,000 for any other person if—

(i) the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(ii) such act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission.

(3) Determination of public interest

In considering under this section whether a penalty is in the public interest, the Commission may consider—

(A) whether the act or omission for which such penalty is assessed involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;

(B) the harm to other persons resulting either directly or indirectly from such act or omission;

(C) the extent to which any person was unjustly enriched, taking into account any restitution made to persons injured by such behavior;

(D) whether such person previously has been found by the Commission, another appropriate regulatory agency, or a self-regulatory organization to have violated the Federal securities laws, State securities laws, or the rules of a self-regulatory organization, has been enjoined by a court of competent jurisdiction from violations of such laws or rules, or has been convicted by a court of competent jurisdiction of violations of such laws or of any felony or misdemeanor described in section 80b-3(e)(2) of this title;

(E) the need to deter such person and other persons from committing such acts or omissions; and

(F) such other matters as justice may require.

(4) Evidence concerning ability to pay

In any proceeding in which the Commission may impose a penalty under this section, a respondent may present evidence of the respondent's ability to pay such penalty. The Commission may, in its discretion, consider such evidence in determining whether such penalty is in the public interest. Such evidence may relate to the extent of such person's ability to continue in business and the collectability of a penalty, taking into account any other claims of the United States or third parties upon such person's assets and the amount of such person's assets.

\*　　\*　　\*

## 15 U.S.C. § 80b-3.  Registration of investment advisers.

\*　　\*　　\*

(i) Money penalties in administrative proceedings

    (1) Authority of Commission

        (A) In general

        In any proceeding instituted pursuant to subsection (e) or (f) against any person, the Commission may impose a civil penalty if it finds, on the record after notice and opportunity for hearing, that such penalty is in the public interest and that such person—

            (i) has willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, subchapter I of this chapter, or this subchapter, or the rules or regulations thereunder;

            (ii) has willfully aided, abetted, counseled, commanded, induced, or procured such a violation by any other person;

            (iii) has willfully made or caused to be made in any application for registration or report required to be filed with the Commission under this subchapter, or in any proceeding before the Commission with respect to registration, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or

has omitted to state in any such application or report any material fact which was required to be stated therein; or

(iv) has failed reasonably to supervise, within the meaning of subsection (e)(6), with a view to preventing violations of the provisions of this subchapter and the rules and regulations thereunder, another person who commits such a violation, if such other person is subject to his supervision;

(B) Cease-and-desist proceedings

In any proceeding instituted pursuant to subsection (k) against any person, the Commission may impose a civil penalty if the Commission finds, on the record, after notice and opportunity for hearing, that such person—

(i) is violating or has violated any provision of this subchapter, or any rule or regulation issued under this subchapter; or

(ii) is or was a cause of the violation of any provision of this subchapter, or any rule or regulation issued under this subchapter.

(2) Maximum amount of penalty

(A) First tier

The maximum amount of penalty for each act or omission described in paragraph (1) shall be $5,000 for a natural person or $50,000 for any other person.

(B) Second tier

Notwithstanding subparagraph (A), the maximum amount of penalty for each such act or omission shall be $50,000 for a natural person or $250,000 for any other person if the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(C) Third tier

Notwithstanding subparagraphs (A) and (B), the maximum amount of penalty for each such act or omission shall be

$100,000 for a natural person or $500,000 for any other person if—

> (i) the act or omission described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

> (ii) such act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission.

(3) Determination of public interest

In considering under this section whether a penalty is in the public interest, the Commission may consider—

> (A) whether the act or omission for which such penalty is assessed involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;

> (B) the harm to other persons resulting either directly or indirectly from such act or omission;

> (C) the extent to which any person was unjustly enriched, taking into account any restitution made to persons injured by such behavior;

> (D) whether such person previously has been found by the Commission, another appropriate regulatory agency, or a self-regulatory organization to have violated the Federal securities laws, State securities laws, or the rules of a self-regulatory organization, has been enjoined by a court of competent jurisdiction from violations of such laws or rules, or has been convicted by a court of competent jurisdiction of violations of such laws or of any felony or misdemeanor described in subsection (e)(2);

> (E) the need to deter such person and other persons from committing such acts or omissions; and

> (F) such other matters as justice may require.

(4) Evidence concerning ability to pay

In any proceeding in which the Commission may impose a penalty under this section, a respondent may present evidence of the respondent's ability to pay such penalty. The Commission may, in its discretion, consider such evidence in determining whether such penalty is in the public interest. Such evidence may relate to the extent of such person's ability to continue in business and the collectability of a penalty, taking into account any other claims of the United States or third parties upon such person's assets and the amount of such person's assets.