No. 20-61007

UNITED STATES COURT OF APPEALS FOR THE
FIFTH CIRCUIT

GEORGE R. JARKESY, JR. AND PATRIOT28, L.L.C.,
Petitioners,

V.

SECURITIES & EXCHANGE COMMISSION,
Respondent.

On Petition for Review of a Final Order of
the Securities and Exchange Commission

PETITIONERS REPLY BRIEF

KAREN COOK, PLLC
**Karen L. Cook**
E-mail: karen@karencooklaw.com
Phone: 214.643.6054
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Fax: 214.295.9556

S. MICHAEL MCCOLLOCH, PLLC
**S. Michael McColloch**
E-mail: smm@mccolloch-law.com
Phone: 214.643.6055
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Fax: 214.295.9556

Attorneys for Petitioners

# TABLE OF CONTENTS

Page

Table of Contents..........................................................................................i

Table of Authorities.....................................................................................ii

I.      Introduction ..................................................................................... 1

II.     The SEC Has Not Rebutted the Actual Seventh Amendment
        Challenge Raised by Jarkesy .......................................................... 1

III.    The SEC's Non-Delegation Response Completely Misses the Point ........... 2

IV.     The SEC's Claim that Equal Protection Rights Do Not Extend to
        Seventh Amendment Deprivations Is Wrong................................... 9

V.      The SEC Mischaracterizes Jarkesy's Prejudgment Claim ........... 11

VI.     This Court Should Not Attempt to Rewrite the Statutory Scheme ............. 13

Conclusion ................................................................................................ 15

Certificate of Service ............................................................................... 16

Certificate of Compliance ........................................................................ 17

# TABLE OF AUTHORITIES

**Cases**                                                              **Page**

*Akin v. Office of Thrift Supervision*, 950 F.2d 1180, 1186 (5th Cir. 1992) .............. 2

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*,
430 U.S. 442, 97 S. Ct. 1261, 51 L. Ed. 2d 464 (1977) ............................. 2-6

*CFTC v. Schor*, 478 U.S. 833, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986)............... 3

*Crowell v. Benson*, 285 U.S. 22, 52 S. Ct. 285, 76 L. Ed. 598 (1932) .................... 4

*Daniel Int'l Corp. v. Fischbach & Moore, Inc.,* 916 F.2d 1061 (5th Cir. 1990)...... 9

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561
U.S. 477, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010) ............................. 14-15

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782,
106 L. Ed. 2d 26 (1989)................................................................................. 3-5

*Lucia v. SEC*, ---U.S.----, 138 S. Ct. 2044, 201 L. Ed. 2d 464 (2018) ................... 15

*MFS Sec. Corp. v. SEC*, 380 F. 3d 611 (2d Cir. 2004)........................................... 15

*Nordlinger v. Hahn,* 505 U.S. 1, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992) ............ 10

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50,
102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982)................................................ 3, 5-6

*Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 29 S. Ct. 671, 53 L.
Ed. 1013 (1909) ............................................................................................ 8

*Oil States Energy Servs., LLC, v. Greene's Energy Grp., LLC*, --- U.S. ----,
138 S. Ct. 1365, 200 L. Ed. 2d 671 (2018).................................................... 2

*Seila Law v. CFPB*, --- U.S. ----, 140 S. Ct. 2183, 2017 L. Ed. 2d 494 ........... 13-14

*Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011)...... 3, 5

*Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 105 S. Ct. 3325,
87 L. Ed. 2d 409 (1985).................................................................................. 3

*United States v. Perkins*, 111 U.S. 479, 4 S. Ct. 525, 28 L. Ed. 478 ..................... 14

# TABLE OF AUTHORITIES CONT'D

**Constitution & Statutes**                                    **Page**

5 U.S.C. § 7521 ................................................................................ 13-15

Dodd-Frank Wall Street Reform and Consumer Act, Pub. L. No. 111-203,
    124 Stat. 1376 (2010) (codified as amended throughout Title 15,
    U.S.C.) .............................................................................. 1-2, 5-6


## OTHER SOURCES

Brief of respondent Securities and Exchange Commission at 20, *Lucia v.*
    *SEC*, ---U.S.----, 138 S. Ct. 2044, 201 L. Ed. 2d 464 (2018) (No. 17-
    130) ....................................................................................... 14

*New York Securities Lawyer Blog* (Lax Neville) January 10, 2014 ....................... 12

# I.

## INTRODUCTION

Jarkesy's[1] petition for review challenges the constitutionality of the SEC's administrative proceedings on specific, narrow grounds—under which the statutory scheme empowering the agency's in-house courts cannot survive constitutional scrutiny. The SEC has implicitly conceded as much: In its brief in response ("Response"), the SEC carefully avoids direct discussion of most of Jarkesy's actual arguments, sets up numerous straw-man issues, and proceeds to thoroughly rebut arguments Jarkesy never advanced.

# II.

## THE SEC HAS NOT REBUTTED THE ACTUAL SEVENTH AMENDMENT CHALLENGE RAISED BY JARKESY

In its simplest terms, the Seventh Amendment challenge raised and narrowly crafted by Jarkesy is this: The federal securities statutes' "anti-fraud" claims are not "new" causes of action "peculiarly suited" to agency adjudication, and for that reason the assignment of such claims *by Congress* to an Article I tribunal was not constitutionally permissible, and therefore the "public rights" doctrine can have no application, rendering the Dodd-Frank § 929P(a) authorization of such claims for Article I litigation against "any person" in violation of the Seventh Amendment.

---

[1] As in Jarkesy's principal brief, pursuant to Fed. R. App. Pro. 28(d) and for ease of reference, the two petitioners are referred to herein as the singular "Jarkesy."

Jarkesy's brief went to great pains to limit this challenge to in-house trials against ordinary citizens (*i.e.*, non-registered parties)[2], to demonstrate how the old *Atlas Roofing* holding had been substantially superseded by subsequent authority[3] and to explain why the "public rights" doctrine—whatever it still means—simply does not apply when the coercive assignment to an Article I tribunal was improper in the first place.[4] Jarkesy further noted that, even if the scheme could somehow overcome the last half-century of constitutional jurisprudence, the unique "coextensive" or "dual" jurisdiction afforded by § 929P(a)—purporting to allow the exact same claims to be litigated *both* before Article I and Article III courts—makes a mockery of the very rationale for Article I tribunals, vitiating the Article I assignment.

The SEC's Response refutes none of this, and indeed concedes some of it and fails to address the remainder. Thus the Response stipulates that Article I assignments can be proper "when Congress creates *new* statutory public rights."[5] The agency also agrees that the Seventh Amendment can be avoided when Congress has "*properly* assign[ed] a matter to adjudication in" an Article I tribunal.[6] Beyond these

---

[2] *See, e.g.*, Brief for Petitioners ("Jarkesy Brief") at 7, n. 12.

[3] *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 97 S. Ct. 1261, 51 L. Ed. 2d 464 (1977). *See* Jarkesy Brief at 15-18.

[4] *Id*. at 25-26.

[5] Response, at 21 (emphasis supplied).

[6] *Id*. at 22, 30 (emphasis supplied), citing *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, --- U.S. ----, 138 S. Ct. 1365, 200 L. Ed. 2d 671 (2018), and this Court's earlier decision in *Akin v. Office of Thrift Supervision,* 950 F.2d 1180, 1186 (5th Cir. 1992). ("[w]here there is a proper administrative forum for adjudicating public rights, there is no right to a jury trial").

ostensible precepts of Article III and Seventh Amendment precedent—with which Jarkesy takes no issue—the Response is bereft of arguments and authorities relevant to the issue at hand.

The most glaring omission is on the impermissibility of the Article I assignment, which is the threshold requirement for any application of the "public rights" doctrine. The SEC continues its talismanic reliance on *Atlas Roofing*, as if this were still 1977 and the many contrary high court decisions over the last half century— including *Northern Pipline*, *Thomas*, *Schor*, *Granfinanciera*, and *Stern*[7]—simply hadn't ever happened. The Response thereby devotes pages to explaining how the "public rights" doctrine—as applied in *Atlas Roofing*—allows for jury-less agency trials, but without ever addressing how the age-old anti-fraud claims can possibly be litigated administratively to begin with.[8] The Response likewise fails to describe how the perpetual, plenary dogma it conjures from *Atlas Roofing* can be reconciled

---

[7] *See* discussion in Jarkesy Brief at 18-23. The cited cases are *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985); *CFTC v. Schor*, 478 U.S. 833, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989); and *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).

The SEC claims, Response at 29, that Jarkesy misspoke in quoting *Granfinaciera's* departure from *Atlas Roofing's* formalistic analysis and determining that the Seventh Amendment applied even to a "public rights" case. Jarkesy Brief at 20-22. Jarkesy did not misquote anything in *Granfinaciera*, including its holding—not mentioned by the SEC—that "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity." 492 U.S. at 60–61.

[8] *See* Response, at 19-31.

with the extensive supervening case law cited by Jarkesy, or reconciled with *Atlas Roofing's* own author's later agreement that the Court had "overrul[ed] or severely limit[ed] the relevant portions" of *Atlas Roofing*.[9]

The original incantation of the "public rights" doctrine began as a rationale for congressional assignments of "new" types of claims to administrative agencies, supplying a sometimes strained exception to the mandates of Article III. Because of the perceived impracticality of empaneling juries in these Article I "courts," the doctrine was later imported, by *Atlas Roofing*, into Seventh Amendment jurisprudence as a corollary to the Article III analysis. As the Jarkesy Brief explains in exhaustive detail, the Supreme Court has been walking back that decision ever since.

But the assignment of securities fraud litigation against ordinary citizens to the SEC's home courts fails to comport with *even* the *Atlas Roofing* construct. That is because the public rights doctrine does not apply at all unless the claims first "properly" qualify for relegation to an Article I forum. That includes, *inter alia*: that the Article I claims are "new" or "novel" statutory obligations, that the high volume of Article I claims would "choke" the federal judiciary; and that those claims are "committed exclusively" by Congress to the agency tribunal. The securities statutes'

---

[9] *See* Jarkesy Brief at 15, n.42, quoting White, J., dissenting in *Granfinanciera,* 492 U.S. at 71. Justice White also conceded, in *Northern Pipeline*, 458 U.S. at 109-10, that his expansive reading of the "public rights" doctrine in *Atlas Roofing* had actually sustained its "death blow" fifty years earlier in *Crowell v Benson*, 285 U.S. 22 (1932).

antifraud claims fail all of these threshold tests for proper assignment to an Article I forum, and the "public rights" doctrine is thereby rendered irrelevant to the analysis. The SEC's Response fails to address any of these issues.

The SEC's silence on the salient elements of the Article III analysis is fatal to its insistence that the "public rights" doctrine can save § 929P(a). The SEC does not contest that the anti-fraud proscriptions are not "new" or "novel," and are indeed "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Stern*, 564 U.S. at 484. Nor does the SEC assert that, all of a sudden in 2010, the "traditional rights and remedies [of securities fraud claims] were inadequate to cope with a manifest public problem," *Atlas Roofing*, 430 U.S. at 461, or that the 2½ securities fraud trials now litigated each year in all of the SEC's home courts combined would somehow constitute the equivalent of "thousands of cases" that would "choke" the federal judicial system.[10] *Id*.

In short, the SEC clings exclusively to the law as it arguably existed in 1977 while ignoring the fundamental precondition for invocation of the "public rights"

---

[10] Nor does the SEC even try to contend that securities fraud trials in federal courts would "go far to dismantle the statutory scheme," or "impede swift resolution" of securities fraud trials, *Granfinanciera*, 492 U.S. 60–61, and for good reason: the SEC has subjected Jarkesy to a nearly decade-long coerced misadventure through its internal courts, indulging itself in a leisurely six years to rule on his "expedited" appeal, not exactly a "swift resolution" even by bureaucratic standards. The SEC is likewise silent on Congress' "careful consideration" of the constitutionality of this invalid assignment, and wisely refrains from arguing that cases like Jarkesy's are "matters that historically could have been determined exclusively by" the internal courts at the SEC. *Northern Pipeline*, 458 U.S. at 68.

doctrine, even in 1977—that the doctrine never comes into play for Seventh Amendment purposes when the underlying Article I assignment is "improper."[11] Without a "proper" Article I assignment, there can be no "public rights" rationale to make the Seventh Amendment disappear.[12] This is a jurisprudential hard stop, and one on which the SEC is silent.

Finally, the Response also has nothing to say about the anomalous "dual" or "coextensive" jurisdiction afforded by § 929P(a)—of the same claims—in *both* federal courts *and* Article I tribunals.[13] Even by *Atlas Roofing* standards, this is a logical and constitutional impossibility. A claim cannot be "peculiarly suited" to agency adjudication, as "not within the conventional experience of judges," and at the same time *within* the conventional experience of judges. This unorthodox and oxymoronic feature of the statutory scheme vitiates the constitutionality of the

---

[11] Even the *Atlas Roofing* Court recognized the constitutional propriety of the underlying Article I assignment as the *sine qua non* of public rights application, sanctioning the OSHA assignment because Congress had "created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved." 430 U.S. at 461. These preconditions do not remotely describe the assignment of the anti-fraud claims to the SEC's home courts, a dilemma the SEC cannot escape and which it prudently avoids.

[12] The "proper assignment" litmus test runs consistently throughout the Court's otherwise-unsteady Article III and Seventh Amendment jurisprudence, reiterated as recently as 2018 in *Oil States*, 138 S. Ct. at 1379.

[13] Actually, the SEC does offer the bare assertion that "when Congress creates new statutory public rights, it can assign their adjudication to a district court, to an administrative proceeding, *or both*." Response, at 21 (emphasis supplied). But the SEC offers no authority for the untrue contention that Congress can assign new claims to "both" of these incongruous tribunals, and indeed that assertion is contravened by the rudiments of logic and all of the relevant case law.

Article I assignment and was discussed at length in Jarkesy's brief,[14] but did not merit a single mention in the Response.

The SEC did not join issue with Jarkesy on the Seventh Amendment violation, because virtually every case on point—*including* the obsolete *Atlas Roofing*—vindicates the rights of ordinary citizens charged with securities fraud, like Jarkesy, to trial in a real, Article III court before a jury of his peers.

### III.
### THE SEC'S NON-DELEGATION RESPONSE COMPLETELY MISSES THE POINT

In his brief Jarkesy challenged the action of Congress in delegating legislative power to an executive agency without any hint of an intelligible principle to guide the exercise of that power. The SEC does not try to concoct an intelligible principle, and again effectively concedes the point.[15] The SEC's Response avoids all of this by instead advancing the tautology that an executive agency exercises only executive power, and therefore any power delegated it by Congress is by definition executive. The SEC then turns to the *non sequitur* that, because the mere everyday exercise of "prosecutorial discretion" is executive power, Congress' stripping away of Article III jurisdiction and the concomitant abrogation of Seventh Amendment rights is also

---

[14]  Jarkesy Brief, at 29-33.

[15]  The Response admits that the delegated power is only governed by the agency's own "complete discretion," consituting "subjective, individualized assessments." Response, at 53-54. The SEC insists that it need not have any "formal process with constitutionally measurable criteria for determining' which cases should proceed in district court and which should be handled in an administrative proceeding," without a jury. *Id*.

executive, not legislative, power.[16]  In doing so, the SEC avoids the substantial case authority establishing that this power is "peculiarly within the authority of the legislative department," and "completely within congresssional control."[17]  Other than citing itself,[18] the SEC offers no relevant authority to the contrary.

Under the SEC's formulation, there could be no non-delegation doctrine, and indeed no separation of powers doctrine, for any power could be transferred willy-nilly from one branch to another, and the transferred power would always, by definetion, then belong properly to that branch.  That is not how the constitution works.

## IV.

### THE SEC'S CLAIM THAT EQUAL PROTECTION RIGHTS DO NOT EXTEND TO SEVENTH AMENDMENT DEPRIVATIONS IS WRONG

Jarkesy's Equal Protection challenge is this:  The decision to eliminate Jarkesy's Seventh Amendment and Article III rights when charging him with anti-fraud violations cannot withstand strict scrutiny, when other targets charged with the

---

[16]  The Response asserts inexplicably that "Petitioners cite no authority" in support of their non-delegation challenge, Response at 53, apparently overlooking the twenty-one cases cited and discussed in Jarkesy's brief on this issue.  The SEC certainly avoids any of this large body of relevant case law, instead relying on a handful of decisions standing for the unremarkable proposition that "bringing an enforcement action is an exercise of executive authority, not legislative authority."  *Id*. at 51-52.  Jarkesy agrees that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case," *id*., but his has nothing to do with the delegation of legislative power to eradicate a citizen's Article III and Seventh Amendment rights.

[17]  *See* Jarkesy Brief, at 37-38, quoting *Oceanic Steam Nav. Co. v. Stranahan,* 214 U.S. 320, 29 S. Ct. 671, 53 L. Ed. 1013 (1909), and *Crowell v. Benson*, 285 U.S. at 50 (cited with approval in *Atlas Roofing*).

[18]  The only on-point authority cited in the Response is *to the SEC's own Final Order*, the very subject of this petition for review.  Response at 52 (citing final order, ROA at 42-43).

same anti-fraud violations were permitted to defend themselves in an Article III court in front of a jury. This is because the Seventh Amendment is a fundamental right, and the government cannot demonstrate a "compelling governmental interest" or that Congress "narrowly tailored" the law to achieve that interest.[19]

Significantly, the Response does not contest that the Seventh Amendment is a fundamental right—and has been so held by this Circuit[20]—so any equal protection analysis is subject to strict scrutiny instead of the less-rigorous "rational basis" test. The SEC thus pursues two paths: (1) that there is no Seventh Amendment problem in the first place, leaving Jarkesy to argue frivolously that the mere exercise of "prosecutorial discretion" somehow violates equal protection, and (2) that Jarkesy was not "similar enough" to the other, comparator, targets.[21] Both of these attacks are unavailing.

The Response asserts that Jarkesy's equal protection claim "fails at a fundamental level," but bases this on its frank admission that the SEC does not have, and

---

[19] Jarkesy Brief at 41-47.

[20] *See Daniel Int'l Corp. v. Fischbach & Moore, Inc.*, 916 F.2d 1061, 1064 (5th Cir. 1990) ("[T]he seventh amendment confers a fundamental right"). The Jarkesy Brief noted that this was a question of first impression, and it is for the Supreme Court and in the specific context of an equal protection challenge. Jarkesy Brief at 44-45; *see* Brief for Amici Goldstein, Cuban and Obus, at 11 (citing *Daniel Int'l*). It is difficult to conceive a basis for construing the Seventh Amendment as affording a "fundamental" constitutional right for purposes of assessing an alleged jury trial waiver, as in *Daniel Int'l*, and not "fundamental" for purposes of equal protection analysis. To its credit, the SEC does not attempt to draw any such distinction.

[21] Response, at 53-57.

need not have, any "'formal process with constitutionally measurable criteria for determining' which cases should proceed in district court and which should be handled in an administrative proceeding."[22] Thus "different treatment is an accepted consequence of the discretion granted"[23] by Dodd-Frank § 929P(a). It is the SEC's position that because its unilateral decision to vanquish Jarkesy's Article III and Seventh Amendment rights is 100% subjective and discretionary—the very reason § 929P(a) violates the nondelegation doctrine—the exercise of that power can carry no equal protection consequences.

The SEC's argument that Jarkesy has not shown he was "similarly situated" to the comparator targets[24] is wide of the mark, overlooking the correct standard for similarity: whether the parties "are in all *relevant* respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis supplied). The SEC provides no argument or authority to explain why the comparators are not alike for *Seventh Amendment discrimination purposes*.[25] What *is* relevant is the *class of claims* each was facing,

---

[22] *Id*. at 54.

[23] *Id*.

[24] *Id*. at 56-57. The SEC faults Jarkesy for not "acknowledging" that still other targets were treated the same way he was. *Id*. at 57. That there are other citizens whose equal protection rights were also violated is hardly a compelling rebuttal.

[25] The Response emphasizes that one of Jarkesy's "comparator" targets was alleged to be running a Ponzi scheme and that the agency wanted an injunction against him, an *equitable* remedy only available in an Article III court. Response, at 56. It does not explain how these factors are in any way relevant to the adjudication of the *legal* claims against both of them, claims for which the Seventh Amendment demands a jury.

and all of them were targeted under the same anti-fraud statutes as Jarkesy, legal claims which fall directly under the commands of the Seventh Amendment.

Discharging the extraordinary power afforded by Dodd-Frank § 929P(a), the SEC's disparate treatment of individual targets charged with the same legal claims can only be sustained constitutionally if that treatment served a "compelling governmental interest" *and* was "narrowly tailored" to achieve that interest.[26] The SEC cannot meet this heavy burden, and has not attempted to do so in the Response.

## V.

### THE SEC MISCHARACTERIZES JARKESY'S PREJUDGMENT CLAIM

Jarkesy has demonstrated that the Commission entered actual findings of fact *against him* by imprudently inserting those findings in a settlement order as to two co-repondents, irretrievably tainting the proceeding with bias.[27] In its Response, the SEC continues the same tack it pursued in the Commission's Final Order—recasting Jarkesy's argument to a silly proposition that it could easily refute. The Response wrongly asserts that Jarkesy is arguing that that "because the Commission settled the proceedings with [Jarkesy's] co-respondents, the Commission must have impermissibly pre-judged the case and been biased against [him]."[28] Presaging the agency's

---

[26] *See* Jarkesy Brief, at 46.

[27] *Id*. at 47-54.

[28] The Final Order falsely asserted that Jarkesy was "contending that an adjudicative body is precluded from further consideration of a multi-party case once it has passed upon one party's settlement." Record, at 36, quoted in the Jarkesy Brief, at 52-53.

approach, Jarkesy declared emphatically in his brief that he was "obviously not claiming that an agency cannot settle with a party in a multi-party enforcement action."[29]  That did not stop the Response from castigating Jarkesy for providing "no authority for the proposition that a tribunal becomes impermissibly biased by adjudicating a related party's liability."[30]  The arguments and authorities offered by the SEC[31] are inapposite to the prejudgment of Jarkesy's case.[32]

---

[29] *Id*. at 53.

[30] Response, at 62.  The SEC tries to liken the Commission's action here to the circumstances surrounding the acceptance of guilty pleas in multi-defendant criminal cases, where courts are required to find a factual basis to support a plea and a sentencing guidelines analysis. That is a far leap from SEC administrative proceedings, where Commissioners are not required to make *any* factual findings to effectuate a settlement.  The Response does not attempt to defend or explain the inexplicable entry of the numerous findings of fact against Jarkesy.

[31] Recognizing the gravity of its error, the Commission attempted to negate the prejudgment retroactively in its Final Order by inserting two footnotes claiming that it was "discontinu[ing] the proceeding" on the issues relating to the co-respondents on which the Commission had already entered findings against Jarkesy in 2013, before his 2014 trial.  This gambit would allow the Commission to now advance a misplaced harmless error claim that it did not really "premise" its sanctions against Jarkesy on the facts it had already found and to which the ALJ had dutifully adhered. Record, at 28 n.87, 32 n.107; *see* Response, at 61.  This is both misleading and too clever by half.  The voluminous pre-determined "facts" and conclusions of law included findings that he had committed relevant fraudulent conduct and consumed an enormous portion of Jarkesy's 2014 trial, factual issues he was forced to defend. The substance of many of these findings, albeit carefully reworded, did find their way into the Final Order. The retroactive "discontinuation" of half the case in 2020 comes at least six years too late.  But even a timely "discontinuation" would have been fruitless—once the case is infected with the prejudgement virus by pre-trial findings of guilt by the ultimate decisionmaker, the case is over on the spot, indeed rendered void *ab initio*.  *See* Jarkesy Brief, at 49-54.

[32] That the Commission's December 5, 2013, order—two months before Jarkesy's "trial"—revealed to the world that the commissioners thought Jarkesy guilty, and indeed had formally said so, is beyond dispute.  Media and industry publications reported that Jarkesy had been found guilty. One financial industry blog, for example, reported in January of 2014, one month before the "trial," that in the December order the commissioners had found "against John Thomas Financial Management Group, dba Patriot28 LLC . . . and manager George Jarkesy, Jr.," finding that "Jarkesy defrauded investors" in a number of specified ways.  *See New York Securities Lawyer Blog* (Lax Neville) January 10, 2014, at 1-2, App. 323-24.

# VI.

## THIS COURT SHOULD NOT ATTEMPT TO REWRITE THE STATUTORY SCHEME

"Constitutional avoidance is not a license to rewrite Congress's work
to say whatever the Constitution needs it to say in a given situation."

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2207 (2020)

SEC ALJs are protected from removal by several layers of tenure protection, which insulate them from control by the President, in violation of Article II.[33] One layer of that unconstitutional removal from presidential control is found in 5 U.S.C. § 7521, which gives the Merit Systems Protection Board—not the President or Commissioners—the authority to remove ALJ's, and only for "good cause." In its Response, the SEC invites the Court to aggressively "construe" the statutory scheme—notably § 7521—to avoid the scheme's multiple layers of protection, or "to sever whatever portion or portions of § 7521" are necessary to vest the Commissioners with the required degree of direct control that the statute does not provide.[34]

Despite the inventive constructions offered in its Response, the SEC has already conceded—to the Supreme Court in 2017—that the scheme indeed imposes multiple layers of protection from removal:

> Here, the statutory scheme provides for at least two, and potentially three, levels of protection against presidential removal authority: The Commission's ALJs may be removed by the Commission only for good cause established and determined by the Merit Systems Protection Board," 5 U.S.C. 7521(a),

---

[33] *See* Jarkesy Brief, at 54-55.

[34] Response, at 41-51.

and members of that Board in turn "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. 1202(d). And the Commissioners, likewise, may be insulated from removal (as the Court assumed in *Free Enterprise Fund*), although the Securities Exchange Act is silent on the question. 15 U.S.C. 78(d).[35]

Now, however, the SEC is backing off, claiming that the statutory scheme does not really afford multiple layers of protection after all and that, even if it does, the scheme can be reinterpreted—or surgically altered—to make the constitutional problem go away. First, the SEC argues that its ALJs should fall under an exception to the rule of presidential control, relying heavily on *Seila Law LLC v. CFPB*, but the Court there acknowledged only two exceptions left after its opinion in *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010):

> First, *Humphrey's Executor* [*v. U.S.,* 295 U.S. 602 (1935)] permitted Congress to give for-cause removal protection to a multimember body of experts who were balanced along partisan lines, appointed to staggered terms, performed only "quasi-legislative" and "quasi-judicial functions," and were said not to exercise any executive power. Second, *Morrison* [*v. Olson,* 487 U.S. 654 (1988)] approved for-cause removal protection for an inferior officer— the independent counsel—who had limited duties and no policymaking or administrative authority.

*Seila Law,* 140 S. Ct. at 2198.[36]

The SEC's ALJ's do not fit either of these narrow exceptions, so the SEC proceeds to urge this Court to reimagine the "good cause" standard in 5 U.S.C. §

---

[35] Brief for the Respondent (SEC) before the U.S. Supreme Court, *Lucia v. SEC*, App. 316.

[36] The SEC also cites *United States v. Perkins,* 111 U.S. 483 (1886), which presented the same scenario as *Morrison*. The Court upheld *one* layer of removal restriction on a military officer who reported to the Secretary of the Navy, who is removable by the President at will.

7521 to essentially mean "any cause" and thereby eliminate one of the layers of removal protection.[37] But even this judicial wizardry would not cure the remaining levels of constitutional infirmity, because the President cannot remove an ALJ without going through two layers of decisionmakers who *themselves* enjoy tenure protection. *See Free Enterprise*, 561 U.S. at 487 (commissioner removal only for "inefficiency, neglect of duty, or malfeasance in office"); *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619-20 (2d Cir. 2004).[38]

Faced with this constitutional Gordian knot, the SEC finally urges the Court to grab a scalpel and start amputating whole sections from § 7521,[39] hoping the surgery will cure at least one of the multiple layers of protection it clearly recognized in 2017. This Court should decline the invitation to legislate.

## CONCLUSION

For all of the reasons set forth above, Jarkesy respectfully prays that this Court hold the proceedings below void and set aside the Final Order entered by the Commission on September 4, 2020.

---

[37] Response, at 41-47.

[38] Section 7521 does not grant the Commission the power to institute removal proceedings at all, because the Merit Systems Protection Board has the *independent and exclusive* power to remove ALJs, and the MSPB board itself enjoys removal protections. *Lucia,* 138 S. Ct. at 2016. The statute says explicitly that ALJs may be removed only "for good cause established and determined by the Merit Systems Protection Board (MSPB)." The SEC would have this Court reinterpret this statutory language to instead allow *the Commission* to remove an ALJ, a rewriting which it assures the Court will "eliminate[] any Article II concerns." Response, at 50.

[39] *Id*., at 50-51.

Respectfully submitted,

By: /s/ S. Michael McColloch
S. MICHAEL MCCOLLOCH, PLLC
**S. Michael McColloch**
E-mail: smm@mccolloch-law.com
Phone: 214.643.6055
KAREN COOK, PLLC
**Karen L. Cook**
E-mail: karen@karencooklaw.com
Phone: 214.643.6054
6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Fax: 214.295.9556

ATTORNEYS FOR PETITIONERS

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2021, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

By: /s/ S. Michael McColloch
S. Michael McColloch

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7) because, excluding the parts of the document exempted by FED. R. APP. P 32(f) this document contains 4,527 words according to the word count function in Microsoft Word Version 16.16.27, and does not exceed 15 pages in length.

2. This document complies with the typeface requirements of FED. R. APP. P 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

June 7, 2021                                     By: */s/ S. Michael McColloch*
                                                     S. Michael McColloch