

**U.S. Department of Justice**
Civil Division

Tel: 202-514-5432

VIA CM/ECF

July 20, 2021

Lyle W. Cayce, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place, Suite 115
New Orleans, LA 70130

    RE: *Jarkesy v. SEC*, No. 20-61007

    We write concerning the Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (June 23, 2021). *Collins* supports the conclusions that (1) the removal protections for administrative law judges in 5 U.S.C. § 7521 are constitutional as properly construed, and (2) petitioners are not entitled to vacatur of the SEC's decision based on their removal challenge.

    *Collins* considered a removal challenge to the Director of the Federal Housing Finance Agency, a principal officer who could only be removed by the President "for cause." 12 U.S.C. § 4512(b)(2). Applying *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Supreme Court held that this removal restriction for "an independent agency led by a single Director" was unconstitutional. *Collins*, 141 S. Ct. at 1783. But the Court declined to "revisit our prior decisions allowing certain limitations on the President's removal power," *id.*, which include "good cause" limitations on removing certain inferior officers, *see Seila Law*, 140 S. Ct. at 2199-2200. Consistent with those precedents, the President can adequately control an inferior officer like an ALJ, who exercises narrow adjudicative authority, is required to follow agency directives, and who enjoys only a "good cause" removal protection.

    *Collins* also rejected the argument that an invalid removal restriction voids all actions taken by the affected officer, and instead held that petitioners must demonstrate that the removal restriction "cause[d] [the] harm" they challenge. *Collins*, 141 S. Ct. at 1788-89. Here, petitioners have

shown no nexus between the ALJ's allegedly unconstitutional removal protection and the Commission's determination that petitioners violated the securities laws.  *See also id.* at 1795 (Thomas, J., concurring) ("I seriously doubt that the shareholders can demonstrate that any relevant action by an FHFA Director violated the constitution."); *id.* at 1802 (Kagan, J., concurring) (similar, and citing with approval this Court's remedial analysis in *Collins v. Mnuchin*, 938 F.3d 553, 594 (5th Cir. 2019)).  Instead, the Commission, after *de novo* review, issued its own opinion—reversing the ALJ on several issues—and there is no basis to believe that the ALJ's removal restrictions altered the Commission's final decision.  *See* Answering Br. 46-47.

Sincerely,

/s/ *Daniel Aguilar*
Daniel Aguilar
Counsel for the Securities and Exchange Commission

## CERTIFICATE OF SERVICE

I certify that on July 20, 2021, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will serve all counsel of record.


　*/s/ Daniel Aguilar*　　　
DANIEL AGUILAR


## CERTIFICATE OF COMPLIANCE

I certify that this letter complies with the word limitations of Federal Rule of Appellate Procedure 28(j) because it contains 350 words.


　*/s/ Daniel Aguilar*　　　
DANIEL AGUILAR

141 S.Ct. 1761
Supreme Court of the United States.

Patrick J. COLLINS, et al., Petitioners
v.
Janet L. YELLEN, Secretary
of the Treasury, et al.;
Janet L. Yellen, Secretary of
the Treasury, et al., Petitioners
v.
Patrick J. Collins, et al.

No. 19-422, No. 19-563
|
Argued December 9, 2020

**Synopsis**

**Background:** Shareholders in Federal National
Mortgage Association (Fannie Mae) and
Federal Home Loan Mortgage Corporation
(Freddie Mac) brought action alleging that
actions by Federal Housing Finance Agency
(FHFA), as companies' conservator under
Housing and Economic Recovery Act (HERA),
adversely affected value of their shares, seeking
declarative and injunctive relief invalidating
transfer of shareholders' economic rights to
Treasury and returning all dividend payments
made to the Treasury, and asserting claims
that FHFA Director acted outside scope of
statutory authority under HERA, and that
FHFA was unconstitutionally structured in
violation of separation of powers. The United
States District Court for the Southern District
of Texas, Nancy F. Atlas, J., 254 F.Supp.3d
841, dismissed shareholders' statutory claims
and granted Government's motion for summary
judgment on shareholders' claim alleging
that FHFA was unconstitutionally structured.

Shareholders appealed. The United States
Court of Appeals for the Fifth Circuit, 896
F.3d 640, affirmed in part and reversed in part.
Rehearing en banc was granted. The Court of
Appeals, Willett, Circuit Judge, and Haynes,
Circuit Judge, 938 F.3d 553, affirmed in part,
reversed in part, and remanded. Certiorari was
granted.

**Holdings:** The Supreme Court, Justice Alito,
held that:

shareholders' claim that FHFA exceeded its
statutory powers was barred by HERA's anti-
injunction clause;

HERA's for-cause removal restriction,
for single Director of FHFA, violated
constitutional separation of powers; but

actions taken by FHFA, when it was headed
by single Director who could be removed by
President only for cause, were not void.

Affirmed in part, reversed in part, vacated in
part, and remanded.

Justice Thomas filed a concurring opinion.

Justice Gorsuch filed an opinion concurring in
part.

Justice Kagan filed an opinion concurring in
part and concurring in the judgment in part, in
which Justices Breyer and Sotomayor joined in
part.

Justice Sotomayor filed an opinion concurring in part and dissenting in part, in which Justice Breyer joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss for Failure to State a Claim; Motion for Summary Judgment.

**West Codenotes**

**Held Unconstitutional**

🚩 12 U.S.C.A. § 4512(b)(2)

*1765 *Syllabus**[*]

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 🚩 *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

When the national housing bubble burst in 2008, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), two of the Nation's leading sources of mortgage financing, suffered significant losses that many feared would imperil the national economy. To address that concern, Congress enacted the Housing and Economic Recovery Act of 2008 (Recovery Act), which, among other things, created the Federal Housing Finance Agency (FHFA)—an independent agency tasked with regulating the companies and, if necessary, stepping in as their conservator or receiver. See 12 U.S.C. § 4501 *et seq.* At the head of the Agency, Congress

installed a single Director, removable by the President only "for cause." §§ 4512(a), (b)(2).

Soon after the FHFA's creation, the Director placed Fannie Mae and Freddie Mac into conservatorship and negotiated agreements for the companies with the Department of Treasury. Under those agreements, Treasury committed to providing each company with up to $100 billion in capital, and in exchange received, among other things, senior preferred shares and quarterly fixed-rate dividends. In the years that followed, the agencies agreed to a number of amendments, the third of which replaced the fixed-rate dividend formula with a variable one that required the companies to make quarterly payments consisting of their entire net worth minus a small specified capital reserve.

A group of the companies' shareholders challenged the third amendment on both statutory grounds—that the FHFA exceeded its authority as a conservator under the Recovery Act by agreeing to the new variable dividend formula—and constitutional grounds—that the FHFA's structure violates the separation of powers because the Agency is led by a single Director, removable by the President only for cause. The District Court dismissed the statutory claim and granted summary judgment in the FHFA's favor on the constitutional claim. The Fifth Circuit reversed the District Court's dismissal of the statutory claim, held that the FHFA's structure violates the separation of powers, and concluded that the appropriate remedy for the constitutional violation was to sever the removal restriction from the rest of the Recovery Act, but not to vacate and set aside the third amendment.

*Held*:

1. The shareholders' statutory claim must be dismissed. The "anti-injunction clause" of the Recovery Act provides that unless review is specifically authorized by one of its provisions or is requested by the Director, "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." § 4617(f). Where, as here, the FHFA's challenged actions did not exceed its "powers or functions" "as a conservator," relief is prohibited. Pp. —— – ——.

(a) The Recovery Act grants the FHFA expansive authority in its role as a conservator and permits the Agency to act in what it determines is "in the best interests of the regulated entity *or the Agency*." § 4617(b)(2)(J)(ii) (emphasis added). So when the FHFA acts as a conservator, it may aim to rehabilitate the regulated entity in a way that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves. This feature of an FHFA conservatorship is fatal to the shareholders' statutory claim. The third amendment was adopted at a time when the companies had repeatedly been unable to make their fixed quarterly dividend payments without drawing on Treasury's capital commitment. If things had proceeded as they had in the past, there was a possibility that the companies would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations. The third amendment's variable dividend formula eliminated that risk, and in turn ensured that all of Treasury's capital was available to backstop the companies' operations during difficult quarters. Although the third amendment required the companies to relinquish nearly all of their net worth, the FHFA could have reasonably concluded that this course of action was in the best interests of members of the public who rely on a stable secondary mortgage market. Pp. —— – ——.

(b) The shareholders argue that the third amendment did not actually serve the best interests of the FHFA or the public because it did not further the asserted objective of protecting Treasury's capital commitment. First, they claim that the FHFA agreed to the amendment at a time when the companies were on the precipice of a financial uptick which would have allowed them to pay their cash dividends and build up capital buffers to absorb future losses. Thus, the shareholders assert, sweeping all the companies' earnings to Treasury increased rather than decreased the risk that the companies would make further draws and eventually deplete Treasury's commitment. But the success of the strategy that the shareholders tout was dependent on speculative projections about future earnings, and recent experience had given the FHFA reasons for caution. The nature of the conservatorship authorized by the Recovery Act permitted the Agency to reject the shareholders' suggested strategy in favor of one that the Agency reasonably viewed as more certain to ensure market stability. Second, the shareholders claim that the FHFA could have protected Treasury's capital commitment by ordering the companies to pay the dividends in kind rather than in cash. This argument rests on a misunderstanding of the agreement between the companies and Treasury. Paying

Treasury in kind would not have satisfied the cash dividend obligation; it would only have delayed that obligation, as well as the risk that the companies' cash dividend obligations would consume Treasury's capital commitment. Choosing to forgo this option in favor of one that eliminated the risk entirely was not in excess of the FHFA's authority as a conservator. Finally, the shareholders argue that because the third amendment left the companies unable to build capital reserves and exit conservatorship, it is best viewed as a step toward liquidation, which the FHFA lacked the authority to take without first placing the companies in receivership. This characterization is inaccurate. Nothing about the third amendment precluded the companies from operating at full steam in the marketplace, and all available evidence suggests that they did. The companies were not in the process of winding down their affairs. Pp. —— – ——.

2. The Recovery Act's restriction on the President's power to remove the FHFA Director, 12 U.S.C. § 4512(b)(2), is unconstitutional. Pp. —— – ——.

(a) The threshold issues raised in the lower court or by the federal parties and appointed *amicus* do not bar a decision on the merits of the shareholders' constitutional claim. Pp. —— – ——.

(i) The shareholders have standing to bring their constitutional claim. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351. First, the shareholders assert that the FHFA transferred the value of their property rights in Fannie Mae and Freddie Mac to Treasury, and that

sort of pocketbook injury is a prototypical form of injury in fact. See *Czyzewski v. Jevic Holding Corp.*, 580 U.S. ——, ——, 137 S.Ct. 973, 981. Second, the shareholders' injury is traceable to the FHFA's adoption and implementation of the third amendment, which is responsible for the variable dividend formula. For purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to "allegedly unlawful conduct" of the defendant, not to the provision of law that is challenged. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556. Finally, a decision in the shareholders' favor could easily lead to the award of at least some of the relief that the shareholders seek. Pp. —— – ——.

(ii) The shareholders' constitutional claim is not moot. After oral argument was held in this case, the FHFA and Treasury agreed to amend the stock purchasing agreements for a fourth time. That amendment eliminated the variable dividend formula that caused the shareholders' injury. As a result, the shareholders no longer have any ground for prospective relief, but they retain an interest in the retrospective relief they have requested. That interest saves their constitutional claim from mootness. P. ——.

(iii) The shareholders' constitutional claim is not barred by the Recovery Act's "succession clause." § 4617(b)(2)(A)(i). That clause effects only a limited transfer of stockholders' rights, namely, the rights they hold "with respect to the regulated entity" and its assets. *Ibid.* Here, by contrast, the shareholders assert a right that they hold in common with all other citizens who have standing to challenge the removal restriction. The succession clause therefore

does not transfer to the FHFA the constitutional right at issue. Pp. ——— – ———.

(iv) The shareholders' constitutional challenge can proceed even though the FHFA was led by an Acting Director, as opposed to a Senate-confirmed Director, at the time the third amendment was adopted. The harm allegedly caused by the third amendment did not come to an end during the tenure of the Acting Director who was in office when the amendment was adopted. Rather, that harm is alleged to have continued after the Acting Director was replaced by a succession of confirmed Directors, and it appears that any one of those officers could have renegotiated the companies' dividend formula with Treasury. Because confirmed Directors chose to continue implementing the third amendment while insulated from plenary Presidential control, the survival of the shareholders' constitutional claim does not depend on the answer to the question whether the Recovery Act restricted the removal of an Acting Director. The answer to that question could, however, have a bearing on the *scope* of relief that may be awarded to the shareholders. If the statute does not restrict the removal of an Acting Director, any harm resulting from actions taken under an Acting Director would not be attributable to a constitutional violation. Only harm caused by a confirmed Director's implementation of the third amendment could then provide a basis for relief. In the Recovery Act, Congress expressly restricted the President's power to remove a confirmed Director but said nothing of the kind with respect to an Acting Director. When a statute does not limit the President's power to remove an agency head, the Court generally presumes that the officer serves at the President's pleasure. See *Shurtleff v. United States*, 189 U. S. 311, 316, 23 S.Ct. 535, 47 L.Ed. 828. Seeing no grounds for departing from that presumption here, the Court holds that the Recovery Act's removal restriction does not extend to an Acting Director and proceeds to the merits of the shareholders' constitutional argument. Pp. ——— – ———.

(b) The Recovery Act's for-cause restriction on the President's removal authority violates the separation of powers. In *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U. S. ———, 140 S.Ct. 2183, the Court held that Congress could not limit the President's power to remove the Director of the Consumer Financial Protection Bureau (CFPB) to instances of "inefficiency, neglect, or malfeasance." *Id.*, at ———, 140 S.Ct., at 2191. In so holding, the Court observed that the CFPB, an independent agency led by a single Director, "lacks a foundation in historical practice and clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." *Id.*, at ——— – ———, 140 S.Ct., at 2192. A straightforward application of *Seila Law*'s reasoning dictates the result here. The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power. The distinctions Court-appointed *amicus* draws between the FHFA and the CFPB are insufficient to justify a different result. First, *amicus* argues that Congress should have greater leeway to restrict the President's power to remove the FHFA Director because the FHFA's authority is more limited than that of the CFPB. But the

nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head. Moreover, the test that *amicus* proposes would lead to severe practical problems. Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies. Second, *amicus* contends that Congress may restrict the removal of the FHFA Director because when the Agency steps into the shoes of a regulated entity as its conservator or receiver, it takes on the status of a private party and thus does not wield executive power. But the Agency does not always act in such a capacity, and even when it does, the Agency must implement a federal statute and may exercise powers that differ critically from those of most conservators and receivers. Third, *amicus* asserts that the FHFA's structure does not violate the separation of powers because the entities it regulates are Government-sponsored enterprises that have federal charters, serve public objectives, and receive special privileges. This argument fails because the President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives. Finally, *amicus* contends that there is no constitutional problem in this case because the Recovery Act offers only "modest" tenure protection. But the Constitution prohibits even "modest restrictions" on the President's power to remove the head of an agency with a single top officer. *Id.*, at ——, 140 S.Ct., at 2205. Pp. —— – ——.

(c) The shareholders seek an order setting aside the third amendment and requiring that all dividend payments made pursuant to that amendment be returned to Fannie Mae and Freddie Mac. In support of this request, they contend that the third amendment was adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*. This argument is neither logical nor supported by precedent. All the officers who headed the FHFA during the time in question were properly *appointed*. There is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office or that actions taken by the FHFA in relation to the third amendment are void. That does not necessarily mean, however, that the shareholders have no entitlement to retrospective relief. Although an unconstitutional provision is never really part of the body of governing law, it is still possible for an unconstitutional provision to inflict compensable harm. The possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out. The parties' arguments on this point should be resolved in the first instance by the lower courts. Pp. —— – ——.

938 F.3d 553, affirmed in part, reversed in part, vacated in part, and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, KAVANAUGH, and BARRETT, JJ., joined in full; in which KAGAN AND BREYER, JJ., joined as to all but Part III–B; in which GORSUCH, J., joined as to all but Part III–C; and in which SOTOMAYOR, J., joined

as to Parts I, II, and III–C. THOMAS, J., filed a concurring opinion. KAGAN, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER and SOTOMAYOR, JJ., joined as to Part II. GORSUCH, J., filed an opinion concurring in part. SOTOMAYOR, J., filed an opinion concurring in part and dissenting in part, in which BREYER, J., joined.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**Attorneys and Law Firms**

Counselor to the Solicitor General Hashim M. Mooppan, Washington, D.C., for the federal parties.

Aaron L. Nielson, appointed by this Court as amicus curiae, and by David H. Thompson, Washington, D.C., for the petitioners in No. 19–422 and the respondents in No. 19–563.

Jeffrey B. Wall, Acting Solicitor General, Counsel of Record, Jeffrey Bossert Clark, Acting Assistant Attorney, General, Hashim M. Mooppan, Counselor to the Solicitor, General, Vivek Suri, Assistant to the Solicitor, General, Mark B. Stern, Abby C. Wright, Gerard Sinzdak, Attorneys, Department of Justice, Washington, D.C., for federal parties.

Charles Flores, Beck Redden LLP, Houston, Texas, Charles J. Cooper, Counsel of Record, David H. Thompson, Peter A. Patterson, Brian W. Barnes, Cooper & Kirk, PLLC, Washington, D.C. for Patrick J. Collins, et al.

**Opinion**

Justice ALITO delivered the opinion of the Court.

**\*1770** Fannie Mae and Freddie Mac are two of the Nation's leading sources of mortgage financing. When the housing crisis hit in 2008, the companies suffered significant losses, and many feared that their troubling financial condition would imperil the national economy. To address that concern, Congress enacted the Housing and Economic Recovery Act of 2008 (Recovery Act), 122 Stat. 2654, 12 U.S.C. § 4501 *et seq.* Among other things, that law created the Federal Housing Finance Agency (FHFA), "an independent agency" tasked with regulating the companies and, if necessary, stepping in as their conservator or receiver. §§ 4511, 4617. At its head, Congress installed a single Director, whom the President could remove only "for cause." 🚩 §§ 4512(a), 🚩 (b)(2).

Shortly after the FHFA came into existence, it placed Fannie Mae and Freddie Mac into conservatorship and negotiated agreements for the companies with the Department of Treasury. Under those agreements, Treasury committed to providing each company with up to $100 billion in capital, and in exchange received, among other things, senior preferred shares and quarterly fixed-rate dividends. Four years later, the FHFA and Treasury amended the agreements and replaced the fixed-rate dividend formula with a variable one that required the companies to make quarterly payments consisting of their entire net worth minus a small specified capital reserve. This deal, which the parties refer to as the "third

amendment" or "net worth sweep," caused the companies to transfer enormous amounts of wealth to Treasury. It also resulted in a slew of lawsuits, including the one before us today.

A group of Fannie Mae's and Freddie Mac's shareholders challenged the third amendment on statutory and constitutional grounds. With respect to their statutory claim, the shareholders contended that the Agency exceeded its authority as a conservator under the Recovery Act when it agreed to a variable dividend formula that would transfer nearly all of the companies' net worth to the Federal Government. And with respect to their constitutional claim, the shareholders argued that the FHFA's structure violates the separation of powers because the Agency is led by a single Director who may be removed by the President only "for cause." § 4512(b)(2). They sought declaratory and injunctive relief, including an order requiring Treasury either to return the variable dividend payments or to re-characterize those payments as a pay down on Treasury's investment.

We hold that the shareholders' statutory claim is barred by the Recovery Act, which prohibits courts from taking "any action to restrain or affect the exercise of [the] powers or functions of the Agency as a conservator." § 4617(f ). But we conclude that the FHFA's structure violates the separation of powers, and we remand for further proceedings to determine what remedy, if any, the shareholders are entitled to receive on their constitutional claim.

I

A

Congress created the Federal National Mortgage Association (Fannie Mae) in 1938 and the Federal Home Loan Mortgage Corporation (Freddie Mac) in 1970 to support the Nation's home mortgage system. See National Housing Act Amendments of 1938, 52 Stat. 23; Federal Home Loan Mortgage Corporation Act, 84 Stat. 451. The companies operate under congressional charters as for-profit corporations owned by private shareholders. See Housing and Urban Development Act of **1771** 1968, § 801, 82 Stat. 536, 12 U.S.C. § 1716b; Financial Institutions Reform, Recovery, and Enforcement Act of 1989, § 731, 103 Stat. 429–436, note following 12 U.S.C. § 1452. Their primary business is purchasing mortgages, pooling them into mortgage-backed securities, and selling them to investors. By doing so, the companies "relieve mortgage lenders of the risk of default and free up their capital to make more loans," *Jacobs v. Federal Housing Finance Agcy. (FHFA),* 908 F.3d 884, 887 (CA3 2018), and this, in turn, increases the liquidity and stability of America's home lending market and promotes access to mortgage credit.

By 2007, the companies' mortgage portfolios had a combined value of approximately $5 trillion and accounted for almost half of the Nation's mortgage market. So, when the housing bubble burst in 2008, the companies took a sizeable hit. In fact, they lost more that year than they had earned in the previous 37 years combined. See FHFA Office of Inspector General, Analysis of the 2012 Amendments to the Senior Preferred

Stock Purchase Agreements 5 (Mar. 20, 2013), https://www.fhfaoig.gov/Content/Files/WPR–2013–002_2.pdf. Though they remained solvent, many feared the companies would eventually default and throw the housing market into a tailspin.

To address that concern, Congress enacted the Recovery Act. Two aspects of that statute are relevant here.

First, the Recovery Act authorized Treasury to purchase Fannie Mae's and Freddie Mac's stock if it determined that infusing the companies with capital would protect taxpayers and be beneficial to the financial and mortgage markets. 12 U.S.C. §§ 1455(*l*)(1), 1719(g)(1). The statute further provided that Treasury's purchasing authority would automatically expire at the end of the 2009 calendar year. §§ 1455(*l*)(4), 1719(g)(4).

Second, the Recovery Act created the FHFA to regulate the companies and, in certain specified circumstances, step in as their conservator or receiver. §§ 4502(20), 4511(b), 4617.[1] A few features of the Agency deserve mention.

[1] Before the Recovery Act was enacted, Fannie Mae and Freddie Mac were regulated by the Office of Federal Housing Enterprise Oversight. See Federal Housing Enterprises Financial Safety and Soundness Act of 1992, §§ 1311–1313, 106 Stat. 3944–3946.

The FHFA is led by a single Director who is appointed by the President with the advice and consent of the Senate. §§ 4512(a), (b)(1). The Director serves a 5-year term but may be removed by the President "for cause." § 4512(b)(2). The Director is permitted to choose three deputies to assist in running the Agency's various divisions, and the Director sits as Chairman of the Federal Housing Finance Oversight Board, which advises the Agency about matters of strategy and policy. §§ 4512(c)–(e), 4513a(a), (c)(4). Since its inception, the FHFA has had three Senate-confirmed Directors, and in times of their absence, various Acting Directors have been selected to lead the Agency on an interim basis. See Rop v. FHFA, 485 F.Supp.3d 900, 915 (WD Mich. 2020).

The Agency is tasked with supervising nearly every aspect of the companies' management and operations. For example, the Agency must approve any new products that the companies would like to offer. § 4541(a). It may reject acquisitions and certain transfers of interests the companies seek to execute. § 4513(a)(2)(A). It establishes criteria governing the companies' portfolio holdings. § 4624(a). It may order the companies to dispose of or acquire any asset. § 4624(c). It may impose caps on how much the companies compensate **\*1772** their executives and prohibit or limit golden parachute and indemnification payments. § 4518. It may require the companies to submit regular reports on their condition or "any other relevant topics." § 4514(a)(2). And it must conduct one on-site examination of the companies each year and may, on any terms the Director deems appropriate, hire outside firms to perform additional reviews. §§ 4517(a)–(b), 4519.

The statute empowers the Agency with broad investigative and enforcement authority

to ensure compliance with these standards. Among other things, the Agency may hold hearings, §§ 4582, 4633; issue subpoenas, §§ 4588(a)(3), 4641(a)(3); remove or suspend corporate officers, § 4636a; issue cease-and-desist orders, §§ 4581, 4632; bring civil actions in federal court, §§ 4584, 4635; and impose penalties ranging from $2,000 to $2 million per day, §§ 4514(c)(2), 4585, 4636(b).

In addition to vesting the FHFA with these supervisory and enforcement powers, the Recovery Act authorizes the Agency to act as the companies' conservator or receiver for the purposes of reorganizing the companies, rehabilitating them, or winding down their affairs. §§ 4617(a)(1)–(2). The Director may appoint the Agency in either capacity if the companies meet certain specified benchmarks of financial risk or satisfy other criteria, § 4617(a)(3), and once the Director makes that appointment, the Agency succeeds to all of the rights, titles, powers, and privileges of the companies, § 4617(b)(2)(A)(i). [2] From there, the Agency has the authority to take control of the companies' assets and operations, conduct business on their behalf, and transfer or sell any of their assets or liabilities. §§ 4617(b)(2)(B)–(C), (G). In performing these functions, the Agency may exercise whatever incidental powers it deems necessary, and it may take any authorized action that is in the best interests of the companies or the Agency itself. § 4617(b)(2)(J).

[2]    Receivership is mandatory in certain circumstances not relevant here. See 12 U.S.C. § 4617(a)(4).

Finally, the FHFA is not funded through the ordinary appropriations process. Rather, the Agency's budget comes from the assessments it imposes on the entities it regulates, which include Fannie Mae, Freddie Mac, and the Nation's federal home loan banks. §§ 4502(20), 4516(a). Those assessments are unlimited so long as they do not exceed the "reasonable costs ... and expenses of the Agency." § 4516(a). In fiscal year 2020, the FHFA collected more than $311 million. See FHFA, Performance & Accountability Report 24 (2020), https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/FHFA-2020-PAR.pdf.


B

In September 2008, less than two months after Congress enacted the Recovery Act, the Director appointed the FHFA as conservator of Fannie Mae and Freddie Mac. The following day, Treasury exercised its temporary authority to buy their stock and the FHFA, acting as the companies' conservator, entered into purchasing agreements with Treasury. [3] Under these agreements, Treasury committed to providing each company with up to $100 billion **\*1773** in capital, upon which it could draw in any quarter in which its liabilities exceeded its assets. In return for this funding commitment, Treasury received 1 million shares of specially created senior preferred stock in each company.

[3]    See Amended and Restated Senior Preferred Stock Purchase Agreement Between the United States Department

of the Treasury and the Federal National Mortgage Association (Sept. 26, 2008); Amended and Restated Senior Preferred Stock Purchase Agreement Between the United States Department of the Treasury and the Federal Home Loan Mortgage Corporation (Sept. 26, 2008) (online sources archived at www.supremecourt.gov).

Those shares provided Treasury with four key entitlements. First, Treasury received a senior liquidation preference equal to $1 billion in each company, with a dollar-for-dollar increase every time the company drew on the capital commitment. In other words, in the event the FHFA liquidated Fannie Mae or Freddie Mac, Treasury would have the right to be paid back $1 billion, as well as whatever amount the company had already drawn from the capital commitment, before any other investors or shareholders could seek repayment. Second, Treasury was given warrants, or long-term options, to purchase up to 79.9% of the companies' common stock at a nominal price. Third, Treasury became entitled to a quarterly periodic commitment fee, which the companies would pay to compensate Treasury for the support provided by the ongoing access to capital. [4] And finally, the companies became obligated to pay Treasury quarterly cash dividends at an annualized rate equal to 10% of Treasury's outstanding liquidation preference.

[4]     Treasury has the authority to waive this fee. At the time this lawsuit was filed, Treasury had always exercised this option and had never received

a periodic commitment fee from the companies. See App. 61.

Within a year, Fannie Mae's and Freddie Mac's net worth decreased substantially, and it became clear that Treasury's initial capital commitment would prove inadequate. To address that problem, the FHFA and Treasury twice amended the agreements to increase the available capital. The first amendment came in May 2009, when Treasury doubled its combined commitment from $200 billion to $400 billion. [5] And the second amendment was adopted in December 2009, when Treasury agreed to provide as much funding as the companies needed through 2012, after which the cap would be reinstated. [6]

[5]     See Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement Between the United States Department of the Treasury and Federal National Mortgage Association (May 6, 2009); Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement Between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation (May 6, 2009) (online sources archived at www.supremecourt.gov).

[6]     See Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement Between the United States Department of the Treasury and Federal National Mortgage Association (Dec. 24, 2009); Second Amendment to Amended

and Restated Senior Preferred Stock Purchase Agreement Between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation (Dec. 24, 2009) (online sources archived at www.supremecourt.gov).

The companies drew sizeable amounts from Treasury's capital commitment in the years that followed. And because of the fixed-rate dividend formula, the more money they drew, the larger their dividend obligations became. The companies consistently lacked the cash necessary to pay them, and they began the circular practice of drawing funds from Treasury's capital commitment just to hand those funds back as a quarterly dividend. By the middle of 2012, the companies had drawn over $187 billion, and $26 billion of that was used to satisfy their dividend obligations.

In August 2012, the FHFA and Treasury decided to amend the agreements for a third time.[7] This amendment replaced **1774** the fixed-rate dividend formula (which was tied to the size of Treasury's investment) with a variable dividend formula (which was tied to the companies' net worth). Under the new formula, the companies were required to pay a dividend equal to the amount, if any, by which their net worth exceeded a pre-determined capital reserve.[8] In addition, the amendment suspended the companies' obligations to pay periodic commitment fees.

[7]     See Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement Between the United State Department of the

Treasury and Federal National Mortgage Association (Aug. 17, 2012); Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement Between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation (Aug. 17, 2012) (online sources archived at www.supremecourt.gov).

[8]     The capital reserve for each company began at $3 billion and was scheduled to decrease to zero by January 2018. In December 2017, however, Treasury agreed to restore the reserve to $3 billion per company in return for a liquidation-preference increase of the same amount. See Letters from S. Mnuchin, Secretary of Treasury, to M. Watt, Director of the FHFA (Dec. 21, 2017). And in September 2019, Treasury agreed to raise the reserve to $25 billion for Fannie Mae and $20 billion for Freddie Mac, again in return for corresponding increases in the liquidation preference. See Letters from S. Mnuchin, Secretary of Treasury, to M. Calabria, Director of the FHFA (Sept. 27, 2019) (online sources archived at www.supremecourt.gov).

Shifting from a fixed-rate dividend formula to a variable one materially changed the nature of the agreements. If the net worth of Fannie Mae or Freddie Mac at the end of a quarter exceeded the capital reserve, the amendment required the company to pay *all of the surplus* to Treasury. But if a company's net worth at the end of a quarter did not exceed the reserve or if

it lost money during a quarter, the amendment did not require the company to pay anything. This ensured that Fannie Mae and Freddie Mac would never again draw money from Treasury just to make their quarterly dividend payments, but it also meant that the companies would not be able to accrue capital in good quarters.

After the third amendment took effect, the companies' financial condition improved, and they ended up transferring immense amounts of wealth to Treasury. In 2013, the companies paid a total of $130 billion in dividends. In 2014, they paid over $40 billion. In 2015, they paid almost $16 billion. And in 2016, they paid almost $15 billion.[9] These payments totaled approximately $200 billion, which is at least $124 billion more than the companies would have had to pay during those four years under the fixed-rate dividend formula that previously applied.

[9] See Fannie Mae, Form 10–K for Fiscal Year Ended Dec. 31, 2016, p. 120, https://www.fanniemae.com/media/26811/display; Freddie Mac, Form 10–K for Fiscal Year Ended Dec. 31, 2016, p. 283, https://www.freddiemac.com/investors/financials/pdf/10k_021617.pdf.

The third amendment stayed in place for another four years. In January 2021, the FHFA and Treasury amended the stock purchasing agreements for a fourth time.[10] This amendment, which is currently in place, suspends the companies' quarterly dividend payments until they build up enough capital to meet certain specified thresholds, a process

that we are told is expected to take years. See Letter from E. Prelogar, Acting Solicitor General, to S. Harris, Clerk of Court (Mar. 18, 2021). During that time, each company is required to pay Treasury through increases in the liquidation preference that are equal to the increase, if any, in its net worth during the previous fiscal year. Once that threshold is met, the company will resume **\*1775** quarterly dividend payments, and those dividends will be equal to the lesser of 10% of Treasury's liquidation preference or the incremental increase in the company's net worth in the previous quarter. In addition, the company will be required to pay periodic commitment fees.

[10] See Letters from S. Mnuchin, Secretary of Treasury, to M. Calabria, Director of the FHFA (Jan. 14, 2021) (online source archived at www.supremecourt.gov).

## C

In 2016, three of Fannie Mae's and Freddie Mac's shareholders brought suit against the FHFA and its Director, and they asserted two claims that are relevant for present purposes. First, they claimed that the FHFA exceeded its statutory authority as the companies' conservator by adopting the third amendment. Second, they asserted that because the FHFA is led by a single Director who may be removed by the President only "for cause," its structure is unconstitutional. They asked for various forms of equitable relief, including a declaration that the third amendment violated the Recovery Act and that the FHFA's structure

is unconstitutional; an injunction ordering Treasury to return to Fannie Mae and Freddie Mac all the dividend payments that were made under the third amendment or alternatively, a re-characterization of those payments as a pay-down of the liquidation preference and a corresponding redemption of Treasury's stock; an order vacating and setting aside the third amendment; and an order enjoining the FHFA and Treasury from taking any further action to implement the third amendment. [11]

[11] The shareholders also sued Treasury and its Secretary, contending that the Agency exceeded its statutory authority and acted arbitrarily and capriciously in adopting the third amendment. The District Court dismissed these claims, the Fifth Circuit affirmed, and the shareholders did not seek review of those holdings in this Court.

The District Court dismissed the statutory claim and granted summary judgment in favor of the FHFA on the constitutional claim, *Collins v. FHFA*, 254 F.Supp.3d 841 (SD Tex. 2017), and a three-judge panel of the Fifth Circuit affirmed in part and reversed in part, *Collins v. Mnuchin*, 896 F.3d 640 (2018) (*per curiam*). At the request of both parties, the Fifth Circuit reheard the case en banc. *Collins v. Mnuchin*, 908 F.3d 151 (2018). In a deeply fractured opinion, the en banc court reversed the District Court's dismissal of the statutory claim; held that the FHFA's structure violates the separation of powers; and concluded that the appropriate remedy for the constitutional violation was to sever the removal restriction from the rest of the Recovery Act, but not

to vacate and set aside the third amendment. *Collins v. Mnuchin*, 938 F.3d 553 (2019).

Both the shareholders and the federal parties sought this Court's review, and we granted certiorari. 591 U. S. ——, 141 S.Ct. 193, 207 L.Ed.2d 1118 (2020). Because the federal parties did not contest the Fifth Circuit's conclusion that the Recovery Act's removal restriction improperly insulates the Director from Presidential control, we appointed Aaron Nielson to brief and argue, as *amicus curiae*, in support of the position that the FHFA's structure is constitutional. He has ably discharged his responsibilities.

II

We begin with the shareholders' statutory claim and conclude that the Recovery Act requires its dismissal.

In the Recovery Act, Congress sharply circumscribed judicial review of any action that the FHFA takes as a conservator or receiver. The Act states that unless review is specifically authorized by one of its provisions or is requested by the Director, "no court may take any action to restrain or affect the exercise of powers or functions **\*1776** of the Agency as a conservator or a receiver." 12 U.S.C. § 4617(f ). The parties refer to this as the Act's "anti-injunction clause."

Every Court of Appeals that has confronted this language has held that it prohibits relief where the FHFA action at issue fell within the scope of the Agency's authority as a conservator, but that relief is allowed if the FHFA exceeded

that authority. See *Jacobs*, 908 F.3d at 889; *Saxton* v. *FHFA*, 901 F.3d 954, 957–958 (CA8 2018); *Roberts* v. *FHFA*, 889 F.3d 397, 402 (CA7 2018); *Robinson* v. *FHFA*, 876 F.3d 220, 228 (CA6 2017); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 605–606 (CADC 2017); *County of Sonoma* v. *FHFA*, 710 F.3d 987, 992 (CA9 2013); *Leon Cty.* v. *FHFA*, 700 F.3d 1273, 1278 (CA11 2012).

We agree with that consensus. The anti-injunction clause applies only where the FHFA exercised its "powers or functions" "as a conservator or a receiver." Where the FHFA does not exercise but instead exceeds those powers or functions, the anti-injunction clause imposes no restrictions.

With that understanding in mind, we must decide whether the FHFA was exercising its powers or functions as a conservator when it agreed to the third amendment. If it was, then the anti-injunction clause bars the shareholders' statutory claim.

A

The Recovery Act grants the FHFA expansive authority in its role as a conservator. As we have explained, the Agency is authorized to take control of a regulated entity's assets and operations, conduct business on its behalf, and transfer or sell any of its assets or liabilities. See §§ 4617(b)(2)(B)–(C), (G). When the FHFA exercises these powers, its actions must be "necessary to put the regulated entity in a sound and solvent condition" and must be "appropriate to carry on the business of the regulated entity and preserve and conserve [its] assets and property." § 4617(b)(2)(D). Thus, when the FHFA acts as a conservator, its mission is rehabilitation, and to that extent, an FHFA conservatorship is like any other. See, *e.g.,* *Resolution Trust Corporation v. CedarMinn Bldg. Ltd. Partnership*, 956 F.2d 1446, 1454 (CA8 1992).[12]

[12] By contrast, when the FHFA acts as a receiver, it is required to "place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity." § 4617(b)(2)(E). The roles of conservator and receiver are very different. See § 4617(a)(4)(D) ("The appointment of the Agency as receiver of a regulated entity under this section shall immediately terminate any conservatorship established for the regulated entity under this chapter").

An FHFA conservatorship, however, differs from a typical conservatorship in a key respect. Instead of mandating that the FHFA always act in the best interests of the regulated entity, the Recovery Act authorizes the Agency to act in what it determines is "in the best interests of the regulated entity *or the Agency*." § 4617(b)(2)(J)(ii) (emphasis added). Thus, when the FHFA acts as a conservator, it may aim to rehabilitate the regulated entity in a way that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves. This distinctive feature of an FHFA conservatorship is fatal to the shareholders' statutory claim.

The facts alleged in the complaint demonstrate that the FHFA chose a path of rehabilitation

that was designed to serve public interests by ensuring Fannie Mae's and Freddie Mac's continued support of the secondary mortgage market. Recall that the third amendment was adopted at **\*1777** a time when the companies' liabilities had consistently exceeded their assets over at least the prior three years. See *supra,* at ——. It is undisputed that the companies had repeatedly been unable to make their fixed quarterly dividend payments without drawing on Treasury's capital commitment. And there is also no dispute that the cap on Treasury's capital commitment was scheduled to be reinstated at the end of the year and that Treasury's temporary stock-purchasing authority had expired in 2009. See §§ 1455(*l*)(4), 1719(g)(4). If things had proceeded as they had in the past, there was a realistic possibility that the companies would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the companies made a draw.

The third amendment eliminated this risk by replacing the fixed-rate dividend formula with a variable one. Under the new formula, the companies would never again have to use capital from Treasury's commitment to pay their dividends. And that, in turn, ensured that all of Treasury's capital was available to backstop the companies' operations during difficult quarters. In exchange, the companies had to relinquish nearly all their net worth, and this made certain that they would never be able to build up their own capital buffers, pay back Treasury's investment, and exit conservatorship. Whether or not this new arrangement was in the best interests of the companies or their shareholders, the FHFA

could have reasonably concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market. The Recovery Act therefore authorized the Agency to choose this option.

### B

The shareholders contend that the third amendment did not actually serve the best interests of the FHFA or the public because it did not further the asserted objective of protecting Treasury's capital commitment. This is so, the shareholders argue, for two reasons.

First, they claim that the FHFA adopted the third amendment at a time when the companies were on the precipice of a financial uptick and that they would soon have been in a position not only to pay cash dividends, but also to build up capital buffers to absorb future losses. Thus, the shareholders assert, sweeping all the companies' earnings to Treasury increased rather than decreased the risk that the companies would make further draws and eventually deplete Treasury's commitment.

The nature of the conservatorship authorized by the Recovery Act permitted the Agency to reject the shareholders' suggested strategy in favor of one that the Agency reasonably viewed as more certain to ensure market stability. The success of the strategy that the shareholders tout was dependent on speculative projections about future earnings, and recent experience had given the FHFA reasons for caution. The companies had been repeatedly unable to pay their dividends from 2009 to 2011. With the aim of more securely ensuring market stability,

the FHFA did not exceed the scope of its conservatorship authority by deciding on what it viewed as a less risky approach.

Second, the shareholders contend that the FHFA could have protected Treasury's capital commitment by ordering the companies to pay the dividends in kind rather than in cash. This argument rests on a misunderstanding of the agreement between the companies and Treasury. The companies' stock certificates required Fannie Mae and Freddie Mac to pay their dividends "in cash in a timely manner." **\*1778** App. 180, 198. If the companies had failed to do so, they would have incurred a penalty: Treasury's liquidation preference would have immediately increased by the dividend amount, and the dividend rate would have increased from 10% to 12% until the companies paid their outstanding dividends in cash.[13] Thus, paying Treasury in kind would not have satisfied the cash dividend obligation, and the risk that the companies' cash dividend obligations would consume Treasury's capital commitment in the future would have remained. Choosing to forgo this option in favor of one that eliminated the risk entirely was not in excess of the FHFA's statutory authority as conservator.

[13]   The senior preferred stock certificates provide: "[I]f at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends

(including any unpaid dividends added to the Liquidation Preference ... ), the 'Dividend Rate' shall mean 12.0%"). App. 180, 198.

Finally, the shareholders argue that because the third amendment left the companies unable to build capital reserves and exit conservatorship, it is best viewed as a step toward ultimate liquidation and, according to the shareholders, the FHFA lacked the authority to take this decisive step without first placing the companies in receivership.

The shareholders' characterization of the third amendment as a step toward liquidation is inaccurate. Nothing about the amendment precluded the companies from operating at full steam in the marketplace, and all the available evidence suggests that they did so. Between 2012 and 2016 alone, the companies "collectively purchased at least 11 million mortgages on single-family owner-occupied properties, and Fannie issued over $1.5 trillion in single-family mortgage-backed securities." *Perry Capital*, 864 F.3d at 602. During that time, the companies amassed over $200 billion in net worth and, as of November 2020, Fannie Mae's mortgage portfolio had grown to $163 billion and Freddie Mac's to $193 billion.[14] This evidence does not suggest that the companies were in the process of winding down their affairs.

[14]   See Dept. of Treasury Press Release, Treasury Department and FHFA Amend Terms of Preferred Stock Purchase Agreements for Fannie Mae and Freddie Mac (Jan. 14,

2021), https://home.treasury.gov/news/press-releases/sm1236.

It is not necessary for us to decide—and we do not decide—whether the FHFA made the best, or even a particularly good, business decision when it adopted the third amendment. Instead, we conclude only that under the terms of the Recovery Act, the FHFA did not exceed its authority as a conservator, and therefore the anti-injunction clause bars the shareholders' statutory claim.

## III

We now consider the shareholders' claim that the statutory restriction on the President's power to remove the FHFA Director, 12 U.S.C. § 4512(b)(2), is unconstitutional.

## A

Before turning to the merits of this question, however, we must address threshold issues raised in the lower court or by the federal parties and appointed *amicus*.

## 1

In the proceedings below, some judges concluded that the shareholders **\*1779** lack standing to bring their constitutional claim. See 938 F.3d at 620 (Costa, J., dissenting in part). Because we have an obligation to make sure that we have jurisdiction to decide this claim, see *DaimlerChrysler Corp. v. Cuno,*

547 U.S. 332, 340, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006), we begin by explaining why the shareholders have standing.

To establish Article III standing, a plaintiff must show that it has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (alterations and internal quotation marks omitted). The shareholders meet these requirements.

First, the shareholders claim that the FHFA transferred the value of their property rights in Fannie Mae and Freddie Mac to Treasury, and that sort of pocketbook injury is a prototypical form of injury in fact. See *Czyzewski v. Jevic Holding Corp.,* 580 U. S. ——, ——, 137 S.Ct. 973, 981–982, 197 L.Ed.2d 398 (2017). Second, the shareholders' injury is traceable to the FHFA's adoption and implementation of the third amendment, which is responsible for the variable dividend formula that swept the companies' net worth to Treasury and left nothing for their private shareholders. Finally, a decision in the shareholders' favor could easily lead to the award of at least some of the relief that the shareholders seek. We found standing under similar circumstances in *Seila Law LLC v. Consumer Financial Protection Bureau,* 591 U. S. ——, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020). See *id.,* at ——, 140 S.Ct., at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and

internal quotation marks omitted)); see also 🚩 *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (considering challenge to removal restriction where plaintiffs claimed injury from allegedly unlawful agency oversight).

The judges who thought that the shareholders lacked standing reached that conclusion on the ground that the shareholders could not trace their injury to the Recovery Act's removal restriction. See 🚩 938 F.3d at 620–621 (opinion of Costa, J.). But for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to "allegedly unlawful conduct" of the defendant, not to the provision of law that is challenged. 🚩 *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); see also 🚩 *Lujan, supra*, at 560, 112 S.Ct. 2130 (explaining that the plaintiff must show "a causal connection between the injury and the conduct complained of," and that "the injury has to be fairly traceable to the challenged action of the defendant" (quoting 🚩 *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); brackets, ellipsis, and internal quotation marks omitted)). Because the relevant action in this case is the third amendment, and because the shareholders' concrete injury flows directly from that amendment, the traceability requirement is satisfied.

2

After oral argument was held in this case, the federal parties notified the Court that the FHFA and Treasury had agreed to amend the stock purchasing **\*1780** agreements for a fourth time.[15] And because that amendment eliminated the variable dividend formula that had caused the shareholders' injury, it is necessary to consider whether the fourth amendment moots the shareholders' constitutional claim.

[15] See Letter from E. Prelogar, Acting Solicitor General, to S. Harris, Clerk of Court (Mar. 18, 2021).

It does so only with respect to some of the relief requested. In their complaint, the shareholders sought various forms of prospective relief, but because that amendment is no longer in place, the shareholders no longer have any ground for such relief. By contrast, they retain an interest in the retrospective relief they have requested, and that interest saves their constitutional claim from mootness.

3

The federal parties contend that the "succession clause" in the Recovery Act bars the shareholders' constitutional claim. Under this clause, when the FHFA appoints itself as conservator, it immediately succeeds to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." 12 U.S.C. § 4617(b)(2)(A)(i). According to the federal parties, this clause transferred to the FHFA the shareholders'

right to bring their constitutional claim, and it therefore bars the shareholders from asserting that claim on their own behalf. In other words, the federal parties read the succession clause to mean that the only party with the authority to challenge the restriction on the President's power to remove the Director of the FHFA is the FHFA itself.

The federal parties read the succession clause too broadly. The clause effects only a limited transfer of stockholders' rights, namely, the rights they hold *as stockholders "with respect to the regulated entity" and its assets*. The right the shareholders assert in this case is one that they hold in common with all other citizens who have standing to challenge the removal restriction. As we have explained on many prior occasions, the separation of powers is designed to preserve the liberty of all the people. See, *e.g.,* *Bowsher v. Synar*, 478 U.S. 714, 730, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (noting that the Constitution "diffuses power the better to secure liberty"). So whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge. See, *e.g.,* *Seila Law, supra,* at ——, 140 S.Ct., at 2196; *Bond v. United States*, 564 U.S. 211, 223, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011); *INS v. Chadha*, 462 U.S. 919, 935–936, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Nearly half our hallmark removal cases have been brought by aggrieved private parties. See *Seila Law*, 591 U. S., at —— – ——, 140 S.Ct., at 2194–2195 (law firm to which the agency issued a civil investigative

demand); *Free Enterprise Fund, supra,* at 487, 130 S.Ct. 3138 (accounting firm placed under agency investigation); *Morrison v. Olson*, 487 U.S. 654, 668, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (federal officials subject to subpoenas issued at the request of an independent counsel); *Bowsher, supra,* at 719, 106 S.Ct. 3181 (union representing employee-members whose benefit increases were suspended due to an action of the Comptroller General).

 **\*1781**  Here, the right asserted is not one that is distinctive to shareholders of Fannie Mae and Freddie Mac; it is a right shared by everyone in this country. Because the succession clause transfers the rights of "stockholder[s] ... with respect to the regulated entity," it does not transfer to the FHFA the constitutional right at issue. [16]

[16]    The federal parties also argue that the Recovery Act's succession clause bars the shareholders' statutory claim. Because we have concluded that the statutory claim is already barred by the anti-injunction clause, we do not address this argument.

4

The federal parties and appointed *amicus* next contend that the shareholders' constitutional challenge was dead on arrival because the third amendment was adopted when the FHFA was led by an *Acting* Director [17] who was removable by the President at will. This argument would have merit if (a) the Acting

Director was indeed removable at will (a matter we address below, see *infra*, at —— – —— ) and (b) all the harm allegedly incurred by the shareholders had been completed at the time of the third amendment's adoption. Under those circumstances, any constitutional defect in the provision restricting the removal of a confirmed Director would not have harmed the shareholders, and they would not be entitled to any relief. But the harm allegedly caused by the third amendment did not come to an end during the tenure of the Acting Director who was in office when the amendment was adopted. That harm is alleged to have continued after the Acting Director was replaced by a succession of confirmed Directors, and it appears that any one of those officers could have renegotiated the companies' dividend formula with Treasury. From what we can tell from the record, the FHFA and Treasury consistently reevaluated the stock purchasing agreements and adopted amendments as they thought necessary. Nothing in the third amendment suggested that it was permanent or that the FHFA lacked the ability to bring Treasury back to the bargaining table. After all, the agencies adopted a fourth amendment just this year. The federal parties and *amicus* do not dispute this. Accordingly, continuing to implement the third amendment was a decision that each confirmed Director has made since 2012, and because confirmed Directors chose to continue implementing the third amendment while insulated from plenary Presidential control, the survival of the shareholders' constitutional claim does not depend on the answer to the question whether the Recovery Act restricted the removal of an Acting Director.

17 See *Rop* v. *FHFA*, 485 F.Supp.3d 900, 915 (WD Mich. 2020).

On the other hand, the answer to that question could have a bearing on the *scope* of relief that may be awarded to the shareholders. If the statute unconstitutionally restricts the authority of the President to remove an Acting Director, the shareholders could seek relief rectifying injury inflicted by actions taken while an Acting Director headed the Agency. But if the statute does not restrict the removal of an Acting Director, any harm resulting from actions taken under an Acting Director would not be attributable to a constitutional violation. Only harm caused by a confirmed Director's implementation of the third amendment could then provide a basis for relief. We therefore consider what the Recovery Act says about the removal of an Acting Director.

The Recovery Act's removal restriction provides that "[t]he Director shall be appointed for a term of 5 years, unless removed **\*1782** before the end of such term for cause by the President." 12 U.S.C. § 4512(b)(2). That provision refers only to "the Director," and it is surrounded by other provisions that apply only to the Director. See § 4512(a) (establishing the position of the Director); § 4512(b)(1) (setting out the procedure for appointing the Director); § 4512(b)(3) (discussing the manner for selecting a new Director to fill a vacancy).

The Act's mention of an "acting Director" does not appear until four subsections later, and that subsection does not include any removal restriction. See § 4512(f ). Nor does it

cross-reference the earlier restriction on the removal of a confirmed Director. *Ibid.* Instead, it merely states that "[i]n the event of the death, resignation, sickness, or absence of the Director, the President shall designate" one of three Deputy Directors to serve as an Acting Director until the Senate-confirmed Director returns or his successor is appointed. *Ibid.*

That omission is telling. When a statute does not limit the President's power to remove an agency head, we generally presume that the officer serves at the President's pleasure. See *Shurtleff v. United States*, 189 U.S. 311, 316, 23 S.Ct. 535, 47 L.Ed. 828 (1903). Moreover, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (internal quotation marks omitted). In the Recovery Act, Congress expressly restricted the President's power to remove a confirmed Director but said nothing of the kind with respect to an Acting Director. And Congress might well have wanted to provide greater protection for a Director who had been confirmed by the Senate than for an Acting Director in whose appointment Congress had played no role. In any event, the disparate treatment weighs against the shareholders' interpretation.

In support of that interpretation, the shareholders first contend that the Recovery Act should be read to restrict removal of an Acting Director because the Act refers to the FHFA as an "*independent* agency

of the Federal Government." 12 U.S.C. § 4511(a) (emphasis added). The reference to the FHFA's independence, they claim, means that any person heading the Agency was intended to enjoy a degree of independence from Presidential control.

That interpretation reads far too much into the term "independent." The term does not necessarily mean that the Agency is "independent" of the President. It may mean instead that the Agency is not part of and is therefore independent of any other unit of the Federal Government. And describing an agency as independent would be an odd way to signify that its head is removable only for cause because even an agency head who is shielded in that way would hardly be fully "independent" of Presidential control.

A review of other enabling statutes that describe agencies as "independent" undermines the shareholders' interpretation of the term. Congress has described many agencies as "independent" without imposing any restriction on the President's power to remove the agency's leadership. This is true, for example, of the Peace Corps, 22 U.S.C. §§ 2501–1, 2503, the Defense Nuclear Facilities Safety Board, 42 U.S.C. § 2286, the Commodity Futures Trading Commission, 7 U.S.C. § 2(a)(2), the Farm Credit Administration, 12 U.S.C. §§ 2241–2242, the National Credit Union Administration, 12 U.S.C. § 1752a, and the Railroad **\*1783** Retirement Board, 45 U.S.C. § 231f(a).

In other statutes, Congress has restricted the President's removal power without referring to

the agency as "independent." This is the case for the Commission on Civil Rights, 42 U.S.C. §§ 1975(a), (e), the Federal Trade Commission, 15 U.S.C. § 41, and the National Labor Relations Board, 29 U.S.C. § 153. And in yet another group of statutes, Congress has referred to an agency as "independent" but has not expressly provided that the removal of the agency head is subject to any restrictions. See 44 U.S.C. §§ 2102, 2103 (National Archives and Records Administration); 42 U.S.C. §§ 1861, 1864 (National Science Foundation). That combination of provisions shows that the term "independent" does not necessarily connote independence from Presidential control, and we refuse to read that connotation into the Recovery Act.

Taking a different tack, the shareholders claim that their interpretation is supported by the absence of any reference to removal in the Recovery Act's provision on Acting Directors. Again, that provision states that if the Director is absent, "the President shall designate [one of the FHFA's three Deputy Directors] to serve as acting Director until the return of the Director, or the appointment of a successor." 12 U.S.C. § 4512(f ). According to the shareholders, this text makes clear that an Acting Director differs from a confirmed Director in three respects (manner of appointment, qualifications, and length of tenure). They assume that these are the only respects in which confirmed and Acting Directors differ, and they therefore conclude that the permissible grounds for removing an Acting Director are the same as those for a confirmed Director.

This argument draws an unwarranted inference from the Recovery Act's silence on this matter. As noted, we generally presume that the President holds the power to remove at will executive officers and that a statute must contain "plain language to take [that power] away." *Shurtleff, supra,* at 316, 23 S.Ct. 535. The shareholders argue that this is not a hard and fast rule, but we certainly see no grounds for an exception in this case.[18]

[18]   In *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), the Court read a removal restriction into the War Claims Act of 1948. But it did so on the rationale that the War Claims Commission was an adjudicatory body, and as such, it had a unique need for "absolute freedom from Executive interference." *Id.,* at 353, 355–356, 78 S.Ct. 1275. The FHFA is not an adjudicatory body, so *Shurtleff,* not *Weiner,* is the more applicable precedent.

For all these reasons, we hold that the Recovery Act's removal restriction does not extend to an Acting Director, and we now proceed to the merits of the shareholders' constitutional argument.

### B

The Recovery Act's for-cause restriction on the President's removal authority violates the separation of powers. Indeed, our decision last Term in *Seila Law* is all but dispositive. There, we held that Congress could not limit

the President's power to remove the Director of the Consumer Financial Protection Bureau (CFPB) to instances of "inefficiency, neglect, or malfeasance." 591 U. S., at ——, 140 S.Ct., at 2197. We did "not revisit our prior decisions allowing certain limitations on the President's removal power," but we found "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.,* at ——, 140 S.Ct., at 2192. "Such an agency," we observed, "lacks a **\*1784** foundation in historical practice and clashes with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." *Id.,* at —— – ——, 140 S.Ct., at 2192.

A straightforward application of our reasoning in *Seila Law* dictates the result here. The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power. Fulfilling his obligation to defend the constitutionality of the Recovery Act's removal restriction, *amicus* attempts to distinguish the FHFA from the CFPB. We do not find any of these distinctions sufficient to justify a different result.

1

*Amicus* first argues that Congress should have greater leeway to restrict the President's power to remove the FHFA Director because the FHFA's authority is more limited than that of the CFPB. *Amicus* points out that the CFPB administers 19 statutes while the FHFA administers only 1; the CFPB regulates millions of individuals and businesses whereas the FHFA regulates a small number of Government-sponsored enterprises; the CFPB has broad rulemaking and enforcement authority and the FHFA has little; and the CFPB receives a large budget from the Federal Reserve while the FHFA collects roughly half the amount from regulated entities.

We have noted differences between these two agencies. See *Seila Law,* 591 U. S., at ——, 140 S.Ct., at 2202 (noting that the FHFA "regulates primarily Government-sponsored enterprises, not purely private actors"). But the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head. The President's removal power serves vital purposes even when the officer subject to removal is not the head of one of the largest and most powerful agencies. The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote. See, *e.g., id.,* at —— – ——, 140 S.Ct., at 2196–2197; *Free Enterprise Fund,* 561 U.S. at 501–502, 130 S.Ct. 3138; *Myers v. United States,* 272 U.S. 52, 131, 47 S.Ct. 21, 71 L.Ed. 160 (1926). In addition, because the President, unlike agency officials, is elected, this control is essential to subject Executive Branch actions to a degree of electoral accountability. See *Free Enterprise Fund,* 561 U.S. at 497–498, 130 S.Ct. 3138. At-

will removal ensures that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Id.,* at 498, 130 S.Ct. 3138 (quoting 1 Annals of Cong. 499 (1789) (J. Madison)). These purposes are implicated whenever an agency does important work, and nothing about the size or role of the FHFA convinces us that its Director should be treated differently from the Director of the CFPB. The test that *amicus* proposes would also lead to severe practical problems. *Amicus* does not propose any clear standard to distinguish agencies whose leaders must be removable at will from those whose leaders may be protected from at-will removal. This case is illustrative. As *amicus* points out, the CFPB might be thought to wield more power than the FHFA in some respects. But the FHFA might in other respects be considered more powerful than the CFPB.

For example, the CFPB's rulemaking authority is more constricted. Under the **\*1785** Dodd-Frank Act, the CFPB's final rules can be set aside by a super majority of the Financial Stability and Oversight Council whenever it concludes that the rule would " 'put the safety and soundness' " of the Nation's banking or financial systems at risk. See *Seila Law, supra,* at ——, n. 9, 140 S.Ct., at 2204 n. 9 (quoting 12 U.S.C. §§ 5513(a), (c)(3)). No board or commission can set aside the FHFA's rules.

In addition, while the CFPB has direct regulatory and enforcement authority over purely private individuals and businesses, the FHFA has regulatory and enforcement authority over two companies that dominate the secondary mortgage market and have the power to reshape the housing sector. See App. 116. FHFA actions with respect to those companies could have an immediate impact on millions of private individuals and the economy at large. See *Seila Law, supra,* at ——, 140 S.Ct., at 2241 (KAGAN, J., concurring in judgment with respect to severability and dissenting in part) (noting that "the FHFA plays a crucial role in overseeing the mortgage market, on which millions of Americans annually rely").

Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry. [19]

[19] *Amicus* argues that there is historical support for the removal restriction at issue here because the Comptroller of Currency and the members of the Sinking Fund Commission were subject to similar protection, but those agencies are materially different because neither of them operated beyond the President's control, and one of them was led by a multi-member Commission. As we explained in *Seila Law*, with the exception of a 1-year aberration during the Civil War, the Comptroller was removable at will by the President, who needed only to communicate the reasons for his decision to Congress. 591 U. S., at ——, n. 5, 140 S.Ct., at 2201 n. 5). And the Sinking Fund Commission, which Congress created to purchase U. S. securities following

the Revolutionary War, was run by a 5-member Commission, and three of those Commissioners were part of the President's Cabinet and therefore removable at will. See An Act Making Provision for the Reduction of the Public Debt, ch. 47, 1 Stat. 186 (1790).

2

*Amicus* next contends that Congress may restrict the removal of the FHFA Director because when the Agency steps into the shoes of a regulated entity as its conservator or receiver, it takes on the status of a private party and thus does not wield executive power. But the Agency does not always act in such a capacity, and even when it acts as conservator or receiver, its authority stems from a special statute, not the laws that generally govern conservators and receivers. In deciding what it must do, what it cannot do, and the standards that govern its work, the FHFA must interpret the Recovery Act, and "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." Bowsher, 478 U.S. at 733, 106 S.Ct. 3181; see also id., at 765, 106 S.Ct. 3181 (White, J., dissenting) ("[T]he powers exercised by the Comptroller under the Act may be characterized as 'executive' in that they involve the interpretation and carrying out of the Act's mandate").

Moreover, as we have already mentioned, see *supra*, at —— – ——, the FHFA's powers under the Recovery Act differ critically from those of most conservators and receivers. It can subordinate the best interests of the company to its own best interests and those of the public. See 12 U.S.C. § 4617(b)(2)(J)(ii). Its business decisions are protected from judicial review. § 4617(f ). It is empowered to issue **\*1786** a "regulation or order" requiring stockholders, directors, and officers to exercise certain functions. § 4617(b)(2)(C). It is authorized to issue subpoenas. § 4617(b)(2)(I). And of course, it has the power to put the company into conservatorship and simultaneously appoint itself as conservator. § 4617(a)(1). For these reasons, the FHFA clearly exercises executive power. [20]

[20]

    *Amicus* claims that O'Melveny & Myers v. FDIC, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), supports his argument, but that decision is far afield. It held that state law, not federal common law, governed an attribute of the FDIC's status as receiver for an insolvent savings bank. Id., at 81–82, 114 S.Ct. 2048. The nature of the FDIC's authority in that capacity sheds no light on the nature of the FHFA's distinctive authority as conservator under the Recovery Act.

3

*Amicus* asserts that the FHFA's structure does not violate the separation of powers because the entities it regulates are Government-sponsored enterprises that have federal charters, serve public objectives, and receive " 'special privileges' " like tax exemptions and certain borrowing rights. Brief for Court-Appointed *Amicus Curiae* 27–28. In *amicus*'s view, the individual-liberty concerns that the removal

power exists to preserve "ring hollow where the only entities an agency regulates are themselves not purely private actors." *Id.,* at 29 (internal quotation marks omitted).

This argument fails because the President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives. And there can be no question that the FHFA's control over Fannie Mae and Freddie Mac can deeply impact the lives of millions of Americans by affecting their ability to buy and keep their homes.

4

Finally, *amicus* contends that there is no constitutional problem in this case because the Recovery Act offers only "modest [tenure] protection." *Id.,* at 37. That is so, *amicus* claims, because the for-cause standard would be satisfied whenever a Director "disobey[ed] a lawful [Presidential] order," including one about the Agency's policy discretion. *Id.,* at 41.

We acknowledge that the Recovery Act's "for cause" restriction appears to give the President more removal authority than other removal provisions reviewed by this Court. See, *e.g., Seila Law,* 591 U. S., at ——, 140 S.Ct., at 2193 ("for 'inefficiency, neglect of duty, or malfeasance in office' "); *Morrison,* 487 U.S. at 663, 108 S.Ct. 2597 (" 'for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of [his or her] duties' ");

*Bowsher, supra,* at 728, 106 S.Ct. 3181 ("by joint resolution of Congress" due to " 'permanent disability,' " " 'inefficiency,' " " 'neglect of duty,' " " 'malfeasance,' " " 'a felony[,] or conduct involving moral turpitude' "); *Humphrey's Executor* v. *United States,* 295 U.S. 602, 619, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (" ' "for inefficiency, neglect of duty, or malfeasance in office" ' "); *Myers,* 272 U.S. at 107, 47 S.Ct. 21 (" 'by and with the advice and consent of the Senate' "). And it is certainly true that disobeying an order is generally regarded as "cause" for removal. See *NLRB* v. *Electrical Workers,* 346 U.S. 464, 475, 74 S.Ct. 172, 98 L.Ed. 195 (1953) ("The legal principle that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough").

**\*1787** But as we explained last Term, the Constitution prohibits even "modest restrictions" on the President's power to remove the head of an agency with a single top officer. *Seila Law, supra,* at ——, 140 S.Ct., at 2205 (internal quotation marks omitted). The President must be able to remove not just officers who disobey his commands but also those he finds "negligent and inefficient," *Myers,* 272 U.S. at 135, 47 S.Ct. 21, those who exercise their discretion in a way that is not "intelligen[t] or wis[e]," *ibid.,* those who have "different views of policy," *id.,* at 131, 47 S.Ct. 21, those who come "from a competing political party who is dead set against [the President's] agenda," *Seila Law, supra,* at ——, 140 S.Ct., at 2204 (emphasis deleted), and those in whom he has simply lost confidence, *Myers, supra,* at 124, 47 S.Ct.

21. *Amicus* recognizes that " 'for cause' ... does not mean the same thing as 'at will,' " Brief for Court-Appointed *Amicus Curiae* 44–45, and therefore the removal restriction in the Recovery Act violates the separation of powers. [21]

21     *Amicus* warns that if the Court holds that the Recovery Act's removal restriction violates the Constitution, the decision will "call into question many other aspects of the Federal Government." Brief for Court-Appointed *Amicus Curiae* 47. *Amicus* points to the Social Security Administration, the Office of Special Counsel, the Comptroller, "multimember agencies for which the chair is nominated by the President and confirmed by the Senate to a fixed term," and the Civil Service. *Id.,* at 48 (emphasis deleted). None of these agencies is before us, and we do not comment on the constitutionality of any removal restriction that applies to their officers.

## C

Having found that the removal restriction violates the Constitution, we turn to the shareholders' request for relief. And because the shareholders no longer have a live claim for prospective relief, see *supra*, at ——, the only remaining remedial question concerns retrospective relief.

On this issue, the shareholders' lead argument is that the third amendment must be completely undone. They seek an order setting aside the amendment and requiring the "return to Fannie and Freddie [of] all dividend payments made pursuant to [it]." [22] App. 117–118. In support of this request, they contend that the third amendment was adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*.

22     In the alternative, they request that the dividend payments be "recharacteriz[ed] ... as a pay down of the liquidation preference and a corresponding redemption of Treasury's Government Stock." App. 118.

We have already explained that the Acting Director who *adopted* the third amendment was removable at will. See *supra,* at —— – ——. That conclusion defeats the shareholders' argument for setting aside the third amendment in its entirety. We therefore consider the shareholders' contention about remedy with respect to only the actions that confirmed Directors have taken to *implement* the third amendment during their tenures. But even as applied to that subset of actions, the shareholders' argument is neither logical nor supported by precedent. All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

**\*1788** The shareholders argue that our decisions in prior separation-of-powers cases support their position, but most of the cases they cite involved a Government actor's exercise of power that the actor did not lawfully possess. See *Lucia* v. *SEC*, 585 U. S. ——, —— (2018) (slip op., at 12) (administrative law judge appointed in violation of Appointments Clause); *Stern v. Marshall*, 564 U.S. 462, 503, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) (bankruptcy judge's exercise of exclusive power of Article III judge); *Clinton v. City of New York*, 524 U.S. 417, 425, and n. 9, 438, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (President's cancellation of individual portions of bills under the Line Item Veto Act); *Chadha*, 462 U.S. at 952–956, 103 S.Ct. 2764 (one-house veto of Attorney General's determination to suspend an alien's deportation); *Youngstown*, 343 U.S. at 585, 587–589, 72 S.Ct. 863 (Presidential seizure and operation of steel mills). As we have explained, there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office. [23]

[23]  Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment. See, *e.g.,* *Seila Law*, 591 U. S., at —— – ——, 140 S.Ct., at 2207–2211.

The shareholders claim to find implicit support for their argument in *Seila Law* and *Bowsher*, but they read far too much into those decisions.

In *Seila Law*, [24] after holding that the restriction on the removal of the CFPB Director was unconstitutional and severing that provision from the rest of the Dodd-Frank Act, we remanded the case so that the lower courts could decide whether, as the Government claimed, the Board's issuance of an investigative demand had been ratified by an Acting Director who was removable at will by the President. See 591 U. S., at ——, 140 S.Ct., at 2211. The shareholders argue that this disposition implicitly meant that the Director's action would be void unless lawfully ratified, but we said no such thing. The remand did not resolve any issue concerning ratification, including whether ratification was necessary. And in *Bowsher*, after holding that the Gramm-Rudman-Hollings Act unconstitutionally authorized the Comptroller General to exercise executive power, the Court simply turned to the remedy specifically prescribed by Congress. See 478 U.S. at 735, 106 S.Ct. 3181. [25] We therefore see no reason to hold that the third amendment must be completely undone.

[24]  What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction. We held that a plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer and that the plaintiff alleges was void. See 591 U. S., at —— – ——, 140 S.Ct., at 2195–2196. But

that holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone. Compare *post*, at —— (GORSUCH, J., concurring in part).

25     In addition, the constitutional defect in *Bowsher* was different from the defect here. In *Bowsher*, the Comptroller General, whom Congress had long viewed as "an officer of the Legislative Branch," 478 U.S. at 731, 106 S.Ct. 3181, was vested with executive power. Here, the FHFA Director is clearly an executive officer. See *post,* at —— – —— (THOMAS, J., concurring).

That does not necessarily mean, however, that the shareholders have no entitlement to retrospective relief. Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from **\*1789** the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those

situations, the statutory provision would clearly cause harm.

In the present case, the situation is less clear-cut, but the shareholders nevertheless claim that the unconstitutional removal provision inflicted harm. Were it not for that provision, they suggest, the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholders.

The federal parties dispute the possibility that the unconstitutional removal restriction caused any such harm.unlawful removal restriction. Se Reply Brief for Federal Parties 43. The parties' arguments should be resolved in the first instance by the lower courts. 26

26     The lower courts may also consider all issues related to the federal parties' argument that the doctrine of laches precludes any relief. The federal parties argue that Treasury was prejudiced by the shareholders' delay in filing suit because, for some time after the third amendment was adopted, there was a chance that it would benefit the shareholders. According to the federal parties, the shareholders waited to file suit until it became apparent that the third amendment would not have that effect.

The shareholders respond that laches is inapplicable because they filed their complaint within the time allowed by the statute of limitations, and they argue that their delay

did not cause prejudice because it was "mathematically impossible" for Treasury to make less money under the Third Amendment than under the prior regime. Reply Brief for Collins et al. 4–5 (emphasis deleted). We decline to decide this fact-bound question in the first instance.

\* \* \*

The judgment of the Court of Appeals is affirmed in part, reversed in part, and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, concurring.

I join the Court's opinion in full. I agree that the Directors were properly appointed and could lawfully exercise executive power. And I agree that, to the extent a Government action violates the Constitution, the remedy should fit the injury. But I write separately because I worry that the Court and the parties have glossed over a fundamental problem with removal-restriction cases such as these: The Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract.

I

As discussed in more detail by the Court, Congress created the Federal Housing Finance Agency (FHFA) in 2008. Housing and Economic Recovery Act of 2008, 12 U.S.C.

§ 4501 *et seq.* The FHFA is "an independent agency." 12 U.S.C. § 4511(a). Among other things, it supervises and regulates Fannie Mae and Freddie **\*1790** Mac, two companies created by Congress to provide liquidity and stability to the mortgage market. See § 4511(b). In the midst of the 2008 financial crisis, the FHFA's Director exercised his statutory authority under § 4617(a)(1) to appoint the Agency as conservator of Fannie Mae and Freddie Mac. As conservator, the Agency in effect had full control over the companies.

The FHFA used this control to have the companies enter into several agreements with the Treasury Department to secure financing to keep both companies afloat. Relevant here, the FHFA and Treasury signed two agreements, known as the Third Amendments, requiring the companies to pay a quarterly dividend to Treasury of nearly all their net worth minus a predetermined capital reserve.

Shareholders of the companies sued the FHFA, the Director, Treasury, and the Secretary of the Treasury. They advanced four theories about why the adoption and enforcement of the Third Amendments violated the law: (1) The FHFA's conduct exceeded its statutory authority; (2) Treasury's conduct exceeded its statutory authority; (3) Treasury's conduct was arbitrary and capricious; and (4) the FHFA's structure violated the "Separation of Powers" because the President could fire the FHFA Director only "for cause." App. 116–117; § 4512(b)(2).

The District Court rejected their claims. The Fifth Circuit affirmed the dismissal of claims two and three, and the shareholders did not

seek review of that decision. The Fifth Circuit reinstated the statutory claim, but today we correctly reverse that decision. *Ante,* at ——– ——. The Fifth Circuit also held that the shareholders are entitled to judgment on the separation-of-powers claim. *Collins v. Mnuchin,* 938 F.3d 553, 587 (2019)

## II

For the shareholders to prevail, identifying some conflict between the Constitution and a statute is not enough. They must show that the challenged Government action at issue —the adoption and implementation of the Third Amendment—was, in fact, unlawful. See *California* v. *Texas,* 593 U. S. ——, —— –——, 141 S.Ct. 1469, 1470–1474, —— L.Ed.2d —— (2021). Modern standing doctrine reflects this principle: To have standing, a plaintiff must allege an injury traceable to an "allegedly unlawful" action (or threatened action) and seek a remedy to redress that action. *Allen* v. *Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); accord, *Virginia* v. *American Booksellers Assn., Inc.,* 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); contra, 938 F.3d at 586 (tracing injury to the removal restriction). Here, before a court can provide relief, it must conclude that either the adoption or implementation of the Third Amendment was unlawful. [1]

***

[1] Another limit on the judicial power is relevant: A party seeking relief must have a legal right to redress. See *Cohens* v. *Virginia,* 19 U.S. (6 Wheat.) 264, 405, 5 L.Ed. 257 (1821) (explaining that Article III "does not extend the judicial power to every violation of the constitution which may possibly take place"). The judicial power extends only to "'a case in law or equity,' in which a right, under such law, is asserted." *Ibid.* We have indicated that individuals may have an implied private right of action under the Constitution to seek equitable relief to "'preven[t] entities from acting unconstitutionally.'" *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 491, n. 2, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). This includes "Appointments Clause or separation-of-powers claim[s]." *Ibid.* I assume the shareholders have brought such a cause of action here and have a legal right to obtain equitable relief if they can show they suffered an injury traceable to a Government action that violates the Constitution.

The shareholders did not raise the Administrative Procedure Act (APA) in count four of their complaint, but now contend their "constitutional claim is cognizable under the APA," which permits a "'reviewing court [to] *hold unlawful and set aside* agency action found to be contrary to constitutional right, power, privilege, or immunity.'" Brief for Collins et al. 74 (quoting 5 U.S.C. § 706; ellipses omitted; emphasis in original). Even assuming they raised their constitutional claim under the APA, it would not change

the analysis; the shareholders would need to show they suffered an injury traceable to a Government *action* that violates the Constitution.

**\*1791** The parties simply assume that the lawfulness of agency action turns on the lawfulness of the removal restriction. Our recent precedents have not clearly questioned this premise, and on this premise, the Court correctly resolves the remaining legal issues. But in the future, parties and courts should ensure not only that a provision is unlawful but also that unlawful *action* was taken.

This suit provides a good example. The shareholders largely neglect the issue of lawfulness to focus on remedy, but their briefing appears premised on several theories of unlawfulness.[2] First, that the removal restriction renders all Agency actions void because the Directors serve in violation of the Constitution's structural provisions, similar to Appointments Clause cases, see *Lucia* v. *SEC*, 585 U. S. ——, —— (2018) (slip op., at 12) (holding that an Administrative Law Judge was unlawfully appointed), and other separation-of-powers cases, *e.g.,* ⚑ *Bowsher v. Synar*, 478 U.S. 714, 727–736, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (holding that the Comptroller General was not an executive officer and could not exercise executive power granted to him by statute). Second, that even if the Director is in the Executive Branch and the removal restriction is just unenforceable, the mere existence of the law somehow taints all of the Director's actions. Third, that "when FHFA's single Director exercises Executive Power without meaningful oversight from the President, he exercises authority that was never

properly his." Brief for Collins et al. 64. Fourth, that the statutory provision that gave the Director the power to adopt and implement the Third Amendments must fall if the statutory removal restriction is unlawful. § 4617(b)(2)(J)(ii).

[2]  Because the shareholders allege the Government acted unlawfully, because their alleged injury can be traced to those allegedly unlawful actions, and because this Court might be able to redress that injury, I agree with the Court that they have standing. See ⚑ *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

As the Court's reasoning makes clear, however, all these theories appear to fail on the merits.

A

I begin with whether the FHFA Director may lawfully exercise executive authority. The shareholders suggest that the removal restriction inherently renders the Agency's actions void. In support, they point to our Appointments Clause cases and our other separation-of-powers cases. But the cases on which they rely prove quite the opposite.

Consider our separation-of-powers cases, which set out a two-part analysis to determine whether an official can lawfully exercise a statutory power *at all*. First, we ask in what branch (if any) an official is located. Second, we determine whether the statutory power possessed by the official belongs to that branch.

In *Bowsher*, the Court determined that the Comptroller General of the United States was "an officer of the Legislative Branch" based on other statutes dating back to 1945 declaring him as such, the expressed views of **\*1792** other Comptrollers General, the fact that only Congress could remove the Comptroller General, and the structure of the office. 478 U.S. at 727–732, 106 S.Ct. 3181. In light of this legislative identity, the Court held the Comptroller General could not lawfully exercise executive powers assigned to him by statute. *Id.,* at 732–735, 106 S.Ct. 3181.[3]

[3]

See also *Stern v. Marshall,* 564 U.S. 462, 503, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) (bankruptcy judges, as Article I officers, cannot exercise exclusive Article III power); *Clinton v. City of New York,* 524 U.S. 417, 438–441, 448–449, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (the President, an Article II officer, cannot exercise Article I line-item-veto power); *Morrison v. Olson,* 487 U.S. 654, 677–679, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (a law cannot give a court powers that violated Article III); *Glidden Co. v. Zdanok,* 370 U.S. 530, 584, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (plurality opinion) (concluding after exhaustive analysis that two courts were Article III courts); *id.,* at 585–588, 82 S.Ct. 1459 (Clark, J., concurring in result) (agreeing "in light of the congressional power exercised and the jurisdiction enjoyed, together with the characteristics of its judges");

*American Ins. Co. v. 356 Bales of Cotton,* 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828) (a territorial court is an Article I court and admiralty jurisdiction can be exercised only by Article III courts, but Article IV removes this limitation with respect to the Territories).

Assuming the shareholders raise a *Bowsher*-type argument, I agree with the Court that the FHFA Director is an executive official who can lawfully "carry out the functions of the office." *Ante,* at —— – ——, and n. 25 (discussing *Bowsher*). The statutory scheme creates a common type of executive officer —an individual nominated by the President and confirmed by the Senate, who heads an agency exercising executive powers and who reports to the President. The only statutory powers assigned to the Director are executive. No party contends the office of the FHFA Director is a nonexecutive office. No statute refers to him as a nonexecutive officer. And the statutory scheme recognizes that the President can remove the officer (but only "for cause"). § 4512(b)(2). In fact, the Court concludes that the removal restriction is unconstitutional in part because the FHFA Director is an executive officer whom the President needs to be able to control. See *ante,* at —— – ——.

Our cases demonstrate that the existence of a removal restriction, without more, usually does not take an otherwise executive officer outside the Executive Branch. True, statutory provisions governing who can remove an officer (and when) can provide evidence of the branch to which that officer belongs. *E.g., Bowsher,* 478 U.S. at 727–728, and n. 5,

106 S.Ct. 3181; *American Ins. Co. v. 356 Bales of Cotton*, 1 Pet. 511, 546, 26 U.S. 511, 7 L.Ed. 242 (1828). But they generally are not dispositive. In many cases, it is obvious that the officer is executive, and it is the removal restriction—not the officer's exercise of executive powers—that is the problem. *E.g.,* *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 492–508, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (holding unconstitutional tenure provisions protecting executive officer, but concluding "the existence of the Board does not violate the separation of powers"); cf. *Myers v. United States*, 272 U.S. 52, 108, 176, 47 S.Ct. 21, 71 L.Ed. 160 (1926).[4]

[4]   I agree with Justice GORSUCH that a court must look at more than the label to determine in what branch an officer sits. *Post*, at ——, n. 1 (opinion concurring in part). To answer this question, courts have historically looked at various factors. See n.3, *supra*. Here, everything about the Director's position, except the removal restriction, indicates he is an executive officer. See also *ante*, at ——, n. 25 (opinion of the Court). As the Court correctly explains, "the removal restriction ... violates the separation of powers" because the Director is an executive officer. *Ante*, at ——.

**\*1793** The Appointments Clause cases do not help the shareholders either. These cases also ask whether an officer can lawfully exercise the statutory power of his office at all in light of the rule that an officer must be properly appointed before he can legally act as an officer.

*Lucia*, 585 U. S., at ——, 138 S.Ct., at 2055; *Ryder v. United States*, 515 U.S 177, 182–183, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995). Otherwise, the official's authority to exercise the powers of the office generally is legally deficient. *Id.*, at 179, 182–183, 115 S.Ct. 2031. Here, "[a]ll the officers who headed the FHFA during the time in question were properly *appointed*." *Ante*, at ——. There is thus no barrier to them exercising power in the first instance.

B

The mere existence of an unconstitutional removal provision, too, generally does not automatically taint Government action by an official unlawfully insulated. It is true the removal restriction here is unlawful. But while the shareholders are correct that the Constitution authorizes the President to dismiss the FHFA Director for any reason, no statute can take that Presidential power away. See *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U. S. ——, ——, 140 S.Ct. 2183, 2219, 207 L.Ed.2d 494 (2020) (THOMAS, J., concurring in part and dissenting in part) ("In the context of a constitutional challenge, ... if a party argues that a statute and the Constitution conflict, then courts must resolve that dispute and ... follow the higher law of the Constitution" (internal quotation marks omitted)); *ante*, at ——.

That the Constitution automatically trumps an inconsistent statute creates a paradox for the shareholders. Had the removal restriction *not* conflicted with the Constitution, the law

would never have unconstitutionally insulated any Director. And while the provision *does* conflict with the Constitution, the Constitution has always displaced it and the President has always had the power to fire the Director for any reason. So regardless of whether the removal restriction was lawful or not, the President always had the legal power to remove the Director in a manner consistent with the Constitution. [5] Brief for Harrison as *Amicus Curiae* 15–16.

[5]
In *Seila Law*, the Court did not address whether an officer acts unlawfully if protected by an unlawful removal restriction. See *ante*, at ——, and nn. 23–24. That is because the Government in effect conceded the issue. *Seila Law*, 591 U. S., at ——, 140 S.Ct., at 2207–2208 (plurality opinion); *id., at* ——, 140 S.Ct., at 2200 (opinion of THOMAS, J.). Perhaps we should have addressed it then. *Post*, at —— – ——, n. 2 (opinion of GORSUCH, J.).
I continue to adhere to the views that I expressed in *Seila Law*: A combination of statutes can produce a separation-of-powers violation that renders Government action unlawful. See 591 U. S., at ——, 140 S.Ct., at 2202–2203 (opinion concurring in part and dissenting in part). In remedying such a separation-of-powers violation, courts cannot purport to rewrite the statute to avoid the violation. *Ibid.*; *post,* at ——, n. 2 (opinion of GORSUCH, J.) ("[W]e cannot divine 'which of the provisions' Congress would have kept and which it would

have scrapped ... had it known its actual choice was unconstitutional," "absent statutory direction from Congress"). However, I respectfully part ways with Justice GORSUCH, because, on the merits, I am uncertain whether the unlawful removal restriction here combines with any other statutory provision in a way that renders the Government action at issue unlawful.

Moreover, no Director has ever purported to occupy the office and exercise its powers despite a Presidential attempt at removal. No court, for example, has enjoined an attempt by the President to remove the Director. [6] So every Director is a **\*1794** lawfully appointed executive officer whom the President may remove in a manner consistent with the Constitution but did not attempt to do so.

[6]
A removal restriction may unconstitutionally insulate an officer such that his actions are unlawful. If the President tries to remove an official but a court blocks this action, then that official is not lawfully occupying his office and would likely be acting without authority. Cf. *ante*, at ——. But that circumstance has not arisen here.

C

Another possible theory the shareholders seem to rely on is that a misunderstanding about the correct state of the law makes an otherwise constitutional action unconstitutional. Thus, if the President or Director *misunderstood* the circumstances under which the President could have removed the Director, then that

creates a defect in authority. But nothing in the Constitution, history, or our case law supports this expansive view of unlawfulness. The Constitution does not transform unfamiliarity with the Vesting Clause into a legal violation when an executive officer acts with authority. [7]

[7]    The APA might permit this type of lawsuit in allowing an individual to challenge an agency action as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). There is a colorable argument that a Government official's misunderstanding about the scope of the President's removal authority would render an agency action arbitrary or capricious in certain cases. However, the shareholders did not bring this constitutional challenge as an arbitrary and capricious claim against the FHFA. And if they had, we would need to consider the interaction between this statutory claim and the Act's anti-injunction provision. Cf. *ante,* at —— – ——.

Perhaps the better understanding of this argument is the Director *might* have acted differently if he knew that he served at the pleasure of the President. That may be true, but it is not enough for a party to show that an official acted differently because he or another official incorrectly interpreted the Vesting Clause—the party must show that the official acted unlawfully. If the President vetoed a bill on the ground that he believed it to be unconstitutional, this Court could not undo that lawful act simply because an injured plaintiff persuasively establishes that the President was mistaken.

Sure enough, we have not held that a misunderstanding about authority results in a constitutional defect where the action was otherwise lawful. Absent such authority in a "constitutional cas[e]," our watchword [should be] caution." *Hernández* v. *Mesa*, 589 U. S. ——, ——, 140 S.Ct. 735, 742, 206 L.Ed.2d 29 (2020). We should be reluctant to create a new restriction on a coequal branch and enforce it through a new private right of action. *Id.,* at —— – ——, 140 S.Ct., at 742–743. Doing so places great stress upon "the Constitution's separation of legislative and judicial power." *Id.,* at ——, 140 S.Ct., at 741.

*Seila Law* and *Free Enterprise* do not help the shareholders on the lawfulness of the Government actions question. *Ante,* at ——, —— – ——. In *Seila Law*, the Government in effect "conceded that [its] actions were unconstitutional" if the removal restriction was unconstitutional. 591 U. S., at ——, 140 S.Ct., at 2200 (opinion of THOMAS, J.). So the Court assumed "that [petitioner] 'sustain[ed] injury' from an executive act that allegedly exceeds the official's authority." *Id.,* at ——, 140 S.Ct., at 2196; *ante,* at —— – ——. In *Free Enterprise*, we considered a similar challenge to a removal restriction without questioning the plaintiffs' standing "where plaintiffs claimed injury from allegedly unlawful agency oversight." *Ante,* at ——. And then we assumed that the agency lacked the authority to act lawfully if the removal restriction there were invalid.

**\*1795 D**

The shareholders' briefing strongly implies one final argument: The statutory provision giving the FHFA the power to act as conservator, 12 U.S.C. § 4617(b)(2)(J)(ii), cannot be severed from the removal restriction. Brief for Collins et al. 77–79. Thus, the argument goes, if the removal provision is unlawful, then § 4617(b)(2)(j)(ii) is too and the FHFA Directors acted without statutory authority.

Assuming that the unlawfulness of one provision can cause another to be unlawful, this inquiry is just a question of statutory interpretation. See Seila Law, 591 U. S., at ——, 140 S.Ct., at 2201–2202 (opinion of THOMAS, J.); Lea, Situational Severability, 103 Va. L. Rev. 735, 764–776 (2017). The Recovery Act contains no inseverability clause. Contra, 4 U.S.C. § 125 (inseverability clause). Nor does it contain any fallback provision stating that § 4617(b)(2)(j)(ii) should be altered if the removal clause is found unlawful. Without something in the statutory text or structure to show that § 4617(b)(2)(j)(ii)'s lawfulness rises or falls based on the removal restriction, this argument is also unconvincing.

* * *

I do not understand the parties to have sought review of these issues in this Court. So the Court correctly resolves the legal issues presented. That being said, I seriously doubt that the shareholders can demonstrate that any relevant action by an FHFA Director violated the Constitution. And, absent an unlawful act, the shareholders are not entitled to a remedy. The Fifth Circuit can certainly consider this issue on remand.

Justice GORSUCH, concurring in part.

I agree with the Court on the merits and am pleased to join nearly all of its opinion. I part ways only when it comes to the question of remedy addressed in Part III–C.

As the Court observes, the only question before us concerns retrospective relief. *Ante*, at ——. By the time we turn to that question, the plaintiffs have proven that the Director was without constitutional authority when he took the challenged actions implementing the Third Amendment. In response to such a showing, a court would normally set aside the Director's ultra vires actions as "contrary to constitutional right," 5 U.S.C. § 706(2)(B), subject perhaps to consideration of traditional remedial principles such as laches. See *ante*, at ——, n. 26; Abbott Laboratories v. Gardner, 387 U.S. 136, 155, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Because the Court of Appeals did not follow this course, this Court would normally vacate the judgment in this suit with instructions requiring the Court of Appeals to conform its judgment to traditional practice. Today, the Court acknowledges it has taken exactly this course in cases involving unconstitutionally appointed executive officials. *Ante*, at —— – ——.

Still, the Court submits, we should treat this suit differently because the Director was unconstitutionally insulated from removal rather than unconstitutionally appointed. *Ante,*

at ——— – ———; see also *ante,* at ——— (THOMAS, J., concurring). It is unclear to me why this distinction should make a difference. Either way, governmental action is taken by someone erroneously claiming the mantle of executive power—and thus taken with no authority at all. The Court points to not a single precedent in 230 years of history for the distinction it would have us draw. Nor could it. The course it pursues today defies our precedents. In **\*1796** *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), this Court concluded that Congress had vested the Comptroller General with "the very essence" of executive power, *id.,* at 732–733, 106 S.Ct. 3181, but that he was (impermissibly) removable only by Congress, *id.,* at 727–728, 106 S.Ct. 3181. In *Seila Law LLC v. Consumer Financial Protection Bureau,* 591 U. S. ——, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020), we found Congress had assigned the CFPB Director sweeping authority over the financial sector, *id.,* at ——— – ———, 140 S.Ct., at 2192–2194, while insulating him "from removal by an accountable President," *id.,* at ——, 140 S.Ct., at 2204. In both cases that meant the officers could "not be entrusted with executive powers" from day one, *Bowsher,* 478 U.S. at 732, 106 S.Ct. 3181, and the challenged actions were "void," *Seila Law,* 591 U. S., at ——, 140 S.Ct., at 2196.[1]

[1] The Court's attempt to sidestep these cases leads nowhere. *Seila Law,* we are told, discussed standing—not remedies —when it said plaintiffs " 'sustain[ ] injury' " from unlawfully insulated executive action and may "challeng[e]

[such] action as void." See *ante,* at ——, n. 24. But standing and remedies are joined at the hip: Article III permits a court only to provide "a *remedy* that redresses the plaintiffs' *injury-in- fact.*" *Collins v. Mnuchin,* 938 F.3d 553, 609 (CA5 2019) (Oldham, J., concurring in part and dissenting in part) (emphasis added). That is why a plaintiff "must have standing [for] each form of relief" sought. *Town of Chester v. Laroe Estates, Inc.,* 581 U. S. ——, ——, 137 S.Ct. 1645, 1650, 198 L.Ed.2d 64 (2017). *Bowsher,* we are told, involved a legislative officer—not an executive one, which supposedly makes all the difference. *Ante,* at ——, n. 25. But there the Comptroller was legislative only in the sense that he headed an "independent" department and was accountable to Congress rather than the President. 478 U.S at 730–732, 106 S.Ct. 3181. If there is any difference here, it's that the FHFA Director—who likewise heads an "independent" agency, 12 U.S.C. § 4511(a)—is accountable to *no one.* The idea that whether acts are void or not turns on a label rather than on the functions an officer is assigned and who he is accountable to should not be taken seriously. *E.g.,* *Bowsher,* 478 U. S. at 727–728, 732–733, 106 S.Ct. 3181; *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 484–486, 496–498, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010); *Seila Law,* 591 U. S., at ——— – ———, ——, 140 S.Ct., at 2192–2194, 2203–

2204; *ante*, at —— – ——, —— – ——.

If anything, removal restrictions may be a greater constitutional evil than appointment defects. New Presidents *always* inherit thousands of Executive Branch officials whom they did not select. It is the power to supervise —and, if need be, remove—subordinate officials that allows a new President to shape his administration and respond to the electoral will that propelled him to office. After all, from the moment "an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear." *Synar v. United States*, 626 F.Supp. 1374, 1401 (DC 1986) (*per curiam*). Chief Justice Taft, who knew a little about such things, put it this way: "[W]hen the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal." *Myers v. United States*, 272 U.S. 52, 122, 47 S.Ct. 21, 71 L.Ed. 160 (1926). Because the power of supervising subordinates is essential to sound constitutional administration, as between presidential hiring and firing "the unfettered ability to remove is the more important." M. McConnell, The President Who Would Not Be King 167 (2020).

Protecting this aspect of the separation of powers isn't just about protecting presidential authority. Ultimately, the separation of powers is designed to "secure[ ] the freedom of the individual." *Bond v. United States*, 564 U.S. 211, 221, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011); **\*1797** *ante*, at —— – ——. That's no less true here than anywhere else. As Hamilton explained, the point of ensuring presidential supervision of the Executive Branch is to ensure "a due dependence on the people" and "a due responsibility" to them; these are key "ingredients which constitute safety in the republican sense." The Federalist No. 70, p. 424 (C. Rossiter ed. 1961). In the case of a removal defect, a wholly unaccountable government agent asserts the power to make decisions affecting individual lives, liberty, and property. The chain of dependence between those who govern and those who endow them with power is broken. *United States v. Arthrex, Inc.*, —— U.S. ——, —— S.Ct. ——, ——, —— L.Ed.2d ——, 2021 WL 2519433, at 14–15 (2021) (GORSUCH, J., concurring in part and dissenting in part). Few things could be more perilous to liberty than some "fourth branch" that does not answer even to the one executive official who *is* accountable to the body politic. *FTC v. Ruberoid Co.*, 343 U.S. 470, 487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting).

Instead of applying our traditional remedy for constitutional violations like these, the Court supplies a novel and feeble substitute. The Court says that, on remand in this suit, lower courts should inquire whether the President would have removed or overruled the unconstitutionally insulated official had he known he had the authority to do so. *Ante*, at ——. So, if lower courts find that the President would have removed or overruled the Director, *then* the for-cause removal provision "clearly cause[d] harm" and the Director's actions may be set aside. *Ibid.*

Not only is this "relief " unlike anything this Court has ever before authorized in cases like

ours; it is materially identical to a remedial approach this Court previously rejected. In 🔖 *Bowsher*, the Court directly addressed and expressly refused the dissent's insistence that it should undertake a " 'consideration' of the 'practical result of the removal provision.' " 🔖 *478 U.S. at 730, 106 S.Ct. 3181*. Instead of speculating about what would have happened in a different world where the officer's challenged actions were reviewable within the Executive Branch, the Court recognized that unconstitutionally insulating an officer from removal "inflicts a 'here-and-now' injury" on affected parties. 🔖 *Seila Law*, 591 U. S., at ——, 140 S.Ct., at 2196. In *this* world, real people are injured by actions taken without lawful authority. "The Framers did not rest our liberties on ... minutiae" like some guessing game about what might have transpired in another timeline. 🔖 *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 500, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

Other problems attend the Court's remedial science fiction. It proceeds on an assumption that Congress would have adopted a version of the Housing and Economic Recovery Act (HERA) that allowed the President to remove the Director. But that is sheer speculation. It is equally possible that—had Congress known it could not have a Director independent from presidential supervision—it would have deployed different tools to rein in Fannie Mae and Freddie Mac. Surely, Congress possessed no shortage of options. By way of example, it could have conferred new regulatory functions on an existing (and accountable) agency like the Department of Housing and Urban Development, or it might have enacted detailed statutes to govern Fannie and Freddie's activities directly. For that matter, Congress might have opted for no additional oversight rather than subject the Federal Housing Finance Agency (FHFA) to supervision by the President.

This Court possesses no authority to substitute its own judgment about *which* **\*1798** legislative solution Congress might have adopted had it considered a problem never put to it. That is not statutory interpretation; it is statutory reinvention. Indeed, while never uttering the words "severance doctrine," the Court today winds up implicitly resting its remedial enterprise upon it—severing, or removing, one part of Congress's work based on speculation about its wishes and usurping a legislative prerogative in the process. See, *e.g., Arthrex*, —— S.Ct., at —— (GORSUCH, J., concurring in part and dissenting in part); 🔖 *Synar*, 626 F.Supp. at 1393. By once again purporting to do Congress's job, we discourage the people's representatives from taking up for themselves the task of consulting their oaths, grappling with constitutional problems, and specifying a solution in statutory text. "Congress can now simply rely on the courts to sort [it] out." 🔖 *Tennessee v. Lane*, 541 U.S. 509, 552, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (Rehnquist, C. J., dissenting).[2]

[2]     Justice THOMAS stakes out more foreign terrain. After saying that he "join[s] the Court's opinion in full," he argues there was no constitutional violation at all because the President —despite statutes barring his way

—was free to remove the Director all along. *Ante*, at ——, ——, ——. Accordingly, it seems Justice THOMAS disagrees with all of Part III–B's merits analysis in addition to the Court's novel remedy in Part III–C. Like the Court, though, he seemingly takes as given that Congress would have chosen to adopt HERA even if it had known this course required subjecting the Director to removal by the President. *Ante*, at —— – ——. In doing so, he parts ways with his opinion last year in *Seila Law*, where he recognized the following: First, in cases like ours, a constitutional violation arises because of "the combination" of statutory terms that (1) confer executive power on an official and (2) improperly insulate him from removal. 591 U. S., at ——, 140 S.Ct., at 2202–2203 (THOMAS, J., concurring in part and dissenting in part). Second, absent statutory direction from Congress, we cannot divine "which of the provisions" Congress would have kept and which it would have scrapped— or what else it might have done— had it known its actual choice was unconstitutional. *Id.,* at ——, 140 S.Ct., at 2203–2204. Third, this Court lacks the " 'editorial freedom' " to pick and choose among options like these, for doing so would usurp Congress's legislative authority. *Ibid.* Today, Justice THOMAS suggests *Seila Law* rested on one party's concession about the meaning of the law. *Ante*, at ——, n. 5; *ante*, at ——. But parties cannot stipulate to the law. *E.g., Zivotofsky v. Kerry,* 576 U.S. 1, 41, n. 2, 135 S.Ct. 2076, 192 L.Ed.2d 83 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part); *Young v. United States,* 315 U.S. 257, 258– 259, 62 S.Ct. 510, 86 L.Ed. 832 (1942). More importantly, his observations were right then—and they remain so today.

The Court's conjecture does not stop there. After guessing what legislative scheme Congress would have adopted in some hypothetical but-for world, the Court tasks lower courts and the parties with reconstructing how executive agents would have reacted to it. On remand, we are told, the litigants and lower courts must ponder whether the President would have removed the Director had he known he was free to do so. *Ante*, at ——. But *how* are judges and lawyers supposed to construct the counterfactual history? It is no less a speculative enterprise than guessing what Congress would have done had it known its statutory scheme was unconstitutional. It's only that the Court prefers to reserve the big hypothetical (legislative) choice for itself and leave others for lower courts to sort out.

Consider the guidance the Court offers. It says lower courts should examine clues such as whether the President made a "public statement expressing displeasure" about something the Director did, or whether the President "attempted" to remove the Director but was stymied by lower courts. *Ibid.* But what if the President never considered the possibility of removing the Director because he was never **\*1799** advised of that possibility? What if

his advisers themselves never contemplated the option given statutory law? And even putting all that aside, what evidence should courts and parties consult when inquiring into the President's "displeasure"? Are they restricted to publicly available materials, even though the most probative evidence may be the most sensitive? To ascertain with any degree of confidence the President's state of mind regarding the Director, don't we need testimony from him or his closest staff?

The Court declines to tangle with any of these questions. It's hard not to wonder whether that's because it intends for this speculative enterprise to go nowhere. Rather than intrude on often-privileged executive deliberations, the Court may calculate that the lower courts on remand in this suit will simply refuse retroactive relief. See, *e.g., ante*, at —— (KAGAN, J., concurring in part and concurring in judgment in part). But if this is what the Court intends, why not just admit it and put these parties out of their misery?

As strange as the Court's remand instructions are, the more important question lower courts face isn't how to resolve this suit but what to do with the next one. Today, the Court sounds the call to arms and declares a constitutional violation only to head for the hills as soon as it's faced with a request for meaningful relief. But as we have seen, the Court has in the past consistently vindicated Article II both in reasoning and in remedy. *E.g., Seila Law*, 591 U. S., at ——, 140 S.Ct., at 2211 (opinion of ROBERTS, C. J.); *Lucia v. SEC*, 585 U. S. ——, —— – ——, n. 5, 138 S.Ct. 2044, 2055 n. 5, 201 L.Ed.2d 464 (2018); *NLRB v. Noel Canning*, 573 U.S.

513, 557, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014); *Ryder v. United States*, 515 U.S. 177, 182–183, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995); *Bowsher*, 478 U.S. at 736, 106 S.Ct. 3181. These cases—involving appointment and removal defects alike—remain good law. So what are lower courts faced with future removal defect cases to make of all this? The only lesson I can divine is that the Court's opinion today is a product of its unique context—a retreat prompted by the prospect that affording a more traditional remedy here could mean unwinding or disgorging hundreds of millions of dollars that have already changed hands. *Ante*, at —— – ——. The Court may blanch at authorizing such relief today, but nothing it says undoes our prior guidance authorizing more meaningful relief in other situations.

For my part, rather than carve out some suit-specific, removal-only, money-in-the-bank exception to our normal rules for Article II violations, I would take a simpler and more familiar path. Whether unconstitutionally installed or improperly unsupervised, officials cannot wield executive power except as Article II provides. Attempts to do so are void; speculation about alternate universes is neither necessary nor appropriate. In the world we inhabit, where individuals are burdened by unconstitutional executive action, they are "entitled to relief." *Lucia*, 585 U. S., at ——, 138 S.Ct., at 2055.

Justice KAGAN, with whom Justice BREYER and Justice SOTOMAYOR join as to Part II, concurring in part and concurring in the judgment.

Faced with a global financial crisis, Congress created the Federal Housing Finance Agency (FHFA) and gave it broad powers to rescue the Nation's mortgage market. I join the Court in deciding that the FHFA wielded its authority within statutory limits. On the main constitutional question, though, I concur only in the judgment. *Stare decisis* compels the conclusion that the FHFA's for-cause removal **\*1800** provision violates the Constitution. But the majority's opinion rests on faulty theoretical premises and goes further than it needs to. I also write to address the remedial question. The majority's analysis, which I join, well explains why backwards-looking relief is not always necessary to redress a removal violation. I add only two thoughts. The broader is that the majority's remedial holding mitigates the harm of the removal doctrine applied here. The narrower is that, as I read the decision below, the Court of Appeals has already done what is needed to find that the plaintiffs are not entitled to their requested relief.

I

I agree with the majority that *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. ——, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020), governs the constitutional question here. See *ante*, at ——. In *Seila Law*, the Court held that an "agency led by a single [d]irector and vested with significant executive power" comports with the Constitution only if the President can fire the director at will. 591 U. S., at ——, 140 S.Ct., at 2200–2201. I dissented from that decision—vehemently. See *id.*, at ——, 140 S.Ct., at 2226 (KAGAN, J.,

dissenting) ("The text of the Constitution, the history of the country, the precedents of this Court, and the need for sound and adaptable governance—all stand against the majority's opinion"). But the "doctrine of *stare decisis* requires us, absent special circumstances, to treat like cases alike"—even when that means adhering to a wrong decision. *June Medical Services L. L. C.* v. *Russo*, 591 U. S. ——, ——, 140 S.Ct. 2103, 2133, 207 L.Ed.2d 566 (2020) (ROBERTS, C. J., concurring in judgment). So the issue now is not whether *Seila Law* was correct. The question is whether that case is distinguishable from this one. And it is not. As I observed in *Seila Law*, the FHFA "plays a crucial role in overseeing the mortgage market, on which millions of Americans annually rely." 591 U. S., at ——, 140 S.Ct., at 2241. It thus wields "significant executive power," much as the agency in *Seila Law* did. And I agree with the majority that there is no other legally relevant distinction between the two. See *ante*, at —— – ——.

For two reasons, however, I do not join the majority's discussion of the constitutional issue. First is the majority's political theory. Throughout the relevant part of its opinion, the majority offers a contestable—and, in my view, deeply flawed—account of how our government should work. At-will removal authority, the majority intones, "is essential to subject Executive Branch actions to a degree of electoral accountability"—and so courts should grant the President that power in cases like this one. *Ante*, at ——. I see the matter differently (as, I might add, did the Framers). *Seila Law*, 591 U. S., at —— – ——, 140 S.Ct, at 2195–2198 (KAGAN, J., dissenting). The right way to ensure that government operates with

"electoral accountability" is to lodge decisions about its structure with, well, "the branches accountable to the people." *Id.*, at ——, 140 S.Ct., at 2245; see *id.*, at ——, 140 S.Ct., at 2245 (the Constitution "instructs Congress, not this Court, to decide on agency design"). I will subscribe to decisions contrary to my view where precedent, fairly read, controls (and there is no special justification for reversal). But I will not join the majority's mistaken musings about how to create "a workable government." *Id.*, at ——, 140 S.Ct., at 2245 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)).

My second objection is to the majority's extension of *Seila Law*'s holding. Again and again, *Seila Law* emphasized that its **\*1801** rule was limited to single-director agencies "wield[ing] significant executive power." 591 U. S., at ——, 140 S.Ct., at 2192 (plurality opinion); see *id.*, at ——, 140 S.Ct., at 2201 (majority opinion); *id.*, at ——, 140 S.Ct., at 2211 (plurality opinion). To take *Seila Law* at its word is to acknowledge where it left off: If an agency did not exercise "significant executive power," the constitutionality of a removal restriction would remain an open question. Accord, *post*, at —— – —— (SOTOMAYOR, J., concurring in part and dissenting in part). But today's majority careens right past that boundary line. Without even mentioning *Seila Law*'s "significant executive power" framing, the majority announces that, actually, "the constitutionality of removal restrictions" does not "hinge[ ]" on "the nature and breadth of an agency's authority." *Ante*, at

——, ——. Any "agency led by a single Director," no matter how much executive power it wields, now becomes subject to the requirement of at-will removal. *Ante*, at ——. And the majority's broadening is gratuitous—unnecessary to resolve the dispute here. As the opinion later explains, the FHFA exercises plenty of executive authority: Indeed, it might "be considered more powerful than the CFPB." *Ante*, at ——. So the majority could easily have stayed within, rather than reached out beyond, the rule *Seila Law* created.

In thus departing from *Seila Law*, the majority strays from its own obligation to respect precedent. To ensure that our decisions reflect the "evenhanded" and "consistent development of legal principles," not just shifts in the Court's personnel, s*tare decisis* demands something of Justices previously on the losing side. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). They (meaning here, I) must fairly apply decisions with which they disagree. But fidelity to precedent also places demands on the winners. They must apply the Court's precedents—limits and all —wherever they can, rather than widen them unnecessarily at the first opportunity. Because today's majority does not conform to that command, I concur in the judgment only.

## II

I join in full the majority's discussion of the proper remedy for the constitutional violation it finds. I too believe that our Appointments Clause precedents have little to say about remedying a removal problem. See *ante*, at —— – ——; cf. *Lucia* v. *SEC*, 585 U. S.

——, ——, 138 S.Ct. 2044, 2055, 201 L.Ed.2d 464 (2018) (requiring a new hearing before a properly appointed official). As the majority explains, the officers heading the FHFA, unlike those with invalid appointments, possessed the "authority to carry out the functions of the office." *Ante*, at ——. I also agree that plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action —only when the President's inability to fire an agency head affected the complained-of decision. See *ante*, at —— – ——. Only then is relief needed to restore the plaintiffs to the position they "would have occupied in the absence" of the removal problem. *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); see D. Laycock & R. Hasen, Modern American Remedies 275 (5th ed. 2019). Granting relief in any other case would, contrary to usual remedial principles, put the plaintiffs "in a better position" than if no constitutional violation had occurred. *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 285, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The majority's remedial holding limits the damage of the Court's removal jurisprudence. As the majority explains, its holding ensures that actions the President supports—which would have gone forward **\*1802** whatever his removal power—will remain in place. See *ante*, at ——. In refusing to rewind those presidentially favored decisions, the majority prevents theories of formal presidential control from stymying the President's real-world ability to carry out his agenda. Similarly, the majority's approach should help protect agency decisions that would never have risen to the President's notice. Consider the hundreds of thousands of decisions that the Social Security Administration (SSA) makes each year. The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block. Cf. *ante*, at ——, n. 21. But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. That makes sense. "[P]residential control [does] not show itself in all, or even all important, regulation." Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2250 (2001). When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.

My final point relates to the last sentence of the majority's remedial section. There, the Court holds that the decisive question—whether the removal provision mattered—"should be resolved in the first instance by the lower courts." *Ante*, at ——. That remand follows the Court's usual practice: We are, as we often say, not a "court of first view." *Alabama v. Shelton*, 535 U.S. 654, 673, 122 S.Ct. 1764, 152 L.Ed.2d 888 (2002). But here the lower court proceedings may be brief indeed. As I read the opinion below, the Court of Appeals already considered and decided the issue remanded today. The court noted that all of the FHFA's policies were jointly "created [by] the FHFA and Treasury" and that the Secretary of the Treasury is "subject to at will removal by the President." *Collins v. Mnuchin*, 938 F.3d 553, 594 (CA5 2019). For that reason, the court concluded, "we need not speculate about whether appropriate presidential oversight would have stopped" the FHFA's actions. *Ibid.* "We know that the

President, acting through the Secretary of the Treasury, could have stopped [them] but did not." *Ibid;* see *ibid.*, n. 6 (noting that the plaintiffs' "allegations show that the President had oversight of the action"). That reasoning seems sufficient to answer the question the Court kicks back, and nothing prevents the Fifth Circuit from reiterating its analysis. So I join the Court's opinion on the understanding that this litigation could speedily come to a close.

Justice SOTOMAYOR, with whom Justice BREYER joins, concurring in part and dissenting in part.

Prior to 2010, this Court had gone the greater part of a century since it last prevented Congress from protecting an Executive Branch officer from unfettered Presidential removal. Yet today, for the third time in just over a decade, the Court strikes down the tenure protections Congress provided an independent agency's leadership.

Last Term, the Court held in *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. ——, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020), that for-cause removal protection for the Director of the Consumer Financial Protection Bureau (CFPB) violated the separation of powers. *Id.*, at ——, 140 S.Ct., at 2192. As an "independent agency led by a single Director and vested with significant executive power," the Court reasoned, the CFPB had "no basis in history and no place in our constitutional structure." *Id.*, at ——, 140 S.Ct., at 2201. *Seila Law* expressly distinguished the Federal Housing Finance

Agency **\*1803** (FHFA), another independent Agency headed by a single Director, on the ground that the FHFA does not possess "regulatory or enforcement authority remotely comparable to that exercised by the CFPB." *Id.*, at —— – ——, 140 S.Ct., at 2202. Moreover, the Court found it significant that, unlike the CFPB, the FHFA "regulates primarily Government-sponsored enterprises, not purely private actors." *Id.*, at ——, 140 S.Ct., at 2202.

Nevertheless, the Court today holds that the FHFA and CFPB are comparable after all, and that any differences between the two are irrelevant to the constitutional separation of powers. That reasoning cannot be squared with this Court's precedents, least of all last Term's *Seila Law*. I respectfully dissent in part from the Court's opinion and from the corresponding portions of the judgment.[1]

[1]    I join Parts I and II of the Court's opinion rejecting petitioners' argument that the FHFA actions under review violated the Housing and Economic Recovery Act of 2008, as well as Part III–C discussing what the appropriate remedial implications would be if the FHFA Director's for-cause removal protection were unconstitutional. I join also Part II of Justice KAGAN's concurrence concerning the proper remedial analysis for the Fifth Circuit to conduct on remand. Finally, I note that Justice THOMAS' arguments that an improper removal restriction does not necessarily render agency action

unlawful warrant further consideration in an appropriate case.

## I

Congress created the FHFA in the Housing and Economic Recovery Act of 2008 (Recovery Act), 12 U.S.C. § 4501 *et seq.* The FHFA supervises the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the 11 Federal Home Loan Banks. These 13 Government-sponsored entities (GSEs) provide liquidity and stability to the national housing market by, among other things, purchasing mortgage loans from, and offering financing to, private lenders.

The FHFA "establish[es] standards" for the GSEs relating to risk management, internal auditing, and minimum capital requirements. § 4513b(a). If the FHFA believes a GSE may be failing to meet its requirements under the Act, the Agency may initiate administrative proceedings, § 4581, issue subpoenas, § 4517(g), and, in some circumstances, impose monetary penalties, § 4585. In the event a GSE falls into financial distress, the FHFA may appoint itself "conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up" the GSE's affairs. § 4617(a)(2).

In 2008, the FHFA put both Fannie Mae and Freddie Mac under conservatorship. In 2016, shareholders of Fannie Mae and Freddie Mac (petitioners) sued the FHFA, challenging the Agency's conservatorship decisions in part by arguing that the Agency's structure is unconstitutional. The FHFA is headed by a single Director, who serves a 5-year term and may be removed by the President "for cause." § 4512(b)(2). According to petitioners, the separation of powers requires the FHFA Director to be removable by the President at will.

## II

Where Congress is silent on the question, the general rule is that the President may remove Executive Branch officers at will. See *Myers v. United States,* 272 U.S. 52, 126, 47 S.Ct. 21, 71 L.Ed. 160 (1926). Throughout our Nation's history, however, Congress has identified particular officers who, because of the nature of their office, require a degree of independence from Presidential control. Those officers may be **\*1804** removed from their posts only for cause. Often, Congress has granted financial regulators such independence in order to bolster public confidence that financial policy is guided by long-term thinking, not short-term political expediency. See *Seila Law,* 591 U. S., at —— – ——, 140 S.Ct., at 2231–2233 (KAGAN, J., concurring in judgment with respect to severability and dissenting in part) (discussing examples). Other times, Congress has provided tenure protection to officers who investigate other Government actors and thus might face conflicts of interest if directly controlled by the President. See, *e.g.,* 28 U.S.C. § 596(a)(1) (making an independent counsel removable "only by the personal action of the Attorney General and only for good cause" or disability).

In a line of decisions spanning more than half a century, this Court consistently approved

of independent agencies and independent counsels within the Executive Branch. See *Humphrey's Executor* v. *United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). In recent years, however, the Court has taken an unprecedentedly active role in policing Congress' decisions about which officers should enjoy independence. See *Seila Law*, 591 U. S. ——, 140 S.Ct. 2183; *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). These decisions have focused almost exclusively on perceived threats to the separation of powers posed by limiting the President's removal power, while largely ignoring the Court's own encroachment on Congress' constitutional authority to structure the Executive Branch as it deems necessary.

Never before, however, has the Court forbidden simple for-cause tenure protection for an Executive Branch officer who neither exercises significant executive power nor regulates the affairs of private parties. Because the FHFA Director fits that description, this Court's precedent, separation-of-powers principles, and proper respect for Congress all support leaving in place Congress' limits on the grounds upon which the President may remove the Director.

A

In *Seila Law*, the Court held that the CFPB Director, an individual with "the authority to bring the coercive power of the state to bear on millions of private citizens and businesses," 591 U. S., at ——, 140 S.Ct., at 2201, must be removable by the President at will. In so holding, the Court declined to overrule *Humphrey's Executor* and *Morrison*, which respectively upheld the independence of the Federal Trade Commission's (FTC) five-member board and an independent counsel tasked with investigating Government malfeasance. See 591 U. S., at ——, 140 S.Ct., at 2206 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today"). Instead, *Seila Law* opted not to "extend those precedents" to the CFPB, "an independent agency led by a single Director and vested with significant executive power." 591 U. S., at ——, 140 S.Ct., at 2201.[2]

[2] As Justice KAGAN explained in dissent, *Seila Law* rested on implausible recharacterizations of this Court's separation-of-powers jurisprudence. I continue to believe that *Seila Law* was wrongly decided. Whatever the merits of that decision, however, it does not support invalidating the FHFA Director's independence.

The Court today concludes that the reasoning of *Seila Law* "dictates" that the FHFA is unconstitutionally structured because it, too, is led by a single Director. **\*1805** *Ante*, at ——. But *Seila Law* did not hold that an independent agency may never be run by a single individual

with tenure protection. Rather, that decision stated, repeatedly, that its holding was limited to a single-director agency with "significant executive power." 591 U. S., at ——, ——, ——, 140 S.Ct., at 2191, 2200, 2211. The question, therefore, is not whether the FHFA is headed by a single Director, but whether the FHFA wields "significant" executive power. It does not.

As a yardstick for measuring the constitutional significance of an agency's executive power, *Seila Law* looked to the FTC as it existed at the time of *Humphrey's Executor* (the 1935 FTC). 591 U. S., at —— – ——, 140 S.Ct., at 2199–2200. That agency had a roving mandate to prevent private individuals and corporations alike from engaging in " 'unfair methods of competition in commerce.' " *Humphrey's Executor*, 295 U.S. at 620, 55 S.Ct. 869 (citing 15 U.S.C. § 45). To carry out its mandate, the 1935 FTC had broad authority to issue complaints and cease-and-desist orders. 295 U.S. at 620, 55 S.Ct. 869. The agency also had "wide powers of investigation," which it used to make recommendations to Congress, as well as the responsibility to assist courts in antitrust litigation by " 'ascertain[ing] and report[ing] an appropriate form of decree.' " *Id.*, at 621, 55 S.Ct. 869.

These powers may seem "significant" in a colloquial sense. In *Seila Law*'s view, however, they did not rise to the level of constitutional significance. That was in contrast to the CFPB's powers, which far outstrip the 1935 FTC's. While the 1935 FTC's ambit was limited to preventing unfair competition and violations of antitrust law, the CFPB "possesses

the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U. S. economy." *Seila Law*, 759 U. S., at ——, 140 S.Ct., at 2200. While the 1935 FTC could issue cease-and-desist orders and recommended dispositions, the CFPB "may unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications" and "seek daunting monetary penalties against private parties on behalf of the United States in federal court." *Ibid.* Far from a "mere legislative or judicial aid" like the 1935 FTC, *ibid.*, the CFPB is a "mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens," *id.*, at ——, n. 8, 140 S.Ct., at 2202 n. 8.

Measured against such standards, the FHFA comfortably fits within the same category of constitutional insignificance as the 1935 FTC. To some, the CFPB Director was "the single most powerful official in the entire U. S. Government, other than the President, at least when measured in terms of unilateral power." *PHH Corp. v. Consumer Financial Protection Bur.*, 881 F.3d 75, 171 (CADC 2018) (Kavanaugh, J., dissenting). The FHFA Director is not one of the most powerful officials in the U. S. Government. As the Court recognized in *Seila Law*, the FHFA does "not involve regulatory or enforcement authority remotely comparable to that exercised by the CFPB." 591 U. S., at ——, 140 S.Ct., at 2202.

The FHFA's authority is much closer to (and, in some respects, far less than) that of the 1935 FTC. Like the 1935 FTC, the FHFA oversees regulated entities and gathers specified information from them on Congress' behalf. Unlike the 1935 FTC, however, which was tasked with implementing the Nation's antitrust laws and policing unfair competition, the FHFA is limited to specified duties under the Recovery **\*1806** Act. Furthermore, while the 1935 FTC had jurisdiction over countless individuals and corporations, the FHFA regulates just 13 GSEs.

Moreover, one of the FHFA's main powers is assuming the mantle of conservatorship or receivership over the GSEs, which hardly registers as executive at all. When acting as a conservator or receiver, an agency like the FHFA " 'steps into the shoes' " of the party under distress, *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), and largely " 'shed[s] its government character,' " *Herron v. Fannie Mae*, 861 F.3d 160, 169 (CADC 2017). Even granting that there are differences between the FHFA's powers as a conservator and those of a common-law conservator, "the FHFA's conservatorship function [is] a role one would be hard-pressed to characterize as near the heart of executive power." *Collins v. Mnuchin*, 938 F.3d 553, 620 (CA5 2019) (Higginson, C. J., dissenting in part).

To be sure, the FHFA has at least one executive power that the 1935 FTC did not: the power to impose fines. But that fining authority is quite limited. The FHFA may impose fines on the 13 GSEs it regulates for failing to meet their reporting requirements and housing goals under the Recovery Act and for violating the requirements of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 106 Stat. 3941. See 12 U.S.C. §§ 4585, 4636. Petitioners point to no instance in the Agency's 13-year history in which it has ever fined a GSE.[3]

[3]  By comparison, the CFPB has fined private actors billions of dollars. *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U. S. ——, ——, 140 S.Ct. 2183, 2193207 L.Ed.2d 494 (2020).

That is not to say that the FHFA possesses no executive authority whatsoever. It does. But the 1935 FTC, too, possessed executive authority, just not enough to be "significant." See *Seila Law*, 591 U. S., at ——, n. 2, 140 S.Ct., at 2217 n. 2) (" '[I]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered "executive," at least to some degree' " (quoting *Morrison*, 487 U.S. at 690, n. 28, 108 S.Ct. 2597)). When measured against the benchmark of the 1935 FTC, the FHFA does not possess "significant executive power" within the meaning of *Seila Law*. It is in "an entirely different league" from the CFPB. 591 U. S., at ——, n. 8, 140 S.Ct., at 2202 n. 8).

B

Because the FHFA does not possess significant executive power, the question under *Seila*

*Law* is whether this Court's decisions upholding for-cause removal provisions in Humphrey's Executor and Morrison should be "extend[ed]" to the FHFA Director. 591 U. S., at ——, 140 S.Ct., at 2201. The clear answer is yes.

Not only does the FHFA lack significant executive power, the authority it does possess is exercised over other governmental actors. In that respect, the FHFA Director mimics the independent counsel whose tenure protections were upheld in Morrison. The independent counsel, as *Seila Law* noted, could bring criminal prosecutions and thus "wielded core executive power." 591 U. S., at ——, 140 S.Ct., at 2200. Separation-of-powers concerns were allayed, however, because "that power, while significant, was trained inward to high-ranking Governmental actors identified by others." Ibid. In explaining why "[t]he logic of Morrison" did "not apply" to the CFPB, *Seila Law* emphasized that the CFPB "has the authority to bring the coercive power of the state to bear on millions **\*1807** of private citizens and businesses." Id., at —— – ——, 140 S.Ct., at 2200.

Morrison's logic may not have applied to the CFPB, but it certainly applies to the FHFA. The FHFA's executive power, too, is "trained inward," on the 13 GSEs "identified by" the Recovery Act. Seila Law, 591 U. S., at ——, 140 S.Ct., at 2200. While the GSEs are now privately owned, they still operate under congressional charters, see 12 U.S.C. § 4501(1), serve "important public missions," ibid., and

receive preferential treatment under law by dint of their Government affiliation, § 1719.[4] Seila Law itself distinguished the CFPB from the FHFA precisely on the basis that the latter Agency "regulates primarily Government-sponsored enterprises, not purely private actors." 591 U. S., at ——, 140 S.Ct., at 2202.

4   The GSEs' ongoing ties with the Government long fueled public perception that the Government would intervene if the GSEs were in danger of collapse. See Congressional Research Serv., Fannie Mae and Freddie Mac in Conservatorship: Frequently Asked Questions 2 (updated May 31, 2019) (noting that it was "widely believed prior to 2008 that the federal government was an implicit backstop for the GSEs in light of their congressional charters"). This perception became reality during the 2008 financial crisis, when the Treasury Department extended hundreds of billions of dollars in credit to Fannie Mae and Freddie Mac, and the FHFA put those entities under conservatorship.

Historical considerations further confirm the constitutionality of the FHFA Director's independence. Single-director independent agencies with limited executive power, like the FHFA, boast a more storied pedigree than do single-director independent agencies with significant executive power, like the CFPB. Consider three such examples, each discussed in *Seila Law*. First, the Comptroller of the Currency, who was briefly independent

from Presidential removal during the Civil War and thereafter retained a lesser form of tenure protection. *Id.*, at ——, 140 S.Ct., at 2200. Second, the Office of Special Counsel, which has been "headed by a single officer since 1978." *Id.*, at —— – ——, 140 S.Ct., at 2201. Third, the Social Security Administration, which has been "run by a single Administrator since 1994." *Id.*, at ——, 140 S.Ct., at 2202. Like the FHFA, these examples lack "regulatory or enforcement authority remotely comparable to that exercised by the CFPB." *Id.*, at —— – ——, 140 S.Ct., at 2202. While these agencies thus offered "no foothold in history or tradition" for the CFPB, *id.*, at ——, 140 S.Ct., at 2202, they provide historical support for an agency with the FHFA's limited purview.

The FHFA also draws on a long tradition of independence enjoyed by financial regulators, including the Comptroller of the Treasury, the Second Bank of the United States, the Federal Reserve Board, the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Federal Deposit Insurance Corporation. See *id.*, at —— – ——, 140 S.Ct., at 2230–2233 (opinion of KAGAN, J.). The public has long accepted (indeed, expected) that financial regulators will best perform their duties if separated from the political exigencies and pressures of the present moment.

In *Seila Law*, this tradition of independence was of little help to the CFPB because, "even assuming financial institutions ... can claim a special historical status," the CFPB's unique powers put it "in an entirely different league"

from other financial regulators. *Id.*, at ——, n. 8, 140 S.Ct., at 2202 n. 8 (majority opinion). In contrast, the FHFA's function as a monitor of regulated entities important to economic stability makes the FHFA far more similar to historically independent financial regulators than to the CFPB. See FHFA, Performance **\*1808** and Accountability Report 18 (2020) ("The [Recovery Act] vests FHFA with the authorities, similar to those of other prudential financial regulators, to maintain the financial health of the regulated entities").

To recap, the FHFA does not wield significant executive power, the executive power it does wield is exercised over Government affiliates, and its independence is supported by historical tradition. All considerations weigh in favor of recognizing Congress' power to make the FHFA Director removable only for cause.

## III

The Court disagrees. After *Seila Law*, the Court reasons, all that matters is that "[t]he FHFA (like the CFPB) is an agency led by a single Director." *Ante*, at ——. From that, the unconstitutionality of the FHFA Director's independence follows virtually *a fortiori*. The Court reaches that conclusion by disavowing the very distinctions it relied upon just last Term in *Seila Law* in striking down the CFPB Director's independence.

On three separate occasions, *Seila Law* stated that its holding applied to single-director independent agencies with "significant executive power." See 591 U. S., at ——, ——, ——, 140 S.Ct., at 2191–2192,

2200, 2211. Remarkably, those words appear nowhere in today's decision. Instead, the Court appears to take the position that exercising essentially any executive power whatsoever is enough. *Ante*, at —— – ——. In terms of explanation, the Court says that it is "not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies" and that it "do[es] not think that the constitutionality of removal restrictions hinges on such an inquiry." *Ante*, at ——.

The Court's position unduly encroaches on Congress' judgments about which executive officers can and should enjoy a degree of independence from Presidential removal, and it cannot be squared with *Seila Law*, which relied extensively on such agency comparisons. Not only did *Seila Law* contrast the CFPB's powers against those of the 1935 FTC in *Humphrey's Executor*, see 591 U. S., at —— – ——, 140 S.Ct., 2199–2200, as well as the independent counsel in *Morrison*, see 591 U. S., at —— – ——, 140 S.Ct., at 2200–2201, it concluded that the FHFA (along with the Comptroller of the Currency, the Office of Special Counsel, and the Social Security Administration) does not possess "regulatory or enforcement authority remotely comparable to that exercised by the CFPB." *Id.*, at —— – ——, 140 S.Ct., at 2202. Those distinctions underpinned *Seila Law*'s proclamation that the CFPB had "no basis in history and no place in our constitutional structure." *Id.*, at ——, 140 S.Ct., at 2201. In the Court's view today, however, all of those comparisons were irrelevant to the bottom-line question whether the CFPB Director's tenure protections comport with the Constitution.

The Court today also suggests that whether an agency regulates private individuals or Government actors does not meaningfully affect the separation-of-powers analysis. *Ante*, at —— – —— ("[T]he President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives"). That, too, is flatly inconsistent with *Seila Law*, which returned repeatedly to this consideration. Not only did *Seila Law* distinguish the CFPB from the independent counsel in *Morrison* on this basis, see 591 U. S., at ——, 140 S.Ct., at 2200, it distinguished the CFPB from both the FHFA and the Office of Special Counsel for the same **\*1809** reason, see *id.*, at ——, 140 S.Ct., at 2202. That the Court is unwilling to stick to the methodology it articulated just last Term in *Seila Law* is a telltale sign that the Court's separation-of-powers jurisprudence has only continued to lose its way.

IV

The Court has proved far too eager in recent years to insert itself into questions of agency structure best left to Congress. In striking down the independence of the FHFA Director, the Court reaches further than ever before, refusing tenure protections to an Agency head who neither wields significant executive power nor regulates private individuals. Troublingly, the Court justifies that result by ignoring the standards it set out just last Term in *Seila Law*. Because I would afford Congress the freedom

it has long possessed to make officers like the FHFA Director independent from Presidential control, I respectfully dissent.

**All Citations**

141 S.Ct. 1761, 21 Cal. Daily Op. Serv. 6072

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.