

**U.S. Department of Justice**
Civil Division

Tel: 202-514-5432

VIA CM/ECF

August 23, 2021

Lyle W. Cayce, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place, Suite 115
New Orleans, LA 70130

     RE:   *Jarkesy v. SEC*, No. 20-61007

     In *Decker Coal Co. v. Pehringer*, No. 20-71449 (9th Cir. Aug. 16, 2021), the Ninth Circuit considered a separation-of-powers challenge to 5 U.S.C. § 7521, the statutory "good cause" removal restrictions for administrative law judges (ALJs). The petitioner argued that the Supreme Court's decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) invalidated those removal restrictions and required vacatur of the agency's adverse decision.

     The court rejected that argument, explaining that *Free Enterprise* "did not broadly declare all two-level for-cause protections for inferior officers unconstitutional" and "specifically left open the question" of ALJ removal restrictions. Op. 18-19. And unlike the scheme in *Free Enterprise*—which was without historical precedent and imposed an "unusually high" standard for removal— there "is a long history of adjudication by ALJs" with removal restrictions under 5 U.S.C. § 7521, which "imposes only an ordinary 'good-cause' standard." Op. 24-25.

     The court concluded that under 5 U.S.C. § 7521, the President "has sufficient control over DOL ALJs." Op. 20. The court based that conclusion on the limited adjudicatory functions of ALJs (Op. 20), the Executive's ability to choose whether it should use ALJs at all (Op. 21-22), and the Department of Labor's ability to review and reverse ALJ decisions (Op. 22-23). And in the recent cases where the Supreme Court invalidated removal restrictions for certain principal officers, the Court still

"reaffirm[ed] the general principle * * * that some tenure restrictions do not violate separation of powers, particularly in the case of inferior officers with sufficient accountability." Op. 26.

The court further held that if § 7521 were unconstitutional, it would be inappropriate to "invalidate the decision reached below," as petitioners seek to do here. Op. 27. Rather, where (as here) the ALJ was properly appointed and there was no evidence that the removal provision "actually caused the plaintiff harm," the proper remedy is to "sever only one level of [removal] protection." Op. 27-28 (citing *Collins v. Yellen*, 141 S. Ct. 1761 (2021)). *See also* Op. 30 (holding that there was "no link between the ALJ's decision" and § 7521).

Sincerely,

/s/ *Daniel Aguilar*
Daniel Aguilar
Counsel for the Securities and Exchange
Commission

## CERTIFICATE OF SERVICE

I certify that on August 23, 2021, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will serve all counsel of record.

*/s/ Daniel Aguilar*
DANIEL AGUILAR

## CERTIFICATE OF COMPLIANCE

I certify that this letter complies with the word limitations of Federal Rule of Appellate Procedure 28(j) because it contains 349 words.

*/s/ Daniel Aguilar*
DANIEL AGUILAR

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DECKER COAL COMPANY, *Petitioner*, | No. 20-71449 |
| v. | BRB No. 19-0366 |
| JERRY PEHRINGER; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, *Respondents.* | OPINION |

On Petition for Review of an Order of the
Benefits Review Board

Argued and Submitted June 10, 2021
Portland, Oregon

Filed August 16, 2021

Before: Kim McLane Wardlaw, Richard C. Tallman, and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Black Lung Benefits Act / Benefits Review Board

The panel denied a petition for review of a decision of the Benefits Review Board ("BRB") affirming an administrative law judge's award of benefits to a claimant under the Black Lung Benefits Act ("BLBA").

After an ALJ awarded claimant BLBA benefits, claimant's employer, Decker Coal Company, filed a joint motion for reconsideration and motion to reopen the record. The ALJ denied the motion, and the BRB affirmed.

The panel held that an ALJ's decision on a motion for reconsideration or a request for modification in a BLBA case is reviewed for abuse of discretion.

The panel began by reviewing the constitutionality of removal provisions applicable to ALJs. 5 U.S.C. § 7521(a) permits removal of an ALJ only for good cause determined by the Merits Systems Protection Board after an opportunity for hearing before the Board. The panel held that 5 U.S.C. § 7521 was compatible with Article II of the Constitution, and was constitutional as applied to Department of Labor ("DOL") ALJs. Specifically, the panel held that the question before it had not been decided by the U.S. Supreme Court. In addressing the constitutionality of § 7521, the panel began with the presumption of constitutionality of statutes. The panel held, first, that the ALJ here was performing a purely

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

adjudicatory function in deciding the BLBA claim.  Second, Congress has not tied the President's hands and hindered his control over his subordinates.  Third, the BRB's role provided the President with meaningful control over the DOL ALJs.  Simply put, ALJs are judges who make decisions that are subject to vacatur by people without tenure protection.  The panel concluded that properly appointed DOL ALJs can adjudicate cases without trammeling the President's executive power.  The panel noted that its holding did not necessarily provide that all remaining two-level tenure protections schemes were constitutional.

The panel held even if it were to conclude that 5 U.S.C. § 7521 was unconstitutional, they would sever only one level of protection, and they would not invalidate the decision reached below.  The panel held that Decker Coal's claim – that *Lucia v. SEC*, 138 S. Ct. 2044 (2018), mandated a new hearing before a new ALJ – was incorrect.

The panel held that the ALJ did not err in adjudicating claimant's claim for benefits.  The panel rejected Decker Coal's argument that the ALJ abused its discretion by denying its motion for reconsideration and rejecting its request to reopen the record to admit evidence it asserted would undermine the veracity of claimant's testimony.  The panel also rejected Decker Coal's argument that § 22 of the Longshore Act required the ALJ to modify the award of benefits.  Specifically, the panel held that there was no ALJ error in rejecting untimely evidentiary submissions that could have been obtained with reasonable diligence during the significant length of time the record was open. The BLBA incorporates § 22, which provides for modifying benefits awards.  The regulation governing modification of BLBA benefits is 20 C.F.R. § 725.310, which provides that an ALJ may only hear a case at the conclusion of

administrative modification proceedings after the district director forwards the claim, and prohibits a party's initiation of a modification proceeding before an ALJ or the BRB. The panel held that the regulation did not conflict with the statutory language of § 22, and concluded that Decker Coal's request for modification in the reconsideration motion filed before the ALJ was procedurally improper.

The panel held that substantial evidence supported the ALJ's conclusion that Decker Coal did not rebut the presumption of entitlement to benefits after claimant established legal pneumoconiosis and causation. Section 921 of the BLBA creates a rebuttable presumption that a miner suffering from a respiratory or pulmonary impairment is totally disabled from pneumoconiosis, even without formal medical diagnosis, if he or she worked for at least fifteen years in substantially similar conditions to underground coal mines. The panel held that once a claimant has successfully invoked the fifteen-year presumption, the burden shifts and the party opposing the claimant's entitlement to benefits must rebut the presumption of total disability due to pneumoconiosis. The panel held that the ALJ reasonably concluded that Decker Coal failed to rebut the presumption of legal pneumoconiosis.

## COUNSEL

John S. Lopatto III (argued), Washington, D.C., for Petitioner.

Joshua M. Salzman (argued), Attorney; Civil Division, United States Department of Justice, Washington, D.C.; Ann Marie Scarpino (argued) and Sarah M. Hurley, Attorneys; Gary K. Stearman, Counsel for Appellate Litigation; Jennifer L. Feldman, Deputy Associate Solicitor; Barry H. Joyner, Associate Solicitor; Kate O'Scannlain, Solicitor of Labor; Office of the Solicitor, United States Department of Labor, Washington, D.C.; for Respondent Director, Office of Workers' Compensation Programs.

Brad A. Austin (argued), Wolfe Williams & Reynolds, Norton, Virginia, for Respondent Jerry Pehringer.

---

## OPINION

TALLMAN, Circuit Judge:

The Powder River Basin produces the most coal of any region in the United States. Trains transport coal daily from the Basin to continental coal-fired generating stations and to Pacific Northwest coal export terminals. The Basin comprises millions of acres of land in northeast Wyoming and southeast Montana. It is home to relatively few people but holds vast reserves of coal and large surface coal mines. The Decker coal mine in southeast Montana was one such mine in the Basin. It was where former coal miner and Decker Coal Company (Decker) employee Jerry Pehringer worked throughout his entire coal mining career and where the story of this dispute began.

Congress established a federal program designed to compensate coal mine workers who contract Black Lung Disease because of their work in the mines.  Decker petitions for review of a Benefits Review Board (BRB) order affirming the decision of a Department of Labor (DOL) administrative law judge (ALJ) awarding benefits to Pehringer under the Black Lung Benefits Act, 30 U.S.C. §§ 901–944 (BLBA).  Decker principally challenges the process by which ALJs can be removed.  Decker argues that the governing statute, 5 U.S.C. § 7521, infringes upon the President's inherent Article II removal power by impermissibly insulating ALJs from termination through two levels of "for-cause" employment protection.  Because of this alleged constitutional defect, Decker asks us to invalidate the award and remand to a different ALJ.

We must decide whether the statute is constitutional with respect to DOL ALJs.  If the statutory removal structure passes constitutional muster, we then must decide whether the ALJ here acted within his discretion in denying Decker's motion for reconsideration and whether substantial evidence supports his decision awarding benefits under the BLBA.  For reasons specific to the statutory scheme at issue, we hold that 5 U.S.C. § 7521 is constitutional as applied to DOL ALJs.  We further hold that the ALJ did not abuse his discretion in denying Decker's post-hearing motion and that substantial evidence supports the ALJ's award of benefits.  Accordingly, we deny the petition for review.

I

A

Decker employed Pehringer at its open-pit surface mine near Decker, Montana, from September 1977 until June 1999.  There were several periods where Pehringer did not

work, including during a roughly three-year-long strike beginning in late 1987, and a shorter period following a neck injury in December 1995. But for most of his coal mining career, Pehringer was regularly exposed to coal dust—so much so that he would leave a blanket on his car seats, undress in his basement, and shake off his dirty clothes outside his home before bathing. He testified that conditions were "bad," that "[i]t was just a constant dust storm all the time," and that coal dust "lingered in the air down [in the pit]."

Pehringer worked primarily as a heavy equipment operator. He operated bulldozers, coal scrapers, and coal haulers, cleaning coal seams, trapping coal, and filling traps to load coal trains. Most vehicle cabs did not have air conditioning. In the warm months, the heat inside the scraper and dozer cabs forced Pehringer to operate the machinery with the door opened. In the winter, coal dust would still creep into the cabs even with the doors closed. Conditions remained like this until the last two years of his coal mining career, when he was able to work in newer, upgraded equipment with air-conditioned cabs.

After being laid off in 1999, Pehringer was awarded Social Security total disability benefits. He never worked again. On November 7, 2014, a little over a month before his sixty-fifth birthday, Pehringer filed his claim for black lung benefits with the DOL, citing his severe chronic obstructive pulmonary disease (COPD). Barbara Cahill, MD, conducted a pulmonary examination in April 2015, pursuant to 30 U.S.C. § 923(b), and determined that "Pehringer is 100% impaired from his COPD." Dr. Cahill found that the causes of the COPD were: "smoking & dust-related." She further opined that Pehringer's coal "dust

exposure and smoking are significant contributors to his COPD impairment."

B

A district director from the DOL Office of Workers' Compensation Programs (OWCP) issued a proposed decision and order awarding Pehringer BLBA benefits on March 8, 2016.  Decker timely appealed this administrative decision, and the district director transferred the claim to the DOL's Office of Administrative Law Judges on June 20, 2016, for a hearing.  The contested claim was assigned to ALJ John P. Sellers, III, whom DOL officials previously selected for service from an Office of Personnel Management competitive service roster.[1]

---

[1] Decker raised a challenge below to the ALJ's authority to decide this claim based on the Appointments Clause and *Lucia v. SEC*, 138 S. Ct. 2044 (2018).  *Lucia* held that Securities and Exchange Commission ALJs appointed by SEC staff rather than the President or department head were "inferior officers" of the United States, and therefore were subject to the Appointments Clause.  138 S. Ct. at 2053–55.  However, "ratification can remedy a defect arising from the decision of an improperly appointed official when a properly appointed official has the power to conduct an independent evaluation of the merits and does so." *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) (cleaned up); *see Edmond v. United States*, 520 U.S. 651, 654–55, 666 (1997); *CFPB v. Gordon*, 819 F.3d 1179, 1190–92 (9th Cir. 2016) (stating that even "rubberstamp" review and ratification may cure earlier Appointments Clause deficiencies); *accord CFPB v. Seila Law LLC*, 997 F.3d 837, 847 (9th Cir. 2021) (confirming that "ratification is available to cure both Appointments Clause defects and structural, separation-of-powers defects").

While the administrative appeal was pending—but before Judge Sellers took any significant action—the Secretary of Labor ratified the prior appointment of Judge Sellers as an ALJ on December 21, 2017.

On June 26, 2018, the ALJ held a merits hearing on the claim in Sheridan, Wyoming.  Decker offered just one exhibit, a transcript of Pehringer's telephonic deposition, taken only days before.  The ALJ admitted the transcript along with the Director's exhibits, including Dr. Cahill's opinion and records from Pehringer's treating physician, Dr. Ackerman.  The ALJ permitted Decker to conduct 60 days of post-hearing evidentiary development.  But Decker filed nothing more.

Based on the admitted evidence, the ALJ found that Pehringer worked as a coal miner for 17.03 years.  The ALJ weighed the medical opinion evidence, pulmonary function tests, and arterial blood gas studies and found that it "overwhelmingly demonstrates that [Pehringer] has a totally disabling respiratory or pulmonary impairment."  Although finding Pehringer's history of smoking significant, the ALJ gave Dr. Cahill's opinion full probative weight that Pehringer's condition was also caused by exposure to coal dust, finding it "both well-reasoned and well-documented" and that "her conclusions [were] consistent with the objective evidence she reviewed and the weight of the evidence as a whole."  The ALJ concluded that Pehringer successfully invoked the rebuttable presumption under 30 U.S.C. § 921(c)(4)—thus entitling him to benefits—as he worked for at least fifteen years[2] in substantially similar

---

Unlike *Lucia*, Judge Sellers had neither heard the case nor issued a proposed decision on the merits prior to that ratification.  It therefore cured any constitutional defect with respect to Judge Sellers' original appointment.

[2] Relying on Pehringer's testimony about work conditions and adjusting for the time actually worked during the last two years of his 17.03 years of total employment, the ALJ found that Pehringer demonstrated he was regularly exposed to coal mine dust for 16.7 years.

conditions to underground coal mines and was totally disabled from pneumoconiosis (which has both a medical and a statutory definition).

The ALJ then determined that Decker successfully rebutted the fifteen-year presumption as to *clinical* (or medical) pneumoconiosis, based on Dr. Cahill's medical opinion and Pehringer's chest x-ray, which was inconclusive as to any of the Black Lung Diseases commonly recognized by the medical community.  However, the ALJ found that Decker failed to rebut the presumption of *legal* (or statutory) pneumoconiosis, based on the weight of the medical evidence, the COPD diagnosis, Dr. Cahill's opinion, Dr. Ackerman's treating records, and absence of any medical rebuttal evidence from Decker.  As to total disability causation, the judge found that Decker submitted no evidence to show Pehringer's COPD "did not arise out of, or in connection with, employment in a coal mine." Accordingly, the ALJ awarded Pehringer BLBA benefits on February 26, 2019.

Decker filed a joint motion for reconsideration and motion to reopen the record on March 11, 2019, challenging the ALJ's invocation of the fifteen-year presumption, seeking to admit records related to Pehringer's employment, and requesting the ALJ modify his award of benefits.  The ALJ denied the motion on April 11, 2019, because—despite his granting two requests for extensions of time to submit evidence following the hearing on June 26, 2018—Decker never submitted additional evidence before the record closed nor filed a post-hearing brief.

Decker timely appealed to the BRB, contesting the ALJ's decision on the post-hearing motion, the constitutionality of Judge Sellers' appointment, and the constitutionality of the statutory removal protections.  The

BRB affirmed the ALJ's decision.  It determined that the Secretary's ratification of the ALJ's appointment cured any Appointments Clause problem.    The BRB then found 5 U.S.C. § 7521 constitutional, distinguishing *Lucia v. SEC*, 138 S. Ct. 2044 (2018), and *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010).  It also concluded that Decker did not advance an argument about *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), but rather requested only a speculative remand.  Further, the BRB agreed with the Director that the ALJ acted within his discretion by treating Decker's post-hearing motion as a request for reconsideration and denying the request to admit new evidence after he had given Decker "ample time to develop the evidence necessary to defend the claim."  Finally, the BRB held that substantial evidence supported the ALJ's determination that Pehringer had at least fifteen years of qualifying coal mine employment.

Decker timely petitioned for review.

## II

We have jurisdiction to review a final order of the BRB under 33 U.S.C. § 921(c).

We review questions of constitutional law de novo. *CFPB v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016).  We must affirm a decision awarding BLBA benefits if the ALJ's underlying findings and conclusions are legally correct and supported by substantial evidence—an extremely deferential standard.  *See* 33 U.S.C. § 921(b)(3); *Peabody Coal Co. v. Dir., OWCP*, 746 F.3d 1119, 1127 (9th Cir. 2014).

We have not previously addressed the standard for reviewing a decision on a reconsideration motion or a

modification request in a BLBA case.  The regulation that
governs modification of benefits awards clearly
distinguishes its mandatory requirements from its
discretionary provisions. *See generally* 20 C.F.R.
§ 725.310.  With respect to motions for reconsideration, the
regulations grant the ALJ broad discretion. *See id.* § .479(b)
("The procedures to be followed in the reconsideration of a
decision and order shall be determined by the administrative
law judge.").

Other federal courts of appeal have reviewed BLBA
modification decisions for abuse of discretion. *See Sharpe
v. Dir., OWCP*, 495 F.3d 125, 130 (4th Cir. 2007); *see also
Crowe ex rel. Crowe v. Zeigler Coal Co.*, 646 F.3d 435, 441
(7th Cir. 2011).  We have previously reviewed for abuse of
discretion a deputy commissioner's decision to deny
rehearing based on new medical evidence after he awarded
compensation under the Longshore Act—a related but
distinct program for maritime workers also administered by
the DOL's OWCP.[3] *Simmons v. Marshall*, 94 F.2d 850, 852
(9th Cir. 1938).  And, in the context of immigration
proceedings, we have held that the abuse of discretion
standard applies to a denial of a motion to reopen or
reconsider. *Salta v. INS*, 314 F.3d 1076, 1078 (9th Cir.
2002).  Accordingly, we now hold that an ALJ's decision on
a motion for reconsideration or a request for modification in
a BLBA case is reviewed for abuse of discretion.

---

[3] The BLBA incorporates § 22 of the Longshore and Harbor
Workers' Compensation Act, which provides for modifying benefits
awards. *See* 30 U.S.C. § 932(a); 33 U.S.C § 922.  As we discuss later in
our decision, however, the Secretary of Labor promulgated a specific
regulation governing modification of benefits awards in Federal Black
Lung Program cases, consistent with the congressional intent behind the
BLBA.

III

We begin by addressing the constitutionality of removal provisions applicable to ALJs.

A

There are nearly 2,000 federal ALJs.[4]  The relevant statute permits removal of an ALJ "only for good cause established and determined by the Merit Systems Protection Board [MSPB] on the record after opportunity for hearing before the Board."  5 U.S.C. § 7521(a).  A MSPB member in turn "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

Decker argues that § 7521 provides a second level of for-cause protection from removal for ALJs and violates the constitutional principle of separation of powers, thus depriving Judge Sellers of constitutional authority to decide Pehringer's claim.  In response, the Director insists that § 7521 is compatible with Article II of the Constitution.  We agree with the Director and hold that 5 U.S.C. § 7521 is constitutional as applied to DOL ALJs.

B

The Constitution provides for separate legislative, executive, and judicial branches.  U.S. Const. arts. I, II, III. "The Framers regarded the checks and balances that they had

---

[4] As of March 2017, DOL had 41 ALJs, while the Social Security Administration had 1,655.  *See* ALJs by Agency, U.S. Off. of Pers. Mgmt., Administrative Law Judges, https://www.opm.gov/services-for-agencies/administrative-law-judges/#url=ALJs-by-Agency (last visited July 7, 2021).

built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976).

Executive power lies at the heart of this case.  Article II's Vesting Clause provides that "[t]he executive Power shall be vested in a President of the United States of America."  U.S. Const. art. II, § 1, cl. 1.  Article II, Section 2 then enumerates specific presidential powers.  One of these key powers is the appointment of Officers of the United States.  The Appointments Clause provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

*Id.* § 2, cl. 2.

The Constitution, however, is silent on the President's power to remove those officers from office.  The Supreme Court first addressed this issue in *Myers v. United States*, 272 U.S. 52 (1926).  Chief Justice Taft's opinion concluded that the President has inherent, exclusive executive power to remove officers of the United States.  *Id.* at 161–62, 176; *see also id.* at 117 (holding "in the absence of any express limitation respecting removals, that as his selection of administrative officers is essential to the execution of the

laws by him, so must be his power of removing those for whom he cannot continue to be responsible").

While adhering to the view that the President's removal power is incident to the appointment power, the Court has tempered its interpretation of Article II with respect to inferior officers. Consistent with the Constitution's separation of powers, the Supreme Court has held that Congress may provide protection to inferior officers from removal. *Morrison v. Olson*, 487 U.S. 654, 691–93 (1988) (concluding that "the imposition of a 'good cause' standard for removal by itself [does not] unduly trammel[] on executive authority"). Inferior officers are generally those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). While more often cited for Justice Scalia's dissent,[5] *Morrison* clarified *Myers*' reach. *See Morrison*, 487 U.S. at 690 ("*Myers* was undoubtedly correct in its holding, and in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role."). The Court interpreted *Myers* to explain that "the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" *Id.* at 689. Rather, the critical question is whether in offering tenure protections Congress has interfered with "the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care

---

[5] *E.g.*, *Morrison*, 487 U.S. at 699 (Scalia, J., dissenting) ("But this wolf comes as a wolf.").

that the laws be faithfully executed' under Article II."  *Id.*
at 690.

Then came *Free Enterprise Fund*.  There, the question
was whether dual for-cause limitations on the President's
ability to remove Public Company Accounting Oversight
Board (PCAOB)**[6]** members—inferior officers appointed by
members of the Securities and Exchange Commission (SEC)
who "determine[] the policy and enforce[] the laws of the
United States"—violated the separation of powers doctrine.
*Free Enter. Fund*, 561 U.S. at 483–84.  The Supreme Court
traced the jurisprudential history, from *Myers* to *Morrison*,
of the removal power inherent in Article II.  *See id.* at 483,
492–95.  The Court ruled that, under the facts of that case,
"such multilevel protection from removal is contrary to
Article II's vesting of the executive power in the President."
*Id.* at 484.

Under the removal scheme invalidated in *Free
Enterprise Fund*, the SEC Commissioners could remove
PCAOB members only "'for good cause shown,' 'in
accordance with' certain procedures," including "notice and
opportunity for a hearing" and a finding "on the record" that
the member violated one of three explicit statutory criteria.
*Id.* at 486 (quoting 15 U.S.C. §§ 7211(e)(6), 7217(d)(3)).
The Commissioners, in turn, were protected from removal
by the President except for "inefficiency, neglect of duty, or
malfeasance in office."  *Id.* at 487 (quoting the standard from
*Humphrey's Ex'r v. United States*, 295 U.S. 602, 620
(1935)).  As a remedy, the Court applied the "normal rule"
and severed only the problematic portion of the statutory
scheme—the    removal    restrictions    on    the    SEC

---

**[6]** The PCAOB enforces securities laws, including the Sarbanes-
Oxley Act, and regulates accounting firms that audit public companies.

Commissioners' ability to remove the PCAOB members—leaving the rest of the statute intact and separating the President from the Board by only one layer of good-cause tenure. *Id.* at 508–09.

The Supreme Court has subsequently issued a series of landmark decisions regarding the Appointments Clause and the President's removal power, *see Collins v. Yellen*, 141 S. Ct. 1761 (2021); *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020); *Lucia v. SEC*, 138 S. Ct. 2044 (2018), but *Free Enterprise Fund* is the last case addressing two-layer removal protections for an inferior officer.

C

Decker primarily relies on *Free Enterprise Fund* in challenging 5 U.S.C. § 7521.  But *Free Enterprise Fund* did not address the issue presented here and its limited holding does not reach § 7521.

*Free Enterprise Fund* held that the "highly unusual" removal statute for PCAOB members deprived the President of adequate control over the Board by "including at one level a sharply circumscribed definition of what constitutes 'good cause,' and rigorous procedures that must be followed prior to removal."  561 U.S. at 505.  Addressing the PCAOB's unusual structure, Chief Justice Roberts quoted then-Judge Kavanaugh's dissent below:  "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

Importantly, the Court did not broadly declare all two-level for-cause protections for inferior officers unconstitutional. *Id.* at 502, 505–07. Rather, it stressed that the particular PCAOB removal provisions presented "an even more serious threat to executive control than an 'ordinary' dual for-cause standard" because the statute codified "unusually high" and specific standards for removal, including "willful violations of the [Sarbanes-Oxley] Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance" with the Act. *Id.* at 502–03; *see id.* at 503 ("The Act does not even give the Commission power to fire Board members for violations of *other* laws that do not relate to the Act, the securities laws, or the Board's authority." (emphasis in original)). Importantly, while not dispositive as to whether the removal structure for PCAOB members impermissibly interfered with the President's executive power, the Court distinguished the "adjudicative rather than enforcement or policymaking functions" of many ALJs from those of the PCAOB. *Id.* at 507 n.10; *cf. Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 758 (2002) (stating "the role of the ALJ, the impartial officer designated to hear a case . . . is similar to that of an Article III judge").

Justice Breyer's dissent attached appendices listing 48 agencies whose heads are removable only for cause and 573 high-ranking officials within those agencies who are likewise removable only for cause. *See Free Enter. Fund*, 561 U.S. at 514–88 (Breyer, J., dissenting). Most troubling to Justice Breyer was the potential reach of the Court's ruling: "I still see no way to avoid sweeping hundreds, perhaps thousands of high-level Government officials within the scope of the Court's holding, putting their job security and their administrative actions and decisions constitutionally at risk." *Id.* at 540–41. Justice Breyer

specifically highlighted ALJs, the MSPB, and the two-level removal protections embodied in 5 U.S.C. §§ 7521 and 1202:

> The potential list of those whom today's decision affects is yet larger.  As Justice SCALIA has observed, administrative law judges (ALJs) "are all executive officers." . . . My research reflects that the Federal Government relies on 1,584 ALJs to adjudicate administrative matters in over 25 agencies.

*Id.* at 542–43 (capitalization in original) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991)).

In response, Chief Justice Roberts' majority opinion emphasized that the Court's holding "does not address that subset of independent agency employees who serve as administrative law judges."  *Id.* at 507 n.10 (majority opinion).  The Chief Justice stressed that none of the positions Justice Breyer identified (including ALJs) "are similarly situated to the Board."  *Id.* at 506 ("Nor do the employees referenced by the dissent enjoy the same significant and unusual protections from Presidential oversight as members of the Board.").

*Free Enterprise Fund* therefore specifically left open the question whether two-level protections for ALJs are constitutionally permissible. *See id.* at 507 n.10, 508.  Eight years later in *Lucia*, the Court again declined to address the constitutionality of removal protection for ALJs.  138 S. Ct. at 2050 n.1.

D

The question before us therefore has not been decided by the Supreme Court. In addressing the constitutionality of § 7521 as applied to DOL ALJs, we begin with the general presumption of constitutionality of statutes. *See United States v. Morrison*, 529 U.S. 598, 607 (2000). For the reasons that follow we conclude the President has sufficient control over DOL ALJs to satisfy the Constitution.

First, the ALJ here was performing a purely adjudicatory function in deciding the BLBA claim. *See* 20 C.F.R. §§ 725.450–.479; *Free Enter. Fund*, 561 U.S. at 507 n.10. Unlike PCAOB members, who exercise policymaking and enforcement functions, an ALJ cannot sua sponte initiate investigations or commence a BLBA case. *See Free Enter. Fund*, 561 U.S. at 485. Then-Judge Kavanaugh noted these differences in his dissent when *Free Enterprise Fund* was before the D.C. Circuit:

> ALJs perform only adjudicatory functions that are subject to review by agency officials, *see* 5 U.S.C. § 557(b), and that arguably would not be considered "central to the functioning of the Executive Branch" for purposes of the Article II removal precedents. *Morrison,* 487 U.S. at 691–92 . . . . Nothing in this dissenting opinion is intended to or would affect the status of employees in independent agencies who have congressionally mandated civil service tenure protection *or the status of administrative law judges*.

537 F.3d at 699 n.8 (Kavanaugh, J., dissenting) (emphasis added).

Second, Congress has not tied the President's hands and hindered his control over his subordinates here in the manner it had in *Free Enterprise Fund*.  Determining whether there is a separation of powers violation turns on whether one branch expanded its own powers and encroached upon another branch or whether one branch has attempted to diffuse another branch's power.  *See id.* at 497–501; *see also Freytag*, 501 U.S. at 878.  By contrast, "[t]he President can always choose to restrain himself in his dealings with subordinates."  *Free Enter. Fund*, 561 U.S. at 497.  So, we must ascertain whether *Congress* trammeled on the President's executive power in § 7521 or whether the President has instead tied his own hands.

Congress did not overstep here.  No statute mandates that the DOL employ ALJs in adjudicating BLBA benefits claims.  Rather, Congress imposed only the requirement that DOL adjudicators be "[q]ualified individuals appointed by the Secretary of Labor."  30 U.S.C. § 932a.  Congress included in the statute a broad definition of "qualified individuals" that is not limited to ALJs.  *Id.* ("For purposes of this section, the term 'qualified individual' means such an individual, *regardless of whether that individual is a hearing examiner appointed under section 3105 of Title 5*." (emphasis added)).  In other words, Congress expressly *refused* to require that these individuals be ALJs appointed under 5 U.S.C. § 3105—and therefore insulated via a dual for-cause removal regime.  *Id.*; *see Free Enter. Fund*, 537 F.3d at 699 n.8 (Kavanaugh, J., dissenting) (explaining "an agency has the choice whether to use ALJs for hearings, *see* 5 U.S.C. § 556(b); Congress has not imposed ALJs on the Executive Branch").  Congress left that decision to the DOL, which can employ ALJs for adjudicating BLBA claims if it desires.  *See* 30 U.S.C. § 932a.  The DOL chose that path, voluntarily promulgating regulations that require

parties to a claim to proceed before an ALJ in accordance with the Administrative Procedure Act if they desire review by the BRB, or, later, in a federal court of appeals pursuant to 33 U.S.C. § 921(c). *See* 20 C.F.R. §§ 725.452(a), .481, .482(a).

The President has broad executive power to order the Secretary of Labor to change DOL's regulatory scheme and remove ALJs from the adjudicatory process under 30 U.S.C. § 932a. Congress offered the President a choice as to how he wanted to administer hearings and administrative adjudications concerning the BLBA. The President can choose to use a "qualified individual" other than an ALJ. But, given that the President (through his department head subject to at-will removal) chose to use ALJs, that choice required the President to accept a dual for-cause removal scheme, even if that means "restrain[ing] *himself* in his dealings with subordinates." *Free Enter. Fund*, 561 U.S. at 497 (emphasis added). Based on 30 U.S.C. § 932a, we cannot here conclude that Congress aggrandized its own power, or impaired that of the President, beyond the limits envisioned by the Framers. *See id.* at 500–01.

Third, the BRB's role provides the President with meaningful control over DOL ALJs. The Board hears appeals from the decisions of ALJs in BLBA compensation cases. *See* 33 U.S.C. § 921(b)(3); 20 C.F.R § 725.481. Congress has authorized the BRB to decide appeals "raising a substantial question of law or fact." 33 U.S.C. § 921(b)(3); 20 C.F.R. § 801.102(a); *see* 30 U.S.C. § 932(a) (making § 921(b)(3) of the Longshore Act applicable to BLBA benefits claims). The BRB cannot accept new evidence. *See* 20 C.F.R. § 802.301. The Board reviews the ALJ's findings of fact for substantial evidence. *See* 33 U.S.C. § 921(b)(3); 20 C.F.R. § 802.301(a). But it cannot accept the ALJ's

findings if they are contrary to the law. *See Port of Portland v. Dir., OWCP*, 932 F.2d 836, 838 (9th Cir. 1991); *Palmer Coking Coal Co. v. Dir., OWCP of USDOL*, 720 F.2d 1054, 1057 (9th Cir. 1983). While the BRB cannot reweigh the evidence, "[q]uestions of law are another matter." *Dir., OWCP, USDOL v. Campbell Indus., Inc.*, 678 F.2d 836, 839 (9th Cir. 1982), *limited on other grounds by Dir., OWCP, USDOL v. Cargill, Inc.*, 709 F.2d 616, 619 (9th Cir. 1983). Therefore, once an ALJ has adjudicated a claim, the BRB on appeal can readily overturn an ALJ's decision that is legally erroneous or unsupported by substantial evidence.

Congress, meanwhile, charged the Secretary of Labor with appointing BRB members. 33 U.S.C. § 921(b)(1). Section 921, however, is silent as to when the Secretary can remove the members of the BRB. *See id.* "That omission is telling." *Collins*, 141 S. Ct. at 1782 ("When a statute does not limit the President's power to remove an agency head, we generally presume that the officer serves at the President's pleasure." (citing *Shurtleff v. United States*, 189 U.S. 311, 316 (1903))). Applying this framework, the D.C. Circuit has held that BRB members serve at the pleasure of the Secretary of Labor. *See Kalaris v. Donovan*, 697 F.2d 376, 401 (D.C. Cir. 1983); *id.* at 381 (adhering "to the long-standing rule that in the face of congressional silence all inferior officers of the United States serve at the discretion of their appointing officer").

If that statutory silence were not enough, the current regulations explicitly state that permanent BRB members "shall serve an indefinite term subject to the discretion of the Secretary." 20 C.F.R. § 801.201(a). And "temporary Board members" may, if appointed, serve for no more than one year. *Id.* § .201(d). Given the regulation's express grant of removal authority to the Secretary over permanent BRB

members, and § 921's silence regarding removal and the regulation's silence as to whether temporary Board members serve at the Secretary's pleasure, we apply the general presumption of removability. *Kalaris*, 697 F.2d at 401. We therefore agree with the D.C. Circuit that all BRB members serve at the pleasure of the Secretary of Labor. And because the Secretary of Labor is subject to at-will removal by the President, just like other department heads, *see* 29 U.S.C. § 551, the President has direct control over BRB members through the Secretary—his "alter ego." *Myers*, 272 U.S at 133.

Thus, the President could at any time order the Secretary of Labor to replace members of the BRB. The President could do this, for instance, if a BRB member approved an ALJ decision with which the President disagreed; if the member disobeyed commands or was negligent or inefficient; if the member had different policy views or was of a different political party; or if the President "has simply lost confidence" in the BRB member. *Collins*, 141 S. Ct. at 1787 (citing *Seila Law*, 140 S. Ct. at 2204–05; *Myers*, 272 U.S. at 124, 135). Moreover, the President can order the Secretary of Labor to request the BRB remand any case to an ALJ at any time, even without the parties' consent. *See* 33 U.S.C. § 921(b)(4).

Finally, the differences between § 7521's broad "good cause" language and the "unusually high" removal restrictions previously contained in the Sarbanes-Oxley Act are also significant. *See Free Enter. Fund*, 561 U.S. at 505. That § 7521 imposes only an ordinary "good-cause" standard on the MSPB's authority to remove an ALJ, suggests a lesser impingement on presidential authority than was present in *Free Enterprise Fund*.

Put simply, ALJs are judges who make decisions that are subject to vacatur by people without tenure protection. With this structure, the President continues to enjoy an "ability to execute the laws—by holding his subordinates accountable for their conduct," *id.* at 496, especially because these ALJs exercise only adjudicative power in the first instance and are not imposed on the President in this context. In sum, we think the BRB has ample control over DOL ALJs and the President, in turn, has direct control over BRB members through the Secretary of Labor.

None of the authorities Decker cites suggests a different conclusion. In *Seila Law,* for instance, the Court held that the Consumer Financial Protection Bureau's (CFPB) leadership structure violated separation of powers because it was an independent agency led by a sole Director "vested with significant executive power" who was "removable only for inefficiency, neglect, or malfeasance." 140 S. Ct. at 2197, 2201. However, the CFPB Director was a principal officer, not an inferior officer like ALJs. *See id.* at 2200 ("Unlike the independent counsel [in *Morrison*], who lacked policymaking or administrative authority, the Director has the sole responsibility to administer 19 separate consumer-protection statutes that cover everything from credit cards and car payments to mortgages and student loans.").

*Seila Law* also relied upon the reasoning in *Free Enterprise Fund*, concluding that the CFPB is a "new situation" having "*no basis in history* and no place in our constitutional structure." *Id.* at 2201 (emphasis added). Here, by contrast, there is a long history of adjudication by ALJs free from political influence. *See generally* Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. § 551, et seq.). While *Seila Law* presented a "new situation" to the Court,

we think its underlying reasoning about the President's removal power actually better supports the Director's arguments here.

Nor is Decker's position supported by *Collins*. That case considered whether a for-cause restriction on the President's ability to remove the Federal Housing Finance Agency (FHFA) Director (a principal officer) violated separation of powers. 141 S. Ct. at 1783. The Court held it did, relying almost entirely on *Seila Law*. *Id.* at 1784; *see also id.* at 1787 (stating "the Constitution prohibits even 'modest restrictions' on the President's power to remove the head of an agency with a single top officer"). The Court reaffirmed that *Seila Law* "did 'not revisit [the Court's] prior decisions allowing certain limitations on the President's removal power,' but [the Court] found 'compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director.'" *Id.* at 1783 (quoting *Seila Law*, 140 S. Ct. at 2192).

For the same reasons *Seila Law* is distinguishable, so too is *Collins*.[7] The agency structures at issue in those cases were completely different from the DOL. And the functions of the CFPB and FHFA directors were unequal to those of an ALJ—an inferior officer. But these two cases do reaffirm the general principle beginning with *Morrison* that some tenure restrictions do not violate separation of powers, particularly in the case of inferior officers with sufficient accountability.

We therefore hold that properly appointed DOL ALJs can adjudicate cases without trammeling on the President's

---

[7] *Collins*, however, guides us in analyzing Decker's arguments about the appropriate remedy, as we will discuss *infra*.

executive power.  Consistent with *Free Enterprise Fund*, however, our holding is limited.  We do not say that all remaining two-level tenure protection schemes are constitutional; instead, we hold only that 5 U.S.C. § 7521 is constitutional as applied to these ALJs.

E

Even if we were to conclude that 5 U.S.C. § 7521 is unconstitutional, we would sever only one level of protection.  *See Seila Law*, 140 S. Ct. at 2209–11 (explaining severability and the preference for "limit[ing] the solution to the problem" and the congressional preference for courts to use a "scalpel rather than a bulldozer" in remedying a constitutional defect); *Free Enter. Fund*, 561 U.S. 509 ("Concluding that the removal restrictions are invalid leaves the Board removable by the Commission at will, and leaves the President separated from Board members by only a single level of good-cause tenure.").  We would not, however, invalidate the decision reached below.

Decker's insistence that *Lucia* mandates a new hearing before a new ALJ is incorrect.  The Court in *Lucia* "held that the appropriate remedy for an adjudication tainted with an *appointments violation* is a new hearing before a properly appointed official."  138 S. Ct. at 2055 (emphasis added) (cleaned up).  But, the ALJ's appointment is not at issue in this case; he was properly appointed when he adjudicated Pehringer's claim on the merits.  *See Collins*, 141 S. Ct. at 1788 (explaining *Lucia* "involved a Government actor's exercise of power that the actor did not lawfully possess"); *id.* at 1788 n.24 ("What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction . . . [and] does not mean that actions taken by such an officer are void *ab initio* and must be undone.").

*Collins* is controlling with respect to the remedy for any unconstitutionality in the removal provisions.  The plaintiffs in *Collins* sought a judicial declaration invalidating prior actions by the FHFA directors, who possessed removal protection and therefore headed an unconstitutionally structured agency.  *Id.* at 1787 (contending that FHFA actions were "adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*").  Justice Alito, writing for the majority, found such relief unwarranted.  *Id.* at 1788.  The key, he wrote, is demonstrating that the unconstitutional provision actually caused the plaintiff harm.  *Id.* at 1788–89.  The Court refused to invalidate the prior actions in their entirety:[8]

> All the officers who headed the FHFA during the time in question were properly *appointed*.  Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA . . . as void.

*Id.* at 1787 (emphasis in original); *see also id.* at 1789 (Thomas, J., concurring) ("The Government does not

---

[8] Just before *Collins*, the Court in *Arthrex* also expressed its hesitation to unilaterally overturn a swath of administrative decisions below or invalidate an entire statutory scheme.  *See generally* 141 S. Ct. at 1986–88.

necessarily act unlawfully even if a removal restriction is unlawful in the abstract.").

Here, the ALJ lawfully exercised power that he possessed by virtue of his appointment, which the Secretary ratified before the ALJ adjudicated the claim. Absent a showing of harm, we refuse to unwind the decisions below.**[9]** While *Collins* remanded for further factual development on the issue of harm, *see id.* at 1786, 1786 n.26, we need not to do so here, as the record is clear. Decker never submitted additional evidence or post-hearing argument despite obtaining two extensions to do so.

In short, there is no indication the ALJ took unlawful action. On this record, we simply cannot conclude that the existence of § 7521 alone tainted the ALJ's decision. As a practical matter, we note that were we to accept Decker's argument and rule § 7521 unconstitutional, it would have potentially catastrophic effects on numerous past and ongoing claim adjudications under various benefits programs administered throughout the federal government.**[10]**          Notwithstanding the practical

---

**[9]** Moreover, equitable defenses can apply to constitutional violations. Indeed, "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977) (cleaned up); *see also Collins*, 141 S. Ct. at 1789 n.26 (noting the parties may address whether the doctrine of laches precludes further relief on remand).

**[10]** Concurring in *Collins*' limited remedial holding only, Justice Kagan wrote separately to express her concern that the Court's recent removal jurisprudence could potentially jeopardize hundreds of thousands of social security decisions. *See* 141 S. Ct. at 1802 (Kagan, J., concurring in part and concurring in the judgment). Perhaps here the DOL's OWCP decisions "would not concern the President at all," as

consequences—but not to diminish them either—we cannot say the law compels us to find a constitutional flaw with § 7521.  Here, there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions.  And nothing commands us to vacate the decisions below on that ground.

## IV

Having held that § 7521 survives constitutional scrutiny, we must next decide whether the ALJ erred in adjudicating Pehringer's claim for benefits.  We conclude he did not.

## A

Decker argues that the ALJ abused his discretion by denying its motion for reconsideration and rejecting its request to reopen the record to admit evidence it asserts would undermine the veracity of Pehringer's testimony.  This evidence, Decker claims, would show that Pehringer could not invoke the fifteen-year statutory presumption based on the length of his employment.  Decker further argues that § 22 of the Longshore Act required the ALJ to modify his award of benefits.  Both arguments are unavailing.

Section 22 of the Longshore Act allows the deputy commissioner sua sponte or at a party's request to review a compensation case and terminate, reinstate, continue, increase, or decrease benefits, or award benefits under the Longshore Act.  33 U.S.C. § 922.  The only grounds for

---

Justice Kagan surmised would be true of social security actions.  *Id.* ("When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.").

modification in § 22 are a "change in conditions or because of a mistake in a determination of fact by the deputy commissioner." *Id.* The BLBA incorporates § 22, which provides for modifying benefits awards. *See* 30 U.S.C. § 932(a); 33 U.S.C § 922. The BLBA incorporation provision states that § 22 "shall . . . *except as otherwise provided* in this subsection *or by regulations of the Secretary* . . . be applicable to each operator of a coal mine in such State with respect to death or total disability due to pneumoconiosis arising out of employment in such mine . . . ." 30 U.S.C. § 932(a) (emphases added). Further, "the Secretary is authorized to prescribe in the Federal Register such additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part and thereafter those provisions shall be applicable to such operator." *Id.*

The regulation governing modification of BLBA benefits awards is 20 C.F.R. § 725.310. Upon a party's request or sua sponte, the district director may reconsider the terms of a benefits award based on a mistake in a factual determination. *Id.* § .310(a). However, the regulation prohibits the initiation of a modification proceeding before an ALJ or the BRB. *Id.* § .310(b). The "initial stages of a modification proceeding, like the initial stages of a new claim proceeding, do not involve hearings." *Saginaw Mining Co. v. Mazzulli*, 818 F.2d 1278, 1282–83 (6th Cir. 1987) (holding that, under § 22 and 20 C.F.R. § 725.310, a motion for modification of an ALJ's order regarding BLBA benefits must be filed with the deputy commissioner—now district director—rather than an ALJ); *accord Lee v. Consolidation Coal Co.*, 843 F.2d 159, 162 (4th Cir. 1988); *see also Blakley v. Amax Coal Co.*, 54 F.3d 1313, 1316–17

(7th Cir. 1995) (describing the process).  An ALJ may only hear a case at the conclusion of administrative modification proceedings *after* the district director forwards the claim. 20 C.F.R. § 725.310(c).

The ALJ thus acted within his discretion in denying Decker's motion based on the pertinent regulations.  Decker filed its motion for reconsideration citing 20 C.F.R. § 725.479(b), which allows a party to request that the ALJ reconsider his decision.  However, in its motion, Decker sought not only reconsideration but also modification of the benefits award, citing § 22 of the Longshore Act and maintaining that a mistake of fact mandated the ALJ to consider new evidence.  The request for modification in the reconsideration motion filed before the ALJ was procedurally improper.  *See id.* § .310(b).

The BLBA's modification regulation does not conflict with § 22 of the Longshore Act.  The plain text of the BLBA's incorporating statute gives the Secretary of Labor wide latitude to promulgate additional regulations to implement and enforce the BLBA separately from the Longshore Act's provisions.  *See* 30 U.S.C. §§ 932(a), 936(a); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991) ("That Congress intended in the [Black Lung Benefits Reform Act of 1977] to delegate to the Secretary of Labor broad policymaking discretion in the promulgation of her interim regulations is clear from the text of the statute and the history of this provision."); *Nealon v. Cal. Stevedore & Ballast Co.*, 996 F.2d 966, 972 n.8 (9th Cir. 1993) (noting the "Secretary of Labor is authorized to promulgate regulations modifying the provisions of the Longshore Act as incorporated by the Black Lung Act.  30 U.S.C. § 932(a)"); *Dir., OWCP, USDOL v. Nat'l Mines Corp.*, 554 F.2d 1267, 1273–74 (4th Cir. 1977) (concluding the

"Black Lung Act does not inflexibly incorporate every provision" of the Longshore Act and "[t]he inclusion of the word 'otherwise'" in 30 U.S.C. § 932(a), "together with the Secretary's statutory authority to promulgate regulations, discloses congressional intention to empower the Secretary to depart from specific requirements" of the Longshore Act "in order to administer the black lung compensation program properly").

While § 22 is silent as to whether ALJs may review a modification request, *see* 33 U.S.C. § 922, the regulation explicitly provides that modification requests must not be initiated with an ALJ, 20 C.F.R. § 725.310(b). That regime does not conflict with the statutory language. Moreover, *Dir., OWCP v. Palmer Coking Coal Co.*, 867 F.2d 552 (9th Cir. 1989), does not support Decker's position. There we addressed the issue of whether § 22 of the Longshore Act allows a deputy commissioner to initiate modification proceedings to correct an ALJ's erroneous factual findings. *Id.* at 555. The deputy commissioner had reviewed a BLBA claim following an ALJ order, concluded the ALJ made a factual error, and issued a proposed modification order. *Id.* at 554. We concluded that the Longshore Act authorizes a deputy commissioner to correct his own factual errors but not those of an ALJ. *Id.* at 555–56. We did not, however, hold that a party may *initiate* a modification proceeding with the ALJ. *Id.*

Further, the BLBA modification regulation is consistent with § 22 of the Longshore Act, as it allows for modification because of factual mistake and requires proceedings to be conducted in accordance with the regulation. *See* 20 C.F.R. § 725.310(a), (b). The regulation mandates automatic forwarding to and review by an ALJ where the district director sua sponte initiates and then concludes modification

proceedings.   *Id.* § .310(c).   At the conclusion of modification proceedings before the district director, the regulation requires the ALJ, not the district director, to consider "whether the evidence of record demonstrates a mistake in a determination of fact." *Id.   Palmer Coking*'s requirements are therefore consistent with the regulation. Neither that case nor the regulation permits the party challenging entitlement to benefits to initiate modification proceedings before an ALJ.

Decker thus sought to initiate modification proceedings before the wrong person:  the ALJ. *Id.* § .310(b).  Decker's failure to direct its request to the district director "defeats [its] argument that [§] 922 provided a basis for review of [its] appeal." *Blevins v. Dir., OWCP, USDOL*, 683 F.2d 139, 142 (6th Cir. 1982) (holding that "20 C.F.R. § 725.310(b) makes clear that modification proceedings shall not be initiated before an administrative law judge or the Benefits Review Board." (cleaned up)).   Because the ALJ did not have authority to consider this procedurally improper request, he did not abuse his discretion in declining to act on Decker's requested relief based on § 22.[11]

---

[11] Moreover, the BLBA's modification regulation leaves no discretion—and the DOL *must* deny a modification request—where the employer has not paid all monetary benefits, including interest, due to the miner. 20 C.F.R. § 725.310(e)(2).  Decker does not dispute it failed to fully comply with this rule.  The Director stated that Decker first paid benefits to Pehringer in September 2020, long after its modification motion.  In its briefing, moreover, Decker did not dispute the Director's representation that the company still owes approximately $6,000 in interest.   Furthermore, Decker challenged the validity of 20 C.F.R. § 725.310(e) via a footnote in its reply brief.  We thus may refuse to address the argument. *See Eberle v. City of Anaheim*, 901 F.2d 814, 817–18 (9th Cir. 1990); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir. 1996) ("The summary mention of an issue in a footnote,

Further, the ALJ acted within his discretion in denying Decker's post-hearing motion for reconsideration on the merits.  The ALJ reasonably concluded that he granted Decker "ample time to submit evidence and argument before the record in this case was closed."  In fact, he granted two requests to extend time for Decker to submit evidence after the hearing.  It was then no surprise—and was not legal error—when he denied the reconsideration motion because Decker "never filed any evidence into the record" and "did not file a post-hearing brief."

Moreover, the ALJ did not abuse his discretion in refusing to reopen the record.  *See* 20 C.F.R. § 725.456(b)(3) (requiring a showing of good cause to admit late evidence and permitting the ALJ to choose between either excluding or remanding to the district director); *see Nat'l Mining Ass'n v. DOL*, 292 F.3d 849, 874 (D.C. Cir. 2002) (per curiam) (recognizing the discretion ALJs have under § 725.456 with respect to evidence in adjudicating BLBA claims).  Even if Decker's argument regarding § 22 was correct, the company's lack of diligence counsels against a finding that the ALJ abused his discretion in not acting on the modification request and refusing to reopen the record.

To be sure, the Seventh Circuit has held that "a modification request cannot be denied solely because it contains argument or evidence that could have been presented at an earlier stage in the proceedings."  *Old Ben Coal Co.*, *v. Dir, OWCP*, 292 F.3d 533, 547 (7th Cir. 2002) (explaining that an ALJ must not give weight only to the

---

without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.").  We simply note that 20 C.F.R. § 725.310(e) may have left Judge Sellers with no discretion and in fact may have required the denial of the modification request.

concern of finality but also to accuracy). But, the scale here tips in favor of finality. *See id.* (stating that "in a given case, it might be quite appropriate to permit this consideration [of finality] to prevail in the adjudication of a case"). Decker had sufficient time before and after the hearing to submit the evidence pertaining to Pehringer's employment. In fact, the company had 1,455 days—from the filing of the claim on November 7, 2014, to the close of evidence on October 31, 2018, the day ending the ALJ's extension periods—to submit its own employment evidence.

Either way, we reach our decision based on the broad discretion the ALJ possessed to deny Decker's motion for reconsideration. There was no error in rejecting untimely evidentiary submissions that could have been obtained with reasonable diligence during the significant length of time the record was open. In our view, Decker failed to diligently defend against Pehringer's BLBA claim. Punishing the claimant for his employer's noncompliance with the applicable rules would result in a decision inconsistent with Congress' goals in enacting and refining the BLBA to facilitate the processing of Black Lung cases. We conclude the ALJ acted well within his discretion in handling Decker's post-hearing motion.

B

Decker further argues that the ALJ erred in finding Pehringer met the criteria for legal pneumoconiosis, which in turn raised the presumption that Pehringer was entitled to benefits. But the real issue is whether substantial evidence supports the ALJ's conclusion that Decker did not rebut the presumption of entitlement to benefits after Pehringer established legal pneumoconiosis and causation. The answer is yes.

Section 921 of the BLBA creates a rebuttable presumption that a miner suffering from a respiratory or pulmonary impairment is totally disabled from pneumoconiosis, even without formal medical diagnosis, if he or she worked for at least fifteen years in substantially similar conditions to underground coal mines.  30 U.S.C. § 921(c)(4).  The Fourth Circuit has aptly explained the purpose of the BLBA's fifteen-year presumption:

> [R]elieving certain claimants of the obligation to come forward with affirmative diagnoses of pneumoconiosis is precisely the point . . . .  Congress adopted that provision to shift the costs of uncertainty about disease causation away from sick miners seeking benefits and onto their employers, in cases where a miner's length of service makes it reasonable to assume a health impact from coal dust exposure.

*W. Va. CWP Fund v. Dir., OWCP, USDOL*, 880 F.3d 691, 699 (4th Cir. 2018); *see Hobet Mining, LLC v. Epling*, 783 F.3d 498, 501 (4th Cir. 2015) ("The fifteen-year presumption is expressly intended to relax the often insurmountable burden of proving a black lung claim for the special class of miners with 15 years['] experience who are disabled by a respiratory or pulmonary impairment." (cleaned up) (quoting S. Rep. No. 92-743, at 2306 (1972))).

Congress directed the Secretary of Labor to promulgate regulations prescribing "standards for determining . . . whether a miner is totally disabled due to pneumoconiosis . . . ."  30 U.S.C. § 921(b).  Consistent with the BLBA, the regulatory definition of pneumoconiosis comprises both "clinical" and "legal pneumoconiosis."  *See* 20 C.F.R.

§ 718.201(a).   Clinical pneumoconiosis consists of those Black Lung Diseases recognized by the medical community. *Id.* § .201(a)(1).   Legal pneumonoconiosis has a broader definition and includes "any chronic lung disease or impairment and its sequelae arising out of coal mine employment."   *Id.* § .201(a)(2).   This encompasses "any chronic pulmonary disease or respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment." *Id.* § .201(b).

The statute and implementing regulation prescribe burden shifting.   The party opposing the entitlement to benefits may rebut the presumption of total disability or death due to pneumoconiosis. *See* 30 U.S.C. § 921(c)(1), (2), (4) (stating the Secretary may rebut); 20 C.F.R. § 718.305(d)(1), (2) (stating the "party opposing entitlement" may rebut).   As to a living miner's claim, the opposing party may rebut the fifteen-year presumption by establishing the miner does not have *either* legal pneumoconiosis and clinical pneumoconiosis arising out of coal mine employment *or* by disproving causation.**[12]** 20 C.F.R. § 718.305(d)(1).   The Eleventh Circuit has characterized the former method as the "empirical method" and the latter as the "causal method." *Oak Grove Res., LLC v. Dir., OWCP*, 920 F.3d 1283, 1287 (11th Cir. 2019). Under either method, the employer bears the affirmative burden to "disprove the miner's presumptive entitlement by a preponderance of the evidence." *Id.* (citing *U.S. Steel Corp. v. Gray*, 588 F.2d 1022, 1028 (5th Cir. 1979)).

---

**[12]** The ALJ, relying on Dr. Cahill's medical opinion, reasonably concluded that Decker rebutted the presumption of clinical pneumoconiosis—a finding not at issue in this petition—because Pehringer's chest x-ray evidence revealed no clinical pneumoconiosis.

Likewise, the Fourth Circuit has said the only question after the claimant successfully invokes the fifteen-year presumption "is whether the *employer* has come forward with affirmative proof that the claimant does *not* have legal pneumoconiosis, because his impairment is not in fact significantly related to his years of coal mine employment." *W. Va. CWP Fund*, 880 F.3d at 699 (emphases in original); *see Hobet Mining, LLC*, 783 F.3d at 502.

We find our sister circuits' reasoning persuasive and consistent with the congressional intent behind the presumption. To guide the district courts and the Department, we therefore hold that once a claimant has successfully invoked the fifteen-year presumption, the burden shifts and the party opposing the claimant's entitlement to benefits must rebut the presumption of total disability due to pneumoconiosis, pursuant to 30 U.S.C. § 921(c)(4) and 20 C.F.R. § 718.305(d)(1).

Decker's argument falls a step short. The ALJ properly found that Pehringer is totally disabled due to pneumoconiosis and properly invoked the fifteen-year presumption under 30 U.S.C. § 921(c)(4). The ALJ thoroughly analyzed Pehringer's employment history, cited record evidence, and found that he worked as a coal miner and was exposed to coal mine dust at surface mines for more than fifteen years. Discussing pulmonary function tests, arterial blood gas studies, and medical opinions, the ALJ then found Pehringer has a totally disabling respiratory or pulmonary impairment—his severe COPD.

Substantial evidence supports the ALJ's conclusion that Pehringer's medical evidence did not aid Decker in rebutting the presumption of legal pneumoconiosis. The ALJ gave probative weight to Dr. Cahill's BLBA medical opinion—the only opinion evidence in the record. "Notably," the ALJ

wrote, "Dr. Cahill opined that [Pehringer] suffered from 'severe oxygen-dependent COPD likely consequent to his history of smoking and dust exposure from his surface mining work.'"  The ALJ reasonably found that Dr. Cahill's causation opinion was "well-reasoned and well-documented"; the doctor specifically stated that Pehringer's "[coal] dust exposure and smoking are significant contributors to his COPD impairment."  Additionally, the ALJ referred to Pehringer's clinical treatment records from Dr. Ackerman:  "Based on history of extensive work in the mines it is certainly possible, if not probable, that coal dust exposure is playing a role in [Pehringer's COPD]."

The ALJ reasonably concluded that Decker failed to rebut the presumption of legal pneumoconiosis.  We agree with the ALJ that once Pehringer invoked the fifteen-year presumption, there was "no need for [him] to prove the existence of pneumoconiosis; instead, pneumoconiosis arising from coal mine employment [wa]s presumed, subject only to rebuttal by [Decker]."  *W. Va. CWP Fund*, 880 F.3d at 699.  Decker did not submit any evidence to rebut the fifteen-year presumption.  The ALJ discussed the record evidence and properly concluded that it only supported Pehringer's side of the case.  "To reverse the ALJ's findings on substantial evidence review in a black lung disability case" we must "find that [Decker's] medical experts' interpretation of the evidence was the *only* permissible one."  *Peabody Coal Co.*, 746 F.3d at 1127 (emphasis added) (cleaned up).  Decker offered no evidence of its own, and no other record evidence from the Director or Pehringer supports Decker's arguments.  The ALJ's conclusion was therefore not erroneous.

C

Having concluded that there were no constitutional impediments to prevent the ALJ from adjudicating this case, we affirm his decision on the merits.  That Decker failed to adequately defend against Pehringer's claim cannot invalidate the ALJ's award of benefits.  Substantial evidence supports the ALJ's finding that Pehringer successfully invoked the presumption of legal pneumoconiosis. Decker—the employer opposing Pehringer's claim—failed to rebut that statutory presumption when it had the burden to do so.  The ALJ's reasoning and decision align with the congressional purpose behind the presumption in favor of the miner.  And, based on the record before us and the BLBA's implementing regulations, the ALJ acted well within his discretion in disposing of Decker's post-hearing motion.  The ALJ's evaluation of the evidence is entitled to substantial deference, and we will not substitute our judgment for his.

V

**THE PETITION FOR REVIEW IS DENIED.**

Costs to respondents.